1  LAURA E. HAYWARD, Bar No. 204014
   LITTLER MENDELSON
2  A Professional Corporation
   650 California Street, 20th Floor
3  San Francisco, CA  94108.2693
   Telephone:    415.433.1940
4  Email: lhayward@littler.com

5  KEITH A. JACOBY, Bar No. 150233
   LITTLER MENDELSON
6  A Professional Corporation
   2049 Century Park East, 5th Floor
7  Los Angeles, CA  90067.3107
   Telephone:    310.553.0308
8  Facsimile:    310.553.5583
   Email: kjacoby@littler.com

9
   Attorneys for Defendants
10 ABM INDUSTRIES INCORPORATED; ABM
   JANITORIAL SERVICES, INC. and ABM
11 JANITORIAL NORTHERN CALIFORNIA

12                    UNITED STATES DISTRICT COURT

13                    EASTERN DISTRICT OF CALIFORNIA

14
   U.S. EQUAL EMPLOYMENT                  Case No. 1:07 CV 01428 LJO-LJT
15 OPPORTUNITY COMMISSION,
                                          **DECLARATION OF LAURA E. HAYWARD
16              Plaintiff,                IN SUPPORT OF ABM DEFENDANTS'
                                          MOTION FOR SUMMARY
17 ERIKA MORALES and ANONYMOUS            ADJUDICATION RE: BAKERSFIELD
   PLAINTIFFS ONE THROUGH EIGHT,          CLAIMANTS/INTERVENERS**
18
                Plaintiff Intervenors,    Hearing Date:  June 17, 2010
19                                         Time:          8:30 a.m.
           v.                             Judge:         Lawrence J. O'Neill
20                                         Courtroom:     4
   ABM INDUSTRIES INCORPORATED
21 and ABM JANITORIAL SERVICES,           **REDACTED VERSION**
   INC.; ABM JANITORIAL NORTHERN
22 CALIFORNIA; JOE VASQUEZ; Does 1 -
   10 inclusive,
23
                Defendants.
24

25

26

27

28

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DECLARATION OF LAURA E.                   CASE NO. 1: 07 CV 01428 LJO-JLT
HAYWARD

1                 I, Laura E. Hayward, declare and state as follows:

2                 1.      I am an attorney admitted to practice before this Court.  I am a shareholder in

3    the law firm of Littler Mendelson, a Professional Corporation, counsel of record for Defendants ABM

4    Industries, Inc., ABM Janitorial Services, Inc. and ABM Janitorial Northern California

5    ("Defendants").  I make this Declaration in support of Defendants' Motion for Summary

6    Adjudication re: Bakersfield Claimants/Interveners.  I have personal knowledge of the facts set forth

7    in this Declaration and, if called as a witness, I could and would testify competently to each fact.

8                 2.      The deposition of Erika Morales was taken in this matter on July 23, 2008

9    before a certified Court reporter.  Relevant portions of this testimony which are cited to in

10   Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as

11   Exhibit A.

12                3.      The deposition of Claimant 2 was taken in this matter on September 10, 2008

13   before a certified Court reporter.  Relevant portions of this testimony which are cited to in

14   Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as

15   Exhibit B.

16                4.      The deposition of Claimant 3 was taken in this matter on September 11, 2008

17   before a certified Court reporter.  Relevant portions of this testimony which are cited to in

18   Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as

19   Exhibit C.

20                5.      The deposition of Claimant 4 was taken in this matter on July 24, 2008 before

21   a certified Court reporter.  Relevant portions of this testimony which are cited to in Defendants'

22   Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as Exhibit D.

23                6.      The deposition of Claimant 5 was taken in this matter on October 24, 2008

24   before a certified Court reporter.  Relevant portions of this testimony which are cited to in

25   Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as

26   Exhibit E.

27                7.      The deposition of Claimant 6 was taken in this matter on October 27, 2008

28   before a certified Court reporter.  Relevant portions of this testimony which are cited to in

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA 94108.2693
415 433 1940

DECLARATION OF LAURA E.
HAYWARD
       1.       CASE NO. 1: 07 CV 01428 LJO-JLT

1   Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as
2   Exhibit F.

3          8.     The deposition of Claimant 7 was taken in this matter on October 6, 2008
4   before a certified Court reporter.   Relevant portions of this testimony which are cited to in
5   Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as
6   Exhibit G.

7          9.     The deposition of Claimant 8 was taken in this matter on August 17, 2009
8   before a certified Court reporter.   Relevant portions of this testimony which are cited to in
9   Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as
10  Exhibit H.

11         10.    The deposition of Claimant 9 was taken in this matter on February 24, 2010
12  before a certified Court reporter.   Relevant portions of this testimony which are cited to in
13  Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as
14  Exhibit I.

15         11.    The deposition of Claimant 10 was taken in this matter on November 17, 2009
16  before a certified Court reporter.   Relevant portions of this testimony which are cited to in
17  Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as
18  Exhibit J.

19         12.    The deposition of Claimant 11 was taken in this matter on February 24, 2010
20  before a certified Court reporter.   Relevant portions of this testimony which are cited to in
21  Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as
22  Exhibit K.

23         13.    The deposition of Claimant 12 was taken in this matter on November 17, 2009
24  before a certified Court reporter.   Relevant portions of this testimony which are cited to in
25  Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as
26  Exhibit L.

27         14.    The deposition of Jose Vasquez was taken in this matter on September 24,
28  2008 before a certified Court reporter.   Relevant portions of this testimony which are cited to in

LITTLER MENDELSON
A PROFESSIONAL CORPORATION
650 California Street
20th Floor
San Francisco, CA  94108.2693
415.433.1940

DECLARATION OF LAURA E.
HAYWARD                           2.                    CASE NO. 1: 07 CV 01428 LJO-JLT

1  Defendants' Motion for Summary Adjudication Re: Bakersfield Claimants are attached hereto as

2  Exhibit M.

3         I declare under the penalty of perjury of the laws of the state of California that the

4  foregoing is true and correct.  Executed this _19th_ day of May, 2010 at San Francisco, California.

5

6                                          _Laura Hayward_

7                                          LAURA E. HAYWARD

8  Firmwide:95488454.1 054667.1005

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LITTLER MENDELSON
A Professional Corporation
650 California Street
20th Floor
San Francisco, CA 94108 2693
415.433.1940

**DECLARATION OF LAURA E. HAYWARD**          3.          **CASE NO. 1: 07 CV 01428 LJO-JLT**

# EXHIBIT

# A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

          Plaintiff,

ERIKA MORALES and ANONYMOUS
PLAINTIFFS ONE THROUGH EIGHT,

   PLAINTIFF-INTERVENORS,

vs.

                           CASE No.
                    1:07-cv-01428-LJO-SMS

ABM INDUSTRIES, INCORPORATED and
ABM JANITORIAL SERVICES, INC.; Does
1-10 Inclusive,

         Defendant,

RELATED CROSS-ACTION.

CERTIFIED COPY

DEPOSITION OF ERIKA MORALES

Fresno, California

Wednesday, July 23, 2008

Volume 1

Reported by:
KATHY MANNLEIN
CSR No. 13153

Job No. 89133

| | |
|---|---|
| 12:14:52 | 1 |
| 12:15:04 | 2 |
| 12:15:08 | 3 |
| 12:15:14 | 4 |
| 12:15:18 | 5 |
| 12:15:20 | 6 |
| 12:15:26 | 7 |
| 12:15:34 | 8 |
| 12:15:46 | 9 |
| 12:16:04 | 10 |
| 12:16:06 | 11 |
| 12:16:10 | 12 |
| 12:16:10 | 13 |
| 12:16:16 | 14 |
| 12:16:18 | 15 |
| 12:16:20 | 16 |
| 12:16:26 | 17 |
| 12:16:26 | 18 |
| 12:16:30 | 19 |
| 12:16:32 | 20 |
| 12:16:36 | 21 |
| 12:16:42 | 22 |
| 12:16:48 | 23 |
| 12:16:50 | 24 |
| 12:16:56 | 25 |

1  another thing.  I don't want another thing to happen.

2  It was in the Bank of America, in the storage room.  He

3  knows it's no cameras there.  He slapped me twice.  He

4  tried to take off my pants.

5      Q.  Take off your what?

6      A.  My pants.  He tried to touch my private part.  He

7  touched my butt.  And we fight together, and I slapped

8  him back, and he gets angry.  It was when he tried to

9  take my shirt off and my bra, but I don't let him.

10      Q.  Was this right before you resigned your

11  employment in September of 2005?

12      A.  Excuse me?

13      Q.  Did this happen just before you resigned -- you

14  quit your employment in September 2005?

15              MR. VIRAMONTES:  Objection.  Assumes facts

16  not in evidence.

17  BY MR. STRAPP:

18      Q.  You can answer.

19      A.  Yes.

20      Q.  How many days went by between this Bank of

21  America incident and your resigning or quitting your job

22  finally?

23      A.  Like two days later.

24      Q.  Who did you speak to at the company about

25  resigning or quitting your job?

64

| | | |
|---|---|---|
| 14:59:08 | 1 | A.  No. |
| 14:59:16 | 2 | MR. VIRAMONTES:  Ms. Hayward, do you have a |
| 14:59:18 | 3 | more readable copy of Exhibit 13? |
| 14:59:22 | 4 | MS. HAYWARD:  Not with me. |
| 14:59:24 | 5 | MR. VIRAMONTES:  You can make the original |
| 14:59:26 | 6 | available to us and we can make a copy of it?  Because |
| 14:59:30 | 7 | there are some lines here that aren't completely clear. |
| 14:59:34 | 8 | MS. HAYWARD:  Yeah.  That's all I have with |
| 14:59:34 | 9 | me.  I can definitely see if there's the original and we |
| 14:59:38 | 10 | can make a better copy. |
| 14:59:40 | 11 | MR. VIRAMONTES:  That would be fine. |
| 14:59:40 | 12 | (Whereupon, Defendant's Exhibit 14 |
| 14:59:42 | 13 | was marked for identification.) |
| 14:59:42 | 14 | BY MR. STRAPP: |
| 14:59:44 | 15 | Q.  I'm showing you another document marked |
| 14:59:48 | 16 | Exhibit 14.  Take your time to look that over, please. |
| 15:01:16 | 17 | Have you seen Exhibit 14 before today? |
| 15:01:18 | 18 | A.  No. |
| 15:01:18 | 19 | Q.  Have you talked to anyone about Exhibit 14 before |
| 15:01:22 | 20 | today? |
| 15:01:22 | 21 | A.  No. |
| 15:01:22 | 22 | Q.  Between September 2005 and June of 2006, you went |
| 15:01:36 | 23 | to the EEOC to make a complaint -- |
| 15:01:40 | 24 | A.  Yes. |
| 15:01:40 | 25 | Q.  -- correct? |

116

| | | |
|---|---|---|
| 15:52:30 | 1 | for these other janitorial companies in Bakersfield? |
| 15:52:34 | 2 | A.  No. |
| 15:52:34 | 3 | (Whereupon, Defendant's Exhibit 15 |
| 15:52:34 | 4 | was marked for identification.) |
| 15:52:34 | 5 | BY MR. STRAPP: |
| 15:53:24 | 6 | Q.  I'm showing you another document marked |
| 15:53:28 | 7 | Exhibit 15.  Please read that over. |
| 15:54:56 | 8 | Is that your signature on this document? |
| 15:54:58 | 9 | A.  Yes. |
| 15:54:58 | 10 | Q.  As far as your returning to work for the company |
| 15:55:18 | 11 | in about July of 2005, you were the one who asked to |
| 15:55:26 | 12 | return to work; correct? |
| 15:55:30 | 13 | MR. VIRAMONTES:  Objection. |
| 15:55:30 | 14 | Mischaracterizes testimony. |
| 15:55:32 | 15 | THE WITNESS:  I don't understand. |
| 15:55:32 | 16 | BY MR. STRAPP: |
| 15:55:34 | 17 | Q.  You were the one contacted the company, either |
| 15:55:36 | 18 | you or your mom, about you returning to work for the |
| 15:55:40 | 19 | company; correct? |
| 15:55:40 | 20 | A.  Yes. |
| 15:55:40 | 21 | Q.  Javier Vasquez didn't seek you out and ask you to |
| 15:55:46 | 22 | return to the company, did he? |
| 15:55:50 | 23 | A.  He called me. |
| 15:55:52 | 24 | Q.  He called you after your mom spoke to him? |
| 15:55:54 | 25 | A.  Yes. |

1    I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby certify:
3    That the foregoing proceedings were taken
4 before me at the time and place herein set forth; that
5 any witnesses in the foregoing proceedings, prior to
6 testifying, were duly sworn; that a record of the
7 proceedings was made by me using machine shorthand
8 which was thereafter transcribed under my direction;
9 that the foregoing transcript is a true record of the
10 testimony given.
11    Further, that if the foregoing pertains to
12 the original transcript of a deposition in a Federal
13 Case, before completion of the proceedings, review of
14 the transcript [✓] was [  ] was not requested.
15    I further certify I am neither financially
16 interested in the action nor a relative or employee
17 of any attorney or party to this action.
18    IN WITNESS WHEREOF, I have this date
19 subscribed my name.
20
21 Dated: ___AUG 1 1 2008___
22
23    _Kathy Mannlein_____
24    KATHY MANNLEIN
25    CSR NO. 13153

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 480-2006-02932 |

California Department Of Fair Employment & Housing                          and EEOC
_State or local Agency, if any_

| Name (indicate Mr., Ms., Mrs.)<br>**Erika Morales** | Home Phone (incl. Area Code)<br>**(661) 328-0342** | Date of Birth<br>**06-30-1976** |
|---|---|---|

Street Address<br>**1321 1/2 Oregon Street, Bakersfield, CA 93305**   City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>**ABM JANITORIAL SERVICES, INC.** | No. Employees, Members<br>**500 or More** | Phone No. (include Area Code) |
|---|---|---|

Street Address<br>**1400 Easton Drive, Suite 149, Bakersfield, CA 93309**   City, State and ZIP Code

| Name | No. Employees, Members | Phone No. (include Area Code) |
|---|---|---|

Street Address                                   City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | Earliest<br>**06-01-2004**   Latest<br>**09-13-2005**<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired by Respondent on June 1, 2004 as a Janitor. Throughout my employment with Respondent, I was assigned to work at various locations in the Bakersfield area. From shortly after my date of hire until September 13, 2005, I was subjected to verbal and physical sexual harassment by Jose Vasquez, Supervisor. The sexual harassment consists of, but is not limited to the following: Mr. Vasquez would make sexual comments, such as "que buena estas" (how fine you are), "que rica" (how delicious), and "que no haria contigo" (what wouldn't I do with you)", he would ask me to go out with him, and touched my breasts, buttocks, and tried to kiss me. Mr. Vasquez also showed me the outline of his erection through his pants and attempted to force me to touch his penis. I repeatedly asked Mr. Vasquez to stop, but the harassment continued. Due to the harassment, I left my job in or around April or May 2005. I returned to work after Javier Vasquez, District Supervisor, requested that I return to work. When I returned to work, I was subjected to further sexual harassment by Jose Vasquez. On or about September 13, 2005, I was constructively discharged from my position.

Despite my requests that he stop the sexual harassment, Jose Vasquez continued to sexually harass me.

I believe that I have been discriminated against on the basis of my sex (female) in violation of Title VII of the Civil Rights Act of 1964, as amended.

I believe a class of females have been discriminated against on the basis of their sex, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| ☐ 6/29/06   _Erika Morales_<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

RECEIVED
JUN 30 2006
EEOC
INTAKE

Δ π EXHIBIT 15
Deponent: E. Morales
Date 7/23 Rptr. KM
WWW.DEPOBOOK.COM

4

# EXHIBIT

# B

A **West Court Reporting Services** transcript, reported by LiveNote Certified
Partner: Network Deposition Services



# United States District Court
## Eastern District Of California
### Fresno Division

## Deposition

## Of

## Claimant 2

## September 10, 2008

## (Exhibits Have Been Bound Separately)

## Erika Morales, Et Al.

## V.

## Abm Industries, Et Al.

9/10/2008

Page 19

1    whenever they give it?

2              MR. MARTINEZ:  Yes, she will.

3              THE WITNESS:  Yes.

4              MR. JACOBY:  So I don't have to ask the

5    question again, right?

6              MS. GARCIA:  Correct.  If you could just

7    translate all the objections.

8              THE INTERPRETER:  I have been.

9         Q.   BY MR. JACOBY:  Other than the Social

10   Security number, is all the other information on the

11   form correct?

12        A.   Yes.

13        Q.   The form is dated I believe February 22nd,

14   2005; is that correct?

15        A.   Yes.

16        Q.   Is that the first time that you ever worked

17   for ABM?

18        A.   Yes.

19        Q.   Do you remember your -- did you fill this

20   out on the very first day that you worked for ABM or

21   a few days before you started working for ABM?

22        A.   After I started working.

23        Q.   How long after you started working did you

24   fill out this form?

25        A.   About two weeks later.

1    A.   No.  Oh, well, Jose did send me to another

2    building, but that building was only one floor.   It

3    was on a Sunday.

4       Q.   Was that just one time or was that a

5    regular Sunday assignment?

6       A.   It was only one time.

7       Q.   And did you stop working for ABM completely

8    in May of 2005?

9       A.   Yes.

10      Q.   And other than the one time you were sent

11   to another building on a Sunday by Jose Vasquez, did

12   you ever work anywhere else for ABM during this

13   four-month period?

14      A.   No.

15      Q.   Did the SBC building have a security guard?

16      MS. GARCIA:   Objection; calls for

17   speculation.

18      Q.   BY MR. JACOBY:   If you know?

19      A.   No.  It didn't have one.

20      Q.   Did you ever see anybody there in the SBC

21   building besides your mother ever?

22      A.   Only Jose.  That sometimes he would go to

23   take us things and sometimes only to talk.

24      Q.   Was Jose Vasquez the only supervisor who

25   ever came to the SBC building?

Page 43

1      Q.    It's been almost an hour.  Why don't we

2  take a break.

3           MS. GARCIA:  Thank you.

4           THE VIDEOGRAPHER:  Going off the record.

5  The time is 11:57 A.M.

6                (Recess taken.)

7           THE VIDEOGRAPHER:  We are back on the

8  record.  The time is 12:09 P.M.

9      Q.    BY MR. JACOBY:  Ms.          at any time

10  did you or someone on your behalf file a complaint

11  with the California Department of Fair Employment

12  and Housing?

13     A.    Can you ask me again, please.

14           MR. JACOBY:  Could you read that back.

15                (Question Read)

16           MS. GARCIA:  Objection as to the term

17  complaint.

18     Q.    BY MR. JACOBY:  Well, by complaint, I mean

19  any type of complaint, a formal complaint, an

20  administrative charge, a letter?

21     A.    We did complain about Javier, or with

22  Javier.

23     Q.    My question is, did you complain to the

24  California government, California Department of Fair

25  Employment and Housing?

Page 44

1    A.   No.  Not that I can remember.  I haven't

2  done that.

3    Q.   Okay.  Since May of 2005, have you ever

4  worked for ABM again in any capacity?

5    A.   No.

6    Q.   I show you a three-page document which I'll

7  mark as Exhibit 302.  Is this the Employment

8  Application that you filled out for ABM?

9         (Deposition Exhibit No. 302 was marked for

10  identification.)

11        MS. GARCIA:  Again, for the record,

12  document Exhibit 302 appears to be in English.

13        THE WITNESS:  I feel these are --

14    Q.   BY MR. JACOBY:  This one is dated January

15  31st, 2005.  Does that refresh your recollection of

16  your first meeting with ABM, when it was?

17    A.   These, I filled those out initially with

18  Javier, but he didn't call me then so I had to fill

19  out another one.

20    Q.   I see.  Was this the only document you

21  filled out at the first meeting with Javier Vasquez?

22    A.   I don't remember quite well because we

23  asked him what he had done with this first

24  application that I had filled out, and he said that

25  he had thrown it away, so I had to fill another one.

9/10/2008

Page 46

```
1    ABM?

2        A.   Yes.

3        Q.   Did he work for ABM?

4        A.   No.

5        Q.   You didn't live with anyone else during

6    this time?

7        A.   No.

8        Q.   Are any of your other relatives employees

9    of any ABM entity?

10       A.   No.

11       Q.   Do you still live with Mr. Higuera?

12       A.   Yes.

13       Q.   You indicated previously that Jose Vasquez

14   came to your work site.  Is it correct that about

15   two weeks into your job you had your first problem

16   with Mr. Vasquez's behavior?

17       A.   Yes.

18       Q.   What happened in that first incident?

19       A.   In that first incident, um, we were in the

20   elevator, him and me, and he touched me on the cheek

21   and he told me how pretty I was.

22       Q.   Was that while the elevator was going up or

23   down?

24       A.   I don't remember.

25       Q.   Was it closed when that happened?
```

9/10/2008

Page 47

1      A.    Yes.

2      Q.    Is there only one elevator in the SBC

3  building?

4      A.    Yes.

5      Q.    Was anybody else in the elevator?

6      A.    No.

7      Q.    Did you respond to him?

8      A.    No.   Because I got embarrassed.

9      Q.    Did you say anything at all?

10      A.    No.

11      Q.    Did he touch you anywhere else besides your

12  cheek at this first incident?

13      A.    On the shoulder.

14      Q.    Did he touch you on the shoulder before or

15  after he touched you on the cheek?

16      A.    After.

17      Q.    And did he just touch your shoulder briefly

18  or did he leave his hand on your shoulder?

19      A.    He kept, he kept it there on the shoulder,

20  kind of like massaging it.

21      Q.    And how long did that happen?

22      A.    It was three times, two or three times that

23  that happened.

24      Q.    Excuse me.  I'm not asking how many times

25  it happened.  I'm asking how long did he maintain

Page 54

1       Q.    Had you ever seen him in a mall or in a

2   store?

3       A.    No.

4       Q.    Have you ever seen him ever besides work?

5       A.    No.

6       Q.    Did Jose Vasquez ever say anything to you

7   that you perceived -- strike that.

8             You indicated that there were no other

9   incidents in elevators.  Correct?

10      A.    Yes.

11      Q.    Could you estimate for me how many other

12  incidences there were between February and May of

13  2005 where you believe Mr. Vasquez behaved

14  inappropriately towards you?

15      A.    Estimating, it would be about, about five.

16      Q.    Can you remember each of them distinctly

17  the way you remembered the first one?

18      A.    It was three times that he touched my

19  shoulder, that he massaged it.

20            THE INTERPRETER:  I need to confirm that

21  statement, Counsel.

22            MR. JACOBY:  Sure.

23            THE WITNESS:  And other times that he would

24  go inside the restroom while I was cleaning, but

25  without touching me.

Page 55

1      Q.    BY MR. JACOBY:   Okay.   Are those the only

2   two types of objectionable behavior that Mr. Vasquez

3   exhibited towards you?

4      A.    Also, certain conversations.

5      Q.    Okay.   Let's try to go through each one.

6   When was the next time that he touched you on your

7   shoulder?

8      A.    I don't remember if it was almost the

9   following week.

10     Q.    But it was closer -- it was close in time

11  to the first time.   Is that fair?

12     A.    Yes.

13     Q.    And where did it occur?

14     A.    At the hallways where my mother had been

15  going and cleaning and also between the hallway of

16  the restroom and the eating area.

17     Q.    The times that he touched your shoulder

18  after the first time, was your mother present at any

19  of those subsequent touchings?   Let me withdraw

20  that.   It's terrible, even in English.

21          After the first time, was your mother ever

22  present when Mr. Vasquez touched your shoulder?

23     A.    Yes.

24     Q.    Was she present at all of the other times

25  or just some of them?

Page 56

1     A.   Yes, in all the times.

2     Q.   Do you remember, did she say anything to

3   Mr. Vasquez during the subsequent touchings?

4     A.   She would just say the same thing.

5          THE INTERPRETER:  I'm using the same, "que

6   confianza estas agarrando."  It changed a little

7   bit.  You're getting out of hand even more now or

8   you're getting a little bit -- you're getting a

9   little bit more trust into what you're doing.  The

10  idiom again.

11    Q.   BY MR. JACOBY:  The touchings on the

12  shoulder occurred on two or three other occasions;

13  is that correct?

14    A.   Yes.

15    Q.   In those two or three other occasions, did

16  he kind of squeeze your shoulder in a massaging

17  manner?

18    A.   Yes.

19    Q.   And did any of them last for more than a

20  couple of seconds?

21    A.   Not that long because I would move away.

22    Q.   By pull away, you mean you would just step

23  backwards?

24    A.   Yes.

25    Q.   Did he ever corner you or try to block you

9/10/2008

Page 57

1    from moving away?

2        A.    No.  But when he would go inside the

3    restrooms, well, I would get out.

4        Q.    Right.  I'm just talking about the shoulder

5    touchings for now.  When he was touching your

6    shoulder, you would move away.  Would he ever try to

7    block your movement?

8        A.    No.  Because I would go towards where my

9    mom was at.

10       Q.    Okay.  Did he ever touch your cheek again

11   ever after the first time in the elevator?

12       A.    No.

13       Q.    Is it correct that he never touched any of

14   your private parts, your breasts, buttocks or

15   vagina, that he never touched any of your sexual

16   organs?

17       A.    Yes, that's correct.

18       Q.    Did he ever touch your waist or your

19   stomach?

20       A.    Correct.

21       Q.    He did not?

22       A.    He did not.

23       Q.    Did he ever touch your lips?

24       A.    No.

25       Q.    Did he ever try to kiss you?

1    A.   No.

2    Q.   When he touched your shoulder, did he come

3  at you from the front where you could see him or

4  would he come from the side or behind?

5    A.   From behind.

6    Q.   Would he startle you?

7    A.   Yes.

8    Q.   Did he touch one shoulder or both?

9    A.   One.

10   Q.   Did he ever hurt you with the massaging

11  motion?

12   A.   No.

13   Q.   Did he ever leave a bruise of any kind?

14   A.   No.

15   Q.   You said that on each occasion your mother

16  would make the statement that the translator said?

17  Correct?

18   A.   Yes.

19   Q.   And then after the third or fourth time,

20  did the touching stop?

21   A.   Yes.  He stopped.  But he kind of seemed

22  like he wanted to try to continue touching my

23  shoulder, but I would move away, away from him.

24   Q.   Okay.  What made you sense that he wanted

25  to touch you but he didn't?  Why did it seem like

1    Q.   Did you ever observe Mr. Vasquez checking

2  the cleaning work at the building?

3    A.   No.

4    Q.   Did you ever observe him doing any work at

5  the building other than dropping off materials?

6    A.   No.

7    Q.   During the four to six hours that you would

8  work on a shift, how much of that was Mr. Vasquez

9  there, if you know?

10    A.   From one to two hours.

11    Q.   And would he be doing things outside of

12  your sight for most of that time?

13        MR. MARTINEZ:  Objection to the extent it

14  calls for speculation.  Go ahead and answer if you

15  can.

16    Q.   BY MR. JACOBY:  Let me ask it a different

17  way.  Was he spending that whole one to two hours

18  with you and your mother or was he doing other

19  things in the building?

20        MR. MARTINEZ:  Same objection.

21        MS. GARCIA:  It's also compound.

22        THE WITNESS:  He would just remain there

23  with us and just talking only sexual things, sexual

24  stuff.

25    Q.   BY MR. JACOBY:  So is it your testimony

9/10/2008

Page 65

1    that Mr. Vasquez would spend one to two hours a

2    night with you and your mother talking sexual stuff?

3        A.   Yes.

4        Q.   Every shift you worked?

5        A.   Yes.

6        Q.   So he would walk around with you while you

7    were doing your cleaning?

8        A.   Yes.

9        Q.   And it would be continuous for one to two

10   hours?

11       A.   It was like I mentioned to you, it was

12   almost like an hour that he would remain or up to

13   two hours and then he would just stay there and then

14   he would leave.

15       Q.   But when you say he was with you for one to

16   two hours, that's physically with you talking to

17   you.   Correct?

18       A.   Yes.   Along with my mom.

19       Q.   During those one to two hours, you're

20   cleaning.   Right?

21       A.   Yes.

22       Q.   Would he sit in a chair while you're

23   cleaning, would he stand by you?   Where would he be?

24       A.   Sometimes standing next to us or sometimes

25   sitting.

9/10/2008

Page 71

1   months?

2       A.   Most of the time, it was regarding sexual

3   things.

4       Q.   I'm asking, would you agree that this

5   occurred upwards of 50 times?  Three days a week for

6   four straight months for one to two hours a day?

7       A.   Yes.

8       Q.   Okay.  Were the conversations ever less

9   than one hour?

10      A.   No.  It was more than one hour.

11      Q.   Okay.  So in those 50 to 100 hours of

12  conversations, what do you remember he said?

13          THE INTERPRETER:  Counsel, did you say 50

14  or 15?

15          MR. JACOBY:  50.  Five, zero.

16          THE WITNESS:  Yes.

17      Q.   BY MR. JACOBY:  Tell me everything you can

18  remember he said in those conversations.

19      A.   He would start talking to us, telling us

20  about the women that he had, and then about how he

21  would make love to them and in the positions that he

22  would place them as well.  And that he always had

23  them satisfied and that he always kept them happy

24  with what he would give them; and that they would

25  always call him, each one of them, so that he could

Page 72

1   go and make love to them the way that they liked,

2   the way that they liked it; and that when he would

3   go, he would make love to them, "de relojito"

4   literally means like a little watch.  And the tiger

5   jump that he would make them do like a little cat.

6   And that he would spank them in the buttocks.  And

7   that they would tell him that they wanted more and

8   that they would still insist to him for him not to

9   leave, to stay there even longer.  And that he

10  always have them very satisfied.

11      Q.   Did he ever tell you who these women were?

12      A.   No.

13      Q.   Did he ever suggest that you should have

14  intercourse with him so you would feel the way they

15  did or words to that effect?

16      A.   He just told me as to why I had got

17  together with my husband; that he would make his

18  women feel the orgasm and that I should be -- that I

19  should experience what it was like to have an

20  orgasm.

21      Q.   Did he ever proposition you specifically?

22      A.   Specifically, specifically I would say no,

23  but kind of like suggesting that I should feel what

24  he does to his women.

25      Q.   Did he ever proposition your mother, in

9/10/2008

Page 73

1    your presence?

2       A.   Yes.  To both of us, he almost suggested

3    directly to us.

4       Q.   About that you should have the opportunity

5    to feel an orgasm?  Let me withdraw that.

6       By proposition, I mean did he ever ask you

7    to have sex with him?

8       A.   No.  He did not do that proposition.

9       Q.   Did he ever ask your mother to have sex

10    with him, as far as you're aware?

11       A.   No.

12       Q.   Did he ever suggest to you that if you did

13    not allow him to touch you or do something else

14    sexual, that your job would be in jeopardy?

15       A.   No.  He would just tell me for me not to

16    leave work, that he was willing to give me more

17    hours and more work, and also in some areas where I

18    wouldn't have to work that much.

19       Q.   Did he say that he would do that if you

20    would agree to do something with him?

21       A.   No.  He didn't tell me if we would agree to

22    do something or anything.  He would just tell me

23    that he would give me more hours of work.

24       Q.   Did you ever respond to any of his sexual

25    talk in any way at all?

9/10/2008

Page 113

1      A.   Yes.

2      Q.   And how much longer after the third

3   complaint did you continue to work for ABM at the

4   SBC building?

5      A.   I don't remember the dates quite well.

6      Q.   Did Mr. Vasquez's behavior continue after

7   the third complaint?

8      A.   Yes.  It continued the same.

9      Q.   And how was it that you decided to leave

10  ABM?

11     A.   Because my mom wanted to leave from there

12  already, and because I didn't want to stay there

13  working alone, and I didn't want to be alone because

14  I was afraid that something would happen to me with

15  Jose Vasquez.

16     Q.   So you and your mother decided to leave

17  together?

18     A.   I decided to leave along with my mom.

19     Q.   And have you obtained a new job after

20  leaving ABM?

21     A.   Not during that year, no.

22     Q.   When did you first obtain a new job?

23     A.   After I left ABM?

24     Q.   Correct.

25     A.   Until the following year, in 2006.

Page 133

1    STATE OF CALIFORNIA       )
                              ) ss:

2    COUNTY OF LOS ANGELES   )

3

4        I, JUDITH SCHLUSSEL, do hereby certify:

5        That I am a duly qualified Certified Shorthand

6    Reporter, in and for the State of California, holder of

7    certificate number 4307, which is in full force and

8    effect and that I am authorized to administer oaths and

9    affirmations;

10       That the foregoing deposition testimony of the

11    herein named witness was taken before me at the time and

12    place herein set forth;

13       That prior to being examined, the witness named

14    in the foregoing deposition, was duly sworn or affirmed

15    by me, to testify the truth, the whole truth, and

16    nothing but the truth;

17       That the testimony of the witness and all

18    objections made at the time of the examination were

19    recorded stenographically by me, and were thereafter

20    transcribed under my direction and supervision;

21       That the foregoing pages contain a full, true

22    and accurate record of the proceedings and testimony to

23    the best of my skill and ability;

24       That prior to the completion of the foregoing

25    deposition, review of the transcript was requested.

1          I further certify that I am not a relative or

2     employee or attorney or counsel of any of the parties,

3     nor am I a relative or employee of such attorney or

4     counsel, nor am I financially interested in the outcome

5     of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8     this 18th day of September    , 2008 .

9

10

11     _Judith Schlussel_

12     JUDITH SCHLUSSEL, CSR No. 4307

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                          134

# EXHIBIT

# C

A West Court Reporting Services transcript, reported by LiveNote Certified Partner: Network Deposition Services

CERTIFIED COPY

United States District Court
Eastern District Of California
Fresno Division

Deposition

Of

Claimant 3

September 11, 2008

(Exhibits Have Been Bound Separately)

U.S. Equal Employment Commission

V.

A B M Industries Incorporated, Et Al.

9/11/2008

1    first job you had after working for ABM?

2         A.   No.

3         Q.   When was your last day with ABM?

4         A.   At around May.

5         Q.   May of 2005?

6         A.   Yes.

7         Q.   And what was the first job you had after

8    working at ABM?

9         A.   After I would clean houses.

10        Q.   Anything else?

11        A.   Just houses.

12        Q.   And were you applying for jobs right

13   away after you left ABM?

14        A.   Yes, but I couldn't place myself.

15        Q.   Did you apply for any jobs before you

16   left ABM?

17        A.   No.  It was after.

18        Q.   Okay.  How many jobs did you apply for

19   after leaving ABM?

20        A.   Well, I went to unemployment to file

21   applications for where they needed.  I took

22   applications to, you know, the potato packing

23   plants.  There's a lot of packing plants for

24   potatoes, carrots.

25        Q.   How many applications did you fill out?

1    wonder how your conscience is."

2         Q.   And he said that to you twice?

3         A.   Yes.

4         Q.   And those are the only two occasions he

5    said something that made you feel uncomfortable,

6    right?

7         MR. STRAPP:  Objection as to scope of time.

8         MS. RYAN:  And I'm talking about the time

9    when you worked alone.

10        THE WITNESS:  Yes.

11   BY MS. RYAN:

12        Q.   So, other than surprising you by

13   standing behind you and the two occasions when he

14   asked about your conscience, during the time you

15   worked alone, did Jose Vasquez do anything else that

16   made you feel uncomfortable?

17        A.   No, because the last time I told him to

18   leave, to let me work.

19        Q.   When he asked about your conscience, is

20   that --

21        A.   When he asked me about my conscience --

22   I mean, I told him that I was fine, that I had

23   nothing --

24        Q.   And after you told him to leave you

25   alone, did he leave you alone to do your work?

1           A.   Yes.  And after that, I didn't see him.

2           Q.   During the time you worked alone, did

3     you ever make a complaint about Jose Vasquez?

4           A.   I mean, this one time I did say to

5     Javier -- I said to Javier that -- you know, what

6     was happening, that his brother would just go, you

7     know, to -- he would just go to take my time.

8           Q.   Okay.  I have a couple questions about

9     that.  When did you talk to Javier during the time

10    you worked alone?

11          A.   I spoke to him once.

12          Q.   And when was that?

13          A.   I do not remember the date.

14          Q.   And to the best of your memory, please

15    tell me exactly what you told Javier.

16          A.   I sat down with Javier -- that Jose

17    would just go and take your time and that I didn't

18    like the fact that he would just go and stand behind

19    me and that he would make comments that had nothing

20    to do with anything.

21          Q.   When you say "take time," do you mean

22    make it longer for you to do your work?

23          A.   Well, yes, part of it.  And he would

24    just go and -- and say things to me like those, you

25    know, for me not to get scared or how my conscience

1    Javier's brother; is that right?

2         A.   Well, I always knew him as Javier's

3    brother.  I was introduced to him as Javier's

4    brother.

5         Q.   Who introduced him as Javier's brother?

6         A.   Ruben.

7         Q.   And was Ruben related to Javier also?

8         A.   Well, I was told that Ruben was Javier's

9    cousin.

10        Q.   Who told you that?

11        A.   Ruben.  And all of them, they look

12   alike.  Maybe they were brothers then.  But that

13   Javier and Jose, they are brothers, and I always

14   knew them as brothers.

15        Q.   During the entire time you worked with

16   Jose, not just when you worked alone, did he ever

17   touch you?

18        A.   No.

19        Q.   Okay.  So, you told me while you worked

20   alone Jose had done some things that made you feel

21   uncomfortable.

22        A.   Well, I would -- felt like, you know, I

23   was being harassed by this other person.  I mean, he

24   would go there and he would stand behind me and he

25   wouldn't say anything.  And then those comments, you

1    know, things like, you know, how my conscience was.

2            He would tell me "You probably can't

3    sleep."  And then I'd say to him "It's because of

4    you that I can't sleep."

5        Q.   What did you think he meant when he said

6    you probably can't sleep?

7        A.   I don't know.  I don't know with what

8    intention he would have said that to me.

9        Q.   Well, you said you felt like you were

10   being harassed when he said it.  What about it made

11   you feel harassed?

12       A.   Well, I mean, who else is not going to

13   feel that way with somebody behind them?

14       Q.   I'm talking about the words "You

15   probably can't sleep."  Why did that bother you?

16       A.   Because I don't know with what intention

17   he said that to me.

18       Q.   Is it possible it was just friendly

19   conversation?

20       A.   I don't think so because he would look

21   at me -- Jose has a stare that is very penetrating.

22   It's almost as though he undresses you with his

23   stare.

24       Q.   You referred your daughter to come work

25   with you at ABM, right?

1      A.    Yes.

2      Q.    And you encouraged her to apply at ABM?

3      A.    Yes, with me.

4      Q.    With you in your building?

5      A.    Yes.

6      Q.    Okay.  And when did you recommend her to

7  come work with you?

8      A.    I do not remember exactly the date.  I

9  don't remember.  It was at around January or

10  February.

11      Q.    She started working with you in January

12  of 2005.  Did you tell her to come apply shortly

13  before she started working?

14      A.    No.  I actually took her with me to go

15  help me.

16      Q.    You brought her to the -- you brought

17  her to the building with you to help?

18      A.    Yes.

19      Q.    Was she an ABM employee?

20      A.    No.  Javier offered her a job.

21      Q.    So, you brought your daughter with you

22  to work --

23      A.    Yes.

24      Q.    -- and then after that, Javier said "I

25  will give her a job"?

1        A.   Well, he asked her if she wanted to work

2   for the company and to go in and fill out an

3   application.

4        Q.   Did you ask permission to bring your

5   daughter to work?

6        A.   I don't remember if I -- I think I did.

7   I think I told Jose.

8        Q.   What did Jose say?

9        A.   He didn't say anything.

10       Q.   So, you just wanted your daughter's help

11   to get the work done?

12       A.   Well, yes.

13       Q.   And what did you tell her about the job

14   before you brought her in to work with you?

15       A.   Well, I told her to try and, you know,

16   file an application there with Javier so she could

17   work at least a few hours.

18       Q.   How old was she at this time?

19       A.   About 18.

20       Q.   Was she 17?

21       A.   I remember she was 18.

22       Q.   When's her birthday?

23       A.   12 -- oh, I'm sorry.  May 12th, '86.

24       Q.   Did you tell her that you had problems

25   with Jose before you brought her to work with you?

9/11/2008

```
 1        A.   No.  No, I never spoke -- because Jose
 2   had calmed down.
 3        Q.   Okay.  Did you tell her that Jose had
 4   bothered you before?
 5        A.   No.
 6        Q.   Did you tell her not to be alone with
 7   Jose in the building?
 8        MS. GARCIA:  Objection.  Vague as to time.
 9        MS. RYAN:  Ever.
10        THE WITNESS:  No, I didn't say anything to
11   her.  I mean, she on her own -- she was -- she was
12   always with me.
13   BY MS. RYAN:
14        Q.   You wouldn't have recommended that she
15   come work with you if you thought she was going to
16   be sexually harassed, right?
17        MR. MARTINEZ:  Objection.  That's
18   argumentative.
19             But go ahead and answer if you can.
20        THE WITNESS:  No.
21        MS. RYAN:  Okay.  Let's take our lunch break
22   now.
23        THE VIDEOGRAPHER:  This marks the end of
24   Tape 1, Volume I, in the deposition of Claimant 3
25             Going off the record.  The time is
```

9/11/2008

```
 1          A.    Yes.

 2          Q.    In your car?

 3          A.    Well, no.  Sometimes she would get there

 4   in her car.

 5          Q.    Sometimes you would drive together in

 6   your car; is that right?

 7          A.    Yes.

 8          Q.    And that was throughout the time you

 9   worked together?

10          A.    Yes.

11          Q.    And would you drive home together when

12   you worked -- when you drove -- let me start over.

13                When you drove in together, would you

14   drive home together?

15          A.    No.  Sometimes she would leave

16   separately.

17          Q.    Would someone come get her?

18          A.    Her husband.

19          Q.    Okay.  What days of the week did Claimant 2

20   work?

21          A.    Monday, Wednesday and Friday.

22          Q.    And during this time period, you still

23   worked five days a week; right?

24          A.    Yes.  I -- I would always go at that

25   time.
```

1      A.    No.

2      Q.    Is it true that at no time you ever made

3  a complaint to the California Department of Fair

4  Employment and Housing about Jose Vasquez?

5      A.    I did not understand.

6      Q.    Okay.  Let me ask it another way.  Did

7  you ever make a complaint to an agency called the

8  California Department of Fair Employment and

9  Housing?

10     A.    No.

11     Q.    Okay.  And you never made a complaint

12  about -- about Jose Vasquez to that agency, right?

13     A.    No.  During that time, no.

14     Q.    At any time.

15     A.    I mean, I never said anything.  I would

16  only complain to Javier.

17     Q.    Okay.  And we'll talk about that later,

18  but -- and I'm glad you brought that up.

19          So, what you're saying is the only

20  complaints you ever made were to Javier?

21     A.    During that time period?

22     Q.    At any time.

23     A.    Yes.

24     Q.    Okay.  Now, after your daughter started

25  working with you, did Jose Vasquez ever do anything

9/11/2008

```
 1   that made you feel uncomfortable?
 2           A.   After my daughter started working there?
 3           Q.   That's right.
 4           A.   Well, at the beginning, everything
 5   was -- was normal.  Afterwards, about two weeks, he
 6   started making some sort of comments towards her
 7   where he would say things like Claimant 2 -ita how pretty,
 8   how tiny," because my daughter is -- is -- is small,
 9   you know.  She's short.  She's small.  She's not
10   tall.
11               And he would say that she looked like a
12   little girl, how pretty.  And this one time in the
13   elevator, he tried to touch her cheek, and I said to
14   him, "I don't like that."  I said, "What you're
15   doing is not good from a supervisor."
16           Q.   Okay.  I'd like to talk about each of
17   those in a little more detail.  So, you said after
18   two weeks, he made comments --
19           A.   After two weeks.
20           Q.   -- he made comments to your daughter?
21           A.   Yes.
22           Q.   And the comments were "How pretty.  How
23   small.  How tiny"?
24           A.   Yes.
25           Q.   Did he say anything else to her?
```

9/11/2008

```
 1        A.   Well, he was trying to kind of, like --
 2   I -- I was thinking that he was trying to make her
 3   feel -- but, like, whatever he told her for her not
 4   to feel uncomfortable.
 5        Q.   Could you explain that?
 6        A.   I mean, with time, I started seeing very
 7   different things, because after a few days after the
 8   time went by when she was there is when he would
 9   start going more, more to the point where he was
10   going almost every day that she was working there.
11   He would go and he would always make comments,
12   sexual comments, you know, things about sex.
13        Q.   Okay.  So, at first his comments were
14   just comments that she was pretty and small,
15   correct?
16        A.   Like -- like, you're trying to, like,
17   you know, get somebody to, like --
18        THE INTERPRETER:  Give me a moment.  Trying
19   to find the right word for this -- like, get someone
20   to like you.
21   BY MS. RYAN:
22        Q.   Was it friendly?
23        A.   I wouldn't see that as friendly.
24        Q.   Was it flirtatious?
25        A.   Like, you're trying -- like, you're
```

```
 1    trying to get some -- like, trying to conquer
 2    someone to, like, have them, like, fall for you or
 3    something with time.
 4         Q.    Was he trying to make her like him?
 5         A.    Yes.  Kind of like trying to, like,
 6    convince her to like -- for her not to be
 7    uncomfortable with what he would say.
 8         Q.    And did you hear these comments
 9    yourself?
10         A.    Yes.
11         Q.    So, you said they started after about
12    two weeks?
13         A.    Right.  Well, first, he started with
14    just that.  And after time, then it started with
15    more.
16         Q.    So, the first time you heard one of
17    these comments, did -- what was the comment you
18    heard?
19         A.    At the beginning, it was -- it was that.
20    Like, he -- he was trying to, like, touch this part
21    here (indicating), but she, like, you know, moved
22    away.  But from what I saw, he was able to actually
23    touch it, but she didn't allow it.
24         Q.    So, the first time he tried to touch her
25    chin --
```

9/11/2008

```
1          A.    Yes.

2          Q.    -- and --

3          A.    From what I saw.

4          Q.    -- and that was before he made a

5    comment; is that right?

6          A.    Well, he said, "How pretty."  But with

7    time, he started saying things, you know, Claimant 2-ita

8    and then he started singing to her, like Claimant 2 and
                                                      -ita
9    this and that.  But I don't remember what it is that

10   he would sing to her.

11         Q.    The time when he touched her chin and

12   said, "How pretty," you said she tried to move away?

13         A.    Yes.

14         Q.    But not until he had touched her chin a

15   little; is that right?

16         A.    Well, see, that time I saw as though,

17   like, he touched her or he kind of, like, brushed

18   her, but she was able to move away.

19         Q.    Okay.

20         A.    But that was inside the elevator.

21         Q.    Okay.  So, he tried to touch her lightly

22   on the chin with his thumb?

23         MS. GARCIA:  Objection.  That misstates her

24   testimony.

25   ///
```

1          Q.    Okay.  So, let me -- let me back up,

2    because the question I asked was just about

3    touching.  So, tell me how --

4          A.    Okay.

5          Q.    -- many times total you ever saw Jose

6    Vasquez touch your daughter.

7          A.    Me, it was three.  But during those

8    three, that thing happened where he would also say

9    stuff.

10         Q.    Okay.  So, let's talk about -- I think

11   we've talked about the first time.  That was when he

12   touched her chin in the elevator, right?

13         A.    Yes.

14         Q.    What was -- and the second time, where

15   did he touch her on her body?

16         A.    The shoulder.  Like he was, like, trying

17   to get closer to her, like, you know, for her to let

18   him hug her, like, for her to let him do whatever he

19   wanted to her.

20         Q.    Okay.  And you saw this?

21         A.    Yes.  That, I did see.

22         Q.    He touched her shoulder with his hand?

23         A.    Yes.

24         Q.    Was his hand open and flat or cupped

25   around her shoulder?

```
 1          A.    Kind of like to, like, you know, rub the
 2    shoulder with the hand, open like that.
 3          Q.    So, he moved his hand open over her
 4    shoulder?
 5          A.    Yes.  Like, you know, like, trying to
 6    rub.
 7          Q.    Okay.  How many seconds was he touching
 8    her shoulder?
 9          MS. GARCIA:  Objection.  Calls for
10    speculation.
11          MS. RYAN:  Just your best recollection.
12          THE WITNESS:  I do not remember.  I mean, my
13    daughter wouldn't allow it.
14    BY MS. RYAN:
15          Q.    So, she moved away?
16          A.    Yes.
17          Q.    Did she move away quickly?
18          A.    Well, I mean, that was the reaction that
19    anybody has.
20          Q.    She moved away immediately?
21          A.    Yes.  She didn't like it.
22          Q.    Okay.  Did she say anything to him?
23          A.    She -- she told him not to touch her, he
24    had no reason to touch her or put his hand on her.
25          Q.    And did you say anything?
```

1   husband doesn't touch you"?

2        A.   Yes.

3        Q.   Okay.  Was there anything else that Jose

4   did during that incident that you thought was

5   inappropriate?

6        A.   Well, it was inappropriate because --

7   because he said, "Well, for your mood to change, let

8   your husband touch you."  It's just ugly.

9        Q.   I understand that you didn't like that

10  comment.  Was there anything else besides touching

11  her shoulder and the comment about your husband

12  touching you that you didn't like during that

13  incident?

14       A.   It's just that he would say to let my

15  husband -- to let my husband -- my husband -- to

16  have relations with me, like, these ways, like doing

17  the clock, doing the jump of the tiger.

18       Q.   Did he say that in the same time when he

19  touched your daughter's shoulder?

20       A.   No.  That was after when he tried to

21  touch her.

22       Q.   Okay.  So, just focusing on that

23  incident when he touched your daughter's shoulder,

24  where did that happen?

25       A.   What do you mean?

```
 1          Q.    Was it in the hall?

 2          A.    Yes, the hallway when we were picking up

 3     the trash.

 4          Q.    And this was about one month or five

 5     weeks after your daughter started, right?

 6          A.    Yes.

 7          Q.    Okay.  And so, during that incident --

 8          A.    More or less.

 9          Q.    More or less.

10                During that incident, he touched your

11     daughter's shoulder, he said you should let your

12     husband touch you so that you wouldn't be mad.  Did

13     he do anything else during that incident that you

14     didn't like?

15          A.    The only thing that I told him was -- I

16     mean, I told him that it was not his problem.  My --

17     my private life was not his business.

18          Q.    Miss Claimant3 listen to my question.

19     During this incident, did Jose Vasquez do anything

20     else or say anything else that you did not like?

21          A.    Well, this was in, like -- this was one

22     time, but this happened, like, on three occasions.

23·    I mean, I would basically kick him out of there.

24          Q.    Okay.  So, we'll talk about all the

25     times, but right now we need to focus on the second
```

1          A.   Yes.  During all the times it happened

2    on the hallway but different floors.

3          Q.   And one time in the elevator, right?

4          A.   Yes.

5          Q.   Okay.  So, this -- this third touch,

6    what did Jose do?

7          A.   Well, he -- he would go there, you know,

8    to try and touch her, like, with the whole intention

9    of, like, trying to put his weight on her, and she

10   would not allow him.

11         Q.   What do you mean when you say he would

12   try to put his weight on her?  Do you mean

13   physically or mentally?

14         A.   Physically.

15         Q.   Would he try to push her down and lay on

16   top of her?

17         A.   No, like, a person that's trying to,

18   like, get, like -- put, like, their hands on her.

19         Q.   So, not his whole weight but just his

20   hands?

21         A.   Yes.  Like -- like, someone who's, like,

22   trying to, like, do this (indicating).

23         Q.   Would he try to lean on her?

24         A.   Yes.

25         Q.   Okay.  So, what part of his body did he

9/11/2008

1   touch her with?

2         A.   With the hand but, like, trying to --

3   how do I tell you?

4         THE INTERPRETER:  She wants to know if she

5   can demonstrate on the interpreter.

6         MS. RYAN:  That's fine.  You can do what you

7   want.

8         THE WITNESS:  He would, like, do this

9   (indicating), and that's not funny.

10        MS. RYAN:  Okay.  So --

11        THE WITNESS:  My -- my daughter was not a

12   cane.

13   BY MS. RYAN:

14        Q.   So, just -- so, because this will only

15   be written up in a book, just so we can just

16   describe what you just demonstrated, he leaned on

17   her --

18        A.   Well, he would try to, but my daughter,

19   she would move away.

20        Q.   Okay.  But he did put his hand on her

21   shoulder?

22        A.   Yes.

23        Q.   Okay.  And as soon as he went to do

24   that, she moved away?

25        A.   Yes.

```
 1          Q.    And what did you say back?

 2          A.    Well, I said, "Well, your intentions

 3     speak as though the contrary."

 4          Q.    And did he say anything back to you?

 5          A.    I don't remember what he answered after

 6     that.

 7          Q.    Did anybody say anything else at this

 8     incident?

 9          A.    Well, my daughter said -- said to him

10     that she was going to tell Javier as well.

11          Q.    And did Jose say anything back about

12     that?

13          A.    I don't remember.

14          Q.    Okay.  Did he leave you alone after

15     that?

16          A.    Well, I mean, afterwards he was, like,

17     walking around there, but I wouldn't see that he was

18     doing something.

19          Q.    So, after the incident where he leaned

20     on your daughter and you and your daughter said you

21     were going to tell Javier, he basically just walked

22     away but was still in the building?

23          A.    Yes.

24          Q.    Okay.  You had said earlier that on one

25     of the occasions when he was trying to touch her, he
```

9/11/2008

1    talked about having seven women, including an

2    18-year-old.

3         A.   Yes.

4         Q.   Which incident was that?

5         A.   Well, he would talk about all the womens

6    that he -- women that he had and what he would do to

7    them, and he would tell Reyna to try -- to try and

8    taste some of what he had.

9         Q.   Was that -- would he -- did he say that

10   to her on one of the times he tried to touch her or

11   on a separate time?

12        A.   On one of the occasions that he tried to

13   touch her.

14        Q.   Was it the time when he put his hand on

15   her shoulder to massage it or the time when he

16   leaned on her?

17        A.   Like, he tried to lean on her.

18        Q.   Okay.   So, it was the time he tried to

19   lean on her?

20        A.   Yes.

21        Q.   And he talked about sexual relationships

22   he had with other women?

23        A.   Yes.

24        Q.   Other than the times we've discussed,

25   were there ever any times when you saw Jose Vasquez

1        A.    No.  No, I don't remember.

2        Q.    So, going back to something you said

3   earlier, you said that he started coming to check

4   your work more often; is that right?

5        A.    Yes, when Cl. 2 started.

6        Q.    And you also said that he would talk

7   about sexual relationships with other women, right?

8        A.    Other women, yes.

9        Q.    Did that ever happen other than the time

10  when it was when he was leaning on her?

11       A.    Well, usually, those were his comments.

12  He had the whole sex thing in his head a lot.

13       Q.    Can you explain to me what you mean by

14  "usually those were the comments"?

15       A.    Because he would always talk about women

16  and women and women and that women were always going

17  after him and that women were always after him.

18       Q.    So, when he would come to check your

19  work, he would talk about women?

20       A.    Regularly, yes.

21       Q.    Okay.  How -- so, how often did he come

22  to check your work after Cl. 2 started?

23       A.    It's just that he wouldn't check the

24  work.  He was just going to, like -- to let's say,

25  you know, talk to Cl. 2.  And it was only on the

1      Q.   Okay.  So, CI. Z started in January, and

2   you left at the beginning of May?

3      A.   Yes.

4      Q.   At what point in that time period did

5   Jose start coming three days a week?  In the middle

6   or in the beginning or towards the end?

7      A.   About two weeks into it or three.

8      Q.   So, toward the beginning?

9      A.   Yes.

10     Q.   So, when he would come -- how long would

11  he stay when he would come to the --

12     A.   Sometimes half an hour.  Other times an

13  hour.  It was a lot of time that he would stay.  I

14  mean, for a supervisor to be there?  He didn't have

15  to be there.

16     Q.   So, when he would come for 30 minutes to

17  an hour, would he be talking to you the whole time,

18  or would he sort of come and go?

19     A.   He would go there, and he would just

20  stay there, and he was, like, behind us.

21     Q.   Okay.  Did you say anything to him?  Was

22  it a conversation?

23     A.   What I would tell him was, you know,

24  since he was going there, why would he not take for

25  me the stuff that I needed to work, because I would

```
 1   days that Cl.2 was working there.

 2        Q.   Okay.  So, out of the days that Cl.2

 3   would work -- she came three days a week?

 4        A.   Yes.

 5        Q.   Did he come two of those days, one of

 6   those days, three of those days?

 7        A.   The three days.

 8        Q.   So, after a while, he started coming

 9   every time she worked?

10        A.   Yes.

11        Q.   Let me ask you this:  When -- when did

12   you leave working at ABM?

13        A.   In May.

14        Q.   Do you know what day in May?

15        A.   I do not remember.  The only thing that

16   I remember is that -- at the beginning of May --

17        Q.   Okay.

18        A.   -- or last days of April.  I'm not too

19   sure.

20        Q.   Okay.  And you and Cl.2 left at the

21   same time, right?

22        A.   Yes.

23        Q.   You had the same last day?

24        A.   Yes.  Cl.2 no longer wanted to be

25   there.
```

1   testimony.

2        MS. RYAN:  You can answer.

3        THE WITNESS:  He didn't stop going.

4   BY MS. RYAN:

5        Q.   So, until you left, he would visit?

6        A.   Yes.

7        Q.   Did he ever ask you to have sex with

8   him?

9        A.   No.

10       Q.   Did he ever ask Cl.2 to have sex with

11  him?

12       MS. GARCIA:  Objection.  Calls for

13  speculation.

14       MS. RYAN:  To your knowledge.

15       THE WITNESS:  From what I heard, what he told

16  her was for her to try what he had.

17  BY MS. RYAN:

18       Q.   And you took that to mean he was saying

19  she should have sex with him?

20       A.   I mean, I was seeing that as harassment,

21  like he was harassing her, like, he was, like, on

22  her.

23       Q.   It was a suggestion of having sex with

24  her?

25       A.   Yes.

9/11/2008

1    feel uncomfortable, did you?

2         A.    Yes, I did tell him.

3         Q.    How many times did you tell him?

4         A.    All the time.  All the time.  But he is,

5    like, you know, the type of person that just goes in

6    through one ear and comes out in the other ear.

7         Q.    Did Jose Vasquez ever suggest that if

8    you did not have sex with him, your job would be in

9    jeopardy?

10        A.    He never said that to me.

11        Q.    Did he say it to your daughter?

12        MS. GARCIA:   Objection.  Calls for

13   speculation.

14        THE WITNESS:   I do not remember.  I don't

15   know.

16   BY MS. RYAN:

17        Q.    The talking about women and sex, was it

18   directed at CI.2 or you or both?

19        A.    Well, I would feel that it was for both,

20   because it's during those occasions where he told

21   me -- I would tell him that I was tired, I was tired

22   and that what I wanted to do was hurry and finish

23   for it -- for it not to be, you know, later, because

24   I couldn't sleep, that I was stressed.  I felt fear

25   of having him so close.  And then he would tell me,

1    "Well, tell your husband to let you sleep."

2         Q.   Did -- did you ever joke back with him

3    about sex?

4         A.   No.  No, never, never.  That is

5    something that's very personal, you know, very

6    private.  No, not that.

7         Q.   Did your daughter ever participate in

8    the conversation about sex or women?

9         A.   No.  Nobody would speak about that.  It

10   was just him.  He -- he had that in his -- in his

11   head.

12        Q.   So, when you talk about sex, you can use

13   either, you know, pretty words like poetry or

14   descriptive words like science, like saying

15   "intercourse," or crude words, like "fuck."  Which

16   kind of words would you describe Jose Vasquez --

17        A.   Well, he would use words that were,

18   like, for me to have, like, sexual relations with my

19   husband, like, on our side or the clock or the jump

20   of the tiger, and those are the same words he would

21   use for Reyna.

22        Q.   Is the clock a sexual position?

23        A.   That's what he would say.  I don't know.

24        Q.   Had you heard of it before he mentioned

25   it?

```
 1            Q.    Okay.  But when did you tell Jose
 2      you're -- you were leaving the job?
 3            A.    About a week before.
 4            Q.    One week before your last day?
 5            A.    A week or two.  I don't remember very
 6      well.
 7            Q.    So, one or two weeks before your last
 8      day, you told Jose you would be quitting?
 9            A.    Yes.
10            Q.    And did you say, "I'm giving you
11      one-week notice" or "two-week notice"?
12            A.    That we were going to leave in about two
13      weeks.
14            Q.    And what did he say?
15            A.    Well, he told Cl. 2 not to leave.
16            Q.    And what did Cl. 2 say?
17            A.    That no, that she was going to leave
18      with me.
19            Q.    And so, did he say anything else?
20            A.    I don't remember, but he begged her to
21      stay.
22            Q.    Okay.  Other than begging her to stay,
23      did he say anything else?
24            A.    Promising a lot of things.
25            Q.    To you or to her or both?
```

9/11/2008

```
 1            MS. GARCIA:   Objection.   That misstates her
 2   testimony.
 3   BY MS. RYAN:
 4        Q.   Is that right?
 5        A.   Well, I told Javier that I was going to
 6   leave because there was no remedy.
 7        Q.   And before you told Javier you were
 8   going to leave, nobody told you you had to leave,
 9   right?
10        A.   No.
11        Q.   So, after you left ABM but before you
12   had -- you started with the carrot juice company,
13   did you have -- did you have any income?
14            MR. MARTINEZ:   Objection.   Asked and
15   answered.   She testified she worked at Affordable.
16            THE WITNESS:   Yes.
17   BY MS. RYAN:
18        Q.   Okay.   So, other than the income from
19   Affordable, did you have any other income during
20   that time?
21        A.   No.
22        Q.   Did your husband have a job during that
23   time?
24        A.   Yes.
25        Q.   Were you able to make your regular
```

```
 1    STATE OF CALIFORNIA          )
                                   ) ss:
 2    COUNTY OF SAN DIEGO          )

 3

 4          I, KAE F. GERNANDT, do hereby certify:

 5          That I am a duly qualified Certified Shorthand

 6    Reporter, in and for the State of California, holder of

 7    certificate number 5342, which is in full force and

 8    effect and that I am authorized to administer oaths and

 9    affirmations;

10          That the foregoing deposition testimony of the

11    herein named witness was taken before me at the time and

12    place herein set forth;

13          That prior to being examined, the witness named

14    in the foregoing deposition, was duly sworn or affirmed

15    by me, to testify the truth, the whole truth, and

16    nothing but the truth;

17          That the testimony of the witness and all

18    objections made at the time of the examination were

19    recorded stenographically by me, and were thereafter

20    transcribed under my direction and supervision;

21          That the foregoing pages contain a full, true

22    and accurate record of the proceedings and testimony to

23    the best of my skill and ability;

24          That prior to the completion of the foregoing

25    deposition, review of the transcript was requested.
```

1    I further certify that I am not a relative or

2  employee or attorney or counsel of any of the parties,

3  nor am I a relative or employee of such attorney or

4  counsel, nor am I financially interested in the outcome

5  of this action.

6

7    IN WITNESS WHEREOF, I have subscribed my name

8  this ~~20th~~ day of ~~September~~ ' ~~2008~~ .

9

10

11  _____

12  KAE GERNANDT, CSR No. 5342

13

14

15

16

17

18

19

20

21

22

23

24

25

191

# EXHIBIT

# D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

U.S. EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                    Plaintiff,
ERIKA MORALES and ANONYMOUS
PLAINTIFFS ONE THROUGH EIGHT,

       PLAINTIFF-INTERVENORS,

vs.                                      CASE No.
                              1:07-cv-01428-LJO-SMS
ABM INDUSTRIES, INCORPORATED and
ABM JANITORIAL SERVICES, INC.; Does
1-10 Inclusive,

            Defendant,                 CERTIFIED

_____             COPY
RELATED CROSS-ACTION.
_____

DEPOSITION OF Claimant 4
Fresno, California
Thursday, July 24, 2008
Volume 1

Reported by:
KATHY MANNLEIN
CSR No. 13153

Job No. 89133

07/24/08

| 10:21:40 | 1 | locations? |
| 10:21:42 | 2 | A. No. |
| 10:21:42 | 3 | Q. Why not? |
| 10:21:48 | 4 | A. Because I haven't been there in person. |
| 10:21:50 | 5 | Q. Do you have plans to apply at any of those |
| 10:21:54 | 6 | companies? |
| 10:21:58 | 7 | A. I have plans of searching for employment. |
| 10:22:02 | 8 | Q. Okay. Prior to working at Care Commercial |
| 10:22:06 | 9 | Cleaning, where was your last employer before that? |
| 10:22:14 | 10 | A. At IBM. |
| 10:22:16 | 11 | Q. At ABM? |
| 10:22:20 | 12 | A. Yes. |
| 10:22:20 | 13 | Q. And was that in Bakersfield? |
| 10:22:22 | 14 | A. Yes. |
| 10:22:24 | 15 | Q. And can you recall the last date that you worked |
| 10:22:30 | 16 | at ABM? |
| 10:22:34 | 17 | A. I worked on March of 2006. |
| 10:22:36 | 18 | Q. So in between March of 2006 and beginning your |
| 10:22:42 | 19 | employment at Care Commercial Cleaning, did you have any |
| 10:22:46 | 20 | other employers during that time period? |
| 10:22:50 | 21 | A. No. |
| 10:22:50 | 22 | Q. And were you searching for work during that time |
| 10:22:56 | 23 | period? |
| 10:23:00 | 24 | A. I don't understand. What time? |
| 10:23:02 | 25 | Q. After you left ABM in March 2006, did you take |

13

07/24/08

| | | |
|---|---|---|
| 10:23:10 | 1 | effort to find employment at that time? |
| 10:23:16 | 2 | A.  No. |
| 10:23:16 | 3 | Q.  And why not? |
| 10:23:22 | 4 | A.  Because I was stopped.  I was laid off from work. |
| 10:23:26 | 5 | Q.  And you believe you were laid off from ABM in |
| 10:23:30 | 6 | March 2006? |
| 10:23:38 | 7 | MS. GARCIA:  Objection.  That misstates her |
| 10:23:40 | 8 | testimony. |
| 10:23:46 | 9 | THE WITNESS:  By the doctor. |
| 10:23:46 | 10 | BY MS. HAYWARD: |
| 10:23:48 | 11 | Q.  Okay.  I want to make sure I understand this |
| 10:23:54 | 12 | correctly. |
| 10:23:54 | 13 | So did you stop working at ABM in March 2006 |
| 10:24:00 | 14 | because your doctor told you that you could not work |
| 10:24:02 | 15 | there? |
| 10:24:04 | 16 | A.  Yes. |
| 10:24:04 | 17 | Q.  And what's the name of that doctor? |
| 10:24:12 | 18 | MS. GARCIA:  Objection.  Not likely to lead |
| 10:24:16 | 19 | to the discovery of admissible evidence. |
| 10:24:24 | 20 | THE INTERPRETER:  What? |
| 10:24:28 | 21 | MS. GARCIA:  Objection.  Not likely to lead |
| 10:24:30 | 22 | to discovery of admissible evidence. |
| 10:24:32 | 23 | BY MS. HAYWARD: |
| 10:24:32 | 24 | Q.  You can still answer the question. |
| 10:24:34 | 25 | A.  I don't remember the name of the doctor. |

14

07/24/08

| | |
|---|---|
| 10:57:44 | 1 |
| 10:57:52 | 2 |
| 10:57:56 | 3 |
| 10:57:56 | 4 |
| 10:58:02 | 5 |
| 10:58:02 | 6 |
| 10:58:02 | 7 |
| 10:58:02 | 8 |
| 10:58:06 | 9 |
| 10:58:28 | 10 |
| 10:59:32 | 11 |
| 10:59:34 | 12 |
| 10:59:34 | 13 |
| 10:59:38 | 14 |
| 10:59:42 | 15 |
| 10:59:44 | 16 |
| 10:59:50 | 17 |
| 10:59:50 | 18 |
| 10:59:54 | 19 |
| 10:59:58 | 20 |
| 11:00:00 | 21 |
| 11:00:06 | 22 |
| 11:00:08 | 23 |
| 11:00:12 | 24 |
| 11:00:14 | 25 |

Q.   Okay.  Do you recall ever being told about a hot line by any of your supervisors?

A.   No.

Q.   I'm going to show you another document and mark it as Exhibit 3.

(Whereupon, Defendant's Exhibit 3 was marked for identification.)

BY MS. HAYWARD:

Q.   It's a double-sided document.  And I believe the Spanish is on the back.

Are you ready to proceed?

A.   Yes.

Q.   If you could look on the side which has the English translation, there's a name printed at the bottom and a signature.

Is any of that your handwriting on the document?

A.   My signature.

Q.   Okay.  What about the printing?  Did you print your name or did someone else do that?

A.   No.

Q.   Who printed that?

A.   I don't know.

Q.   Did you understand that by signing the document, you were agreeing that you had read and understood the document?

07/24/08

| | | |
|---|---|---|
| 11:37:44 | 1 | "problems." |
| 11:37:54 | 2 | BY MS. HAYWARD: |
| 11:37:56 | 3 | Q.  Do you understand the question? |
| 11:37:58 | 4 | A.  Like, what type of problems? |
| 11:37:58 | 5 | Q.  Let me rephrase the question. |
| 11:38:02 | 6 | During the time you were working for Aara, did |
| 11:38:06 | 7 | Jose Vasquez do anything that you felt was |
| 11:38:16 | 8 | inappropriate? |
| 11:38:16 | 9 | A.  While I was working at Aara? |
| 11:38:18 | 10 | Q.  Yes.  I'm just focusing on Aara for now. |
| 11:38:24 | 11 | A.  No.  I didn't have a lot of dealings with him at |
| 11:38:28 | 12 | that point. |
| 11:38:28 | 13 | Q.  Okay.  What about during the time that you were |
| 11:38:32 | 14 | working at the Oildale Airport and Sierra Vista Clinic, |
| 11:38:44 | 15 | did Jose Vasquez do anything during that time period |
| 11:38:48 | 16 | which you felt that seemed inappropriate? |
| 11:38:50 | 17 | A.  Yes. |
| 11:38:50 | 18 | Q.  Can you remember the first time that Jose Vasquez |
| 11:38:56 | 19 | did anything that you felt was inappropriate? |
| 11:39:04 | 20 | A.  Yes.  Making sexual comments. |
| 11:39:08 | 21 | Q.  Okay.  Can you remember approximately when this |
| 11:39:12 | 22 | was, the date? |
| 11:39:16 | 23 | A.  I don't remember the date. |
| 11:39:16 | 24 | Q.  Okay.  What comments can you recall Mr. Vasquez |
| 11:39:24 | 25 | making? |

48

07/24/08

| | |
|---|---|
| 11:39:26 | 1 |
| 11:39:34 | 2 |
| 11:39:40 | 3 |
| 11:39:48 | 4 |
| 11:39:56 | 5 |
| 11:40:04 | 6 |
| 11:40:08 | 7 |
| 11:40:14 | 8 |
| 11:40:26 | 9 |
| 11:40:30 | 10 |
| 11:40:32 | 11 |
| 11:40:36 | 12 |
| 11:40:38 | 13 |
| 11:40:38 | 14 |
| 11:40:46 | 15 |
| 11:40:48 | 16 |
| 11:40:54 | 17 |
| 11:40:58 | 18 |
| 11:41:02 | 19 |
| 11:41:02 | 20 |
| 11:41:08 | 21 |
| 11:41:18 | 22 |
| 11:41:18 | 23 |
| 11:41:22 | 24 |
| 11:41:28 | 25 |

A.   I remember that once -- one instance my co-worker and I were eating, and he arrived where we were.  So then he told us, both of us, what was wrong with us, that we looked mad, that we were like this is because we had never felt an orgasm with our husbands.

So he made a comment to Lupe.  Since Guadalupe was single, he told -- he told her that she needed a woman -- she needed a man like him so she would be mad, because he would last about 45 minutes with a woman to make her feel like a woman.

Q.   Was -- were both of these comments during the same incident?

A.   Yes.

Q.   And can you recall Guadalupe's last name?

A.   I don't remember the last name.

Q.   Okay.  Was anyone else present during this incident?

A.   No, because only she and I were working at that location.

Q.   So you were the only two janitors working at that location at that time?

A.   The night shift, yes.

Q.   And what were the hours of the night shift that you were working at that time?

A.   We would start at 5:00, I remember, and we would

49

07/24/08

| | | |
|---|---|---|
| 11:41:32 | 1 | end at 11:00. |
| 11:41:32 | 2 | Q.   5:00 p.m. to 11:00 p.m.? |
| 11:41:36 | 3 | A.   Yes. |
| 11:41:36 | 4 | Q.   After Jose Vasquez made the comments that you've |
| 11:41:42 | 5 | just told us about, did either you or Guadalupe respond |
| 11:41:48 | 6 | to Jose? |
| 11:41:52 | 7 | A.   I told him that, why he was talking to us like |
| 11:41:56 | 8 | that. |
| 11:41:56 | 9 | Q.   And did he respond? |
| 11:42:02 | 10 | A.   And he said that I -- why was I playing dumb |
| 11:42:10 | 11 | because that's what we liked. |
| 11:42:10 | 12 | Q.   And did you have a response to that comment? |
| 11:42:16 | 13 | A.   No. |
| 11:42:18 | 14 | Q.   Did Mr. Vasquez leave after making that comment? |
| 11:42:24 | 15 | A.   No.   He remained there. |
| 11:42:26 | 16 | Q.   And did he make any further comments which you |
| 11:42:30 | 17 | felt were inappropriate on that same shift? |
| 11:42:46 | 18 | A.   Not the same shift, but days later. |
| 11:42:48 | 19 | Q.   Tell me the next incident that you can recall in |
| 11:42:50 | 20 | which Jose Vasquez did or said anything inappropriate. |
| 11:42:56 | 21 | A.   Yes.   Once Guadalupe didn't come to work, so |
| 11:43:06 | 22 | Claimant 12 took her place.   And he again arrived at |
| 11:43:10 | 23 | 9:00 p.m.   So then Cl. 12 was bent over mopping, and he |
| 11:43:20 | 24 | was standing next to me by the table.   And he told me |
| 11:43:26 | 25 | that Cl. 12 was bending over because he -- she liked that |

50

07/24/08

| | |
|---|---|
| 11:43:36 | 1 | a man would introduce her. |
| 11:43:40 | 2 |                MS. GARCIA:  No, that's not what she said. |
| 11:43:46 | 3 | She said that -- well, my interpretation is that men |
| 11:43:50 | 4 | sticking it -- or she could repeat it again. |
| 11:43:58 | 5 | BY MS. HAYWARD: |
| 11:43:58 | 6 |     Q.  Can we have you repeat the comment? |
| 11:44:02 | 7 |     A.  Yes.  He said that Lucia was bending over because |
| 11:44:08 | 8 | she liked that men would stick his part in her. |
| 11:44:16 | 9 |     Q.  And did you have a response to that comment? |
| 11:44:22 | 10 |     A.  No.  I told Cl. 12 about it in front of him. |
| 11:44:28 | 11 |     Q.  And what did Cl. 12 say? |
| 11:44:32 | 12 |     A.  Cl. 12 told him to be quiet because he would |
| 11:44:40 | 13 | always make sexual comments, and that he was sick. |
| 11:44:48 | 14 |     Q.  And did you tell anyone else about this comment |
| 11:44:52 | 15 | besides Cl. 12? |
| 11:45:02 | 16 |     A.  To Guadalupe the next day that she went to work. |
| 11:45:12 | 17 |     Q.  Was Guadalupe also a janitor? |
| 11:45:14 | 18 |     A.  Yes. |
| 11:45:14 | 19 |     Q.  Did you ever tell Javier Vasquez about his |
| 11:45:20 | 20 | comment? |
| 11:45:28 | 21 |     A.  No. |
| 11:45:28 | 22 |     Q.  Why not? |
| 11:45:30 | 23 |     A.  Because I didn't want to get in trouble. |
| 11:45:32 | 24 |     Q.  Why did you think you would get in trouble? |
| 11:45:44 | 25 |     A.  Because Javier made a comment that Jose, Javier, |

51

|          |    |
|----------|----|
| 11:49:22 | 1  |

                    MS. GARCIA:  Objection.  Calls for

11:49:22  2   speculation.

11:49:26  3                   THE WITNESS:  With the water hose.

11:49:26  4   BY MS. HAYWARD:

11:49:30  5       Q.  Oh, so the hose incident was taking place in the

11:49:32  6   kitchen; is that correct?

11:49:34  7       A.  Yes.

11:49:34  8       Q.  Can you tell me about the next comment or conduct

11:49:44  9   that Jose Vasquez did that you felt was inappropriate?

11:49:54  10      A.  Yes.  I remember that Guadalupe and I were

11:49:58  11  waiting for the kitchen floor to dry so we can turn the

11:50:04  12  lights off.  So we went outside and sat down for a

11:50:10  13  little while.  And at that moment Jose Vasquez arrived.

11:50:16  14  And he said -- he said that he -- that he liked to suck

11:50:22  15  on the breasts, because when he was a child, his hands

11:50:28  16  were not tied down.

11:50:32  17          And then I told him, Are you going to start again

11:50:36  18  with your comments?  Why don't you leave?  How come

11:50:40  19  you're here?  Because he would not bring any supplies or

11:50:44  20  anything.  He would just bother us.

11:50:48  21      Q.  And did he have a response when you asked him why

11:50:52  22  he was there?

11:50:56  23      A.  No.  He would just laugh.

11:50:58  24      Q.  And was anyone else present besides yourself and

11:51:02  25  Guadalupe?

54

| 12:04:14 | 1 | A.   No. |
| 12:04:18 | 2 | MR. MARTINEZ:  Clarification.  Maybe you |
| 12:04:20 | 3 | want to clarify as far as time if you'd like. |
| 12:04:26 | 4 | MS. HAYWARD:   That's fine. |
| 12:04:26 | 5 | BY MS. HAYWARD: |
| 12:04:36 | 6 | Q.   Did Jose Vasquez ever touch you in a way you felt |
| 12:04:38 | 7 | was inappropriate? |
| 12:04:44 | 8 | A.   No. |
| 12:04:44 | 9 | Q.   Did he ever attempt to hug you? |
| 12:04:50 | 10 | A.  No. |
| 12:04:50 | 11 | Q.   Did he ever force you to touch him? |
| 12:05:02 | 12 | A.   No. |
| 12:05:02 | 13 | Q.   Did Jose Vasquez ever threaten you with violence? |
| 12:05:10 | 14 | A.   No. |
| 12:05:12 | 15 | Q.   Did Jose Vasquez ever expose his private parts to |
| 12:05:20 | 16 | you? |
| 12:05:20 | 17 | A.   No. |
| 12:05:22 | 18 | Q.   Did Jose Vasquez ever promise you anything if you |
| 12:05:36 | 19 | would have sex with him? |
| 12:05:38 | 20 | A.   No. |
| 12:05:40 | 21 | Q.   Can you remember any other comments or incidents |
| 12:05:58 | 22 | that you observed Jose Vasquez do or say during the time |
| 12:06:08 | 23 | that you were working at the airport and the Sierra |
| 12:06:12 | 24 | Vista Clinic? |
| 12:06:12 | 25 | A.   Up until now, those are the comments that I |

62

07/24/08

| | | |
|---|---|---|
| 12:11:14 | 1 | Q.   And how was he standing in relation to her? |
| 12:11:22 | 2 | A.   He was walking. |
| 12:11:22 | 3 | Q.   Was he next to her, behind her, in front of her? |
| 12:11:30 | 4 | A.   Next to her. |
| 12:11:32 | 5 | Q.   And did you discuss this incident with Angelica? |
| 12:11:40 | 6 | A.   No, because -- because she was not aware that I |
| 12:11:46 | 7 | was looking, because at the same time that I looked and |
| 12:11:50 | 8 | saw them, I noticed that he was pushing her, so I just |
| 12:11:56 | 9 | removed myself from the area. |
| 12:11:58 | 10 | Q.   And did she ever discuss this pushing incident |
| 12:12:02 | 11 | with you? |
| 12:12:06 | 12 | A.   No. |
| 12:12:06 | 13 | Q.   Did you ever tell her that you had seen this take |
| 12:12:12 | 14 | place? |
| 12:12:14 | 15 | A.   I didn't do that either. |
| 12:12:16 | 16 | Q.   What's the next incident or comment by Jose |
| 12:12:20 | 17 | Vasquez that you can recall which you felt was |
| 12:12:24 | 18 | inappropriate? |
| 12:12:28 | 19 | A.   Once she was vacuuming the church, and he said to |
| 12:12:36 | 20 | me, If I go where she is and give her a hug, I'll break |
| 12:12:42 | 21 | her in pieces. |
| 12:12:44 | 22 | Q.   Who was he referring to? |
| 12:12:46 | 23 | A.   To hug her. |
| 12:12:48 | 24 | Q.   Who are we talking about?  Which co-worker? |
| 12:12:54 | 25 | A.   Angelica. |

66

07/24/08

12:43:52  1   her?

12:43:54  2       A.  Comments.

12:43:56  3       Q.  Did she tell you that he was doing anything else

12:44:00  4   besides making comments to her?

12:44:04  5       A.  No.

12:44:04  6       Q.  Did you speak to Maria Alvarado about Jose

12:44:12  7   Vasquez on any other occasions than the one we just

12:44:14  8   discussed?

12:44:18  9       A.  No.

12:44:18  10      Q.  Just on that day at the clinic?

12:44:26  11          After the plate factory, is the next place you

12:44:30  12  worked ACS?

12:44:38  13      A.  Yes.

12:44:38  14      Q.  And is it correct that you -- did you testify

12:44:42  15  that you only worked at ACS for two days?

12:44:48  16      A.  Yes.

12:44:48  17      Q.  And during those two days at ACS, did Jose

12:44:56  18  Vasquez ever come to the location while you were

12:45:00  19  working?

12:45:00  20      A.  No.

12:45:02  21      Q.  When was the last time you saw Jose Vasquez?

12:45:10  22      A.  Back in 2006, March of 2006.

12:45:16  23      Q.  Have you seen Jose Vasquez any time since you

12:45:20  24  stopped working at ABM?

12:45:26  25      A.  Yes.

07/24/08

| | | |
|---|---|---|
| 12:45:26 | 1 | Q.   And when was that? |
| 12:45:32 | 2 | A.   That was a few months ago. |
| 12:45:34 | 3 | Q.   And where did you see Mr. Vasquez a few months |
| 12:45:42 | 4 | ago? |
| 12:45:42 | 5 | A.   I ran into him on the street.   I was driving and |
| 12:45:46 | 6 | he was, as well. |
| 12:45:48 | 7 | Q.   So you were both driving? |
| 12:45:54 | 8 | A.   Well, no.   He was driving and I was driving, but |
| 12:45:58 | 9 | he was going one way and I was going the other way. |
| 12:46:00 | 10 | Q.   Okay.   So you didn't have a chance to speak with |
| 12:46:04 | 11 | Mr. Vasquez on that occasion? |
| 12:46:04 | 12 | A.   No. |
| 12:46:06 | 13 | Q.   So have you ever spoken to Jose Vasquez since |
| 12:46:10 | 14 | you've stopped working at ABM? |
| 12:46:14 | 15 | A.   No. |
| 12:46:14 | 16 | Q.   Can you think of any other comments or conduct by |
| 12:46:34 | 17 | Jose Vasquez during your employment at ABM which we have |
| 12:46:42 | 18 | not discussed? |
| 12:46:42 | 19 | A.   Yes. |
| 12:46:42 | 20 | Q.   Okay.   Please tell me about that. |
| 12:46:48 | 21 | A.   I remember that I worked with Ramona Huerta at |
| 12:46:56 | 22 | the Bank of America, and he said to me, Isn't it true |
| 12:47:02 | 23 | that Ramona needs a man?   Because he would always ask a |
| 12:47:12 | 24 | question, whether you had -- whether we had a husband or |
| 12:47:16 | 25 | we were single.   And Ramona said that she was single, |

81

07/24/08

| | | |
|---|---|---|
| 12:47:20 | 1 | and then he said, Well, you need a man. |
| 12:47:26 | 2 | Q.  Can you remember when this incident occurred? |
| 12:47:44 | 3 | A.  I don't. |
| 12:47:44 | 4 | Q.  How long did you work at the Bank of America |
| 12:47:48 | 5 | approximately? |
| 12:47:48 | 6 | A.  For a few days, because the other person didn't |
| 12:47:54 | 7 | show up and I was called in to cover that. |
| 12:47:56 | 8 | Q.  Can you remember anything else that occurred |
| 12:48:02 | 9 | while you were working at the Bank of America that you |
| 12:48:06 | 10 | thought was inappropriate? |
| 12:48:12 | 11 | A.  At the Bank of America? |
| 12:48:16 | 12 | Q.  Yes. |
| 12:48:16 | 13 | A.  No. |
| 12:48:18 | 14 | Q.  And was anyone else present at the time Jose |
| 12:48:22 | 15 | Vasquez made the comment about Ramona? |
| 12:48:28 | 16 | A.  It was just Ramona and I. |
| 12:48:30 | 17 | Q.  Did you discuss the comment with Ramona? |
| 12:48:36 | 18 | A.  No. |
| 12:48:36 | 19 | Q.  Did you ever tell Javier Vasquez about the |
| 12:48:40 | 20 | comment? |
| 12:48:44 | 21 | A.  No. |
| 12:48:44 | 22 | Q.  Can you recall any other comments or conduct by |
| 12:48:50 | 23 | Jose Vasquez during your employment at ABM that you |
| 12:48:54 | 24 | found inappropriate other than those we've discussed? |
| 12:49:02 | 25 | A.  At this moment I don't, but I remember someone |

82

```
12:52:36   1                    THE WITNESS:  I don't remember.
12:52:38   2     BY MS. HAYWARD:
12:52:46   3         Q.  Did you ever make any complaints to Javier
12:52:50   4     Vasquez about Jose Vasquez?
12:52:54   5                    MR. MARTINEZ:  Objection.  Asked and
12:52:56   6     answered.
12:52:56   7                    But go ahead and answer.
12:53:02   8                    THE WITNESS:  No.
12:53:04   9     BY MS. HAYWARD:
12:53:04  10         Q.  Did you ever call the harassment hot line to make
12:53:06  11     any complaints about Jose Vasquez?
12:53:10  12         A.  No.
12:53:12  13         Q.  Did you ever make any complaints to a union
12:53:18  14     representative about Javier Vasquez -- sorry, about Jose
12:53:26  15     Vasquez?
12:53:26  16         A.  No.
12:53:26  17         Q.  Did you ever make any complaints to ABM's Human
12:53:34  18     Resources Department about Jose Vasquez?
12:53:38  19         A.  No.
12:53:40  20         Q.  Did you ever make any complaints to the police
12:53:50  21     about Jose Vasquez?
12:53:52  22         A.  No.
12:53:52  23         Q.  Did you ever make any complaints to any managers
12:54:00  24     or supervisors other than Javier Vasquez while -- about
12:54:08  25     Jose Vasquez?
```

| | | |
|---|---|---|
| 12:54:10 | 1 | A.   No. |
| 12:54:10 | 2 | Q.   Did you tell any of your friends or family |
| 12:54:14 | 3 | members about Jose Vasquez's comments or conduct? |
| 12:54:22 | 4 | A.   Yes. |
| 12:54:22 | 5 | Q.   And who did you tell? |
| 12:54:26 | 6 | A.   To a friend of mine. |
| 12:54:30 | 7 | Q.   And what's your friend's name? |
| 12:54:32 | 8 | A.   Juanita. |
| 12:54:34 | 9 | Q.   What's her last name? |
| 12:54:38 | 10 | A.   Pacheco. |
| 12:54:40 | 11 | Q.   And does Juanita live in Bakersfield? |
| 12:54:46 | 12 | A.   She's my neighbor. |
| 12:54:46 | 13 | Q.   And what did you tell Juanita about Jose Vasquez? |
| 12:54:54 | 14 | A.   She said why not -- how come I don't place a |
| 12:54:58 | 15 | complaint about him. |
| 12:55:00 | 16 | Q.   And what did you tell her? |
| 12:55:06 | 17 | A.   And my response was that I would -- that I would |
| 12:55:10 | 18 | not place a complaint against him because they were all |
| 12:55:14 | 19 | family, all the people there at the office. |
| 12:55:16 | 20 | Q.   And is that the reason that you did not complain |
| 12:55:22 | 21 | about Jose Vasquez? |
| 12:55:28 | 22 | A.   Well, it's better to say that we -- all the |
| 12:55:32 | 23 | people never complained about him because of that. |
| 12:55:34 | 24 | Q.   Because -- because he -- people thought he was -- |
| 12:55:40 | 25 | his brother was Javier? |

1        I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11        Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [✓] was [  ] was not requested.

15        I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18        IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:    AUG 1 2 2008

22

23                              *Kathy Mannlein*

                             KATHY MANNLEIN

24                             CSR NO. 13153

25

#3

 **Janitorial Services**

> Attn: Supervisors!
> Original to Personnel File
> Copy to Employee

---

## EMPLOYEE INFORMATION REGARDING THE HARASSMENT HOTLINE®

*Please read carefully, sign below, and return to your supervisor.*

TO:       ALL ABM JANITORIAL SERVICES EMPLOYEES
FROM:     ABM JANITORIAL SERVICES
SUBJECT:  OUR COMMITMENT TO A ZERO TOLERANCE POLICY TOWARD EMPLOYEE HARASSMENT
DATE:     MARCH 1, 1999

---

ABM Janitorial Services has a zero tolerance policy regarding any discriminatory, harassing, or retaliatory conduct in the workplace. Pursuant to that policy, ABM Janitorial Services has subscribed to a telephone reporting/complaint services called the Harassment Hotline so that our employees can readily report such acts including theft, and safety matters without fear of retaliation, job loss, or embarrassment.

The hotline is an unbiased, third party reporting system and satisfies the United State's Supreme Court's position that companies must "...clearly show they provide a simple complaint process that is calculated to encourage victims of harassment to come forward.

We do not anticipate that our employees will need to use the Harassment Hotline®. We expect and assume that all of our employees will conduct themselves free of harassment. However, if it is needed, the service is available and allows ANY employee to report any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party.

For the convenience of our employees, the Hotline can be accessed 24-hours a day, 7-days a week. The toll-free number is 1-800-97-STOP-IT which is 1-800-977-8674. Our company has a unique identification number. It is 980043. Remember that any employee may call the toll-free telephone number at any time and report harassment, discrimination, retaliation, theft, or any safety concern without fear of retaliation.

Sexual harassment, discrimination, retaliation and other dysfunctional behavior cannot and will not be tolerated under any circumstances. The only way we can stop such behavior in the workplace is by bringing it out into the open by communication and total employee and employer commitment.

---

I have read this document and I understand that I can report any act of harassment (sexual or otherwise) to either a company representative or call the Harassment Hotline® without fear of retaliation or job loss."

Print your name   *Claimant 4*

Sign your name    *Claimant 4*

Date signed       *8-25-99*

**The toll free harassment hotline telephone number is
1-800-97-STOP-IT • 1-800-977-8674**

**Our company identification code is: 980043**

> Δ π EXHIBIT 3
> Deponent_____
> Date 7/24 Rptr. KM
> WWW.DEPOBOOK.COM

 **Janitorial Services**

Attn: Supervisores!
Original al Expediente de Personal
Copia al Empleado

## INFORMACIÓN PARA LOS EMPLEADOS ACERCA DE LA LÍINEA DIRECTA DE ACOSO
### (HARASSMENT HOTLINE*)

*Por favor lea completamente, firme y devuelva a su supervisor.*

: TODOS LOS EMPLEADOS DE ABM JANITORIAL SERVICES
E: ABM JANITORIAL SERVICES
SUNTO: NUESTRO COMPROMISO A UNA POLÍTICA DE CERO TOLERANCIA HACIA EL ACOSO DE EMPLEADOS
ECHA: MARZO 1, 1999

M Janitorial Services cuenta con una política de cero tolerancia respecto a cualquier forma de conducta criminatoria, acosadora, o cualquier forma de represalias que ocurran en el lugar de trabajo. De acuerdo a dicha lítica ABM Janitorial Services está inscrita en un servicio telefónico para reportar quejas y el cual se llama la Línea ecta de Acoso (Harassment Hotline®) para que los empleados puedan reportar fácilmente dichas situaciones así como obo y asuntos respecto a la de seguridad, sin el temor de represalias, despido o vergüenza.

Línea Directa es un sistema de reportaje imparcial de una tercera persona que satisface la posición indicada por la rte Suprema de Justicia de los Estados Unidos en cuanto a que las compañías deben de "claramente demostrar que porcionan a sus empleados, un proceso sencillo para reportar quejas el cual tiene el propósito de apoyar a las timas del acoso para que reporten su queja."

anticipamos que nuestros empleados necesitarán usar la Línea Directa de Acoso (Harassment Hotline¨) puesto que eramos y suponemos que todos nuestros empleados se comporten de una manera que no involucra el acoso u tigamiento. Sin embargo, si se llegara a necesitar, el servicio está disponible y permite que CUALQUIER empleado orte cualquier supuesto acoso sexual, discriminación, represalias, robo, o cualquier problema de seguridad que ocurra el trabajo o cualquier forma de acoso por parte de una tercera persona.

a la comodidad de nuestros empleados, la Línea Directa se puede acessar las 24 horas al día, 7 días a la semana. El ero sin costo es el 1-800-97-STOP-IT o sea 1-800-977-8674. El número de identificación de la compañía ABM itorial Services es 980043. Recuerde que cualquier empleado puede llamar al número sin costo en cualquier nento y reportar el acoso, discriminación, represalia, robo, o cualquier problema de seguridad sin el temor a que se en represalias en su contra.

coso u hostigamiento sexual, la discriminación, las represalias y otros tipos de comportamiento disfuncional no serán ados bajo ninguna circunstancia. La única manera en que podemos poner un fin a tal comportamiento en el lugar de ajo es el comunicarlo abiertamente así como con el compromiso total entre el empleador y el empleado.

leído este documento y entiendo que puedo reportar cualquier situación de acoso a ya sea un representante
Compañía o llamar a la Línea Directa de Acoso (Harassment Hotline¨) sin temor a que se tomen represalias
a pérdida de mi empleo." (Empleado debe de firmar los dos lados de este documento.)

iba su nombre con letra de molde _____

rma _____

ia en que firmó _____

El número telefónico de la Línea Directa para reportar el acoso es:
1-800-97-STOP-IT • 1-800-977-8674

El código de identificación de nuestra compañía es: 980043

# EXHIBIT

# E

A West Court Reporting Services transcript, reported by LiveNote Certified
Partner: Network Depositions Services



United States District Court
Eastern District Of California
Fresno Division

Deposition

Of

Claimant 5

October 24, 2008

U.S. Equal Employment Commission,

V.

Abm Industries, Et Al.

1       MR. VIRAMONTES:  Objection.  Calls for a legal

2    conclusion.

3       MR. MARTINEZ:  Objection.  Calls for a legal

4    conclusion.

5    BY MR. JACOBY:

6       Q.   You can answer.

7       A.   Yeah.

8       Q.   Okay.  One of the rule of depositions,

9    these guys get to object, and you still have to

10   answer the question unless they instruct you not to

11   answer.  Sometimes I'll change my question when they

12   object, sometimes I won't.  If I'm not going to

13   change it, I'll just say, "You can answer the

14   question."  If I change it, then you can ask the

15   new -- answer the new question.

16          So when did you -- what type of services

17   did you perform for some ABM entity?

18      A.   Can you repeat your question?

19      Q.   Sure.  What did you do for ABM?

20      A.   I was there to help my mom.

21      Q.   Okay.  When did you do that?

22      A.   Can you repeat that?

23      Q.   Sure.  When did you do that?

24      A.   2004.

25      Q.   Okay.  Were you employed by ABM formally?

1    A.    No.

2    Q.    Or were you just helping your mom?

3    A.    No.  I was just helping my mom.

4    Q.    Okay.  And who is your mother?

5    A.    Claimant 3

6    Q.    Okay.  So in 2004, how long did you do

7    this?

8    A.    About three weeks.

9    Q.    Do you remember what month those three

10   weeks were?  Month or months?

11   A.    November.

12   Q.    Was it hot or cold?

13   A.    A little bit cold.

14   MR. VIRAMONTES:  Mr. Jacoby, I think the answer

15   was November.

16   MR. JACOBY:  Oh, November was the answer.

17   BY MR. JACOBY:

18   Q.    I'm sorry.  I thought it was "I don't

19   remember."  I don't care whether it's hot or cold.

20   It was in November.  So November of 2004.

21        Do you recall what building or buildings

22   your mom was working in in November of 2004 that you

23   were going along with her?

24   A.    AT&T buildings.

25   Q.    And was -- did anybody else work with your

Page 58

1    MR. JACOBY:  Correct me if I'm wrong.  Maybe

2  you -- I'd like to give the witness a reference

3  point.

4         When was the conciliation?

5    MR. MARTINEZ:  Don't remember off of the top of

6  my head.

7    MR. JACOBY:  Was that December '06?

8    MR. VIRAMONTES:  I don't know.

9  BY MR. JACOBY:

10   Q.   Okay.  Let me try it this way.

11        For the remainder of 2004, did you tell

12  anybody what Mr. Vasquez did?

13   A.   No.

14   Q.   For -- during the entirety of 2005, did

15  you tell anybody what Mr. Vasquez did?

16   A.   Yes.

17   Q.   Who did you tell?

18   A.   I talked to a counselor at school.

19   Q.   Okay.  Do you remember the counselor's

20  name?

21   A.   No.

22   Q.   And you told me that was Bakersfield High

23  School?

24   A.   Yes.

25   Q.   Was it a man or a woman?

10/24/2008

Page 65

1     A.    And I just wanted to just let it go.

2     Q.    Okay.

3     A.    Never wanted to see him again.

4     Q.    Okay.  Have you ever seen him again?

5     A.    No.

6     Q.    Okay.  Did you ever have a discussion with

7  your sister *Claimant 2* about Jose Vasquez?

8     A.    No.

9     Q.    Okay.  Is there anybody else who you told

10  about Mr. Vasquez that you haven't talked about

11  today?

12     A.    No.

13     Q.    Did you ever file a complaint with the

14  Department of Fair Employment and Housing?

15     A.    No.

16     Q.    Did you ever file a complaint with the

17  EEOC?

18     A.    No.

19     Q.    And you never filed a police report,

20  correct?

21     A.    Correct.

22     Q.    Did you ever write down anything that

23  happened to you anywhere, like in a journal or a

24  diary?

25     A.    I did.  But I have a thing for journals.

Page 86

1    BY MR. JACOBY:

2        Q.   Did you ever discuss that with your

3    mother?

4        A.   No.

5        Q.   Have you ever made a claim for wages

6    against ABM?

7        A.   No.

8        Q.   Is there anything about your encounters

9    with Mr. Vasquez that you haven't talked about this

10   morning in the deposition?

11       A.   That's all I remember.

12       MR. JACOBY:   Okay.  I don't have any further

13   questions at this time.

14   BY MR. JACOBY:

15       Q.   Did you ever -- I have a couple more.

16           Did you ever consider yourself to be an

17   employee of ABM?

18       MR. VIRAMONTES:   Objection.  Calls for a legal

19   conclusion...

20       THE WITNESS:   Can you repeat?

21   BY MR. JACOBY:

22       Q.   Did you ever consider yourself to be an

23   employee of ABM?

24       A.   No.

25       Q.   Okay.  You just thought you were helping

10/24/2008

Page 87

1    out your mom?

2        A.   Yes.

3        Q.   Okay.

4        MR. MARTINEZ:   Again, we would like to object

5    on the fact that it calls for a legal conclusion.

6    BY MR. JACOBY:

7        Q.   Have you ever helped out your mom in any

8    other workplace?

9        A.   No.

10       Q.   Have you ever helped out any relative in

11   any other workplace?

12       A.   No.

13       Q.   Do you intend to look for a job when

14   you're -- at any point?

15       A.   Yes.

16       Q.   When do you intend to look for a job?

17       A.   As a matter of fact, I'm looking for a

18   job.

19       Q.   Okay.  What are you doing to try to

20   find -- try to find a job?

21       A.   Go to a career service center.

22       Q.   Where's that?

23       A.   That's on Bell Terrace, Bakersfield.

24       Q.   Okay.  Have you actually gone to the

25   center yet?

10/24/2008

Page 103

1   STATE OF CALIFORNIA        )
                              ) ss:
2   COUNTY OF ORANGE          )

3

4        I, LINDA D. WHITE, do hereby certify:

5        That I am a duly qualified Certified Shorthand

6   Reporter, in and for the State of California, holder of

7   certificate number 12009, which is in full force and

8   effect and that I am authorized to administer oaths and

9   affirmations;

10       That the foregoing deposition testimony of the

11  herein named witness was taken before me at the time and

12  place herein set forth;

13       That prior to being examined, the witness named

14  in the foregoing deposition, was duly sworn or affirmed

15  by me, to testify the truth, the whole truth, and

16  nothing but the truth;

17       That the testimony of the witness and all

18  objections made at the time of the examination were

19  recorded stenographically by me, and were thereafter

20  transcribed under my direction and supervision;

21       That the foregoing pages contain a full, true

22  and accurate record of the proceedings and testimony to

23  the best of my skill and ability;

24       That prior to the completion of the foregoing

25  deposition, review of the transcript was requested.

1          I further certify that I am not a relative or

2  employee or attorney or counsel of any of the parties,

3  nor am I a relative or employee of such attorney or

4  counsel, nor am I financially interested in the outcome

5  of this action.

6

7          IN WITNESS WHEREOF, I have subscribed my name

8  this __5th__ day of __November__, __2008__.

9

10

11  _Linda D. White_

12  LINDA D. WHITE, CSR No. 12009

13

14

15

16

17

18

19

20

21

22

23

24

25

104

# EXHIBIT

# F

A West Court Reporting Services transcript, reported by LiveNote Certified
Partner: Network Deposition Services



# United States District Court
## Eastern District Of California
### Fresno Division

Deposition

Of

Claimant 6

October 27, 2008

(Exhibits Have Been Bound Separately)

U.S. Equal Employment Commission

V.

A B M Industries, Incorporated, Et Al.

1       Q.    This is -- this is the ABM employee

2    handbook for janitors.  And it's been photocopied.

3    So if you look at the second page, which may be

4    upside down on your copy, but you can turn it -- you

5    got it.   Perfect.   That's it.

6       A.    This?

7       Q.    That's it.  Yeah.

8       A.    Huh-uh.

9       Q.    So see how it's -- there's two lines down

10   the side.   The original document was that size.  And

11   it's been copied with two pages to one sheet here.

12   So may help you to remember that it was a little

13   booklet.

14             Do you recall receiving a little booklet

15   that was the employee handbook?

16       A.    I don't remember.

17       MS. RYAN:  Okay.  Let's mark this as

18   Exhibit 1108.

19             (Whereupon Exhibit 1108 was marked.)

20   BY MS. RYAN:

21       Q.    Please keep the handbook close at hand,

22   and take a look at this 1108 Exhibit.  And let me

23   know when you've finished.

24       A.    (Witness complies.)  Okay.

25       Q.    Ms. Cl. 6   is that your signature at the

10/27/2008

Page 138

1    bottom this document?

2        A.   Yes.

3        Q.   And is it your name handwritten on

4    "Employee's printed name"?

5        A.   Yes.

6        Q.   And is it your handwriting with the date

7    "5/14/04"?

8        A.   The date, I don't remember.

9        Q.   Is that your handwriting?

10       A.   Yes.

11       Q.   And this document is from your file here,

12   ABM employee file, and at the top it says,

13   "Acknowledgment -- Handbook Receipt and

14   Acknowledgment."  And what it says is that it's an

15   acknowledgment that you read and understood the

16   employee handbook.

17           Do you remember filling out this document?

18       A.   I don't remember.

19       Q.   But it is your signature, right?

20       A.   Yes.

21       Q.   Does this refresh your recollection that

22   you received the employee handbook for ABM Janitors?

23       MS. GARCIA:  Objection as to the term

24   "received."  It's vague.

25       THE WITNESS:  No.

Page 155

1      MS. GARCIA:  Objection.  Asked and answered.

2      THE WITNESS:  No.  No.

3   BY MS. RYAN:

4      Q.   Do you know there's a department for

5   people to take personnel problems at ABM?

6      A.   No.

7      MS. RYAN:  I'd like to mark this as

8   Exhibit 1111.

9          (Whereupon Exhibit 1111 was marked.)

10  BY MS. RYAN:

11     Q.   Is this your signature where it says

12  "Employee's signature"?

13     A.   Yes.

14     Q.   On Exhibit 1111?

15     A.   Yes.

16     Q.   And is this your handwriting where it says

17  "Employee's printed name"?

18     A.   Yes.

19     Q.   And your handwriting for the date,

20  "5/14/04"?

21     A.   Yes.

22     Q.   And this is a document from your file

23  that's titled "Sexual Harassment Information Sheet

24  Acknowledgment," acknowledging that the employee has

25  been provided with a copy of ABM's company policy on

10/27/2008

Page 156

1     sexual harassment.

2              Do you remember signing this document?

3         A.   I don't remember.

4         Q.   Does it refresh your recollection that you

5    received a copy of ABM's company policy on sexual

6    harassment?

7         A.   Can you repeat that question?

8         Q.   Does this make you remember that you

9    received a copy of ABM's sexual harassment policy?

10        A.   No.

11        MS. RYAN:   Mark this as Exhibit 1112.

12             (Whereupon Exhibit 1112 was marked.)

13        THE WITNESS:   Okay.

14   BY MS. RYAN:

15        Q.   Here on Exhibit 1112, is that your

16   signature at the bottom?

17        A.   Yes.

18        Q.   And is that your handwriting where it says

19   "Print your name"?

20        A.   Yes.

21        Q.   And is that -- you signed the date

22   "5/14/04"?

23        A.   I don't remember about the date.

24        Q.   Okay.   But it's your signature?

25        A.   My signature, yes.

1    stay at the East Hills Mall instead of going to work

2    at the styrofoam company?

3         A.    No.

4         Q.    So when he told you that, you just said,

5    "Okay.  I'll do it"?

6         A.    Yes.

7         Q.    And after one month of the styrofoam

8    project, did you change jobs -- or change locations

9    again?

10        A.    Javier send me to the airport academy.

11        Q.    What's the airport academy?

12        A.    It's for Japanese students.

13        Q.    To learn to fly?

14        A.    Yes.

15        Q.    And how long did you work there?

16        A.    Up until August 28th of 2006.

17        Q.    You worked there until you left ABM?

18        A.    Yes.

19        Q.    So August 28, 2006, was your last day at

20   ABM?

21        A.    Yes.

22        Q.    Okay.  Was Jose Vasquez your supervisor at

23   the styrofoam cup company?

24        A.    Yes.

25        Q.    And was he your supervisor at the airport

1    need, if we need chemicals and all that.

2         Q.    Did he give you his phone number the first

3    time he came?

4         A.    He gave us a card, but I don't remember

5    his name.

6         Q.    Did it have his phone number on it in case

7    you needed to call him?

8         A.    Yes.

9         Q.    Did you have Javier Vasquez' phone number

10   too?

11        A.    Yes.

12        Q.    You said you left ABM on August 28th,

13   2006; is that right?

14        A.    Yes.

15        Q.    Why did you leave?

16        A.    They offered me a better position.

17        Q.    Who's "they"?

18        A.    Varsity Contractors.

19        Q.    And what was the position?

20        A.    Area manager.

21        Q.    So they said, "If you come back to work

22   for us, we'll make you a manager.  Put you on

23   salary," is that what happened?

24        A.    Yes.

25        Q.    And so you said, "Okay.  I'll go work with

Page 180

1   Varsity"?

2        A.   Yes.

3        Q.   Makes sense to me.

4             Have you ever been a member of a union?

5        A.   No.

6        Q.   Now, you said that there were two times

7   where you had safety trainings while you worked at

8   ABM, right?

9        A.   Yes.

10       MS. RYAN:   Okay.  I'm going to mark this

11   exhibit as Number -- 1115?

12       MR. MARTINEZ:   16.

13       MS. RYAN:   16.

14       THE REPORTER:   15.

15       MS. RYAN:   15.

16            (Whereupon Exhibit 1115 was marked.)

17       MS. RYAN:   Go ahead and mark this one as 1116

18   at the same time.

19       THE REPORTER:   Do you want the witness to have

20   this as well?

21       MS. RYAN:   Sure.

22            (Whereupon Exhibit 1116 was marked.)

23   BY MS. RYAN:

24       Q.   Okay.  So looking at Exhibits 1115 and

25   1116, does this refresh your recollection or help

Page 262

1   somebody saw Lupe and Jose kissing?

2       A.   No.  Only Martina.

3       Q.   Martina told you that?

4       A.   Yes.

5       Q.   Is she the one who saw them kissing?

6       A.   Yes.

7       Q.   Yes?

8       A.   Yes.

9       Q.   Okay.  Did you ever hear anything else

10  about anyone else that you thought was sexual

11  harassment, other than what you told me?

12      A.   No.

13      Q.   And you never complained about Jose

14  Vasquez to anyone at ABM, right?

15      MS. GARCIA:  Objection.  Asked and answered.

16      THE WITNESS:  No.

17  BY MS. RYAN:

18      Q.   Is that correct, you never made a

19  complaint?

20      A.   Yes, that's correct.

21      Q.   Did you ever make a complaint to the

22  California Department of Fair Employment and Housing

23  about Mr. Vasquez?

24      A.   Can you repeat that?

25      Q.   Did you ever file a complaint with any --

10/27/2008

Page 295

```
1    STATE OF CALIFORNIA         )
                                 ) ss:
2    COUNTY OF ORANGE            )

3

4         I, LINDA D. WHITE, do hereby certify:

5         That I am a duly qualified Certified Shorthand

6    Reporter, in and for the State of California, holder of

7    certificate number 12009, which is in full force and

8    effect and that I am authorized to administer oaths and

9    affirmations;

10        That the foregoing deposition testimony of the

11   herein named witness was taken before me at the time and

12   place herein set forth;

13        That prior to being examined, the witness named

14   in the foregoing deposition, was duly sworn or affirmed

15   by me, to testify the truth, the whole truth, and

16   nothing but the truth;

17        That the testimony of the witness and all

18   objections made at the time of the examination were

19   recorded stenographically by me, and were thereafter

20   transcribed under my direction and supervision;

21        That the foregoing pages contain a full, true

22   and accurate record of the proceedings and testimony to

23   the best of my skill and ability;

24        That prior to the completion of the foregoing

25   deposition, review of the transcript was requested.
```

1       I further certify that I am not a relative or

2   employee or attorney or counsel of any of the parties,

3   nor am I a relative or employee of such attorney or

4   counsel, nor am I financially interested in the outcome

5   of this action.

6

7       IN WITNESS WHEREOF, I have subscribed my name

8   this __4th__ day of __November__, __2008__.

9

10

11   _Linda D. White_

12   LINDA D. WHITE, CSR No. 12009

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                  296

## HANDBOOK RECEIPT AND ACKNOWLEDGMENT

I acknowledge that I have read and understand the Employee Handbook, and I accept the terms and conditions of employment contained therein.

I understand that this Handbook summarizes the Company's personnel policies and guidelines, and that it is furnished to me solely for my information. I further understand that the policies and procedures contained in the Handbook are not intended to create an employment contract.

I understand that the Company may modify or rescind any of its policies, guidelines, benefits, or practices described in the Handbook at any time, except for its policy of at-will employment and those policies required by law.

Dated: 5-14-04

Claimant 6

(Employee's Printed Name)

_____   Claimant 6

(Employee's Signature)

34                          (02/01)

D0313
CONFIDENTIAL

EXHIBIT
1108

# SEXUAL HARASSMENT INFORMATION SHEET
## ACKNOWLEDGEMENT

I acknowledge that I have been provided with a copy of ABM's Company Policy on Sexual Harassment. I also understand that it is my responsibility to read this information as provided by my employer, and that I may, at any time, review the contents contained within this information sheet with my employer.

Dated: 5-14-04

Claimant 6
(Employee's Printed Name)

Claimant 6
(Employee's Signature)

_(signature)_
(Witness Signature)



**D0317**
**CONFIDENTIAL**


EXHIBIT
111

---

### EMPLOYEE INFORMATION REGARDING THE HARASSMENT HOTLINE®

*Please read carefully, sign below, and return to your supervisor.*

TO:       ALL ABM JANITORIAL SERVICES EMPLOYEES
FROM:     ABM JANITORIAL SERVICES
SUBJECT:  OUR COMMITMENT TO A ZERO TOLERANCE POLICY TOWARD EMPLOYEE HARASSMENT
DATE:     MARCH 1, 1999

---

ABM Janitorial Services has a zero tolerance policy regarding any discriminatory, harassing, or retaliatory conduct in the workplace. Pursuant to that policy, ABM Janitorial Services has subscribed to a telephone reporting/complaint services called the Harassment Hotline so that our employees can readily report such acts including theft, and safety matters without fear of retaliation, job loss, or embarrassment.

The hotline is an unbiased, third party reporting system and satisfies the United State's Supreme Court's position that companies must "...clearly show they provide a simple complaint process that is calculated to encourage victims of harassment to come forward.

We do not anticipate that our employees will need to use the Harassment Hotline.® We expect and assume that all of our employees will conduct themselves free of harassment. However, if it is needed, the service is available and allows ANY employee to report any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party.

For the convenience of our employees, the Hotline can be accessed 24-hours a day, 7-days a week. The toll free number is 1-800-97-STOP IT which is 1-800-977-8674. Our company has a unique identification number. It is 980043. Remember that any employee may call the toll-free telephone number at any time and report harassment, discrimination, retaliation, theft, or any safety concern without fear of retaliation.

Sexual harassment, discrimination, retaliation and other dysfunctional behavior cannot and will not be tolerated under any circumstances. The only way we can stop such behavior in the workplace is by bringing it out into the open by communication and total employee and employer commitment.

---

I have read this document and I understand that I can report any act of harassment (sexual or otherwise) to either a company representative or call the Harassment Hotline® without fear of retaliation or job loss."

Print your name    _Claimant 6_

Sign your name     _Claimant 6_

Date Signed        _5-14-04_

The toll free harassment hotline telephone number is
1-800-97-STOP IT · 1-800-977-8674

Our company identification code is:   980043

D0323
CONFIDENTIAL

EXHIBIT
1112

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 480-2007-01134 |

**California Department Of Fair Employment & Housing** and EEOC
*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Law Office of Mallison & Martinez | (925) 283-3842 | |

| Street Address | City, State and ZIP Code |
|---|---|
| 1042 Brown Ave. Suite A, Lafayette, CA 94549 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| ABM JANITORIAL SERVICES, INC. | 500 or More | (661) 322-3289 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1400 Easton Drive, Suite 149,  Bakersfield, CA 93309 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| ABM INDUSTRIES, INC. | | |

| Street Address | City, State and ZIP Code |
|---|---|
| 160 Pacific Avenue, Suite 222, San Francisco, CA 94111 | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest  01-01-2003   Latest  08-28-2006

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I am filing on behalf of a female Utility Worker who was subjected to verbal and physical sexual harassment from on or about January 2003 through August 28, 2006.  The sexual harassment consisted of, but is not limited to the following:  the female being raped by Jose Vasquez, Supervisor, being invited out to hotels with Mr. Vasquez, being subjected to unwanted sexual comments and innuendos, and Mr. Vasquez would expose his penis to her.  The sexual harassment created a hostile work environment, which led the female to resign from her position on or about August 28, 2006.  I believe other females have been subjected to similar physical and sexual harassment.

Mr. Vasquez threatened to tell Javier Vasquez, Operations Manager, that the female had initiated the sexual advances if she reported the sexual harassment to Respondent.

I believe that the female Utility Worker in question has been discriminated against on the basis of her sex, female.

I believe that a class of females have been discriminated against on the basis of their sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 1/23/07<br>Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME RECEIVED<br>(month, day, year)<br>JAN 2  2007 |

EXHIBIT
1/21