# EXHIBIT

# G

A West Court Reporting Services transcript, reported by LiveNote Certified
Partner: Network Depositions Services



## United States District Court
### Eastern District Of California

### Deposition

### Of

### Clamant 7

### October 6, 2008

### (Exhibits Have Been Bound Separately)

### U.S. Equal Employment Commission,

### V.

### Abm Industries, Et Al.

Page 27

1    met with her?

2        A.   No.

3        Q.   What did Sara Aguirre tell you when you met

4    with her the first time?

5        A.   Well, she asked me if I knew Jose Vasquez.

6        Q.   What did you say?

7        A.   That I did.

8        Q.   What else?

9        A.   She asked me if I had been harassed.

10       Q.   What did you say?

11       A.   I mean I just explained what had happened

12   at my job.

13       Q.   When she asked you if you had been

14   harassed, what did you understand that she was

15   asking you?

16       A.   If I had been touched.

17       Q.   So what did you tell her?

18       A.   I mean I didn't say that I had been touched

19   because I wasn't touched.  But I told her maybe the

20   things that Jose would tell me.

21       Q.   When you say maybe, I want you to tell me

22   what you remember telling her.  So I don't want you

23   to guess.  You can tell me the gist.  Do you

24   understand the difference?

25       A.   Yes.

Page 29

1      A.    No.

2      Q.    Did you work with him anywhere other than

3   at ABM?

4      A.    I mean I didn't work with him.  I worked

5   for ABM.

6      Q.    Right.  Did he work -- go ahead.

7      A.    I would work with somebody else at that

8   place, but he would go there.

9      Q.    Did Jose also work for ABM?

10      A.    Yes.

11      Q.    So for how long did you work for ABM at the

12   same time that Jose Vasquez worked for ABM?

13      A.    I mean I don't know when he worked.  I

14   don't know when he started working there.  I mean I

15   know when I started.  I don't remember either when

16   it is that he started going there.

17      Q.    When did you start working for ABM?

18      A.    At around November 2004.

19      Q.    When did you stop working for ABM?

20      A.    About June/July 2005.

21      Q.    You were a janitor?

22      A.    Yes.

23      Q.    And did you work for, in one building that

24   whole time?

25      A.    Yes.

10/6/2008

Page 32

1    A.    No.  They were not relatives.

2    Q.    The last name is a coincidence?

3    A.    Yes.

4    Q.    Was Natalie nice?

5    A.    Yes.

6    Q.    Were you friends?

7    A.    Yes.

8    Q.    Have you stayed in touch with Natalie since

9  you left working for ABM?

10   A.    No.

11   Q.    Have you talked to her even one time since

12 you left working at the clinic?

13   A.    Yes.

14   Q.    When is the last time you talked to Natalie

15 Vasquez?

16   A.    It would be when she got married.  It was

17 about two years ago, but I don't remember the month.

18   Q.    Did you go to the wedding?

19   A.    Yes.

20   Q.    Have you talked to Natalie since her

21 wedding?

22   A.    No.

23   Q.    Can you tell me all the things that -- let

24 me ask you this.  After you started working for ABM

25 in about November of 2004, how long were you working

10/6/2008

Page 33

1    before the first time you met Jose Vasquez?

2        A.    I think approximately about three or four

3    months.

4        Q.    So it was three or four months that you

5    worked there before you saw him; is that right?

6        A.    Yes.  I think so.

7        Q.    So that would put us in like February or

8    March of 2005?

9        A.    Approximately.

10       Q.    Can you please describe for me the first

11   time you saw Jose Vasquez.

12       A.    He got there one night, and since I did not

13   know him, I got scared, and he told me not to be

14   scared; that he worked for ABM.

15       Q.    Did he have supplies with him?

16       A.    I didn't see.

17       Q.    Did he have a shirt on that said ABM on it?

18       A.    I don't remember.

19       Q.    So was Sierra Vista Clinic a medical

20   clinic?

21       A.    Yes.

22       Q.    Was it offices?

23       A.    What do you mean offices?

24       Q.    Well, was it business offices, too, or just

25   a place where people go for medical treatment?

10/6/2008

Page 93

1    you that first meeting?

2        A.   Not that I remember.

3        Q.   Did he tell you his name?

4        A.   Yes.

5        Q.   Did you tell him your name?

6        A.   Well, how I was called, yes.

7        Q.   Okay.  And did you say anything else to him

8    that day?

9        A.   Not that I remember.

10       Q.   Did he say anything else to you that day?

11       A.   Not that I remember.

12       Q.   Okay.  So how long did you talk to him that

13   first meeting?

14       A.   Maybe like few minutes.

15       Q.   When was the next time you saw him?

16       A.   Approximately about one or two weeks later.

17       Q.   That was also during your shift at the

18   clinic?

19       A.   Yes.

20       Q.   Was Natalie working during that shift?

21       A.   Yes.

22       Q.   Did Jose Vasquez say anything to you that

23   second time you saw him?

24       A.   I think that's when he started asking me if

25   I was married, how long I had been married.

1    don't know exactly how many times.

2        Q. . BY MS. RYAN:  Okay.  And then other than

3    that, you saw him one time at Mrs. Vasquez's

4    funeral, right?

5        A.   Yes.

6        Q.   So other than seeing Jose Vasquez at work

7    and seeing Jose Vasquez at Mrs. Vasquez's funeral,

8    have you ever seen him any other time or place?

9        A.   No.

10       Q.   So you said that the second time you saw

11   Jose Vasquez, he asked if you were married; is that

12   right?

13       A.   Yes.

14       Q.   And did you tell him how long you had been

15   married?

16       A.   Yes.

17       Q.   Did he say anything else to you during that

18   second meeting?

19       A.   I don't remember if it was at that time or

20   at another occasion that he said that since I had

21   gotten married so young, that like I was not in love

22   with my husband.  I don't remember if it was on that

23   occasion that he started saying that I was like, I

24   don't know, like too pretty to have that job; he

25   also mentioned that he had a lot of women.  He would

10/6/2008

Page 99

1   also go there and invite me to go and dance with

2   him.

3       Q.   I understand that you don't remember

4   exactly on which meetings he said what; is that

5   right?

6           MS. GARCIA:   I'm not sure she was done.

7   Can you ask her if she was done?

8           THE WITNESS:   Everything that he would tell

9   me, no.

10      Q.   BY MS. RYAN:   Okay.   So I understand that

11  you don't remember the occasions on which maybe he

12  said what.   And I know that I started by asking you

13  about on that second meeting, but it sounds like

14  you're telling me now a list of all the things you

15  remember him saying to you; is that right?

16      A.   Yes.   Because it was on several occasions

17  that he would ask me the same thing.

18      Q.   Okay.   So he would -- you said you saw him

19  at work five or six times approximately, right?

20      A.   Approximately.

21      Q.   Okay.   Your shift was three hours long,

22  right?

23      A.   Yes.

24      Q.   Do you remember when you would see him at

25  work, how long his visit would last?

Page 100

1     A.   About 20 to 30 minutes.

2     Q.   Would he talk to Natalie, too?

3          MS. GARCIA:   Objection; calls for

4     speculation.

5          ·THE WITNESS:   Sometimes.

6     Q.   BY MS. RYAN:   So when he would come and

7     visit, would he talk to you and Natalie could hear

8     or could Natalie not hear what he was saying to you?

9          MR. MARTINEZ:   Objection; calls for

10    speculation.. Go ahead and answer if you can.

11         THE WITNESS:   We were separate, so you

12    couldn't hear.

13    Q.   BY MS. RYAN:   Okay.   So you were giving me

14    a list of the things that you are telling me that

15    Jose Vasquez said to you.   Here's what I have so

16    far.

17         He asked if you were married, he asked how

18    long you were married.   Did either of those

19    questions bother you?

20    A.   Yes.

21    Q.   Why?

22    A.   Well, it was a work place.   There was no

23    reason why he had to ask me that.

24    Q.   Okay.   Other than those two questions, you

25    said that he said to you, you got married so young,

10/6/2008

Page 101

1  you're not in love with your husband, right?

2     A.   Yes.

3     Q.   He said that you're too pretty to have this

4  job?

5     A.   Yes.

6     Q.   He mentioned that he had had a lot of

7  women?

8     A.   Yes.

9     Q.   And by that, did you understand that he

10  meant he had had sex with a lot of women?

11     A.   Yes.

12     Q.   Did he specifically say that?

13     A.   Well, he didn't say that.  But he had also

14  said that he had had a lot of children and he didn't

15  even know exactly how many he had.

16     Q.   You said that he invited you to go and

17  dance with him?

18     A.   Yes.

19     Q.   Is there anything else he ever said to you

20  on any visit that you didn't like?

21     A.   I didn't necessarily like the way that he

22  would look at me or follow me.  And when I was like

23  in the bathrooms, he would go in there as I was

24  cleaning them.

25         MS. GARCIA:  I just want to state for the

1    get more hours because Natalie was not going to be

2    there anymore.

3         Q.   Did he say anything else at that time?

4         A.   That I could have more hours.

5         Q.   You said it was on your last day of work.

6    Did you know it was your last day of work?

7         A.   No.

8         Q.   Did you quit or were you fired?

9         A.   Well, I was never told that I was fired,

10   but Natalie just told me that we were not going to

11   work there anymore.

12        Q.   When did Natalie tell you that?

13        A.   The next day.

14        Q.   Did she call you?

15        A.   Yes.

16        Q.   Did she say why you weren't going to work

17   there anymore?

18        A.   She said that there were like complaints,

19   that there was something.

20        Q.   Complaints by who?

21        A.   From a worker in the clinic.

22        Q.   About what?

23        A.   Exactly, I don't know, but it was something

24   relating to Natalie that -- something that Natalie

25   had said to that employee that she had not liked,

Page 107

1   and that's the only thing that she told me.

2       Q.   Did Javier ever tell you you weren't going

3   to be working there anymore?

4       A.   I called them that day that Natalie told

5   me, and he told me that there was a complaint

6   against Natalie, and since I worked with Natalie,

7   then he had to remove both of us from there.

8       Q.   Do you know what the complaint was?

9       A.   No.

10      Q.   Did he tell you he would transfer you to

11  another place?

12      A.   Well, he asked me that if I did want to

13  work somewhere else, it would have to be in

14  Bakersfield.

15      Q.   Did you say you did not want to transfer to

16  Bakersfield?

17      A.   Yes.

18      Q.   So did you tell him you didn't want to work

19  anymore for ABM?

20      A.   Yes.

21      Q.   Because you didn't want to transfer to

22  Bakersfield?

23      A.   Yes.

24      Q.   Your last day of work when Jose Vasquez was

25  telling you there would be changes and that you

1  recollection, what day was your last day of work?

2      A.   I don't remember.

3      Q.   Is there anything else that Jose Vasquez

4  ever said to you that you were bothered by?

5      A.   Not that I remember.

6      Q.   Jose Vasquez never touched you, right?

7      A.   No.

8      Q.   But you said that he did some things you

9  didn't like, right?

10     A.   Yes.

11     Q.   The ones you told me were that you didn't

12 like the way he looked at you or followed you into

13 the bathrooms, right?

14     A.   Yes.

15     Q.   And also that on your last day of work, he

16 stood too close to you when he was telling you

17 about, that Natalie wouldn't be working there

18 anymore?

19     A.   Yes.

20     Q.   Did he ever do anything else that bothered

21 you?

22     A.   Just the invitations to dancing and the

23 questions in regards to my life.

24     Q.   Is there anything else you haven't told me

25 that Jose Vasquez ever did that bothered you?

10/6/2008

Page 113

1  Natalie about Jose?

2      A.    No.

3      Q.    Did you ever tell Natalie that Jose Vasquez

4  was saying things to you that you didn't like?

5      A.    That occasion, not that I remember.

6      Q.    On any occasion?

7      A.    It's just that occasion.  That's what I

8  remember.

9      Q.    You only told her about the time with

10  permission to go to the wedding?  Is that right?

11      A.    I think so.

12      Q.    Did Jose Vasquez ever ask you to have sex

13  with him?

14      A.    No.

15      Q.    Did he ever suggest to you that you should

16  have sex with him?

17      A.    No.

18      Q.    Did he ever suggest to you that if you did

19  not have sex with him, your job would be in

20  jeopardy?

21      A.    No.

22      Q.    Did he ever suggest that your work would be

23  easier if you had sex with him?

24      A.    No.

25      Q.    Did he ever suggest that your work would be

10/6/2008

Page 114

1  easier if you let him touch you?

2     A.   No.

3     Q.   Did you ever joke around with Jose Vasquez

4  at work?

5     A.   No.

6     Q.   Did Mr. Vasquez ever use any crude language

7  around you?

8        MS. GARCIA:  Objection as to the term

9  crude.  I'm not sure if she understands.

10     Q.   BY MS. RYAN:  I mean language that you

11  wouldn't want to use in front of your mother.

12     A.   No.

13     Q.   Did he ever use the word "fuck" in front of

14  you?

15     A.   Not that I remember.

16     Q.   Did he ever use the word "chingar" in front

17  of you?

18     A.   Yes.

19     Q.   How many times?

20     A.   About two times.  One or two times.

21     Q.   Can you tell me the sentence he used with

22  that word in it?

23     A.   No.  I don't remember.

24     Q.   You never told Jose Vasquez he was making

25  you really uncomfortable, did you?

1        A.    Not in those words.  But I told him not to

2    say that to me.

3        Q.    Did you ever report Mr. Jose Vasquez to

4    anyone?

5        A.    No.

6        Q.    Did you ever make a complaint about him?

7        A.    No.

8        Q.    Did you ever tell Javier Vasquez that Jose

9    Vasquez was bothering you?

10        A.    No.

11        Q.    Did you ever tell Ruben Vasquez that Jose

12    Vasquez was bothering you?

13        A.    No.

14        Q.    You knew that Jose Vasquez and Ruben

15    Vasquez were related?

16            THE INTERPRETER:  I'm sorry.  What was the

17    second thing?

18        Q.    BY MS. RYAN:  Ruben Vasquez and Jose

19    Vasquez are related?

20        A.    Yes.

21        Q.    Did you ever tell Lucy Vasquez that Jose

22    Vasquez was bothering you?

23        A.    Yes.

24        Q.    When did you tell Lucy Vasquez that?

25        A.    I think that I had already stopped working

1    there.

2        Q.    Was it on one occasion that you talked to

3    Lucy Vasquez about this?

4        A.    Yes.

5        Q.    Where were you?

6        A.    At home.

7        Q.    At your house?

8        A.    Yes.

9        Q.    And what did you say to her?

10       A.    I just told her that he would invite me to

11   go to the dance.

12       Q.    Did you tell her that you didn't like it?

13       A.    Yes.

14       Q.    What did Lucy say back?

15       A.    That he had always been like that, like a

16   womanizer; that he had always been like the black

17   sheep of his home.

18       Q.    Did you say anything else to Lucy about

19   Jose Vasquez?

20       A.    No.

21       Q.    Did she say anything else to you?

22       A.    Not that I remember.

23       Q.    Did you ever tell your husband that Jose

24   Vasquez bothered you?

25       A.    Yes.

1   that you don't remember?

2       A.   I don't know.

3       Q.   Well, this is your chance to tell me

4   everything that Jose Vasquez did that you didn't

5   like.  To the best of your recollection, as you sit

6   here right now, have you told me everything that

7   Jose Vasquez said to you that you didn't like?

8       A.   Yes.

9       Q.   Have you told me everything that Jose

10  Vasquez ever did near you or around you that you

11  didn't like?

12      A.   Yes.

13      Q.   Before the break, we were talking about

14  complaints.  You never talked to anyone about Jose

15  Vasquez bothering you other than Lucy Vasquez and

16  your husband, right?

17          MS. GARCIA:  Objection.  That misstates her

18  testimony.  I think she testified as to Natalie.

19          THE WITNESS:  Yes.

20      Q.   BY MS. RYAN:  So did you talk to anyone

21  else about Jose Vasquez bothering you?

22      A.   My husband, Lucy, Natalie.

23      Q.   That's it?

24      A.   Yes.

25      Q.   You never at any time made a complaint to

1   the California Department of Fair Employment and

2   Housing about Jose Vasquez, did you?

3       A.   No.

4       Q.   Did you know that ABM has a Human Resources

5   Department?

6       A.   No.

7       Q.   Do you know what a Human Resources

8   Department is?

9       A.   No.

10      Q.   As you sit here today, you don't know what

11  Human Resources is?

12      A.   Not by that name.   Does it have another

13  name?

14      Q.   Do you know that ABM has a department where

15  you can go to say if you're having problems at work?

16      A.   No.

17      Q.   Did you ever get any papers attached to

18  your paycheck?

19          MS. GARCIA:   Objection as to the phrase

20  papers.   It's vague.

21      Q.   BY MS. RYAN:   Was there ever any note or

22  notice attached with your paycheck?

23      A.   Not that I remember.

24      Q.   Do you read Spanish?

25      A.   Yes.

1      Q.    The investigator did not tell you that?

2      A.    She said that there was an investigation

3   that was being done.  But she did not speak about

4   other women.

5            MS. RYAN:  This is probably a good time to

6   go off the record to let our interpreter make a

7   phone call.

8            THE VIDEOGRAPHER:  Going off the record,

9   the time is 3:57 P.M.

10                    (Recess taken.)

11           THE VIDEOGRAPHER:  We are back on the

12  record.  The time is 4:09 P.M.

13     Q.    BY MS. RYAN:  Ms. Portillo, why did you

14  wait more than two years after you left your

15  employment with ABM to file a lawsuit?

16     A.    There were investigations that needed to be

17  done, follow certain, follow certain steps.

18     Q.    But you didn't file a lawsuit for two years

19  after you left ABM, right?

20           MS. GARCIA:  I'm going to object.  The

21  lawsuit it's named EEOC or Equal Employment

22  Opportunity Commission versus ABM.

23     Q.    BY MS. RYAN:  You never filed any complaint

24  against ABM with any government agency, right?

25     A.    No.

Page 137

1    Q.   And you never filed any complaint against

2  Jose Vasquez with any government agency, right?

3    A.   Yes.

4    Q.   Have you ever sought any type of medical

5  care as a result of the harms caused by Jose

6  Vasquez?

7    A.   No.

8    Q.   Are there any sort of physical problems you

9  suffered that you attribute to ABM?

10   A.   I mean problems, just when I was working

11 there, now that I'm remembering.  But --.

12   Q.   As you sit here today, do you have any

13 physical problems that you think are the result of

14 the actions of Jose Vasquez?

15       MS. GARCIA:  Objection as to the term

16 physical.  I'm not sure she understands.

17   Q.   BY MS. RYAN:  Do you understand the

18 question?

19   A.   No.

20   Q.   You know what a physical ailment is, right?

21   A.   You mean, right now I can tell you my head

22 hurts.

23   Q.   Well, other than -- is your head hurting

24 just from concentrating today on the deposition?

25   A.   Maybe, and the thinking and remembering

Page 150

1  STATE OF CALIFORNIA        )
                             ) ss:
2  COUNTY OF LOS ANGELES      )

3

4        I, JUDITH SCHLUSSEL, do hereby certify:

5        That I am a duly qualified Certified Shorthand

6  Reporter, in and for the State of California, holder of

7  certificate number 4307, which is in full force and

8  effect and that I am authorized to administer oaths and

9  affirmations;

10        That the foregoing deposition testimony of the

11  herein named witness was taken before me at the time and

12  place herein set forth;

13        That prior to being examined, the witness named

14  in the foregoing deposition, was duly sworn or affirmed

15  by me, to testify the truth, the whole truth, and

16  nothing but the truth;

17        That the testimony of the witness and all

18  objections made at the time of the examination were

19  recorded stenographically by me, and were thereafter

20  transcribed under my direction and supervision;

21        That the foregoing pages contain a full, true

22  and accurate record of the proceedings and testimony to

23  the best of my skill and ability;

24        That prior to the completion of the foregoing

25  deposition, review of the transcript was requested.

1      I further certify that I am not a relative or

2  employee or attorney or counsel of any of the parties,

3  nor am I a relative or employee of such attorney or

4  counsel, nor am I financially interested in the outcome

5  of this action.

6

7      IN WITNESS WHEREOF, I have subscribed my name

8  this <u>16th</u> day of <u>October</u>      , <u>2008</u> .

9

10

11

JUDITH SCHLUSSEL, CSR No. 4307

12

13

14

15

16

17

18

19

20

21

22

23

24

25

151

# EXHIBIT

# H

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---

U.S. EQUAL EMPLOYMENT            ) Case No.
OPPORTUNITY COMMISSION,          )
                                 ) 1:07CV01428 LJO-TAG
                Plaintiff,       )
                                 )
        vs.                      )
                                 )
ERIKA MORALES AND ANONYMOUS      )
PLAINTIFFS ONE THROUGH EIGHT,    )
                                 )
        Plaintiff Intervenors,   )
                                 )
        vs.                      )
                                 )
ABM INDUSTRIES INCORPORATED      )
AND ABM JANITORIAL SERVICES,     )
INC.; ABM JANITORIAL NORTHERN    )
CALIFORNIA; JOSE VASQUEZ; DOES   )
1 - 10 INCLUSIVE,                )
                                 )
                Defendants.      )
                                 )

VIDEOTAPED DEPOSITION OF *Claimant 8*
MONDAY, AUGUST 17, 2009
10:23 a.m.

JOB NO. 17522



## CERTIFIED COPY

**David Feldman**
W o r l d w i d e

From File to Trial ™

California  |  New York  |  Texas
www.david-feldman.com

21

1          (Whereupon, Defendants' Exhibit No. 700

2          was marked for identification.)

3          MS. GARCIA:   Is that the witness's copy?

4          MS. HAYWARD:   Oh, yeah.

5    BY MS. HAYWARD:

6          Q.   If you would please take a look at

7    Exhibit 700.   Take a minute to look at it.   It is

8    a four-page document.

9          A.   (Witness complies.)

10         Q.   When you are ready, you can let me know.

11         A.   I'm ready.

12         Q.   Do you recognize this document?

13         A.   Yes.

14         Q.   Is this -- does this look like the

15   application that you filled out before starting

16   work at ABM?

17         A.   Yes.

18         Q.   And did you, in fact, fill the

19   application out before you started working at ABM?

20         A.   Yes.

21         Q.   And it looks like the date on the

22   application is November 22nd, 2004?

23         A.   Correct.

24         Q.   Does that refresh your memory as to when

25   you started working at ABM?

22

1      A.    Yeah.

2      Q.    Do you remember if it was on that date

3   or later in November?

4      A.    Maybe a couple of days after the date of

5   the application.

6      Q.    Okay.  If you could look at -- is

7   everything on the first page -- as you sit here

8   today, does everything on that first page look

9   accurate to you as of the time you filled it out?

10     A.    Yeah.

11     Q.    And if I could have you look at the

12  second page, employment history.

13     A.    Okay.

14     Q.    And does -- is this a fair summary of

15  your employment history at the time that you

16  filled out this application?

17     A.    Yes.

18     Q.    And when you say on -- under "Pam,

19  Inc.," it says "Reason for leaving, Job Ended,"

20  what does that mean?

21     A.    Well, me and my boyfriend Jude worked as

22  a team.  We were hired as a team.

23     Q.    Okay.

24     A.    And they want -- he worked the office.

25  I worked the maintenance part.  And they wanted to

42

1      Q.   And did you do the same types of duties

2  at the ACS building?

3      A.   Yes.

4      Q.   Was there anything different about your

5  employment at the ACS building other than the fact

6  that it was a different building and there were

7  other people working?

8      A.   The same.

9      Q.   And did your pay rate change when you

10  went to the ACS building?

11      A.   No.

12      Q.   Did you ever receive any warning --

13  performance warnings while you were working at

14  ABM?

15      A.   No.

16      Q.   Did Joe ever tell you anything about

17  your performance?

18      A.   No.

19      Q.   Did Javier ever tell you anything about

20  your performance?

21      A.   No.  I was always in the green.

22      Q.   I'm sorry?

23      A.   They have a scale.  Green meaning well

24  and yellow meaning, ah, so what, and red meaning

25  bad work.  And I was always graded in the green.

43

1      Q.   And how did you know you were graded in

2   the green?

3      A.   Because they would come and show us the

4   paper stating that -- where we were on that scale.

5      Q.   Okay.  And who would typically show you

6   that?

7      A.   Ruben or Joe.

8      Q.   And was it -- what did the document look

9   like that they would show you?

10      A.   It was a paper.  And it had little

11   bubbles, little circles.

12      Q.   Was it actually green, or did it just

13   say --

14      A.   No.  It -- it had to check off -- they

15   checked off -- the bosses or supervisors would

16   check off, you know, if we did well in this area

17   or not good in this area, you know, floors,

18   dusting, whatnot, bathrooms.  They would check off

19   the areas, and then they would grade it at the

20   bottom.

21      Q.   Okay.  And approximately how many times

22   during your employment do you remember seeing a

23   performance sheet like this?

24      A.   I want to say once a month.

25      Q.   Okay.  And would Ruben or Joe come to

44

1    the location you were working to show you this, or

2    would you be shown it when you came into the

3    office?

4        A.    They would come to the location.

5        Q.    So during the entire time you worked at

6    ABM, no one told you that there were any problems

7    with your performance?

8        A.    No.

9        Q.    Is that correct?

10       A.    Nobody, yes.

11           MS. GARCIA:  "Yes," that's correct?

12           THE WITNESS:  Yes, that's correct.  I'm

13   sorry.

14   BY MS. HAYWARD:

15       Q.    Now, how often did you see Javier during

16   the time you were employed at ABM?

17           Would you see him -- strike that.

18           Why don't I ask the question.

19           How often would you see Javier in a

20   typical week or month?

21       A.    I wouldn't see Javier until payday.

22       Q.    Okay.  So you -- did Javier ever come

23   out to any of the sites you were working at?

24       A.    No.

25       Q.    So you only saw Javier in the office?

49

```
 1        Q.   And he chuckled.  Did he say anything
 2   else in response?
 3        A.   No.
 4        Q.   Did he say anything in response?
 5        A.   No, he didn't.
 6        Q.   Did you ever ask any of the other two,
 7   Ruben or Javier, whether they were related?
 8        A.   No.
 9        Q.   Did any of the three ever tell you that
10   they were related?
11        A.   No.
12        Q.   At some point you stopped working at
13   ABM, correct?
14        A.   Yes.
15        Q.   And approximately when did you stop
16   working there?
17        A.   I don't remember.
18        Q.   Why did you stop working there?
19        A.   I had women problems.
20        Q.   Okay.
21        A.   And I needed to get surgery done.
22        Q.   So you stopped working because you had
23   to -- some kind of a medical condition --
24        A.   Yeah.
25        Q.   -- that you needed to get surgery for?
```



50

1      A.    Yeah.

2      Q.    And did you ever take a leave of

3   absence?

4      A.    Well, it was supposed to be a leave of

5   absence.  And Javier told me, once I got cleared

6   by the doctor, to bring back the notice, and he

7   would put me back to work.

8      Q.    Did you ever bring a notice back to

9   Javier?

10      A.    Yes.  I brought the notice back to

11   Javier after I was cleared from the doctor, and he

12   told me he did not have any work for me, to go

13   collect Unemployment.

14      Q.    And can you recall where this

15   conversation took place?  Was it in the office?

16      A.    Actually, I dropped off the notice.  He

17   told me to call him that next Wednesday to find

18   out if there was any openings or work, he would

19   place me, and that is over the phone is when he

20   told me to go collect Unemployment.

21      Q.    And did you ever call Javier again to

22   see whether any openings had come up?

23      A.    Yes.

24      Q.    And approximately, how long after that

25   first conversation?

55

1    She is a claimant.  She is not suing anybody.

2              MS. HAYWARD:   Okay.  Let me rephrase.

3    BY MS. HAYWARD:

4       Q.   Why are you participating in the lawsuit

5    against ABM?

6       A.   Because I had an incident with Joe.

7       Q.   Okay.  And is that Joe Vasquez?

8       A.   Yes.

9       Q.   And when did that incident occur?

10      A.   I don't remember the year, but I

11   remember it was December 4th because it was my

12   birthday.

13      Q.   Was it the year that you started working

14   there?

15      A.   I believe so.

16      Q.   Okay.  And where did the incident take

17   place?

18      A.   At the Clinica Sierra Vista in Arvin.

19      Q.   What happened?

20      A.   He came in through the back hallway and

21   sat down on one of the roller chairs in the office

22   while I was dusting.  And I told him, "You know

23   it's my birthday.  You can give me this day off."

24   And he went to grab for my shirt and tried to sit

25   me on his lap and which I pulled away from him and

56

1   went back around the other side of the counter and

2   continued my work and then he left.

3      Q.   Okay.  So when you said he went to grab

4   your shirt and pull you on his lap, did he

5   actually physically touch you?

6      A.   Yes.

7      Q.   Where did he touch you?

8      A.   On my side, right here by my hip.

9      Q.   So on your left side?

10     A.   My left side.

11     Q.   And you said he went to grab your shirt.

12  So did he, in fact, pull on your shirt?

13     A.   Yes.

14     Q.   And did he succeed in pulling you onto

15  his lap?

16     A.   No, he didn't.

17     Q.   What did you do after he tried to grab

18  your shirt?

19     A.   I just pulled away and went on with my

20  duties.

21     Q.   And did Joe say anything to you at the

22  time that this was taking place?

23     A.   No.  I think he got the idea when I

24  pulled away from him.

25     Q.   Did you say anything back to him --

57

1      A.   No.

2      Q.   -- as you were pulling away?

3      A.   No.  I just went on with my job and --

4      Q.   Did Joe stay sitting on the rolling

5   chair for a while, or did he leave right after the

6   incident?

7      A.   He sat there for a few minutes.  He

8   yawned and then he got up and he walked out, said

9   he was leaving.

10      Q.   And was Joe there to bring you supplies

11   on that date?

12      A.   Yes.

13      Q.   And when Joe dropped off supplies, did

14   he typically hang out for a while, or did he

15   usually drop them off and leave?

16      A.   Sometimes he would walk through the

17   clinic and look around.  But most of the time he

18   would drop off the supplies and then leave.

19      Q.   Before Joe left on that day, did you say

20   anything to him?

21      A.   No.

22      Q.   Did you ever tell anybody at ABM about

23   this incident?

24      A.   No.

25      Q.   So you never told Javier about the



58

1    incident?

2        A.   No.

3        Q.   You never told Ruben about the incident?

4        A.   No.

5        Q.   Did you ever report the incident to

6    anyone at ABM's HR Department?

7        A.   No.

8        Q.   Why not?

9        A.   I needed my job.

10       Q.   And why do you think that reporting the

11   incident would have affected your ability to keep

12   your job?

13       A.   For the fact that they looked related,

14   real striking resemblance amongst Javier, Joe, and

15   Ruben.

16       Q.   So based on the fact that Ruben, Javier,

17   and Joe looked related, you felt like you couldn't

18   report the incident?

19       A.   Correct.

20       Q.   Did you ever talk to any of the --

21   anyone else that was employed at ABM about the

22   incident?

23       A.   No.

24       Q.   Did you tell any of your family members

25   about the incident?



59

1    A.    Just my daughter Alicia.

2    Q.    What did you tell her?

3    A.    I was contemplating on telling my

4    fiance.

5    Q.    Is that -- you told Alicia you were

6    thinking about telling your fiance?

7    A.    Yes.

8    Q.    And what did she say?

9    A.    She didn't know what to say.

10   Q.    Did you tell your fiance about the

11   incident?

12   A.    No, I didn't.

13   Q.    And is this Jude that we are talking

14   about?

15   A.    Yes.

16   Q.    Why didn't you tell Jude about the

17   incident?

18   A.    I was afraid to.

19   Q.    Why were you afraid to tell him?

20   A.    For the fact that he'd probably go and

21   confront him, and I would lose my job.

22   Q.    And prior to this incident on

23   December 4th, had Joe Vasquez ever done anything

24   that was inappropriate to you?

25   A.    I thought it was inappropriate when

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123  (212)705-8585

60

1    they would -- he would come unannounced.

2         It was late at night.  I'm in a building

3    by myself, and the areas that we entered --

4    actually the clinic, it was a back alleyway.  And

5    he would come through that back door without no

6    keys jiggling, at least you can hear change in the

7    pocket while they were coming down the hallway.

8    It was very, very quite.  I was in the bathroom

9    scrubbing the toilet, and I couldn't even hear him

10   coming down the hallway.  And I come out of the

11   bathroom area, and he is standing there, which

12   startled me many times.  And I thought that was

13   very inappropriate.

14        Q.   Did you ever say anything to him?

15        A.   Yes, I did.  I started carrying a can of

16   mace, and I told him, "You guys got to let me know

17   when you come in this building so that I know you

18   are coming so that I don't end up spraying you."

19        Q.   And what did he say as a response?

20        A.   He just looked at me and said, "Okay"

21   and then walked off.

22        Q.   And in the future did he do anything to

23   announce his presence before he --

24        A.   Yes.

25        Q.   -- arrived?

61

1      A.    Yes.

2      Q.    What would he do?

3      A.    As soon as he got in the garage, he

4    would yell,  _Claimant 8_

5      Q.    And other than arriving unannounced and

6    the incident where he tried to pull you onto his

7    lap, was there anything else that Joe Vasquez did

8    that you considered to be inappropriate to you?

9      A.    No.

10     Q.    Did Mr. Vasquez ever make any comments

11   to you that you thought were inappropriate?

12     A.    No.

13     Q.    Did he ever make any comments of a

14   sexual nature to you?

15     A.    No.

16     Q.    Other than the incident where he tried

17   to pull you onto his lap, did Joe Vasquez ever

18   touch you in any way you thought was inappropriate?

19     A.    No.

20     Q.    Did Mr. Vasquez ever ask you out on a

21   date?

22     A.    No.

23     Q.    Did Mr. Vasquez ever ask you to have sex

24   with him?

25     A.    No.

62

1    Q.    Did Mr. Vasquez ever promise you

2  anything in return for going out on a date or

3  having sex with him?

4    A.    No.

5    Q.    And after the incident on December 4th,

6  did Joe Vasquez continue to come to the work sites

7  that you were working at?

8    A.    Not really.  That's when I -- it came to

9  that time when I was picking up my supplies every

10 time I picked up my check.  See him very rarely.

11   Q.    Okay.  So after December 4th, you didn't

12 call Joe for supplies anymore?  You would pick

13 them up yourself?

14   A.    I would call him, but he would be either

15 up on the hill -- Frazier Park or something -- and

16 tell me he would get to me the next day, and I

17 needed those supplies.  So I took it upon myself

18 to get them myself.

19   Q.    Okay.  After the incident on

20 December 4th, did Mr. Vasquez ever do anything to

21 you that you considered inappropriate?

22   A.    No.

23   Q.    Did he ever do anything to you after

24 December 4th --

25   A.    No.

63

1        Q.    -- that you considered to be of a sexual

2    nature?

3        A.    No.

4        Q.    When is the last time that you seen

5    Mr. Vasquez -- Mr. Joe Vasquez?

6        A.    Since the last I worked for him.

7        Q.    Okay.  So after your employment at ABM

8    ended, have you ever seen Joe Vasquez?

9        A.    No.

10        Q.    And were there any witnesses to the

11    incident on December 4th?

12        A.    No.

13        Q.    And did -- when Joe would come to the

14    work sites that you were working at, would you

15    guys speak to each other in English or Spanish?

16        A.    English.  I don't speak Spanish.

17        Q.    That's an easy one then.

18            Did Mr. Vasquez ever joke around with

19    you when he was at the work sites?

20        A.    No.

21        Q.    Did he ever have any discussions with

22    you other than about the job?

23        A.    No.

24        Q.    Did you ever make any complaints to the

25    Department of Fair Employment and Housing --

64

1      A.   No.

2      Q.   -- about ABM?

3      A.   No.

4      Q.   About -- did you ever make any

5  complaints to the Department of Fair Employment

6  and Housing about Joe Vasquez?

7      A.   No.

8      Q.   Did you ever have any conversations with

9  any other ABM employees about Joe Vasquez?

10     A.   No.

11     Q.   Did any other ABM employees ever tell

12  you that Joe Vasquez had done anything inappropriate

13  to them?

14     A.   No.

15     Q.   Are you aware of whether any other ABM

16  employee had ever made any complaints about

17  Mr. Vasquez -- Mr. Joe Vasquez?

18     A.   No.

19     Q.   So you are not aware of any -- sorry.

20  Let me ask that question again.

21          Are you aware of any other employees,

22  ABM employees, who made complaints about Joe

23  Vasquez?

24     A.   Now I am.

25     Q.   Okay.  During the time that you worked

72

1      A.    After -- when I got home.

2      Q.    Okay.  So after you received the

3   employee handbook, you reviewed the policy?

4      A.    Uh-huh.

5      Q.    And did you notice on page 22 it says if

6   you witness unlawful harassment on the job, you

7   are expected to report it immediately to your

8   supervisor any other member of management or any

9   local resource representative?

10     A.    Correct.

11     Q.    But it is your testimony that you never

12  reported any harassment while you were working at

13  ABM?

14     A.    Correct.  I wouldn't report it because

15  seeing that they looked related, I wouldn't go to

16  my supervisor, because he was a supervisor so --

17     Q.    Was there any other management personnel

18  working at the office located on California

19  Street, to your knowledge?

20     A.    No.

21     Q.    Do you remember the name Rick Stiner?

22     A.    Big boss.

23     Q.    Okay.  Did you ever report any incident

24  of harassment to Rick Stiner?

25     A.    No.

73

1     Q.   But Rick Stiner didn't look related to

2  Joe, Javier and Ruben, did he?

3     A.   No.

4     Q.   So why didn't you report it to him?

5     A.   Just didn't.

6     Q.   Okay.

7     A.   Like I said, I needed my job.

8         MS. HAYWARD:  I'm going to introduce

9  Exhibit 704.

10        (Whereupon, Defendants' Exhibit No. 704

11        was marked for identification.)

12  BY MS. HAYWARD:

13     Q.   Let me know when you are ready to

14  proceed.

15     A.   Okay.

16     Q.   Does that appear to be your signature on

17  the bottom of the page?

18     A.   Yes, ma'am.

19     Q.   And the printed name and date above,

20  does that also look like your handwriting?

21     A.   Yes.

22     Q.   Do you recall signing this document

23  on -- when you first started at ABM?

24     A.   This refreshes my memory, yes.

25     Q.   And were you, in fact, provided with a

74

1    copy of ABM's company policy on sexual harassment?

2        A.   Yeah.

3        Q.   Did you sign understanding that it was

4    your responsibility to read the information?

5        A.   Yes.

6        Q.   And did you, in fact, review the

7    information in the harassment policy?

8        A.   Yes.

9            MS. HAYWARD:   Next exhibit will be 705.

10           (Whereupon, Defendants' Exhibit No. 705

11           was marked for identification.)

12           THE WITNESS:   Okay.

13   BY MS. HAYWARD:

14       Q.   Do you recall ever having received a

15   copy of this document?

16       A.   This all here with the 800 number, I

17   don't recall that.

18       Q.   Okay.  So you are not sure if you

19   received a copy of this exact document?

20       A.   Yeah.  I don't recall.

21       Q.   Do you know for a fact that you didn't

22   receive it, or you just don't remember?

23       A.   I don't remember.

24       Q.   I'm going to ask you to actually look

25   back at Exhibit 703, the handbook?

77

1      A.   Yes.

2      Q.   And do you recall receiving a document

3  that looked like this that contained employee

4  instructions, information and work rules when you

5  started working at ABM?

6      A.   Well, apparently I did, because that is

7  my signature on there.

8      Q.   But do you have any recollection of

9  receiving --

10     A.   No.

11     Q.   -- a document that looks like this?

12     A.   No.

13     Q.   But you -- you signed it, so you

14  probably received one?

15        Is that what you are saying?

16     A.   Yeah.

17        MS. HAYWARD:  I have another exhibit I'm

18  going to mark 707.

19        (Whereupon, Defendants' Exhibit No. 707

20        was marked for identification.)

21        THE WITNESS:  Okay.

22  BY MS. HAYWARD:

23      Q.   Is that your signature and handwriting

24  at the bottom of the page --

25      A.   Yes.

78

1    Q.   -- on Exhibit 707?

2    A.   Yes.

3    Q.   And does this refresh your memory about

4    the harassment hotline we were talking about

5    earlier?

6    A.   Yeah.

7    Q.   So do you recall receiving this document

8    discussing the harassment hotline?

9         MS. GARCIA:   Objection; vague as to

10   time.

11   BY MS. HAYWARD:

12   Q.   You can answer.

13        Do you recall having received a copy of

14   this document when you started your employment at

15   ABM?

16   A.   Yeah.

17   Q.   So you were aware that there was a

18   harassment hotline, correct?

19   A.   I guess so.   I signed it.

20        MS. GARCIA:   We don't want you to guess.

21   We just want you to give your testimony.

22        THE WITNESS:   Okay.   I don't remember.

23   BY MS. HAYWARD:

24   Q.   Okay.   But you didn't ever call the

25   harassment hotline at any time during your



84

1     A.    Correct.

2     Q.    And how long would you say that the

3  December 4th incident lasted?

4     A.    Split-second.

5     Q.    And on that -- do you recall what time

6  in the night or evening that the incident

7  occurred?

8     A.    I would say probably around 8:00.

9     Q.    And on that occasion, can you recall how

10  long Mr. Vasquez -- Mr. Joe Vasquez was at the

11  Clinica in your presence?

12     A.    Maybe about 25 -- 25 minutes -- 25 or

13  30 minutes.

14     Q.    And did the incident occur at the

15  beginning of that time period or the end?

16     A.    Probably like at the beginning.

17     Q.    And I believe previously you said after

18  you pulled away from Mr. Vasquez that he didn't do

19  anything further, correct?

20     A.    Correct.

21     Q.    Do you recall what Mr. Vasquez was doing

22  for the remaining time that he was there on that

23  evening?

24     A.    Just looking around.  He sat on that

25  chair for a while -- for a few more minutes and

91

1                    REPORTER'S CERTIFICATE

2

3          I, CYNTHIA R. POLA, CSR No. 11204, Certified

4     Shorthand Reporter, certify:

5          That the foregoing proceedings were taken

6     before me at the time and place therein set forth,

7     at which time the witness was put under oath by

8     me;

9          That the testimony of the witness, the

10    questions propounded, and all objections and

11    statements made at the time of the examination

12    were recorded stenographically by me and were

13    thereafter transcribed;

14         That the foregoing is a true and correct

15    transcript of my shorthand notes so taken.

16         I further certify that I am not a relative

17    or employee of any attorney for the parties, nor

18    financially interested in the action.

19         I declare under penalty of perjury under the

20    laws of California that the foregoing is true and

21    correct.

22         Dated this 27th day of August, 2009.

23

24    _____

25    CYNTHIA R. POLA, CSR No. 11204

# SEXUAL HARASSMENT INFORMATION SHEET ACKNOWLEDGMENT

I acknowledge that I have been provided with a copy of ABM's Company Policy on Sexual Harassment. I also understand that it is my responsibility to read this information as provided by my employer, and that I may, at any time, review the contents contained within this information sheet with my employer.

Dated: _11.22.04_

_Clamant 8_
(Employee's Printed Name)

_Clamant 8_
(Employee's Signature)

_____
(Witness Signature)

ABM-643 [4/00]

704

 **Janitorial Services**

> Attn: Supervisors!
> Original to Personnel File
> Copy to Employee

---

## EMPLOYEE INFORMATION REGARDING THE HARASSMENT HOTLINE®

*Please read carefully, sign below, and return to your supervisor.*

**TO:** ALL ABM JANITORIAL SERVICES EMPLOYEES
**FROM:** ABM JANITORIAL SERVICES
**SUBJECT:** OUR COMMITMENT TO A ZERO TOLERANCE POLICY TOWARD EMPLOYEE HARASSMENT
**DATE:** MARCH 1, 1999

---

ABM Janitorial Services has a zero tolerance policy regarding any discriminatory, harassing, or retaliatory conduct in the workplace. Pursuant to that policy, ABM Janitorial Services has subscribed to a telephone reporting/complaint services called the Harassment Hotline so that our employees can readily report such acts including theft, and safety matters without fear of retaliation, job loss, or embarrassment.

The hotline is an unbiased, third party reporting system and satisfies the United State's Supreme Court's position that companies must "..clearly show they.provide a simple complaint process that is calculated to encourage victims of harassment to come forward.

We do not anticipate that our employees will need to use the Harassment Hotline®. We expect and assume that all of our employees will conduct themselves free of harassment. However, if it is needed, the service is available and allows ANY employee to report any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party.

For the convenience of our employees, the Hotline can be accessed 24-hours a day, 7-days a week. The toll-free number is 1-800-97-STOP-IT which is .1-800-977-8674. Our company has a unique identification number. It is 980043. Remember that any employee may call the toll-free telephone number at any time and report harassment, discrimination, retaliation, theft, or any safety concern without fear of retaliation.

Sexual harassment, discrimination, retaliation and other dysfunctional behavior cannot and will not be tolerated under any circumstances. The only way we can stop such behavior in the workplace is by bringing it out into the open by communication and total employee and employer commitment.

---

"I have read this document and I understand that I can report any act of harassment (sexual or otherwise) to either a company representative or call the Harassment Hotline® without fear of retaliation or job loss."

Print your name _____ Claimant 8 _____

Sign your name _____ Claimant 8 _____

Date signed _____ 11-22-04 _____

The toll free harassment hotline telephone number is
**1-800-97-STOP-IT • 1-800-977-8674**

Our company identification code is: **980043**

707

# EXHIBIT

# I

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

_____

U.S. EQUAL EMPLOYMENT          ) Case No.
OPPORTUNITY COMMISSION,        )
                               ) 1:07CV01428 LJO-TAG
                Plaintiff,     )
                               )
        vs.                    )
                               )
ERIKA MORALES AND ANONYMOUS    )
PLAINTIFFS ONE THROUGH EIGHT,  )
                               )
    Plaintiff Intervenors,     )
                               )
        vs.                    )
                               )
ABM INDUSTRIES INCORPORATED    )
AND ABM JANITORIAL SERVICES,   )
INC.; ABM JANITORIAL NORTHERN  )
CALIFORNIA; JOSE VASQUEZ; DOES )
- 10 INCLUSIVE,                )
                               )
            Defendants.        )
                               )

DEPOSITION OF *Claimant 9*
WEDNESDAY, FEBRUARY 24, 2010
3:23 P.M.

JOB No. 18790-B



CERTIFIED COPY

**David Feldman**
W o r l d w i d e

From File to Trial™

1          Q.   Did you talk with Javier also at the same

2     office --

3          A.   Yes.

4          Q.   -- as the lady with the brown hair?

5               What did you and Javier talk about?

6          A.   Me and my sister went in there, both of us.

7          Q.   Do you remember --

8          A.   I don't remember.

9          Q.   -- what he said to you?

10         A.   He just asked me, like, questions.  Like

11    "If we hired you for this company, what would you

12    bring to this company?"  Or, like, just -- I don't

13    know.  Like job questions.

14         Q.   I want to show you a document.

15              MS. ROBINSON:  We are on 2006.  Is that

16    correct?

17              (Whereupon, Defendants' Exhibit 2006

18               was marked for identification.)

19    BY MR. ROBINSON:

20         Q.   Does this document look familiar to you at

21    all?

22         A.   I think it is the application.

23         Q.   And if I can direct your attention to the

24    date in the upper right-hand corner, it says

25    "July 25th, 2006."  Does that -- is that the day you



31

1    applied?

2         A.    I think so.

3         Q.    Is all the handwriting -- let's look at

4    Page 1 first.

5              Is all the handwriting on that page your

6    handwriting?

7         A.    Yes.

8         Q.    And turn to Page 2.

9         A.    (Witness complies.)

10        Q.    And at the top it looks like you list your

11   previous employers.  It says "Kirby Company."  And

12   it looks like you worked there from December 1st,

13   2005 to January 1st, 2006.

14             Does that sound about right for the time

15   you worked at Kirby?

16        A.    Yeah.

17        Q.    And then the reason for leaving Kirby, it

18   says you went back to school.

19             Was that when you went to the medical

20   assistant program?

21        A.    I don't think I went back to school.

22        Q.    Okay.

23        A.    I was planning on to, and then I didn't.

24        Q.    By the time you left Kirby, that was why

25   you left?

32

1          A.    That's why I left.

2          Q.    At the time you talked to Javier and he

3     asked you kind of interview questions, did he say

4     anything else to you?

5          A.    No.   Like what?

6          Q.    He tell you -- did he tell you where you

7     were going to be working?

8          A.    No.

9          Q.    At that time, on the day you applied and

10    talked to Javier, did he hire you then?

11         A.    He -- yeah.   The same day he hired me.

12         Q.    Did he hire you, like, right there on the

13    spot when you were talking to him?

14         A.    Yeah, me and my sister, both.   He just

15    said that he needed to find where he was going to

16    put us, and that's it.

17         Q.    Okay.   Did he tell you anything else?

18    Like, did he tell you what your pay was going to be?

19         A.    Huh-uh.

20         Q.    Did he tell you what date you would be

21    starting?

22         A.    No.

23         Q.    Did you talk about any other -- like terms

24    of employment or what your employment would be like?

25         A.    Huh-uh.

36

1    what the papers were for?

2          MS. GARCIA:   Which papers are you talking

3    about?

4          MS. ROBINSON:   The papers she said she

5    picked up when she went to the office prior to her

6    first day of work.

7          THE WITNESS:   It was just like the manual

8    papers, where it told you how to lift the -- like it

9    was mostly to show you how to -- what you were going

10   to be doing, not to be -- to wear what kind of

11   shoes.

12   BY MS. ROBINSON:

13        Q.   Okay.

14        A.   And to wear jeans and, like, the dress

15   code and stuff.

16        Q.   So like company policy-type stuff?

17        A.   Like -- yeah.   It was like a little

18   booklet.

19        Q.   And you said it was about dress code and

20   how to lift things?

21        A.   Yeah.   That's all I -- I just flipped

22   through it.

23        Q.   Do you recall the date of your first day

24   of employment with ABM?

25        A.   No.

37

1      Q.   You said it was probably a couple of days

2   after the day you applied?

3      A.   Yeah.  So like 20 -- like the 29th or the

4   28th, I believe.

5      Q.   What were your job duties when you first

6   started working at ABM?

7      A.   Cleaning the restrooms.  Cleaning,

8   mopping, sweeping and then mopping the floors.

9      Q.   And I guess you were at a mall location?

10      A.   Yes.

11      Q.   So was that all the floors throughout the

12   entire mall?

13      A.   Yeah, except for the ones in the stores.

14      Q.   Do you wash windows?

15      A.   Not that I recall.

16      Q.   Vacuum at all?

17      A.   Some of the -- the -- what you think --

18   the -- like the -- the rugs.  They were -- I can't

19   remember where they were, but I think that is all

20   that we would vacuum, I believe.  I never vacuumed,

21   but the other girl would vacuum.

22      Q.   So it sounds like primarily you would mop

23   the floors and clean the bathrooms; is that correct?

24      A.   Yes.

25      Q.   Who did you report to when you first started

43

1    she was talking about those documents?

2         A.   Yes.

3         Q.   Do you remember asking any questions about

4    those documents?

5         A.   She was just pointing, and then she would

6    say something, and then she would move along quickly,

7    and then she would go to the next one, because there

8    was, like, a stack.

9         Q.   So to the best of your recollection, you

10   didn't ask any questions --

11        A.   No.

12        Q.   -- or follow-up questions?

13             MS. GARCIA:   Objection; asked and answered.

14   BY MS. ROBINSON:

15        Q.   Okay.   I'm going to show you the first

16   document.

17             MS. ROBINSON:   We'll mark this as 2007.

18             (Whereupon, Defendants' Exhibit 2007

19             was marked for identification.)

20   BY MS. ROBINSON:

21        Q.   Take a minute to look over that.

22   Actually, let me show you this.   Never mind.

23             Does this document look familiar to you at

24   all?

25        A.   Not really.   That is my signature.

44

1    Q.   Is that your handwriting for name and the

2  date also?

3    A.   Uh-huh.

4    MS. GARCIA:   Is that a "yes"?

5    THE WITNESS:  Yes.  Sorry.

6  BY MS. ROBINSON:

7    Q.   And the date says "April 26th"?

8    A.   Yeah.

9    Q.   Is -- that would be prior to when you

10  remember being employed by ABM, correct?

11    A.   Yes.

12    Q.   Were you ever employed by ABM in April of

13  2000?

14    A.   No.  I don't know what is up with that.

15    Q.   But do you think this was probably one of

16  the documents you received that first day?

17    A.   Probably.

18    Q.   Okay.  Did you ever read this prior to

19  right now?

20    A.   No.

21    Q.   Do you recall if you received this document

22  in English as well?

23    A.   I don't remember.

24    Q.   Did you have any understanding that this

25  document says that you can report any act of

46

1    time during your employment -- that ABM had a policy

2    not to retaliate against you for making harassment

3    complaints?

4         A.    Huh-uh.

5             MS. GARCIA:  Is that a "no"?

6             THE WITNESS:  No.  Sorry.

7    BY MS. ROBINSON:

8         Q.    Okay.  I'm going to quickly show you this

9    next document.  It is the same information regarding

10   the harassment hotline.  It is just the English

11   version.

12             MS. GARCIA:  Is this 2008?

13             MS. ROBINSON:  Yes.  This is 2008.

14             (Whereupon, Defendants' Exhibit 2008

15              was marked for identification.)

16   BY MS. ROBINSON:

17        Q.    And just briefly, do you have -- does this

18   look familiar to you?

19        A.    Nope.

20        Q.    But again, is that your signature at the

21   bottom?

22        A.    Uh-huh.  Yes.

23        Q.    Thank you.

24             Is that your handwriting in the name and

25   date spaces?

47

1          A.   Yes.

2          Q.   And, like, the last one, do you think the

3     date should actually be July 26th, '06?

4          A.   I don't know.

5          Q.   Do you recall ever being employed in

6     April 2006?

7          A.   No.

8          Q.   I will show you another document.

9               MS. ROBINSON:   And this will be 2009.

10    This is a sexual harassment information sheet

11    acknowledgment.

12               (Whereupon, Defendants' Exhibit 2009

13               was marked for identification.)

14               THE WITNESS:   That's her name.   Seraya.

15    BY MS. ROBINSON:

16          Q.   Oh, is that -- that's the brown-haired

17    lady?

18          A.   Yeah.

19          Q.   Does this document look familiar to you at

20    all?

21          A.   No.  I just -- oh, sorry.

22          Q.   No.  Go ahead.

23          A.   No.

24          Q.   Okay.  Is that your signature at the bottom?

25          A.   Yes.

48

1      Q.    Is that your handwriting under the name

2   section?

3      A.    Yes.

4      Q.    And the date, is that your handwriting?

5      A.    Yes.

6      Q.    Do you think you received this on that

7   first day when you applied at ABM at the office?

8      A.    I don't remember.

9      Q.    Okay.  Do you recall ever receiving this

10   document?

11      A.    Uh-huh.  No.

12      Q.    Do you remember ever reading it before

13   just right now?

14      A.    No.

15      Q.    Did you have any understanding that you

16   were signing to say that you had received a copy of

17   ABM's sexual harassment policy?

18           MS. GARCIA:  Objection; vague as to time.

19   BY MS. ROBINSON:

20      Q.    At the time you signed this.

21      A.    No.

22      Q.    Had you ever been provided ABM's sexual

23   harassment policy?

24      A.    Not that I remember.

25      Q.    Did you have any understanding of ABM's

54

1          MS. GARCIA:   Objection; asked and answered.

2     BY MS. ROBINSON:

3          Q.    You can answer.

4          A.    No.

5          Q.    Okay.  The next thing I will show you

6     is -- we'll mark this 2012.  It is a handbook

7     receipt and acknowledgement.  Take a second to

8     review that.

9          A.    (Witness complies.)

10               (Whereupon, Defendants' Exhibit 2012

11               was marked for identification.)

12    BY MS. ROBINSON:

13         Q.    Do you remember receiving this document

14    ever?

15         A.    No.  I think -- I don't remember.

16         Q.    Do you think you might have received it on

17    that first day when you applied?

18         A.    I remember she didn't have any handbooks,

19    so I think she just maybe had given me this.

20         Q.    Okay.  So do you think you filled this out

21    and signed it on that day?

22         A.    Yeah.

23         Q.    Is that your handwriting and signature on

24    this document?

25         A.    Yes.

55

1      Q.   You said she told you -- did she tell you

2  she didn't have any handbooks?

3      A.   Yeah.  She told me that she would give it

4  to me later.

5      Q.   Did she ever give it to you later?

6      A.   When I picked it up.

7      Q.   Was that the booklet you were referring to?

8      A.   Yes.

9      Q.   Prior to your first day of work when you

10 went to pick up papers?

11     A.   Yeah.

12     Q.   Okay.  Was it your understanding that that

13 booklet was ABM's employee handbook?

14     A.   Uh-huh.  Yes.

15     Q.   Next document I want to show you is ABM's

16 employee handbook.  This will be 2014.

17          MS. GARCIA:  -13?

18          MS. ROBINSON:  -14.  Oh, you're right.  I

19 skipped -12.  It's -13.

20          (Whereupon, Defendants' Exhibit 2013

21          was marked for identification.)

22 BY MS. ROBINSON:

23     Q.   Just let me know when you have had a

24 chance to review it.

25     A.   Okay.

56

1    Q.   Does that look like the handbook that you

2    received?

3    A.   Yeah.

4    Q.   When you started at ABM?

5    A.   Yes.

6    Q.   Did you read it when you first started

7    with ABM?

8    A.   No.

9    Q.   Did anyone tell you you should read it?

10   A.   No.  She just handed it to me.

11   Q.   Did you think it was your responsibility

12   to read it?

13   A.   I don't know.

14   Q.   Can you turn your attention quickly to

15   Page 21?

16   A.   (Witness complies.)

17   Q.   Page 21 lays out the harassment -- Page 21

18   through 23 is the harassment and retaliation

19   policies.

20        Do you recall ever reviewing these pages?

21        MS. GARCIA:  Objection; vague as to time.

22   BY MS. ROBINSON:

23   Q.   When you first started with ABM, did you

24   ever review these pages?

25   A.   No.

59

1   A.   I think the office.

2   Q.   Did you consider yourself a good employee

3   while you were at ABM?

4   A.   Yes.

5   Q.   Did you ever receive any verbal or written

6   warnings about your work performance?

7   A.   No.

8   Q.   Were you ever suspended from your employment?

9   A.   Yes.

10   Q.   For what?

11   A.   I think he said it was because he had

12   talked to the security and they said that somebody

13   was leaving early that worked the nightshift.

14   Q.   When you say "he," who is he?

15   A.   Joe.

16   Q.   When did this occur?

17   A.   I don't remember the date.

18   Q.   Do you remember how soon after?  Like from

19   the time you first started, how soon after that this

20   occurred?

21   A.   I think it was towards the ending, like --

22   well -- well, towards the ending -- sorry.  Like

23   after I started working, maybe like a month and a

24   half.

25   Q.   So you think it was, like, August 2006 or

60

1    September 2006?

2         A.   Yeah.   September, or August.

3         Q.   Okay.   How did you find out you were being

4    suspended?

5         A.   He came up to me, and he told me that I

6    was -- that he was going to let me go.

7         Q.   Were you suspended or terminated?

8         A.   I think I was suspended.

9         Q.   And what were the reasons he gave?

10        A.   He said it was because somebody had told

11   him -- one of the security guards told him that one

12   of the employees had been leaving early.

13        Q.   Did he know -- did Joe know whether it was

14   you that was leaving early?

15        A.   I'm guessing that's why he told me.

16             MS. GARCIA:   We don't want you to guess.

17             THE WITNESS:   I don't know:   I don't know

18   if he --

19   BY MS. ROBINSON:

20        Q.   Had you been leaving early?

21        A.   No.

22        Q.   Do you know if another employee was leaving

23   early?

24        A.   Yes.

25        Q.   Who was leaving early?

61

1         A.    The girl with the brown hair.

2         Q.    The skinny girl that you talked about?

3         A.    Yeah, before.

4         Q.    Okay.  Were you told how many days you

5 were suspended for?

6         A.    He said until further notice.

7         Q.    Okay.  Did -- and "until further notice,"

8 did he ever give you further notice of anything?

9         A.    No.

10        Q.    Did you ever talk to Joe after that incident?

11        A.    No.

12        Q.    So the last time you talked to him is when

13 he said you were suspended; is that correct?

14        A.    Yes.

15        MS. GARCIA:  Can we take a break whenever

16 you get a chance?

17        MS. ROBINSON:  Yeah.  Like, ten seconds.

18 BY MS. ROBINSON:

19        Q.    Were you disciplined any other time during

20 your employment with ABM?

21        A.    No.

22        MS. ROBINSON:  Okay.  We can take a break.

23        THE VIDEOGRAPHER:  We're off the record at

24 4:28 p.m.

25        (Recess taken.)

1    you like Joe?

2         A.   I didn't -- like, as a boss?  I didn't

3    really know him.  Yeah.  I was just there to work

4    so --

5         Q.   But you didn't dislike him when you first

6    started?

7         A.   No.

8         Q.   Would you say you just had like a normal

9    work relationship with him at first?

10        A.   Uh-huh.  Yes.  Sorry.

11        Q.   While you were working, how often did you

12   see Joe?

13        A.   Like, in the office or in the East Hills

14   Mall?

15        Q.   Both.  Like in an average week when you

16   were working, how many days would you see Joe?

17        A.   Like twice.

18        Q.   Okay.  And was that -- was it usually

19   about twice throughout the whole month and a half or

20   two months you were working?

21        A.   I think it was, like, twice, and then

22   maybe three times in the last week.

23        Q.   Okay.  Do you know why sometimes you saw

24   him more?  Was it for any particular reason?

25        A.   The third time that I saw him in that week



84

1    is when he suspended me.

2         Q.    Did you usually see him when he would come

3    to your location at the mall?

4         A.    Yeah.

5         Q.    And did you -- you said you sometimes also

6    saw him in the office?

7         A.    Yes.

8         Q.    How often did you see him in the office?

9         A.    I think I just saw him, like, three times

10   at the office or four times, like, when I went to

11   pick up my check and the two times -- the first two

12   times that I saw him.

13        Q.    Okay.  Did you usually speak to each other

14   in Spanish or English?

15        A.    Spanish mostly, but, like -- well, I think

16   it was mostly Spanish.

17        Q.    When you would see Joe when he would come

18   to your location at the mall, would you interact

19   with him on all those occasions?

20        A.    No, not all of them.

21        Q.    So sometimes would you just see him?

22        A.    Yeah.

23        Q.    How often would you actually interact with

24   him or speak with him during a week?

25        A.    During a week?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585



85

1          Q.   (Nods head.)

2          A.   I don't think I interacted with him until

3     the very end, cause one time we were -- I was

4     mopping, and he just like -- like, he was standing

5     there, and he kind of, like, scared me so --

6     because he was -- he didn't make a noise, and I felt

7     like someone was looking at me, and he turned around

8     and told me, "You missed a spot."  I see nothing so

9     I just cleaned where he pointed.  And then he

10    started asking me questions like, "Where were you

11    born?"  And I told him I -- where I was born.  And

12    he asked me if I had a boyfriend, when did I

13    graduate high school, and then how old was I, and

14    was this my -- like, my first job, and just -- I

15    answered all the questions.

16         Q.   Was that incident where you were mopping

17    and he came up and kind of surprised you, was that

18    the first time you actually spoke with him after the

19    time you first met him in the office?

20         A.   I think it might have been the second

21    time.  I think it was the second time.

22         Q.   Do you remember the first time you

23    interacted with him after the initial time when you

24    met him in the office?

25         A.   When I was throwing -- because I would

87

1    Q.    When did he ask you if you needed a ride?

2    A.    The same night after all the -- he was

3    asking me all the questions.  My dad was late so the

4    security guards were outside waiting with me, and he

5    was leaving, I guess, and he asked me if I wanted a

6    ride on home.  And I said, "No.  Thank you."

7    Q.    And did he say anything?

8    A.    He said, "Are you sure?"  And I said,

9    "Yes."

10    Q.    Did he leave after that?

11    A.    Yes.

12    Q.    When was the first time that Joe did

13    something that you felt was inappropriate towards

14    you?

15    A.    Towards me?  When he was asking me all

16    those questions, I didn't like -- like, I didn't

17    think -- why did he need to know if I had a

18    boyfriend, or why did he need to know how old was I

19    or if it was my first job?  I felt kind of

20    uncomfortable.  But I was, like, he is my boss so I

21    guess I got to answer the questions.

22    Q.    Had you ever been asked those kind of

23    questions at your previous job at Kirby?

24    A.    No.

25    Q.    Has any of your supervisors at Target

88

1      asked you those kind of questions?

2          A.    No.

3          Q.    When was the next time he did something

4      that you thought was inappropriate?

5          A.    Towards me?

6          Q.    Towards you.

7          A.    It was that same day when he -- I caught

8      him looking at my boobs when I -- it was so weird.

9      When I was -- when he told me I missed a spot.  And

10     when I was cleaning it, I had to bend over and clean

11     it because I had the rag.  I had the mop, but it was

12     all wet.  I didn't see nothing so I just cleaned it

13     with a rag, and I looked up, and I caught him

14     looking at my -- like, my boobs, and I was, like,

15     weird.

16         Q.    So that was all kind of during the same

17     incident with the mop?

18         A.    Yeah.

19         Q.    Did he say anything about your boobs?

20         A.    No.

21         Q.    Was there anything else that day that you

22     felt that he did was inappropriate?

23         A.    No.

24         Q.    After that what was the next thing that

25     you think he did that was inappropriate?

92

1    was no possible way you could get trained in there.

2        Q.   Is that because the room was small?

3        A.   The machine was big and the room was

4    small.

5            So the fact that he was trying to get me

6    into that creepy room, and he was creeping me out

7    was because -- I don't know why, but it was just

8    weird.  It was very uncomfortable.  It was -- it was

9    like he was trying to force me to do something that

10   I didn't want to do.  I didn't mind getting trained,

11   but I knew there was no way -- you can't get trained

12   in that room with that machine.

13       Q.   So he tried to get you into the room.

14           Did he say anything else other than just

15   "I'll go train you in the room" or "We are going to

16   do the training in the room"?

17           MS. GARCIA:  Other than what she testified

18   earlier about her being defiant?

19   BY MS. ROBINSON:

20       Q.   Yes.

21       A.   He just asked me, like, four or five times

22   to go into the room, that that is where I needed to

23   get trained.

24       Q.   And your response each time he kept asking

25   you that?  What was your response?

93

```
 1        A.   I was -- well, I went from "Can you bring

 2   it outside, please?  Or the other one was "I

 3   can't -- I can't.  I can't get trained in there.

 4   The machine is too big."  And "I can't use the

 5   machine in that room."  And the other -- like two

 6   times was like, "Can you please bring it outside?"

 7        Q.   Okay.  And when did he tell you you were

 8   being defiant?

 9        A.   When I -- when he told me, "If you

10   don't" -- like he -- he, like, basically said, "Okay

11   then, so I'm not going to train you."  Because he

12   goes -- he goes, "Oh, okay then."  And then he goes,

13   "I don't understand why you are being defiant."

14        Q.   What did you say when he said that?

15        A.   I said I'm not -- I just said -- I was,

16   like, "I don't think I'm being defiant."

17        Q.   Did he say anything else after that?

18        A.   He just told me -- no.  I don't think he

19   said anything.  I don't remember if he said anything

20   else after that.

21        Q.   At that point did he leave?

22        A.   I thought he did.  I think he did.  I'm

23   not sure.

24        Q.   Did you see him the rest of the night

25   after that?
```

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123 (212)705-8585

94

1      A.   I can't remember.

2      Q.   Did he -- during this conversation, did he

3  touch you at all?

4      A.   No.

5      Q.   And you said the other girl, the skinny

6  girl, was in the building at the time?

7      A.   Uh-huh.  Yes.

8      Q.   Did she witness this conversation?

9      A.   No.

10     Q.   Did anyone else witness this conversation?

11     A.   No.  Maybe the security.

12     Q.   The security guards?

13     A.   The cameras.

14     Q.   And what about the first incident you

15  described where you were mopping and he looked at

16  your boobs, was -- did anyone see that happen other

17  than you and Joe?

18     A.   The cameras.  I don't know.  Nobody else.

19  Like, personally, nobody else.

20     Q.   After the -- after he tried to get you to

21  go into the room, that incident, did you complain to

22  anyone about that?

23     A.   No.

24     Q.   How come?

25     A.   Because I just went home after that.  And

95

1    then the next day when I came into work was when he

2    suspended me.

3        Q.   Did you ever consider complaining to someone

4    about that?

5        A.   I didn't know I could complain.  I didn't

6    know -- I just thought I was -- I just thought I

7    was -- I thought I was just -- how do you say it?  I

8    don't know how to say it.  I didn't think it was --

9    I don't know.  I just thought it was something

10   normal.  I don't know why.  I mean, other than the

11   feeling creeped out -- but I didn't -- I don't know

12   how to explain it.

13       Q.   Did you --

14       A.   Like, it was my first job, and it was my

15   first, like, you know, my first real job, and I was

16   young, so I didn't -- I didn't know anything.  I

17   didn't know I could explain.  I didn't know I could

18   tell somebody that he was trying to force me to go

19   into that room, and I really didn't want to go in

20   there, that I really couldn't -- you know, that if

21   they would check, you can't get trained in that

22   room.  I didn't know I could complain about it.

23       Q.   Did you ever complain to anyone about the

24   time you were mopping and he looked at your boobs

25   and asked you where you were born and all that?

96

1      A.    I never complained.  I didn't think -- he

2  did that to other girls that, like, worked in the

3  mall, not ABM, but like in the stores.  So I thought

4  he was being like -- how do you say it?  Like --

5  like just -- like, I don't know how to say it.  It

6  is just -- I just thought he was just -- because,

7  like, he would always look at the other girls, and I

8  didn't think nothing of it.  He didn't touch me or

9  anything so I didn't think I could complain about

10  that.

11      Q.    Okay.  Did you ever tell Joe he was making

12  you feel uncomfortable?

13      A.    No.

14      Q.    So he never touched you?

15      A.    No.

16      Q.    Did he ever ask you out?

17      A.    No.  He just asked me if I wanted a ride

18  home.  That's it.

19      Q.    Did he ever ask you to have sex with him?

20      A.    No.

21      Q.    Did you complain to any co-workers about --

22      A.    No.

23      Q.    -- those incidents you described?

24      A.    (Witness shakes head.)

25      Q.    Other than those two days you described,

131

REPORTER'S CERTIFICATE

1

2

3      I, CYNTHIA R. POLA, CSR No. 11204, Certified

4  Shorthand Reporter, certify:

5      That the foregoing proceedings were taken

6  before me at the time and place therein set forth,

7  at which time the witness was put under oath by me;

8      That the testimony of the witness, the

9  questions propounded, and all objections and

10  statements made at the time of the examination were

11  recorded stenographically by me and were thereafter

12  transcribed;

13      That the foregoing is a true and correct

14  transcript of my shorthand notes so taken.

15      I further certify that I am not a relative or

16  employee of any attorney for the parties, nor

17  financially interested in the action.

18      I declare under penalty of perjury under the

19  laws of California that the foregoing is true and

20  correct.

21      Dated this 8th day of March, 2010.

22

23

24  CYNTHIA R. POLA, CSR No. 11204

25

## INFORMACIÓN PARA EMPLEADOS SOBRE EL SISTEMA AUTOMÁTICO DE LÍNEA TELEFÓNICA ESPECIAL PARA PRESENTAR QUEJAS DE ACOSO

### ***POR FAVOR LEA COMPLETAMENTE, FIRME Y DEVUELVA A SU SUPERVISOR.***

A: TODOS LOS EMPLEADOS, DE ABM JANITORIAL SERVICES
DE: ABM JANITORIAL SERVICES
ASUNTO: NUESTRA LÍNEA TELEFÓNICA PARA PRESENTAR QUEJAS DE PRÁCTICAS COMERCIALES ILÍCITAS, INCLUYENDO ACOSO, FRAUDE CONTABLE O DE AUDITORÍA, DISCRIMINACIÓN, REPRESALIAS Y OTROS ASUNTOS
FECHA: AUGUST 1, 2004

El 2 de abril de 2004, Harassment Hotline presentó una versión nueva del sistema Harassment (Corporate Accountability) Hotline® (el sistema "Hotline"), sistema automático para presentar quejas que permite a los empleados informar de violaciones o infracciones tales como acoso ilícito, abuso y fraude en la empresa, discriminación, represalias, robos, infracciones de las medidas de seguridad, fraude relativo a indemnizaciones por accidentes de trabajo y fraude por abuso médico, que los empleados observen o de los que sean víctimas en el lugar de trabajo.

ABM Janitorial Services no tolerará acto alguno que viole o infrinja cualquiera de las normas de notificación que estén cubiertas por el sistema Hotline ni cualquier otro acto civil o penal que interfiera con las actividades comerciales que realizamos.

El sistema Hotline le brinda un medio de comunicación con terceros imparciales y responde a la posición adoptada por la Corte Suprema de los Estados Unidos en cuanto a que las compañías deben "... demostrar claramente que brindan un proceso sencillo para presentar quejas que esté pensado para alentar a las víctimas de acoso por parte de terceros [y de cualquier otro acto ilícito, como por ejemplo fraude contable o de auditoría] a presentarse e informar del caso".

Confiamos en que nuestros empleados no tengan que usar el sistema Harassment (Corporate Accountability) Hotline® porque esperamos y suponemos que la conducta de todos nuestros empleados estará exenta de acoso alguno o cualquier otro acto ilícito. Aún así, en caso de ser necesario, el servicio del sistema Hotline está a su disposición las 24 horas del día, los 7 días de la semana.

El número de teléfono gratuito es 1-800-87-STOP IT (1-800-977-8674). Nuestra compañía tiene un número de identificación especial: 980043. El sistema Hotline usa la más alta tecnología de voz interactiva y requiere que la persona que llame pulse botones para responder a preguntas básicas durante la llamada inicial. Al finalizar la llamada, quien llama recibirá un número de confirmación especial que le servirá para demostrar que ha notificado un evento cubierto. Por lo general, en un plazo de 12 horas del informe inicial, un profesional se comunicará con usted para revisar lo informado por usted y luego recibir cualquier otra información pertinente. A continuación se enviará el informe completo a su empleador. Después a criterio de la ABM Janitorial Services llevar a cabo una investigación completa y detallada, de lo informado.

"He leído este documento y me consta que puedo llamar para informar de cualquier acto de acoso ilícito o informar en forma anónima de algún abuso contable o fraude de auditoría, discriminación, ya sea a un representante de la compañía o llamar al sistema Harassment (Corporate Accountability) Hotline® sin temor alguno de sufrir represalias o de quedarme sin trabajo".

Nombre impreso    Claimant 9

Firma    Claimant 9

Fecha de firma    4-26-06

El número de teléfono gratuito para llamar al sistema Hotline es:

1-800-87-STOP IT - 1-800-977-8674

El código de identificación de nuestra compañía es: 980043

Atención: Supervisor
Original al Expediente de Personal
Copia al Empleado

DEFT(S) 2007 PLF(S) ____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: September 24, 2010
WITNESS:

ABM Janitorial Services

2007

# EMPLOYEE INFORMATION REGARDING THE HARASSMENT HOTLINE®

### * * * PLEASE READ FULLY, SIGN BELOW AND RETURN TO YOUR SUPERVISOR. * * *

TO:        ALL EMPLOYEES

FROM:      ABM JANITORIAL SERVICES

SUBJECT:   OUR COMMITMENT TO A ZERO TOLERANCE POLICY AGAINST EMPLOYEE HARASSMENT

DATE:      JANUARY 1, 1999

ABM Janitorial Services has a zero tolerance policy regarding any discriminatory, harassing, or retaliatory conduct in the workplace. Pursuant to that policy, ABM Janitorial Services has subscribed to a telephone reporting/complaint service called the Human Resources ("HR") Harassment Hotline® so that our employees can readily report such acts (as well as theft and safety matters) without fear of retaliation, job loss or embarrassment.

The hotline is an unbiased, third party reporting system and satisfies the United State's Supreme Court's position that companies must "...clearly show they provide a simple complaint process that is calculated to encourage victims of harassment to come forward."

We do not anticipate that our employees will need to use the HR Harassment Hotline®, as we expect and assume that all of our employees will conduct themselves free of harassment. Still, if it is needed, the service is available and allows ANY employee to report any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party.

For the convenience of our employees, the Hotline can be accessed 24 hours per day, 7 days per week. The toll-free number is 1-800-97-STOP IT which is 1-800-977-8674. Our Company has a unique identification number, it is 980043. Remember that any employee may call the toll-free telephone number at any time and report harassment, discrimination, retaliation, theft, or any safety concern without fear of retaliation.

Sexual harassment, discrimination, retaliation and other dysfunctional behavior cannot and will not be tolerated under any circumstances. The only way we can stop such behavior in the workplace is bring it out into the open by communication and total employee/employer cooperation.

"I have read this document and I understand that I can report any act of harassment (sexual or otherwise) to either a company representative or call the HR Harassment Hotline® without fear of retaliation or job loss."

Print your name   _Claimant 9_

Sign your name    _Claimant 9_

Date signed   _4-26-06_

### The toll free harassment hotline telephone number is:
### 1-800-97-STOP IT • 1-800-977-8674
### Our Company Identification Code is: 980043

Attn: Supervisor
   Original to Personnel File
   Copy to Employee

DEFT(S) 2008 PLF(S)     EXHIBIT FOR I.D.
CYNTHIA REPOLA, CSR # 11204
DATE: _February 24, 2010_
WITNESS:

ABM Janitorial Services

2008

# SEXUAL HARASSMENT INFORMATION SHEET
## ACKNOWLEDGEMENT

I acknowledge that I have been provided with a copy of ABM's Company
Policy on Sexual Harassment. I also understand that it is my responsibility
to read this information as provided by my employer, and that I may, at any
time, review the contents contained within this information sheet with my
employer.

Dated: 4-26-06

Claiment g
**(Employee's Printed Name)**

Claiment g
**(Employee's Signature)**

Seraya Torres
**(Witness Signature)**

DEFT(S) 2007 PLF(S) _____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: February 24, 2010
WITNESS:

ABM-045 (4/96)

2009

12/07/2009  00:49 15596511835                    ABM                          #0908 P.006/022

## HANDBOOK RECEIPT AND ACKNOWLEDGMENT

I acknowledge that I have read and understand the Employee Handbook, and I accept the terms and conditions of employment contained therein.

I understand that this Handbook summarizes the Company's personnel policies and guidelines, and that it is furnished to me solely for my information. I further understand that the policies and procedures contained in the Handbook are not intended to create an employment contract.

I understand that the Company may modify or rescind any of its policies, guidelines, benefits, or practices described in the Handbook at any time, except for its policy of at-will employment and those policies required by law.

Dated: 4-26-06

Claimant 9

(Employee's Printed Name)

Claimant 9

(Employee's Signature)

DEFT(S) 2012 PLF(S) _____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: February 24, 2010
WITNESS:

34                          (07/04)

2012

DEFT(S) 20/34 F(S) _____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: January 24, 2010
WITNESS:

# EMPLOYEE HANDBOOK



**ABM** Janitorial Services

2013

## PRESIDENT'S MESSAGE

**W**e're very happy to welcome you to the ABM Family of Services. You have joined an organization that has established an outstanding reputation for quality service and products. Credit for this goes to every employee. We hope that you, too, will find satisfaction and take pride in your work here.

This Handbook is intended to help you get acquainted with your Company's employment guidelines, policies and procedures. We hope that it will serve as a useful reference document throughout your employment. *These guidelines, policies and procedures apply to all employees unless individual employment contracts or collective bargaining agreements provide otherwise.*

From time to time, the information included in our Employee Handbook may change. New guidelines, policies and procedures will be announced in bulletins, memos or other Company publications. You should keep copies of these. When it becomes necessary, we'll update this entire Handbook and you'll receive a new copy.

Mutual respect for each other is a requirement as we work together to reach our common goals. Having a clear understanding of the employment guidelines, policies and procedures will go a long way in developing your career potential. We hope that this Handbook will help you understand what is expected of you during your period of employment with the Company.

Your compliance with these guidelines, policies and procedures can be very important to your future and to the future of your Company.

Henrik Slipsager
President and Chief Executive Officer
ABM Industries Incorporated

(07/04)

# CONTENTS

PRESIDENT'S MESSAGE ............................ i

CONDITIONS OF EMPLOYMENT
  Equal Employment Opportunity ................ 1
  At-Will Employment ............................ 1
  New Hires ...................................... 2
  Introductory Period ........................... 2
  Employment Status ............................. 2
  Employment of Relatives/Conflicts ........... 4
  Personnel Records ............................. 5
  Employee Privacy .............................. 6
  Self-Identification ........................... 6
  Polygraph Testing ............................. 6
  Company Communication ........................ 7

COMPENSATION
  Work Schedules ................................ 8
  Payment of Wages .............................. 8
  Overtime ...................................... 8
  Breaks and Meal Periods ...................... 9
  Garnishments .................................. 9
  Punctuality and Attendance ................... 9
  Absence without Notice ....................... 11
  Company and/or Customer Property ............ 11

PAID TIME OFF
  Holidays ...................................... 12
  Jury/Witness Duty ............................. 12
  Military Leave ................................ 12
  Voting Time Off ............................... 12
  Sick Leave .................................... 12

ii

UNPAID TIME OFF
  Personal Leave ................................ 13
  Parental Leave for School Activities ....... 13
  Religious Observances ......................... 13
  Family/Medical Leave .......................... 13
  Pregnancy-Disability Leave ................... 15

COMPANY RULES
  Cause for Disciplinary Action and
    Discharge ................................... 16
  Alcoholic Beverages and Drugs ............... 19
  Harassment .................................... 21
  Solicitations ................................. 23
  English in the Workplace ..................... 24
  Personal Appearance .......................... 24
  Employment Disputes .......................... 24

WORKPLACE SAFETY AND HEALTH
  Safety and Health Policy ..................... 26
  Violence Prevention ........................... 26
  Smoking ....................................... 27
  Fitness for Duty Policy ...................... 28

BENEFITS
  Social Security and Income Tax
    Withholding ................................. 30
  State Disability Insurance ................... 30
  Unemployment Insurance ....................... 30
  Work Related Illness or Injury .............. 31

TERMINATION
  Procedure on Termination of
    Your Employment ............................. 32

HANDBOOK RECEIPT AND ACKNOWLEDGMENT ........... 34

iii

(07/04)

CONFIDENTIAL

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

The Company is an equal employment opportunity employer. The Company will not discriminate against qualified applicants or employees with respect to any terms or conditions of employment based on race, color, national origin, ancestry, gender, sexual orientation, age, religion, creed, physical or mental disability, marital status or any other characteristic protected by state or federal law or local ordinances.

When necessary, the Company will reasonably accommodate employees and applicants with disabilities if the person is otherwise qualified to safely perform all of the essential functions of the position.

## AT-WILL EMPLOYMENT

You are free to terminate your employment with the Company at any time, with or without a reason, and the Company has the right to terminate your employment at any time, with or without a reason unless prohibited by law or written contract. Although the Company may choose to terminate employment for cause, cause is not required. This is called "at-will" employment.

No one other than the President of the Company has the authority to alter this policy of "at-will" employment. Further, any such change of policy must be in writing and signed by the President.

The Company reserves the right to make lawful changes in its terms and conditions of employment. Nothing in this Handbook should be read as contractually limiting that right or as guaranteeing employment for any specific length or period of time.

1                           (07/04)

## NEW HIRES

All offers of employment are contingent on verification of your right to work in the United States, as required by the Immigration Reform & Control Act of 1986. Upon receiving a conditional offer of employment, you will be asked to provide original documents verifying your right to work and to sign a verification form required by federal law. If you cannot verify your right to work in the United States, the Company may be obligated to revoke your employment.

## INTRODUCTORY PERIOD

New employees are "introductory employees." During this period, you will have an opportunity to learn your new position and see whether you enjoy your employment here. The Company will use this period to determine whether you are able to meet its expectations. Upon completion of this period, the Company will review your performance.

Completion of this introductory period does not entitle you to remain employed by the Company for any definite period of time. After completion of this period, eligible employees may be eligible for benefits described in this Handbook.

## EMPLOYMENT STATUS

There are five types of employees at the Company. You employment status is one of the following:

(1) *Introductory Employee* - employees who have not yet completed the "introductory period";

2                           (07/04)

## EMPLOYMENT OF RELATIVES/COHABITANTS
### Potential for Conflicts

The employment of relatives or close friends in the same area of an organization may cause serious conflicts and problems with favoritism and employee morale. Therefore, any hire, transfer, or promotion involving a relative by blood or marriage, or co-habitant, of any executive or manager of the Company requires prior written approval of an operating subsidiary senior vice president or corporate vice president. For purposes of this policy, relatives means a person's spouse, parents, children, grandchildren, siblings, mothers-in-law and fathers-in-law, sons and daughters-in-law, brothers and sisters-in-law, aunts and uncles and the spouses of aunts and uncles, [the children of aunts and uncles,] and anyone who shares the employee's home. Employees have a duty to bring such relationships to the attention of their human resources representative.

In addition, no relative of an employee shall be employed by the Company in any position where either of them is subject to any supervision, direction or review by the other, directly or through another person, with respect to any work activity, compensation or financial transactions or records, *without prior written approval of ABM Industries' President & Chief Executive Officer, and ABM Industries' Senior Vice President of Human Resources or ABM Industries' Vice President of Internal Audit.* This policy also applies to employees in positions which have access to Company proprietary information and/c sensitive information that may affect or influence employment conditions in any manner. It would apply, for instance, to any employee in a financial or human resources role. Finally, no relative by blood or marriage, or co-habitant can be employed in a position where the roles of the individuals, when taken together, would cause a weakness in internal controls.

In all cases where a personal relationship exists and where a conflict or the potential for conflict arises, whether or not a supervisory relationship is involved, the parties may be separated by reassignment or terminated from employment.

---

(2)   *Regular Full-Time Employee (exempt or non-exempt)* - employees who are salaried, although the salary may be converted to an hourly rate. These employees are not in a temporary status and are regularly scheduled to work the Company's full-time schedule.

(3)   *Regular Part-Time Employee (exempt or non-exempt)* - employees who are salaried, although the salary may be converted to an hourly rate. These employees are not assigned to a temporary status and are regularly scheduled to work less than the Company's full-time work schedule. Regular part-time employees working less than 30 hours weekly are not generally eligible for Company benefits.

(4)   *Temporary Employee* - employees who are hired as interim replacements to temporarily supplement the workforce or to assist in the completion of a specific project. Employment assignments in this category are of a limited duration. Temporary employees, whether full-time or part-time, are generally not eligible for Company benefits.

(5)   *Hourly Employee* - employees who may or may not be on a regular schedule and are paid by the hour only for the hours they work. These jobs may be "on call" or restricted in schedule. Hourly employees generally are not eligible for Company benefits.

*Union Employees* may fall into any one of the above classifications and are members of an independent labor union whose terms and conditions of employment are covered by a collective bargaining agreement between the Company and that union.

*If an employee marries or begins to share a household with another employee and they work in the same department or report to the same immediate supervisor, or if his/her relationship represents a security risk, internal control issue, or creates a potential conflict of interest, the employees may select between themselves which will transfer or be terminated subject to approval by ABM Industries' Senior Vice President of Human Resources.* The Company will make reasonable efforts to provide transfer opportunities so that employment of both employees may be continued with the ABM organization.

The potential for conflicts also exists with respect to the hire, transfer or promotion of any employee related by blood or marriage to an employee or principal of any client, customer, independent contractor or vendor of the Company and requires the same levels of approval outlined above. Any hiring involving a former professional employee of the Company's independent auditor, a close relative of a professional employee of the Company's independent auditor, or a relative of a member of the Company's Board of Directors *requires the approval of ABM Industries' General Counsel or delegate.* For purposes of this independent auditor restriction, a close relative means all relatives under this policy other than the children of aunts and uncles.

## PERSONNEL RECORDS

The Company keeps a personnel file on each employee. The contents of your file, except for letters of reference and other confidential information, are open for your inspection at reasonable times and at reasonable intervals at your request. You may only make copies of documents in the file that you have previously signed.

Any changes in your personal data, such as address and phone number, must be reported to your local Human Resource Representative, in writing, so that the Company records can be kept up to date. If you are enrolled in any Company health or welfare benefit plans, you must also notify the Company, in writing, of changes in marital status or number of dependents.

It is Company policy that no personnel or medical files be released to outsiders or unauthorized Company personnel without the written consent of the employee. Exceptions are made only when required under legal order or as required by government administrative regulations.

## EMPLOYEE PRIVACY

The Company respects your individual privacy. However, you should not anticipate an expectation of privacy with respect to your work-related conduct, including, but not limited to the use of Company-owned furniture, equipment or supplies, Company stationery, desks, telephones, voice mail, facsimile machines, copiers, e-mail, software and computer network systems are for business purposes only and may be accessed by management at any time. Therefore, you should practice professional discretion when using Company-owned property or communication systems.

## SELF-IDENTIFICATION

The Company has adopted a program to employ and advance persons who are: a) individuals with a disability b) war veterans or c) disabled veterans. In order to make this program succeed we ask that you identify yourself if you qualify under this program. It is completely voluntary and you will not be disciplined or refused employment if you do not wish to provide this information.

## POLYGRAPH TESTING

The Company will not use polygraph tests to randomly test employees. If polygraph testing is used as part of an ongoing investigation of workplace theft or other incidents causing economic loss or injury to the Company, the Company will conduct the testing in accordance with the provisions set forth in the Employee Polygraph Protection Act of 1988.

## COMPANY COMMUNICATIONS

Every company employee is responsible for ensuring the Company's communications systems are used property and in accordance with this policy. Company stationary, telephones, facsimile machines, copiers, voice-mail, e-mail, software, and computer network systems are for business purposes only. Additionally:

1. The Company expressly reserves the right to monitor, access, retrieve, read and delete any communication that is created on, received through, or sent on Company property or systems to assure compliance with this or any other Company policy.

2. No messages or information should be transmitted through any Company communications system without a legitimate business purpose.

3. The provisions of the Company's Solicitations policy (page 23) fully apply to all communication systems.

4. No communications should be retrieved, created or sent that may constitute intimidating, hostile or offensive material based on gender, race, color, religion, national origin, sexual orientation or disability. The Company's policy against sexual harassment and other harassment applies fully to all company communication systems and any violation of that policy is grounds for discipline up to and including termination.

5. All electronic and telephonic communication systems and all communications and information transmitted by, received from, or stored in these systems, as well as passwords or codes utilized to access such communications and information, are the property of the Company.

## WORK SCHEDULES

Management reserves the right to assign work schedules to accommodate business conditions, and you may be required to adjust your schedule accordingly. The regular workweek will not exceed 40 hours, and regular working hours generally will not exceed 8 hours per day within any consecutive 24-hour period.

## PAYMENT OF WAGES

In most cases, employees will be paid at least twice monthly. If a regularly scheduled payday falls on a weekend or scheduled holiday, paychecks will be distributed on the last regular workday before the holiday or weekend.

## OVERTIME

Some employees are exempt from the overtime pay requirements of the law. "Exempt" employees are paid a salary and are in executive, administrative, sales or professional positions.

Nonexempt employees are paid either a salary or on an hourly basis, and receive overtime pay for hours worked in excess of 40 hours per week. A number of states have more restrictive laws regarding the number of hours which may be worked in a day.

When operating requirements or other needs cannot be met during regular working hours, you may be expected to work overtime.

If you work overtime, you will be paid at a rate of 1-1/2 times your regular rate for all hours worked greater than the daily maximum for your state or over 40 hours per week.

Overtime pay is based on actual time worked. Time off for sick leave, vacation leave or any leave of absence will not be considered hours worked for the purpose of calculating overtime hours.

Approval to Work Overtime

Overtime, as well as any time in excess of your regular work schedule, must be authorized in advance by your Supervisor. If you work overtime without receiving prior authorization, you may be subject to disciplinary action up to and including termination.

## BREAKS AND MEAL PERIODS

If you are a non-exempt employee, you may be entitled to rest periods during your work period. Rest periods and meal periods may not be combined or used to leave work early. Additionally, you may receive at least one-half hour time off as a meal period. Your supervisor schedules meal and break periods.

## GARNISHMENTS

If the Company receives a court order to garnish your wages, we must comply with that order. A garnishment will reduce your take-home pay.

## PUNCTUALITY AND ATTENDANCE

Regular and punctual attendance is an essential function of your job. Unless you are unable to provide advance notice, you must notify your immediate Supervisor of absences as soon as possible.

Failure to do so is cause for disciplinary action and may be cause for denial of absence pay.

When you call to inform the Company of an unexpected absence or late arrival, ask for your Supervisor directly. Notifying the switchboard operator or another employee is not sufficient. If your Supervisor is not available when you call, you may leave the information with another supervisor or manager.

Excessive absences and tardiness will lead to discipline, up to and including discharge. An absence is defined as failure to report for or remain at work as scheduled; this includes arriving late and leaving early. Multiple consecutive days off work for the same reason shall constitute a single absence.

Absence and tardiness are considered excessive if frequent or show a pattern. The following are general guidelines for unacceptable attendance:

| Guidelines – Excessive Absenteeism | |
| --- | --- |
| Three (3) absences* in a Six (6) month period | Informal Warning |
| Four (4) absences* in a Six (6) month period | Formal Warning |
| More than four (4) absences* In a six (6) month period | Probation or Termination |

*see definition of "absence" above

(07/04)

(07/04)

6

9

## ABSENCE WITHOUT NOTICE (JOB ABANDONMENT)

Absence from work for three consecutive days without notifying your Supervisor will be considered a voluntary resignation.

## COMPANY AND/OR CUSTOMER PROPERTY

The Company or our customers may, from time to time, entrust you with the care, custody and control of certain property such as uniforms, vehicles, tools, communication or computer equipment, supplies, catalogs, books and other materials. The Company may deduct from your paycheck the value of such items if they are not returned upon request, or for any damages beyond ordinary wear and tear to such items. The Company further reserves the right to take legal action against you to recover such property or its value, if necessary.

(07/04)

11

## HOLIDAYS

All holidays to be observed shall be determined in advance by the Company's senior management, subject to the guidelines established by ABM.

## JURY/WITNESS DUTY

Unless you are informed otherwise by the Company for which you work, Jury Duty is an unpaid leave of absence, subject to local state law. Any pay received is subject to an offset for any "jury pay" received by the employee. If you are subpoenaed to appear as a witness in court or as a party to the action (plaintiff or defendant), you will be granted an unpaid leave. If you are subpoenaed to appear as a witness for the Company, you will be granted a paid leave.

## MILITARY LEAVE

All employees may take a leave of absence to accommodate service in the Armed Forces, Military Reserves and National Guard. The specific terms of the absence and of your rights to reinstatement, seniority, benefits and compensation after a military leave are governed by law.

## VOTING TIME OFF

In the event your work schedule would prevent you from voting on Election Day, the Company will give you the necessary time off to vote (up to a maximum of two hours).

## SICK LEAVE

If you are absent from work due to a non-work related illness or injury, you may be eligible for sick pay. In most cases, you will be required to complete your introductory period before you become eligible for this benefit, if offered. Your Human Resource Representative can provide you additional information on this benefit.

The Company reserves the right to require medical documentation substantiating all illness, injury and medical absences.

Excessive absenteeism, whether paid or unpaid, will be cause for disciplinary action.

(07/04)

12

## PERSONAL LEAVE

Personal leaves of absence are unpaid and may be granted at the sole discretion of management in extraordinary circumstances.

## PARENTAL LEAVE FOR SCHOOL ACTIVITIES
(California, District of Columbia, Louisiana, Minnesota Only)

If you are a parent, guardian or grandparent having custody of a child in Kindergarten or grades 1-12 and it becomes necessary to attend a school activity, you must notify your Supervisor as soon as possible so that alternative arrangements can be made. Time off will be unpaid and in compliance with your local state law.

## RELIGIOUS OBSERVANCES

You may be granted unpaid time off to observe religious holidays, business permitting.   A written request for such time off must be submitted at least 30 days in advance.

## FAMILY/MEDICAL LEAVE

Family/medical leave is permitted for the birth of an employee's child, or placement of a child with the employee for adoption or foster care, to care for an employee's spouse, child or parent who has a serious health condition; or to care for an employee's own serious health condition.

If you have been employed for at least 12 months and worked 1,250 hours in the last 12 months, you may be eligible to take a family/medical leave up to 12 workweeks in a 12-month period. This leave is unpaid and subject to the requirements of the Family and Medical Leave Act of 1993 ("FMLA").

13                                                          (07/04)

For the purposes of measuring the amount of time available for an FMLA-covered leave, the company will use a "rolling" twelve month calendar, measured backward from the current date. For calculation purposes, the Company must determine the amount of leave previously used, if any, by examining your last twelve (12) months of attendance. This twelve-month calendar moves forward as the FMLA leave is spent.

If you are applying for a medical leave for yourself, you must submit a written certification from your treating physician which contains the following information:

(1) The date on which your disability began or will begin;
(2) The probable duration of your condition; and
(3) A statement that, due to your serious health condition, you are (or will be) unable to perform the functions of your position.

You may be required to first utilize your sick leave benefits in the event of your own "serious medical condition," or your accrued vacation time off.

If you are applying for a leave to care for your child, spouse, or parent who has a serious health condition, you must submit a written certification signed by the treating physician that includes the following information:

(1) The date on which the serious health condition began;
(2) The probable duration of the condition;
(3) An estimate of the amount of time that the health care provider believes you need to take in order to care for your child, parent or spouse; and
(4) A statement that the serious health condition warrants the participation of a family member to provide care during a period of treatment or supervision of your child, parent, or spouse.

You may be required to first utilize your accrued vacation benefits for such time off.

14                                                          (07/04)

- If foreseeable, you must provide a 30-day advance written notice of your intent to take a family/medical leave. If not foreseeable, written notice must be provided as soon as practicable within 15 days.

- The Company will then provide you with a notice of your rights and obligations as soon as practicable (usually within two days) after you give notice for the leave.

- If the request is for a medical leave and the Company questions the validity of the medical certification, the Company can require a second medical opinion at the Company's expense.

- If you return from your family/medical leave in a timely manner, you will be returned to the same or similar position with equivalent terms and conditions of employment, including pay and benefits.

## PREGNANCY-DISABILITY LEAVE

Some states have more restrictive laws for pregnancy related disabilities. Contact your Human Resource Representative for information.

15

(07/04)

## CAUSE FOR DISCIPLINARY ACTION AND DISCHARGE

It is not possible to provide employees with a complete list of every possible cause that will, like unsatisfactory performance, result in disciplinary action, including discharge. However, in order to give you some guidance, examples of unacceptable conduct are listed below. You should be aware that conduct that is not listed below, but or is unprofessional or potentially embarrassing, adversely affects of our employees, customers, or the public at large, may also result in disciplinary action, up to and including immediate termination. Inclusion of the following list does not limit or diminish the Company's policy of "at-will" employment.

1. Inefficiency or failure to perform job duties satisfactorily.

2. Falsification of any Company record.

3. Theft, willful damage or unauthorized removal or use of Company, employee, or customer property, equipment, records or information.

4. Excessive tardiness.

5. Excessive absences.

6. Unauthorized absence or failure to promptly notify the Company of intended absence.

7. Failure to comply with instructions of a supervisor or manager.

16

(07/04)

8. Deliberate unsatisfactory work or negligence.

9. Wasting time, loitering, sleeping during work hours or leaving the workplace without authorization.

10. Failing to keep work areas and equipment clean, creating unsafe conditions or defacing Company or a customer's property.

11. Violation of safety, health or security rules.

12. Personal or unauthorized use of Company material, time or equipment.

13. Careless or negligent use of Company vehicle, equipment or other property.

14. Insubordination to a supervisor or manager such as direct confrontation or profanity.

15. Possession, distribution, sale, transfer or misuse of alcohol, prescription drugs or illegal drugs in the workplace, while on duty, or while operating Company-owned vehicles or equipment.

16. Being under the influence of alcohol or other drugs while at work, or possessing or using alcohol or other drugs on Company premises.

17. Creating, encouraging or participating in disorder or violence, fighting or threatening bodily harm.

(07/04)

17

18. Conviction of, or pleading guilty to or admission of a criminal offense involving dishonesty, violence, illegal drugs or moral turpitude.

19. Obtaining employment on the basis of false or misleading information, or a material omission of information.

20. Having an interest in or engaging in activities in direct or indirect competition with the Company or any of its affiliates as an employee, partner, consultant or owner.

21. Unauthorized disclosure or misuse of the Company's confidential information, including, but not limited to customer lists, trade secrets or other proprietary information.

22. Unauthorized duplication or use of keys that lock or secure Company or customer premises or property.

23. Possession of firearms, explosives or any item intended for use as a weapon on Company or customer premises.

24. Soliciting funds or distributing written or printed material during working hours without authorization from the Company.

25. Creating discord or harassing any other employee, customer or visitor.

26. Discrimination against or harassment of any applicant, employee, visitor or customer on the basis of gender, race, national origin, color, religion, age, disability, sexual orientation or marital status.

27. Conduct inappropriate in a business environment.

(07/04)

18

28. Any flagrantly deliberate or gross misconduct.

29. Misuse of Company or customer funds.

30. Commission of or attempt to commit any criminal act against the Company, its customers, employees or property, including, but not limited to fraud, theft, vandalism or extortion.

31. Failure to cooperate with a request to search Company or customer property.

32. Dress or grooming inappropriate in a business environment.

Company policy requires all employees to cooperate fully in any internal investigation concerning the workplace.

## ALCOHOLIC BEVERAGES AND DRUGS.

By policy, the Company strictly prohibits employees from being under the influence, bringing in, possessing, providing, producing, buying, selling or using alcoholic beverages, unprescribed or illegal drugs at any time on Company premises or in Company vehicles.

Limited consumption of alcoholic beverages at certain Company-sponsored events held on Company property is allowed only with prior written approval of the Company's senior management. Consumption of alcoholic beverages is also permitted at certain Company-sponsored events off Company premises with prior written approval of the Company's senior management.

The Company is not liable for occupational injury or illness payments for any injuries arising out of voluntary participation in any off-duty

recreational, social or athletic activity not constituting part of the employee's work-related duties.

"Under the influence" is defined as being unable to perform work in a safe and productive manner; being in a physical or mental condition that creates a risk to the safety and well-being of the affected employee, other employees, the general public or Company property; and/or having any detectable level, in excess of a trace, of alcohol, unprescribed drugs or illegal drugs in the body.

An employee who is involved with on-the-job illegal drug use, possession or sale is in violation of Company policy. Off-the-job use, possession or sale of unprescribed or illegal drugs which has an adverse affect on the Company's customers, other employees, the general public or the Company's reputation or image is also considered a violation of this policy. In deciding what action to take, the Company will take into consideration the nature of the conduct and the employee's present assignment and record with the Company.

Additionally, any employee who is taking prescription or non-prescription drugs or medication which may adversely affect the employee's ability to work in a safe or productive manner is encouraged to report the use of this medication to his or her supervisor, or, if this is not possible, to the office manager before beginning work or entering any Company or customer facility. This includes drugs which are known or advertised as possibly affecting judgment, coordination or other senses, including those which may cause drowsiness or dizziness. Management, after obtaining medical advice, will then determine if any work restrictions will be necessary.

Consent to drug or alcohol testing, when requested by the Company, is a condition of continued employment with the Company and refusal to comply is insubordination.

Violations of this policy, including refusal to consent to drug or alcohol testing, will result in immediate suspension of the employee pending an investigation. The Company will then make a determination concerning the appropriate discipline, up to and including discharge, on the basis of evidence then available to the Company, reasonable inferences which the Company draws from that evidence, and the employee's refusal to consent to such testing.

## HARASSMENT

The Company is committed to providing a work environment that is free of discrimination including harassment. In keeping with this policy, the Company strictly prohibits unlawful harassment of any kind, including harassment on the basis of race, color, religion, gender, age, mental or physical disability, medical condition, national origin, marital status, veteran status, sexual orientation, or any other characteristic protected under federal or state law or local ordinance. Harassment may take many forms, but the most common forms include:

*Verbal harassment,* such as jokes, epithets, slurs, negative stereotyping and unwelcome remarks about an individual's body, color, physical characteristics, appearance, or talents, references to women such as "honey," "doll," or "sweetheart," comments or questions about a person's sexual practices, and patronizing terms or remarks;

*Physical harassment,* such as physical interference with normal work, impeding or blocking movement, assault, unwelcome physical contact, staring at a person's body, and threatening, intimidating or hostile acts that relate to a protected characteristic;

*Visual harassment,* such as offensive or obscene photographs, calendars, posters, cards, cartoons, drawings, gestures, and any other written material, display of sexually suggestive or lewd objects, unwelcome personal notes or letters, and any other written or graphic material that denigrates or shows hostility or aversion toward an individual because of a protected characteristic, including posting or circulating any such items in the workplace.

There are two distinct categories of sexual harassment:

*Quid pro quo* sexual harassment occurs when an individual's submission to or rejection of unwelcome sexual conduct is used as a basis for employment decisions affecting that individual, including, granting of employment benefits;

*Hostile environment* sexual harassment occurs when unwelcome sexual conduct unreasonably interferes with an individual's job performance or creates an intimidating, hostile or offensive working environment, even if it does not lead to tangible or economic job consequences.

Sexual harassment includes harassment of women by men, of men by women, and same-sex/gender-based harassment.

If you witness unlawful harassment on the job, you are expected to report it immediately to your supervisor, any other member of management, or your local Human Resource Representative. *It is the responsibility of any employee who has been harassed or otherwise discriminated against, or who has witnessed such harassment or discrimination, to immediately report all such conduct to their direct supervisor or to a senior supervisor. Furthermore, it is the responsibility of any supervisor who receives such a report to*

*Immediately communicate it to their management and to their Human Resource representative.*

The Company's policy is to immediately conduct a thorough, objective and complete investigation of any harassment complaint. At the conclusion of its investigation, it will attempt to determine whether unlawful harassment has occurred. The Company will look at the conduct and the context in which it occurred.

The Company will, as promptly as possible, communicate its findings to the accused, and the remedial action (if any) to be taken to the complainant, and when appropriate, to other persons who are directly concerned.

If the Company determines that harassment has occurred, the Company will take remedial action commensurate with the severity of the offense. This action may include disciplinary action against the harasser, up to and including termination. Steps will be taken, as necessary, to prevent any further harassment.

In situations involving consensual relationships between employees, the Company reserves the right to take whatever action is necessary to preserve a hostile-free and harassment-free environment.

No individual will suffer any reprisals or retaliation for reporting any incidents of harassment, or for participating in any investigation of incidents of harassment or perceived harassment.

## SOLICITATIONS

The Company discourages solicitation of its employees by co-workers. Such solicitation is only allowed during non-working time

23

(07/04)

and the non-working time of the person being solicited. "Non-working" time means time during meal periods or breaks and before or after working hours. The Company prohibits solicitation, collection, posting or distributing of printed or written materials anywhere on Company premises by non-employees.

## ENGLISH IN THE WORKPLACE

To assure compliance with many state and federal employment notice requirements, it is expected that all Company employees read and understand English sufficiently to maintain a safe and lawful work environment. To the extent practical, management will strive to provide alternate translations to further clarify those areas of concern.

## PERSONAL APPEARANCE

A professional appearance is essential to your job. You are a representative of the Company, so you must present a clean and professional image to our customers, employees, management and the general public. You must practice good grooming and personal hygiene. You must dress in a uniform, if required, or if not, in a professional and appropriate manner. If your attire or physical appearance is inappropriate, you may be required to leave the premises until such time as your appearance is appropriate. Consult your Supervisor if you have questions as to what constitutes appropriate appearance.

## EMPLOYMENT DISPUTES

All employees should seek a prompt review of their work-related problems. When such problems arise, you are expected to take the following steps to seek resolution:

24

(07/04)

*First, talk to your immediate Supervisor* - Discuss the problems you are having at work with your Supervisor. In most cases, he or she will be in the best position to help you.

*Or, talk to your Supervisor's manager* - If you are having trouble communicating with your immediate Supervisor, you should make an appointment with your Supervisor's manager and explain the problem.

*Talk to your local Human Resource representative, ABM's Human Resources Department or your union representative* - The Company's Human Resources staff or your union representative will work with you and any other people you've asked to have contacted to resolve the problem.

Salaried and hourly office and sales employees hired after March 11, 1994 are subject to the Company's Pre-Dispute Resolution program and may be subject to arbitration of their employment disputes.

(07/04)

25

## SAFETY AND HEALTH POLICY

The Company is committed to providing all of its employees with a safe and healthy environment in which to work. The Company recognizes that a safe and healthy workplace is the right and the responsibility of every employee. The Company strongly believes that "accidents" are preventable if safety is made an integral part of daily activities. The prevention of work-related injuries is of such consequence that it will take precedence over any unsafe activity or condition. ABM's Safety Services Department is available for consultation on all health and safety matters.

In compliance with the Federal Hazard Communication Standard, the Company maintains Material Safety Data Sheets ("MSDS") for all chemicals used in the course of business. These MSDS sheets are available for review by all employees, as well as their representatives and physicians.

To promote the concept of a safe workplace, the Company maintains an Injury and Illness Prevention Program. This program is available for your review.

## VIOLENCE PREVENTION

Violence or threats of violence against the life, health, well-being, family or property of others, express or implied by words, gestures, symbols, intimidation or coercion, will be regarded as violating the fundamental rights of the Company to operate its business in a safe and peaceful manner. The Company has adopted the following practices to deal with any violence that may occur on its premises, and to ensure the safety of its employees.

(07/04)

28

- Report all threats of violence, whether direct or indirect, as soon as possible to your Supervisor, or if he or she cannot be reached, to any other supervisor or manager. Be as specific as possible.

- Report all suspicious individuals or activities to your Supervisor or to any other supervisor or manager, as soon as possible.

- Do not put yourself in peril.

- If you hear a violent commotion near your work area, do not investigate or interfere. Telephone 911 immediately!

- Cooperate fully with security, law enforcement and medical personnel that respond to a call for help.

- Let the Company respond to all inquiries from the media about violence on its premises so that the Company can speak with one voice.

- If you are qualified, you may provide first aid to injured persons.

## SMOKING

In keeping with the Company's intent to provide a safe and healthful work environment, smoking is prohibited anywhere within a Company-owned or Company-leased building, and in any Company-owned or Company-leased vehicle. Smoking is discouraged in any other vehicle being driven in connection with Company business. Employees who smoke do not receive any additional break time or any other special considerations.

27

(07/04)

## FITNESS FOR DUTY POLICY

To protect the health and well being of all employees, and to maintain a safe work environment, the Company reserves the right to require a fitness-for-duty evaluation when:

- there is reasonable cause for serious concern about an employee's ability to safely perform his or her job;

- an employee's behavior is grossly inappropriate for the workplace, as determined by the Human Resources Department of ABM;

- there is reasonable cause to protect public safety; or

- medical clarification is necessary to support a reasonable accommodation request.

An employee may be requested to report for a fitness-for-duty examination, on Company time and at Company expense, to a physician or medical facility designated by the Company. The employee will be asked to authorize the release of the examination results to the ABM Human Resources Department. All medical fitness-for-duty examinations will be held in strict confidence as required by law.

An employee's decision to comply with the request for a fitness-for-duty examination may affect the determination of whether disciplinary action should be taken, what type of action may be taken, or whether reasonable accommodation should be made.

28

(07/04)

An employee's refusal to comply will be considered insubordination and, subject to review by ABM's Human Resources Department, may result in disciplinary action up to and including termination.

29

(07/04)

## SOCIAL SECURITY AND INCOME TAX WITHHOLDING

All employees must contribute to the Federal Social Security Program and federal and state income tax withholding. The Company pays a matching contribution for each employee's Social Security taxes. The Company requires all employees to complete an IRS-approved W-4 Form and to provide their Social Security number. Violation or interference with this policy is considered insubordination and may be grounds for discipline including discharge.

## STATE DISABILITY INSURANCE

Some states require that each employee contribute to a State Disability Insurance plan. Contributions are made through payroll deduction. Disability insurance is payable when you cannot work because of illness or injury that is unrelated to your employment with the Company.

## UNEMPLOYMENT INSURANCE

The Company contributes thousands of dollars each year to each State's Unemployment Fund on behalf of its employees. Unemployment benefits are provided by the state and are available to employees who have been subject to a layoff, but are usually not available to employees who have quit voluntarily or have been terminated for cause.

30

(07/04)

## WORK RELATED ILLNESS OR INJURY

An occupational injury or illness program may cover the cost of a legitimate occupational injury or illness that results from working for the Company. Benefits help pay for your medical treatment and part of any income you may lose while recovering. Specific benefits are prescribed by law depending on the circumstances of each case. To be assured of maximum coverage, each injury or illness must be reported immediately to your Supervisor who will promptly file a claim.

Occupational injury or illness coverage will not apply when your illness or injury is unrelated to working for the Company or when an injury arises out of voluntary participation in an off-duty recreational, social or athletic activity not constituting a part of your work-related duties.

Occupational injury or illness leaves of absence from the Company will run concurrently with the Federal Family and Medical Leave Act ("FMLA") leaves of absence for employees with FMLA-qualifying health conditions.

## PROCEDURE ON TERMINATION OF YOUR EMPLOYMENT

Your employment with the Company is at-will, which means that you may terminate your employment at any time, with or without notice, for any reason, and likewise, the Company may terminate your employment at any time, with or without notice and with or without cause, unless prohibited by law or written contract. No one other than the President of the Company has the authority to alter this arrangement.

Your employment with the Company may be deemed terminated for any of the following reasons:

- Voluntary resignation;
- Retirement;
- Reorganization within the Company (including, but not limited to, job elimination);
- Involuntary termination, with or without cause and with or without notice;
- Failure to return to work in a timely manner following an absence;
- Failure to report to work without notice for three (3) consecutive work days;
- Prolonged disability resulting in an inability to safely and satisfactorily perform all the essential functions of your job with or without reasonable accommodation; or
- Death

If you wish to voluntarily terminate your employment with the Company, you are requested to give at least two weeks' written notice, if possible.

If you quit your employment without notice, the Company will pay you for all hours worked including any earned but unused vacation time, up to the last day of your employment.

If you quit your employment with notice, the Company may, at its discretion, pay you for the period of your notice, and excuse you from coming to work during that time.

## ACKNOWLEDGMENT

I acknowledge that I have read and understand the Employee Handbook, and I accept the terms and conditions of employment contained therein.

I understand that this Handbook summarizes the Company's personnel policies and guidelines, and that it is furnished to me solely for my information. I further understand that the policies and procedures contained in the Handbook are not intended to create an employment contract.

I understand that the Company may modify or rescind any of its policies, guidelines, benefits, or practices described in the Handbook at any time, except for its policy of at-will employment and those policies required by law.

Dated: _____

_____
(Employee's Printed Name)

_____
(Employee's Signature)