# EXHIBIT

# J

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

———————

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) | Case No. |
| ) | 1:07CV01428 LJO-TAG |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| ERIKA MORALES AND ANONYMOUS PLAINTIFFS ONE THROUGH EIGHT, ) | |
| ) | |
| Plaintiff Intervenors, ) | |
| ) | |
| vs. ) | |
| ) | |
| ABM INDUSTRIES INCORPORATED AND ABM JANITORIAL SERVICES, INC.; ABM JANITORIAL NORTHERN CALIFORNIA; JOSE VASQUEZ; DOES - 10 INCLUSIVE, ) | |
| ) | |
| Defendants. ) | |
| ) | |

DEPOSITION OF Claimant 10
TUESDAY, NOVEMBER 17, 2009
10:09 A.M.

JOB No. 18077-A

DAVID  FELDMAN  WORLDWIDE,  INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123   (212)705-8585

4d05070a-5207-4681-a497-1f97ed2c86c7

Page 30

1  Q.  Do you remember reading anything that was

2  in the packet?

3  A.  No.

4  MR. FARMER:  Let's mark Exhibit 901

5  entitled "Handbook Receipt and Acknowledgment."

6  (Whereupon, Exhibit No. 901 was

7  marked for identification.)

8  BY MR. FARMER:

9  Q.  Ma'am, my question is if that is your

10  signature on what has been marked as Exhibit 901?

11  A.  Yes.

12  MS. GARCIA:  Just for record, this

13  document is in English.  And I'm referring to

14  Exhibit 901.

15  THE WITNESS:  You asked if this was my

16  signature?

17  BY MR. FARMER:

18  Q.  Yes, ma'am.

19  A.  Oh, yes.

20  Q.  Now, it says at the top of Exhibit 901,

21  quote, "I have acknowledged and read and understand

22  the employee handbook, and I accept the terms and

23  conditions of employment contained therein" end

24  quote.

25  At the time that you signed this, were you

Page 31

1   provided an employee handbook?

2        A.   I don't recall.

3        Q.   Do you remember at any time reading an

4   employee handbook of ABM?

5        A.   No.

6             MR. FARMER:  Let's mark this as Exhibit 902.

7             MR. MARTINEZ:  Thank you.

8             (Whereupon, Exhibit No. 902 was

9             marked for identification.)

10   BY MR. FARMER:

11        Q.   My question to you, ma'am, is looking at

12   Exhibit 902, if that is your signature on this

13   document?

14        A.   Yes.

15        Q.   Do you remember reading this document

16   before signing it?

17        A.   No.

18             MR. FARMER:  Let's mark this as Exhibit 903.

19             MS. GARCIA:  Thank you.

20             MR. MARTINEZ:  Thank you.

21             (Whereupon, Exhibit No. 903 was

22             marked for identification.)

23   BY MR. FARMER:

24        Q.   My question to you, ma'am, what we've

25   marked as Exhibit 903, if that is your signature on

DAVID  FELDMAN  WORLDWIDE,  INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123   (212) 705-8585
4d05070a-5207-4681-a497-1f97ed2c86c7

Page 32

1    this document?

2         A.   Yes.

3         Q.   Do you remember signing what has been marked

4    as Exhibit 903?

5         A.   Yes.

6         Q.   Do you remember reading before -- do you

7    remember reading what's been marked Exhibit 903

8    before signing it?

9         A.   No.

10        Q.   Take your time on reading any of the

11   content on Exhibit 903, ma'am.

12             With that in mind, I will represent to you

13   that it does make reference to a toll free number to

14   call to report complaints of harassment,

15   discrimination, retaliation, and the like.

16             With that in mind, my question to you,

17   ma'am, is:  At any time that you worked at ABM, were

18   you ever aware that there was such a number that you

19   could call to report complaints of harassment,

20   discrimination or retaliation?

21        A.   No.

22        Q.   At any time when you worked at ABM were

23   you aware if you could complain about sexual

24   harassment if you had suffered sexual harassment on

25   the job?

Page 39

1      Q.   Is this your signature what's been on --

2 what's been marked Exhibit 905?

3      A.   Yes.

4      Q.   Did you read what's been marked as

5 Exhibit 905 before signing Exhibit 905?

6      A.   No.

7      Q.   In 2006 -- more specifically July of 2006,

8 did you have a practice of signing documents without

9 reading them?

10          MS. GARCIA:  Objection; argumentative.

11          THE WITNESS:  No.

12 BY MR. FARMER:

13      Q.   Exhibit 905 states in the first sentence

14 quote, "I acknowledge that I have been provided with

15 a copy of ABM's Company policy on sexual harassment"

16 end quote.

17          Do you ever remember being provided a copy

18 of ABM's policy on sexual harassment at any time

19 that you worked with ABM?

20      A.   No.

21          MR. FARMER:  All right.  We can go ahead

22 and our break.

23          MS. GARCIA:  Thank you.

24          THE VIDEOGRAPHER:  We are off the record

25 at 11:06 a.m.

Page 48

1          MS. GARCIA:  Or others?

2          MR. FARMER:  Towards her.

3          THE WITNESS:  From up to what I can recall

4     for now, yes.

5     BY MR. FARMER:

6          Q.    Are let's -- what I want to do now, ma'am,

7     is I want to go through each of the areas that

8     you've shared with us today and ask you some more

9     specific questions.

10          Now, the first thing that I have on my

11     list here is the manner in which he spoke to you or

12     requested things.

13          Tell me specifically what -- what happened

14     in that regard?

15          A.    When he would speak, he would always speak

16     things with double meaning.

17          Q.    Do you remember any examples?

18          A.    Right now I can't recall, but they were

19     commentary.  They were jokes with double meaning.

20          Q.    "Double meaning" as in what?

21          A.    They're jokes with double meaning.  I

22     don't know.  I can't recall them very well or

23     conversations that he would have.  He was almost

24     always laughing.

25          Q.    When you say "double meaning," did you

Page 49

1   have the understanding that he was making some type

2   of sexual comment?

3        A.   Yes.

4        Q.   But you can't remember any specifics of

5   what he said that -- that -- that had a double

6   meaning?

7        A.   Specifically, no.

8        Q.   Now, you also said that he would tell

9   jokes?

10       A.   Yes.  With double meaning, also.

11       Q.   Do you remember any of the specifics of

12  the jokes he told that had a double meaning?

13       A.   Right now I don't remember.

14       Q.   So as you sit here today, you recall him

15  making comments that would have a double meaning,

16  but you can't give me anything more specific than

17  that?

18       A.   Not right now.

19       Q.   How often would he -- would he use double

20  meaning in his -- in his speech?

21            MS. GARCIA:  Objection; calls for

22  speculation.

23            MR. FARMER:  Let me go ahead -- let me go

24  ahead and rephrase that.

25  BY MR. FARMER:

Page 51

1   you recall over hearing Mr. Vasquez speak with a

2   double meaning?

3          A.   I don't know.  I would have to begin to

4   count because I don't have a -- an exact amount of

5   how many times.

6          Q.   And I'm not looking for an exact number.

7   Whatever your best estimate would be.  And if you

8   need to take a few moments to calculate that in your

9   head and give me an estimate, that's fine.

10         MS. GARCIA:  We don't want her to guess.

11   We want an estimate.

12         THE WITNESS:  I would say about 50 percent

13   every time I spoke to him during all that time that

14   passed by.

15   BY MR. FARMER:

16         Q.   How often in a week would you speak to

17   Mr. Vasquez when you worked at ABM?

18         A.   About two or three times.

19         Q.   So would it be -- strike that.

20         During the entire time that you worked at

21   ABM, did it remain consistent that you would speak

22   to Mr. Vasquez about two to three times a week?

23         A.   Yes.

24         Q.   So if we do your math there, would it be

25   fair to state then that it was about one to two

1   times a week then that you would hear Mr. Vasquez

2   speak with a double meaning at the time that you

3   worked at ABM?

4           A.   Yes.

5           Q.   Have you told me everything that you can

6   remember about the -- the issue of Mr. Vasquez

7   speaking to you with a double meaning?

8           A.   From what I can recall now, yes.

9           Q.   Did you ever complain to anyone at ABM

10  about Mr. Vasquez speaking to you with a double

11  meaning?

12          A..  I did try to complain to Mr. Javier, but

13  he never had time.

14          Q.   That is Javier Vasquez?

15          A.   Yes.  Javier Vasquez.

16          Q.   Tell me what you did to try.

17          A.   I went to the office, and I saw him

18  writing on his computer, and I said, "Can I speak to

19  you?"  He said, "I don't have any time."  And he

20  closed the door.

21          Q.   Did you -- besides that one time, did you

22  try at any other time to reach out to Mr. Javier

23  Vasquez to speak to him about Mr. Jose Vasquez

24  speaking to you with a double meaning?

25          A.   Yes.

Page 53

1    Q.    About how many more times after that?

2    A.    About two times more, but it was always

3    the same thing, "I don't have time" and he would

4    close the door.

5    Q.    So you went to the office where Mr. Javier

6    Vasquez worked, correct?

7    A.    Well, we would go there to pick up the

8    check, and I would always want to take advantage of

9    that occasion and talk to him, but he would always

10   say he didn't have time.

11   Q.    Was that at the -- the same office that

12   you applied for your job at ABM?

13   A.    Yes.

14   Q.    Now, I have it down -- and correct me if I

15   am wrong on this -- that it was about two to three

16   times that you tried to complain to Mr. Javier

17   Vasquez about Mr. Jose Vasquez speaking to you with

18   double meaning?

19   A.    Double meaning, yes.  And about other

20   things as well, but he never had time.

21   Q.    Why were you looking to complain to

22   Mr. Javier Vasquez?

23   A.    I don't like the way he talks.  I didn't

24   like the way he joked.  It would make me feel

25   uncomfortable.

Page 58

1   BY MR. FARMER:

2       Q.   Did Mr. Jose Vasquez -- did he ever touch

3   you on the shoulder in a similar fashion as you

4   demonstrated on the court reporter -- or the

5   interpreter a few moments ago?

6       A.   Yes.

7       Q.   How many times did he touch you on the

8   shoulder?

9       A.   Approximately two to three times.

10      Q.   So the entire time you worked at ABM,

11  Mr. Jose Vasquez touched you on the shoulder

12  approximately two to three times, correct?

13      A.   Yes.

14      Q.   And was each of those occasions something

15  along the lines of giving a greeting, "Hey, how are

16  you doing?" and rubbing your shoulder?

17      A.   No.  Sometimes it was just in the middle

18  of the conversation.

19      Q.   So -- well, let's go over each of the two

20  or three times he touched you on the shoulder.

21          In what context did he touch your shoulder

22  the first time you remember that happening?

23      A.   What do you mean in what context?

24      Q.   Well, the first time he touched your

25  shoulder, was it the middle of the conversation, as

Page 59

1  you described, or was it -- did he come up to you,

2  "Hey, how are you doing today, Claimant 10 and then

3  touching your shoulder?  Something different?  I

4  don't know.  That's what I'm trying to find out from

5  you?

6      A.   No.  It was when he was speaking, he would

7  say, "Oh, how are you?" and he would rub me.

8      Q.   Your shoulder?

9      A.   Yes.

10      Q.   Do you remember if it was left or your

11  right shoulder?

12      A.   The left.

13      Q.   Those two to three times that he touched

14  your shoulder, was it always your left shoulder?

15      A.   From what I recall, yes.

16      Q.   Did he ever -- on those two to three times

17  that he touched your shoulder, did he ever, in

18  conjunction with that, say anything to you sexual in

19  nature?

20      A.   Not sexually specific -- specifically, but

21  it was the way he would touch you that would make

22  you feel uncomfortable.

23      Q.   How long would he touch your shoulder when

24  he would touch it?  How long would it last?

25      A.   Can I demonstrate because I don't know how

1   to tell?

2       Q.    Let's go ahead and demonstrate, and then

3   we'll see if we can explain it on the record.

4       A.    Like this, "How are you?"  "How you've

5   been?"  And I would say, "Okay.  I'm fine."  And I

6   would move away because I felt uncomfortable.  I

7   didn't like it.

8       Q.    Now, you rubbed the interpreter's shoulder

9   there, and it looked like for about five to ten

10  second, somewhere in there?

11      A.    More or less.

12      Q.    So each of the two to three times that he

13  touched your shoulder, he would -- he would rub it

14  for about five to ten seconds?

15      A.    More or less.

16      Q.    And just so I understand, it wasn't what

17  he was saying to you when he rubbed your shoulder,

18  it was the way that he was rubbing your shoulder

19  that made you feel uncomfortable?

20      A.    Uncomfortable, yes.

21      Q.    Now, you also -- strike that.

22          Have you told me everything that you can

23  remember about the two to three times Mr. Jose

24  Vasquez touched your left shoulder?

25      A.    When he touched the shoulder, yes.

Page 61

1    Q.   Okay.  Now, you also said that he asked

2  you something along the lines of, "Are you tired?

3  Would you like to sit on my legs?"

4    A.   Yes.

5    Q.   How many times did he ask you that?

6    A.   One time.

7    Q.   What location did that happen at?

8    A.   At the Clinica Sierra Vista in Lamont.

9    Q.   Going back to the -- when he touched your

10  shoulders, do you recall if he touched your shoulder

11  in front of any other person?

12    A.   No.  We would be alone.

13    Q.   What about the one time that that -- in

14  Lamont where he -- he said "Are you tired?  Would

15  you like to sit on my legs?" to your knowledge, was

16  there anybody else around?

17    A.   No.

18    Q.   Did you say anything to him in response to

19  that?

20    A.   Yes.  "I'm not going to sit in your legs."

21    Q.   Did he say anything in response to that?

22    A.   Well, he said, "You said you were tired."

23    Q.   Did you say anything after that to him in

24  regards to his comment about sitting on his legs?

25    A.   Yes.  I said, "I am tired, but I don't

Page 62

1   have to sit in your legs.  I can sit on a chair."

2        Q.   Did he say anything in response to that?

3        A.   He only started to laugh a lot.  That made

4   him laugh lot.

5        Q.   Have you told me all that you can remember

6   about the conversation that you had with Mr. Jose

7   Vasquez in Lamont the one time he said, "Are you

8   tired?  Would you like to sit on my legs?"

9        A.   No.  But there was two or three occasions

10  to -- he told me to clean the spiderwebs.  And at

11  that time he was behind me.  I turned back on an

12  occasion and I saw that he was looking at my buttocks.

13       Q.   I'll -- I'll get to that in a minute.

14       A.   Okay.

15       Q.   I want to just focus for a second on the

16  comment that he made to you about "Are you tired?

17  Would you like to sit on my legs?"

18            My question is:  Have you told me everything

19  that you can remember about the conversation you had

20  with Mr. Jose Vasquez during which time he asked you

21  something along the lines of, "Are you tired?  Would

22  you like to sit on my legs?"

23       A.   From what I can recall, yes.

24       Q.   Now, how many times were you cleaning

25  spiderwebs and you would catch Mr. Jose Vasquez

1    but more or less that distance.

2         Q.   Did Mr. -- did Mr. Jose Vasquez ever tell

3    you that he was looking at your buttocks?

4         A.   He didn't say so, but I could see him.

5         Q.   So you would turn around and you would see

6    his eyes directed toward your buttocks?

7         A.   Yes.

8         Q.   Was he making any facial gestures when he

9    was looking at your buttocks?

10        A.   No.  But it made me feel very uncomfortable

11   because I would turn around, and I didn't like him

12   looking at that area.  Presumably, he was trying to

13   tell me where the spiderwebs were, and not to be

14   looking at my back side.

15        Q.   I have in the general category of his

16   attitude we've discussed, the two to three times he

17   touched you on the shoulder, the time he asked you

18   are you tired would you like to sit on his legs, and

19   the two to three times that he would -- when you

20   were cleaning spiderwebs, he would stand behind you

21   and stare at your buttocks.

22        Besides those things, was there anything

23   else about his attitude that you felt was

24   inappropriate?

25        A.   Yes.  I was cleaning the rest room.  He

1   was standing behind me.  I was cleaning the toilet,

2   and I felt him looking at me.  I don't know how to

3   explain it, but I could feel him looking at me, and

4   it made me feel uncomfortable.  I was washing the

5   toilet.  He just went in, and he said, "What are you

6   doing?"  I said, "What else could I be doing?  I'm

7   cleaning."

8        Q.    How many times did that happen?

9        A.    Just on one occasion.

10        Q.    Where was that at?

11        A.    The same clinica Sierra Vista.

12        Q.    Oh, in Lamont?

13        A.    Yes.

14        Q.    So you were cleaning a rest room, and you

15   believe that he was looking at you from behind?

16        A.    It wasn't that I thought.  I felt it.

17   Something like that.

18        Q.    How did you feel him looking at you?

19        A.    I could feel it.  I was washing.  He

20   arrived.  He was behind me.  And since I know the

21   way he is and how it had happened on other

22   occasions, that it made me feel uncomfortable.

23        Q.    How long did that last?

24        A.    What do you mean how long did it last?

25        Q.    How long did you feel that he was standing

1  behind you and looking at you when you were cleaning

2  the rest room?

3      A.  All the time that it took me to clean the

4  rest room.  I would say about a minute.  I tried to

5  clean it quickly.

6      Q.  Have you told me everything that you can

7  remember about the one time you were cleaning the

8  rest room and you felt he was looking at you from

9  behind?

10     A.  In the rest room, yes.

11     Q.  Now, I have again, under the general

12  category of his attitude, that he touched you on the

13  shoulder two to three times; one time he asked if

14  you were tired and would like to sit on his leg; two

15  to three times he looked at your buttocks from

16  behind when you were cleaning spiderwebs; and, four,

17  he looked at you one time from behind when you

18  cleaning the rest room.

19          Besides those things, was there anything

20  else that you felt was inappropriate about his

21  attitude?

22     A.  When I was cleaning the desk, he said "Get

23  the duster and clean underneath the desk."  And then

24  he said, "Lean forward more so you could see it

25  right."

Page 67

1        THE INTERPRETER:  "See it better."

2        Can you change that?

3   By Mr. Farmer:

4        Q.   Did that happen just one time?

5        A.   Yes.

6        Q.   Why did you feel that was inappropriate?

7        A.   Because I was believe I was leaning down,

8   and I was already passing through the duster, but I

9   felt uncomfortable that he said lean over more to

10  clean, and I could feel that he was watching me.

11       Q.   Did you see him watching you?

12       A.   Specifically, see him looking at me, no,

13  but I could feel it because it had happened on other

14  occasions.

15       Q.   Now, what happened on other occasions

16  exactly?

17       A.   The time about the spiderwebs that I

18  told -- that I looked around and saw him looking at

19  me.

20       Q.   Okay.  I see.  Okay.  Okay.

21            Have you told me everything that you can

22  remember about the time that you were cleaning the

23  desk, and he told you to lean forward more to see it

24  and clean it better?

25       A.   Yes.  That's what I recall.

1        There is another occasion now I recall.

2   In the morning I would go in at 6:00 in the morning.

3   I had to wash down the building with a water hose,

4   and I would see him outside like at the street side

5   parked in his truck, and I could see he was looking

6   at me.

7   BY MR. FARMER:

8        Q.    Let me go back to the way he would speak

9   to you.

10        Are you talking about -- let me strike

11   that.

12        Going back again to your testimony about

13   the way he would speak to you, were you referring to

14   again about him speaking to you with double meaning,

15   or is there something else there?

16        A.    Well, double meaning.  It made me feel

17   uncomfortable.

18        Q.    And I'm -- I'm just trying to -- because

19   you mentioned it.  If you remembered something else

20   or if when you told me just a few moments ago about

21   the way he would speak to you, you were referring to

22   you again how he would speak to you with double

23   meaning?

24        A.    Yes.

25        Q.    Him speaking to you in double meaning,

Page 71

1   correct?

2        A.   Yes.

3        Q.   Okay.   Now, was it just one time that you

4   saw him out in his truck looking at you?

5        A.   Two or three times.

6        Q.   Where did that happen at?

7        A.   At the Lamont clinic.

8        Q.   How do you know he was looking at you from

9   his truck?

10        A.   I could see him.   There is a white truck.

11   It says ABM.   I knew what kind of truck he drove.

12        Q.   Where were you at when he was looking at

13   you?

14        A.   Outside the building.   We had to wash down

15   the building with water in the morning using a water

16   hose.

17        Q.   And that made you feel uncomfortable?

18        A.   Yes.   I would say "Why is it that he is

19   there in the truck just looking at me?   If he has

20   something to tell me, why doesn't get off and tell

21   me what he wants to say instead of just sitting

22   there looking at me."

23        Q.   Was he making any facial expression when

24   he was looking at you?

25             MS. GARCIA:   Objection; calls for

Page 74

1    Q.    Did you ever tell Javier Vasquez that what

2  you were wanting to complain about involved Jose

3  Vasquez?

4    A.    No, because he gave me no opportunity to

5  do so.

6    Q.    So that is a no, correct?

7    A.    Yes. It's a no.

8         MS. GARCIA:   Counsel, it is about 12:18.

9  I don't know if we're going to take a lunch break.

10        MR. FARMER:   Let's -- I think we are about

11 out of tape.

12        Let's go ahead and go off the record.

13        THE VIDEOGRAPHER:   This marks the end of

14 videotape number one of the deposition of Gloria

15 Bernal.

16        We are off the record at 12:18 p.m.

17        (Luncheon Recess taken.)

18        THE VIDEOGRAPHER:   We are back on the

19 record at 12:31 p.m.

20        This marks the beginning of videotape

21 number two in the deposition of Gloria Bernal.

22

23              EXAMINATION (CONTINUED)

24 BY MR. FARMER:

25    Q.    Ma'am, do you understand you are still

Page 63

1   behind you looking at your buttocks?

2        A.   Two or three times, from what I remember.

3        Q.   Where did those two or three times happen

4   at?

5        A.   At the Clinica Sierra Vista in Lamont.

6        Q.   How do you know he was looking at your

7   buttocks?

8        A.   Because I would turn around and tell him,

9   "What spiderweb?"  "Oh, yes, they are right there.

10  Look further ahead, look higher up and try to clean

11  it."

12       Q.   And so by him telling you to look for the

13  spiderweb, that made you believe that he was looking

14  at your buttocks?

15       A.   No, because I would turn around and look

16  at him, and I could see him and what he was looking

17  at.  And I would say, "Where is the spiderweb?"   And

18  then on one occasion, he said it was under a writing

19  desk.

20       Q.   How close behind you was he?

21       A.   Like, from here where this lady is.

22       Q.   And that looks to be about -- about four

23  to five feet.

24            Would that be accurate, in your mind?

25       A.   I don't know if it is four feet or five,

Page 76

1    But again, getting back, you have now told
2  us everything that you can remember in regards to
3  inappropriate conduct that Mr. Jose Vasquez directed
4  towards you?
5        MS. GARCIA:  Objection; asked and
6  answered.
7        THE WITNESS:  From what I recall, yes.
8        Also what bothered me a lot is that he was
9  always laughing about everything.
10 BY MR. FARMER:
11     Q.   What specifically would he laugh at?
12     A.   When he would say things.  For example,
13 when that happened regarding the spiderwebs and the
14 case in the rest room, he was always laughing, then
15 and that made me feel uncomfortable, because -- I
16 don't know.
17     Q.   Are there any other specific times that
18 you recall him laughing where he made you feel
19 uncomfortable?
20     A.   Regarding that it happened directly with
21 me, yes.
22     Q.   Please tell me then.
23     A.   It's because, for example, every time he
24 would say something, he was always laughing, because
25 when I told him -- for example, the time about the

Page 79

1      A.   Well, presumably, I'm not too sure, but it
2  seems she was pregnant from him.
3      Q.   How did you gather that information?
4      A.   Because Jose said so.  She said -- he
5  said, "I have her pregnant and another three."
6      Q.   Jose Vasquez told you that he impregnated
7  Veronica?
8      A.   Yes.
9      Q.   How many times did he tell you that?
10     A.   Two or three times, more or less.
11     Q.   Do you know if Veronica was pregnant at
12 the time he was telling you that?
13     A.   Yes.  She was five months.
14     Q.   Did Veronica ever tell you who the father
15 of the baby was?
16     A.   No.
17     Q.   Did you ever ask Veronica who the father
18 of the baby was?
19     A.   No.  We were always with Jose.  I never
20 had an opportunity to speak to her alone.
21     Q.   Was there anything else that you observed
22 between Veronica and Jose Vasquez that you believe
23 was inappropriate?
24     A.   That he would put his arms around her and
25 when he spoke to her, it was always with double

1  meaning, and then there was the laughter.  And all

2  of that made me feel uncomfortable.

3        Q.   Do you know if Veronica and Jose Vasquez

4  were in some type of romantic relationship?

5        A.   No.

6        Q.   From what you were observing, did Veronica

7  seem to be trying to reject his show of affection or

8  putting his arm around her?

9        A.    Sometimes, yes; sometimes, no, because he

10  needed the work done.

11           MS. GARCIA:  Can you translate -- can you

12  have her repeat that, because there was some problem

13  with the last sentence.

14           THE INTERPRETER:  (Complies.)

15           THE WITNESS:  She needed the -- she needed

16  the job.

17  BY MR. FARMER:

18        Q.   Was there anything else that you observed

19  involving Veronica and Jose Vasquez that you felt

20  was inappropriate that you haven't already shared

21  with us?

22        A.   With Veronica, no.

23        Q.   All right.  Let's move over to Natalie.

24           What did you observe involving Natalie and

25  Jose Vasquez that you felt was inappropriate?

Page 81

1    A.   But first it was Rosalva.

2    Q.   Okay.  Let's do Rosalva next.  That's

3  fine.

4    A.   First I saw things with Rosalva's and then

5  Natalie.

6    Q.   Okay.  Let's talk -- that's fine.  Let's

7  talk about Rosalva.

8         What did you observe involving Rosalva and

9  Jose Vasquez that you felt was inappropriate?

10   A.   That he would put his arms around her and

11  he would remove her -- his arm from her, and he

12  would leave, and she would always tell me "I don't

13  like it when he puts his arms around me, and I feel

14  very uncomfortable."

15   Q.   Anything else that you observed involving

16  Rosalva and Jose Vasquez that you felt was

17  inappropriate?

18   A.   One time I saw her -- her -- her husband

19  had beat her.  She told me that her husband -- that

20  is -- Rosalva's husband had seen -- seen Jose

21  Vasquez put his arms around her.  And I saw her

22  after that, that she had been beat up, and she said

23  that he had beat her up because of it.

24   Q.   She told you her husband beat her up, as

25  in Rosalva?

Page 82

1     A.   Yes.  Yes.  He got jealous.

2          Okay.  This is the situation.  She had two

3 trash bags with her.  She was walking along towards

4 the area where you drop off the trash.  There is a

5 big can.  And her husband was waiting for her in the

6 parking lot.  And Jose was walking along with her,

7 and then Jose hugged her, and her husband saw it and

8 that's -- they had an argument.  And the following

9 day, I seen that she had been beat up, and that is

10 when she told me, when she was going in to her

11 shift.  Her shift was after mine.

12     Q.  And she told you that her husband beat her

13 up?

14     A.  Yes.

15     Q.  Do you recall what her husband's name was?

16     A.  No.  I have never known it.

17     Q.  Anything else involving Rosalva and Jose

18 Vasquez that you observed that you felt was

19 inappropriate?

20     A.  Only when he hugged her and how

21 comfortable she was when he did that, and the jokes

22 and the laughing that made her feel uncomfortable.

23     Q.  Anything else?

24     A.  Not with her.

25     Q.  Now, did Veronica ever tell you that Jose

Page 83

1   Vasquez made her feel uncomfortable, or did she
2   complain to you -- let me strike that.   Let me start
3   over.
4           Did Veronica ever say to you that Jose
5   Vasquez made her feel uncomfortable?
6       A.   She said that sometimes he did, but that
7   she needed the job.
8       Q.   Do you know if Veronica ever complained to
9   anyone at ABM about Jose Vasquez?
10      A.   That I know of, no.
11      Q.   Do you know if Rosalva ever complained to
12  anyone at ABM about Jose Vasquez?
13      A.   That I know of, no.
14      Q.   All right.  Let's move over to Natalie.
15          What did you observe involving Natalie and
16  Jose Vasquez that you felt was inappropriate?
17      A.   The same thing.  That he would want to put
18  his arms around her.
19          Natalie seemed really young, like she was
20  17 or 18 or so.  And it was the same thing.  He
21  would hug her, joking with double meaning, and all
22  the time laughing.  And what I would do is I would
23  just go away because I felt uncomfortable, and I
24  would go do my job.
25      Q.   Besides those things that you just

Page 84

1   described, did you observe anything else involving

2   Natalie and Jose Vasquez that you felt was

3   inappropriate?

4        A.   From what I recall, no.

5        Q.   Did Natalie ever complain to you about

6   Jose Vasquez?

7        A.   Yes.  That he was a dirty man that said

8   dirty things.

9        Q.   Did she tell you specifically what he said

10  that was dirty?

11       A.   No.  She would just say, "Oh, that man, he

12  speaks only dirty stuff."

13       Q.   Do you know if Natalie complained to anyone

14  with ABM about Jose Vasquez?

15       A.   That I know of, no.

16       Q.   When you worked at ABM, did you work a

17  40-hour a week shift?

18       A.   More or less.

19       Q.   When you left ABM, how much were you paid

20  an hour?

21       A.   7.50.

22       Q.   You didn't have any type of benefits

23  through ABM?  And by that, like health benefits or

24  health insurance or vision insurance, or anything

25  like that?

Page 85

1      A.   No.

2      Q.   Did you ever receive any type of written

3  warnings for poor performance while you were at ABM?

4      A.   No.

5      Q.   How did your employment with ABM end?

6           Did you quit, or were you -- or were you

7  fired from your employment?

8      A.   The contract ended with IFDA and a new

9  company came in named TransWest.

10     Q.   And did you become employed with

11 TransWest, or what happened?

12     A.   No.  They said that we had one month to

13 apply because they wanted the same personnel because

14 we knew how to do the work.  They just didn't want

15 to change to the other company.

16     Q.   Did you apply?

17     A.   Yes.

18     Q.   And did you get selected?

19     A.   Yes.

20     Q.   So you did end up working for the new

21 company at the airport then, correct?

22     A.   Correct.

23     Q.   I'm sorry.  You may have said it.  What

24 was the new company's name?

25     A.   TransWest Service.

109

1                          REPORTER'S CERTIFICATE

2

3          I, CYNTHIA R. POLA, CSR No. 11204, Certified

4    Shorthand Reporter, certify:

5          That the foregoing proceedings were taken

6    before me at the time and place therein set forth,

7    at which time the witness was put under oath by me;

8          That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13         That the foregoing is a true and correct

14   transcript of my shorthand notes so taken.

15         I further certify that I am not a relative or

16   employee of any attorney for the parties, nor

17   financially interested in the action.

18         I declare under penalty of perjury under the

19   laws of California that the foregoing is true and

20   correct.

21         Dated this 27th day of November, 2009.

22

23              *Cynthia R. Pola*

24         CYNTHIA R. POLA, CSR No. 11204

25

## HANDBOOK RECEIPT AND ACKNOWLEDGMENT

I acknowledge that I have read and understand the Employee Handbook, and I accept the terms and conditions of employment contained therein.

I understand that this Handbook summarizes the Company's personnel policies and guidelines, and that it is furnished to me solely for my information. I further understand that the policies and procedures contained in the Handbook are not intended to create an employment contract.

I understand that the Company may modify or rescind any of its policies, guidelines, benefits, or practices described in the Handbook at any time, except for its policy of at-will employment and those policies required by law.

Dated: _7/11/06_

_Claimant 10_

(Employee's Printed Name)

_Claimant 10_

(Employee's Signature)

34                                        (07/04)

DEFT(S) _901_ PLF(S) _____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: _November 17, 2009_
WITNESS:

D1351

_901_

# INFORMACIÓN PARA EMPLEADOS SOBRE EL SISTEMA AUTOMÁTICO DE LÍNEA TELEFÓNICA ESPECIAL PARA PRESENTAR QUEJAS DE ACOSO

### *★★★POR FAVOR LEA COMPLETAMENTE, FIRME Y DEVUELVA A SU SUPERVISOR.★★★*

**A:**   TODOS LOS EMPLEADOS, DE ABM JANITORIAL SERVICES
**DE:**   ABM JANITORIAL SERVICES
**ASUNTO:**   NUESTRA LÍNEA TELEFÓNICA PARA PRESENTAR QUEJAS DE PRÁCTICAS COMERCIALES ILÍCITAS, INCLUYENDO ACOSO, FRAUDE CONTABLE O DE AUDITORÍA, DISCRIMINACIÓN, REPRESALIAS Y OTROS ASUNTOS
**FECHA:**   AUGUST 1, 2004

El 2 de abril de 2004, *Harassment Hotline* presentó una versión nueva del sistema *Harassment"(Corporate Accountability) Hotline®* (el sistema "Hotline"), sistema automático para presentar quejas que permite a los empleados informar de violaciones o infracciones tales como acceso ilícito, abuso y fraude en la empresa, discriminación, represalias, robos, infracciones de las medidas de seguridad, fraude relativo a indemnizaciones por accidentes de trabajo y fraude por abuso médico, que los empleados observen o de los que sean víctimas en el lugar de trabajo.

ABM Janitorial Services no tolerará acto alguno que viole o infrinja cualquiera de las normas de notificación que estén cubiertas por el sistema Hotline ni cualquier otro acto civil o penal que interfiera con las actividades comerciales que realizamos.

El sistema Hotline le brinda un medio de comunicación con terceros imparciales y responde a la posición adoptada por la Corte Suprema de los Estados Unidos en cuanto a que las compañías deben "... *demostrar claramente que brindan un proceso sencillo para presentar quejas que esté pensado para alentar a las víctimas de acoso por parte de terceros [y de cualquier otro acto ilícito, como por ejemplo fraude contable o de auditoría] a presentarse e informar del caso*".

Confiamos en que nuestros empleados no tengan que usar el sistema Harassment *(Corporate Accountability)* Hotline® porque esperamos y suponemos que la conducta de todos nuestros empleados estará exenta de acoso alguno o cualquier otro acto ilícito. Aún así, en caso de ser necesario, el servicio del sistema Hotline está a su disposición las 24 horas del día, los 7 días de la semana.

El número de teléfono gratuito es 1-800-97-STOP IT (1-800-977-8674). Nuestra compañía tiene un número de identificación especial: 980043. El sistema Hotline usa la más alta tecnología de voz interactiva y requiere que la persona que llame pulse botones para responder a preguntas básicas durante la llamada inicial. Al finalizar la llamada, quien llame recibirá un número de confirmación especial que le servirá para demostrar que ha notificado un evento cubierto. Por lo general, en un plazo de 12 horas del informe inicial, un profesional se comunicará con usted para revisar lo informado por usted y luego recibir cualquier otra información pertinente. A continuación se enviará el informe completo a su empleador. Quedará a criterio de la ABM Janitorial Services llevar a cabo una investigación completa y detallada de lo informado.

"He leído este documento y me consta que puedo llamar para informar de cualquier acto de acoso ilícito o informar en forma anónima de algún abuso contable o fraude de auditoría, discriminación, ya sea a un representante de la compañía o llamar al sistema Harassment (Corporate Accountability) Hotline® sin temor alguno de sufrir represalias o de quedarme sin trabajo".

Nombre impreso   _Claimant 10_

Firma   _Claimant 10_

Fecha de firma   _7/1/06_

El número de teléfono gratuito para llamar al sistema Hotline es:

**1-800-97-STOP IT • 1-800-977-8674**

El código de identificación de nuestra compañía es: **980043**

Atención: Supervisor
Original al Expediente de Personal
Copia al Empleado

DEFT(S) _903_ PLF(S) _____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: _____
WITNESS: _____



D1354

_903_

# SEXUAL HARASSMENT INFORMATION SHEET
# ACKNOWLEDGEMENT

I acknowledge that I have been provided with a copy of ABM's Company
Policy on Sexual Harassment. I also understand that it is my responsibility
to read this information as provided by my employer, and that I may, at any
time, review the contents contained within this information sheet with my
employer.

Dated: _7/11/06_

_Claimant 10_
(Employee's Printed Name)

_Claimant 10_
(Employee's Signature)

_Jenaya Torre_
(Witness Signature)

ABM-045 (4/99)

DEFT(S) _905_ PLF(S) ____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: _November 17, 2009_
WITNESS:.

D1357

905

# EXHIBIT

# K

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

———————————

U.S. EQUAL EMPLOYMENT          ) Case No.
OPPORTUNITY COMMISSION,        )
                               ) 1:07CV01428 LJO-TAG
              Plaintiff,       )
                               )
        vs.                    )
                               )
ERIKA MORALES AND ANONYMOUS    )
PLAINTIFFS ONE THROUGH EIGHT,  )
                               )
     Plaintiff Intervenors,    )
                               )
        vs.                    )
                               )
ABM INDUSTRIES INCORPORATED    )
AND ABM JANITORIAL SERVICES,   )
INC.; ABM JANITORIAL NORTHERN  )
CALIFORNIA; JOSE VASQUEZ; DOES )
- 10 INCLUSIVE,                )
                               )
              Defendants.      )
                               )


              DEPOSITION OF Claimant 11
              WEDNESDAY, FEBRUARY 24, 2010
                     10:03 A.M.

JOB No. 18790-A




CERTIFIED COPY

David Feldman
W o r l d w i d e

From File to Trial™

California  |  New York  |  Texas
www.david-feldman.com

23

1     houses, what was your rate of pay for that job?

2          A.   I don't remember, because sometimes it was

3     per week or per day.

4          Q.   Do you have an estimate of how much it was

5     per week usually?

6          A.   About 200 per week.

7          Q.   And how many per day -- or how much per

8     day?

9          A.   About 40.

10         Q.   And why did you stop cleaning houses?

11         A.   For the same reason.  I had my child.

12         Q.   Why did you move to Bakersfield?

13              MS. GARCIA:  Objection; relevance.

14              THE WITNESS:  Because of the economy.

15    BY MS. ROBINSON:

16         Q.   So I guess less expensive to live in

17    Bakersfield?

18         A.   Uh-huh, less expensive.

19         Q.   And you said you first applied to work at

20    ABM in 2005, correct?

21              MS. GARCIA:  Objection; that mischaracterizes

22    her prior testimony.

23              THE WITNESS:  2005, yes.

24    BY MS. ROBINSON:

25         Q.   Do you remember the specific date that you

24

1    first applied to work at ABM?

2         A.   The date, I don't remember.

3         Q.   Do you remember the month?

4         A.   I'm not sure, but I think it was September.

5         Q.   Okay.  Why did you decide to go back to

6    work in 2005?

7         A.   Because I wanted to help my husband.

8         Q.   What does your husband do for a living?

9              MS. GARCIA:  Objection; relevance.

10             THE WITNESS:  Driver.

11   BY MS. ROBINSON:

12        Q.   What kind of driver?  Like a truck driver?

13        A.   Yes.  Truck driver.

14        Q.   How did you first hear about ABM?

15        A.   In 2005.

16        Q.   How did you first hear about them, though?

17   Did someone tell you about ABM?  Had you seen the

18   buildings?

19        A.   Somebody told my husband.  Somebody

20   cleaned up at a bank.

21        Q.   Was that a friend of your husband's?

22        A.   No.

23        Q.   Do you know the name of the person who

24   told your husband that?

25        A.   Yes.

43

1  . Q. So Cl·ll is your maiden name?

2  A. Yes.

3  Q. What's the name of your other child?

4  A. Nelson Wilfredo Lopez Zavala.

5  Q. How old is he?

6  A. Eighteen.

7  Q. I'm sorry.  You said "other married name."

8 I just want to clarify:  Have you only been married

9 once?

10  A. Yes.

11  Q. Okay.  Thank you.

12   Do you currently have any relatives working

13 for ABM?

14  A. No.

15  Q. Did you ever have any relatives working for

16 ABM?

17   MS. GARCIA:  Objection; calls for

18 speculation.

19   THE WITNESS:  No.

20 BY MS. ROBINSON:

21  Q. I want to show you another document.

22   MS. ROBINSON:  We will mark this as 2001.

23   (Whereupon, Defendants' Exhibit 2001

24   was marked for identification.)

25 BY MS. ROBINSON:

44

1      Q.   You can take a minute to review it.

2           Does this document look familiar to you at

3      all?

4           MS. GARCIA:   For the record, Exhibit 2001

5      is in English.

6      BY MS. ROBINSON:

7      Q.   Does it look familiar to you?

8      A.   No.

9      Q.   Is that your signature at the bottom of

10     it?

11     A.   Yes.

12     Q.   Do you recall when you received this?

13     A.   No.

14     Q.   Is that your handwriting where it

15     says "Date signed"?  At the bottom it says "September

16     1st, 2005"?

17     A.   Yes.

18     Q.   Do you think you received it September 1st,

19     2005?

20     A.   I think so.

21     Q.   Did you ever receive this document in

22     Spanish?

23     A.   I don't remember.

24     Q.   Do you remember if you ever asked to see

25     this document in Spanish?

46

1     Q.    At any time during your employment.

2           MS. GARCIA:   During her employment with

3     ABM?

4           MS. ROBINSON:   Sorry.   Yes, with ABM.

5           THE WITNESS:   No.

6     BY MS. ROBINSON:

7     Q.    Did you at any time during your employment

8     with ABM understand that you could call a harassment

9     hotline to report harassment?

10    A.    No.

11    Q.    So you never used the harassment hotline?

12    A.    No.

13    Q.    Did you understand at any time during your

14    employment with ABM that it was ABM's policy not to

15    retaliate against you for making complaints of

16    harassment?

17    A.    No.

18    Q.    I'm going to show you another document.

19    This is a sexual harassment information sheet

20    acknowledgment form.   Take a second to review that.

21    And I realize that this document is in English, as

22    well.

23          MS. GARCIA:   And this will be marked as

24    Exhibit 2002?

25          MS. ROBINSON:   Yes.   Thanks.

47

1          (Whereupon, Defendants' Exhibit 2002

2          was marked for identification.)

3    BY MS. ROBINSON:

4          Q.   Is that your signature at the bottom?

5          A.   Yes.

6          Q.   And is that your handwriting where it says

7    your name and the date?

8               MS. GARCIA:   Objection; compound.

9               THE WITNESS:   Yes.

10   BY MS. ROBINSON:

11         Q.   Do you recall receiving this document?

12         A.   No.  I don't remember.

13         Q.   Do you think you received it on

14   September 1st, 2005?

15         A.   Yes.

16         Q.   Did you have any understanding as to why

17   you were signing this document?

18         A.   No.

19         Q.   So the document says, "I acknowledge that

20   I have been provided with a copy of ABM's policy on

21   sexual harassment."

22              Did you have any understanding that you

23   were signing to say that you had received a copy of

24   the policy on sexual harassment?

25              MS. GARCIA:   Objection; vague as to time.

63

1   did your job duties ever change besides that?

2       A.   No.   I would always do the cleaning, and I

3   had to train the other people.   And he told me that

4   he wasn't going to pay for more hours.

5       Q.   When you were training people, was that at

6   Sierra Vista Clinic?

7       A.   Yes.

8       Q.   So would you stay extra hours at Sierra

9   Vista?

10      A.   It wasn't much longer because I was trying

11  to work as fast as possible because they weren't

12  going to pay me.   Sometimes I worked half an hour,

13  40 minutes.

14      Q.   When did you stop working for ABM?

15      A.   I'm not sure, but it was in 2006 at the

16  beginning.

17      Q.   Do you remember the month?

18      A.   It was in January.

19      Q.   Do you think it was the beginning of

20  January?

21      A.   I'm not sure.

22      Q.   Why did you stop working for ABM?

23      A.   Because -- because the day that I

24  decided -- well, I didn't decide.   It was the day

25  that Mr. Jose told me that -- I had already done my

64

1   job.  It was my off time, and it was 12:30.  I was

2   leaving, and I was about -- I was getting my purse

3   when -- when he arrived where I was, and he told me

4   that I had to stay for another two hours.  And then

5   I told him I couldn't because I had already

6   fulfilled my work hours and because my husband was

7   already outside waiting for me.  So he got very

8   upset, and he told me that if I didn't stay,

9   tomorrow not to show up to work.

10      Q.   So is it your understanding that you were

11  fired?

12      A.   I understood that, but I had the hope

13  because I wasn't being fired by the person who hired

14  me.

15      Q.   The person who hired you was Javier?

16      A.   Yes.

17      Q.   Do you remember what words Jose said to

18  you when he -- you said he got very mad.

19          Do you remember anything else that he said?

20      A.   He told me -- well, I remember there was a

21  broomstick next to the door, and very upset -- he --

22  he -- he moved the stick like that -- the broomstick

23  like that.  And he told me, "If you don't stay, you

24  won't have a job tomorrow."

25          MS. GARCIA:  And for the record, it looked

66

1   ambiguous to the term "like that before."

2          THE WITNESS:  No, not before.

3   BY MS. ROBINSON:

4      Q.   So prior to that day, you always left

5   Sierra Vista at 12:30; is that correct?

6          MS. GARCIA:  Objection; mischaracterizes

7   her testimony.

8          THE WITNESS:  I don't know.  Not always.

9   Not always.  Because like I mentioned before, on the

10  last days of my employment -- excuse me -- he

11  sometimes will send people so I could teach them.

12  BY MS. ROBINSON:

13     Q.   What was your rate of pay when your

14  employment ended at ABM?

15     A.   The same when I first started, 7.25.

16     Q.   And that day when Jose told you not to

17  come back the next morning, if you couldn't stay

18  extra hours, was that the last time you saw Jose?

19     A.   Yes.  That was the last time.

20     Q.   Did you ever see Javier after that?

21     A.   I spoke to him over the phone.

22     Q.   When did you speak to him over the phone?

23     A.   The next day after Jose told me that I

24  didn't have any -- my job anymore.

25     Q.   Do you remember what exactly you told

67

1    Javier?

2         A.   Yes.

3         Q.   What did you tell him?

4         A.   I asked him if I could go report to work

5    in the afternoon because the night before the

6    brother had supposedly told me that I had no -- no

7    job.  So that is when I decided to make sure that I

8    still had a job.  And I called and I talked to

9    Mr. Javier.  And he told me that the report was that

10   I had left the job.  That's a lie.  Because I told

11   him what he had told me.  He told me that I was not

12   going to have my job anymore because I didn't want

13   to have to stay and do more hours of work when I was

14   already done with my hours of work.  And that -- he

15   told me that the report that he had given, it was

16   that I had left the job.  So he told me to report to

17   work and that he was going to talk to Mr. Jose.

18   Then he came and he said that he thought it was

19   weird because when I was first given the job, I saw

20   the --

21              THE INTERPRETER:  Hold on.  The

22   interpreter needs a moment.

23              THE WITNESS:  When he saw my performance

24   on my job --

25   BY MS. ROBINSON:

68

1    Q.   Okay.

2    A.   The report that he gave after I was hired

3    is that I was an excellent worker.  That's why he

4    felt it was weird that the person who had made that

5    report giving me the job was now changing his mind.

6    Q.   Okay.  So you -- I think you said that

7    Javier told you to report back to work and that he

8    would talk to Jose; is that correct?

9    A.   Yes.

10   Q.   And did you report back to work then?

11   A.   No.  My husband didn't want me to.

12   Q.   Why not?

13   A.   He told me it is not good what is going

14   on.  Because if you already fulfilled your work

15   duties, why does he want you to stay longer.  And

16   also the way he spoke to me wasn't appropriate for

17   me.

18   Q.   So when you talked to Javier on the

19   telephone, did you actually go back to work ever?

20   A.   No.

21   Q.   Was the last time you had contact with

22   Javier or Jose that time you talked to Javier on the

23   telephone?

24   MS. GARCIA:  Objection; that's vague and

25   ambiguous.  I don't believe she testified that Jose

83

1    Q.   Did you ever see them kiss?

2    A.   No.

3    Q.   So when Jose came to your work location

4  and he tried to talk to you, what would he say to

5  you?

6    A.   Okay.  One time he -- when I met him, I

7  thought he was a person -- I don't know how to

8  describe it.  Well, I thought he was a good person.

9  But the first time he disrespected me was when he

10  touched my shoulder.  On another time he blew over

11  here like as a surprise.

12    MS. GARCIA:  She is pointing to her ear

13  and her neck.

14  BY MS. ROBINSON:

15    Q.   He blew on your neck?

16    A.   Yeah, uh-huh.

17    Q.   Did he ever --

18    MS. GARCIA:  I don't know if she was done.

19    MS. ROBINSON:  Oh, I'm sorry.

20    THE WITNESS:  And on another time --

21    THE INTERPRETER:  The interpreter needs to

22  inquire.

23    THE WITNESS:  Another time when I was

24  cleaning the laboratory, he came in and he got close

25  to my body, and he told me that I smelled good and

84

1   why did I -- I -- I --

2          THE INTERPRETER:   The interpreter needs a

3   moment to think about it.

4          THE WITNESS:   Why did I fix myself up so

5   well to -- to go to work.   And always whenever I was

6   alone -- because we would divide the work with my

7   co-worker.   And at the times I was distracted

8   cleaning, he would show up, and when I looked back,

9   he was already looking at me.   And then I said I

10   felt uncomfortable on the way that he was looking at

11   me.

12          On another time I was cleaning the

13   bathroom, and he came into the bathroom, and there I

14   also felt uncomfortable because -- I don't know.   I

15   don't know.   He was looking at me very strangely.

16   At some other times he made some comments about my

17   mouth, about what wouldn't he do with my mouth.   At

18   another time he touched my hip, like two -- like

19   twice -- two to three times.

20   BY MS. ROBINSON:

21      Q.   Anything else?

22      A.   And also when we would take our rest time,

23   our break, he would play recordings where women

24   would call him.   He would always try to get there at

25   the time we were eating.   He would laugh at the

85

1   matter that women would call him to ask for money

2   for their children.  Well, what he did, as he would

3   start playing the recordings of what he said, was

4   that they had to suffer.

5           And then one time that I told him to keep

6   his distance, he asked me why do you women play hard

7   to get if at the end we always fall for it.

8           And some other time my co-worker mentioned

9   that -- Belen mentioned to me that she didn't

10  hear -- that she -- that she -- so -- because we

11  would send girls so we could teach them, that one

12  time he showed up with that girl.  And Belen told me

13  that he -- she had seen when he was saying things to

14  the girl, and they were in an office all by

15  themselves.  I didn't pay much attention.  I just

16  said something like "That's his problem" because I

17  was focusing on my job.  She said, "Look, that's why

18  he gets into trouble."  But I don't know why she

19  made that comment to me.

20          And at the times when he would try to talk

21  to me was the times I was all by myself cleaning up

22  the offices.  One time I was cleaning the windows.

23  I was standing on a chair when I saw that he was

24  looking at my body, the lower part, and he would try

25  to find a way to tell me, "Look, you have to clean

86

1   up the things that are higher up."  And one time I

2   told him I couldn't because I could fall down.  And

3   he said, "No.  You have to do it because some

4   supervisors are going to come on a certain day, and

5   it has to be clean."  I understand it was part of my

6   work -- my job, but -- but there were some places

7   that I would imagine that weren't very appropriate

8   for a woman to get on top.

9        Q.   Okay.  Is there anything else you could

10  remember?  We are -- I want to go through all the

11  stuff you just mentioned a little more in detail,

12  but is there any other incidents that you recall

13  right now?

14       A.   When we were -- more than anything, the

15  three employees, and we -- it was a little work.

16  And we were eating one time, he mentioned that he

17  liked women with big boobs, and I would feel bad.  I

18  would feel bad because there were comments that

19  were --

20            Also on another time -- something else.

21  When it was my off time, time to get off work, at

22  least my husband talked to me about it.  Sometimes I

23  would have disagreements with my husband because he

24  would tell me that he was not happy with that job,

25  because whenever I get off work, the man would come

87

1      out to the door, and he would wait until I got into

2      my husband's car, to be able to go back to the

3      clinic.  And my husband asked me one time, "Why does

4      he do that?"  And I said, "I don't know.  Maybe --

5      maybe he wants to make sure that I'm okay."  But

6      that was constant that he would come out to the

7      door.  And after I would leave with my husband, that

8      is when he would go back inside or then -- or he

9      would leave.

10          Q.    Okay.

11              MS. GARCIA:  I don't know if she is done.

12     BY MS. ROBINSON:

13          Q.    Is there anything else that you remember?

14          A.    Yes.  One time I remember that I was

15     cleaning some shelves in an office.  Well, it wasn't

16     an office.  It's a clinic.  And I was standing up,

17     and I didn't realize when he came in.  He was always

18     dressed in black.  And at the moment he stood behind

19     me, I got nervous, but I don't know.  At that moment

20     I don't know how long he had been there watching me.

21     He would always try to say a way to tell me, "  Cl. 11

22     you have to do this faster."

23              Also, one time I found him and Belen --

24     Belen and him alone in a room, and she -- she was

25     crying.

89

1    off or pulled his hand away?  How did you respond?

2        A.   He touched me.  I did this (indicating),

3    and I told him to respect me.

4        Q.   And when you said you "did this," it

5    looked like -- like you were pulling his hand off.

6             Is that what you were gesturing?

7        A.   Yes.

8        Q.   And did he say anything or did he just

9    leave?

10       A.   He left.

11       Q.   Where did this take place?

12       A.   At the Sierra Vista in Lamont.

13       Q.   Where in the clinic?  In the offices or

14   one of the rooms?

15       A.   One of the rooms.

16       Q.   And did he come up behind you and put his

17   hand on your shoulder?

18       A.   Here on the shoulder.  I don't know.  It

19   was from behind or on the side because I was

20   cleaning the windows.

21       Q.   Did you ever complain about this incident

22   to anyone other than what you told Jose at the time

23   about respecting you?

24       A.   No.

25       Q.   Why not?

90

1    A.   Because I didn't think it was so much to

2  put in a complaint.

3    Q.   So you didn't think it was a big deal?

4        MS. GARCIA:   Objection; that

5  mischaracterizes her testimony.

6        THE WITNESS:   I didn't understand very

7  well.   What was that?

8  BY MS. ROBINSON:

9    Q.   You said you didn't complain.

10       Did you not complain because you didn't

11  think it was a big deal at the time?

12   A.   Yes, that's correct.

13   Q.   Was anyone else present in the building

14  when this happened, when he touched you on the

15  shoulder?

16   A.   My other two co-workers, but they weren't

17  in the same area.

18   Q.   And that's Alex and Belen?

19   A.   Yes.

20   Q.   And did anyone see Jose touch your

21  shoulder on this occasion?

22       MS. GARCIA:   Objection; calls for

23  speculation.

24  BY MS. ROBINSON:

25   Q.   That you know of.

105

1    in front of his employees.

2         Q.   Did you feel like it was harassment?

3         A.   More than anything, I feel like it was

4    more like a mockery of an example he was setting.

5         Q.   Did you tell him it bothered you?

6         A.   No.  But I tried to eat fast and get up

7    from the table.

8         Q.   Did you tell anyone else that the

9    recording bothered you?

10        A.   No.

11        Q.   I think you said another time when you

12   were eating Jose commented that he liked women with

13   big boobs; is that correct?

14        A.   Yes.

15        Q.   Did that happen just the one time?

16        A.   Yes, one time.

17        Q.   And do you remember when that was?

18        A.   No.

19        Q.   But was it -- would you say it was around

20   kind of two months into your employment like the

21   other stuff?

22        A.   Yes.

23        Q.   Do you remember his exact words that he

24   used?

25        A.   Yes.  He referred to that -- to the fact

109

1    that's when he said, "Here, I brought you your

2    liquid." But I never thought with what purpose he

3    did that with the liquid. He didn't put it in the

4    garage where we have the liquid.

5         Q.   When he said -- when he finally said, "I

6    brought you the liquid," did you move out of the

7    doorway at that time?

8         A.   Yes. I took the liquid from him, and I

9    kept going to -- to where I was going to continue

10   cleaning.

11        Q.   How long was he standing in the doorway

12   before he moved?

13        A.   It was right away because he -- I was on

14   my way out, and he was coming. And he moved like

15   this. And then he said "Here, here is your liquid."

16             MS. GARCIA:  And she was moving her hands

17   side to side.

18   BY MS. ROBINSON:

19        Q.   Were there any other witnesses to any of

20   the conduct -- the inappropriate conduct you

21   described other than Alex and Belen?

22        A.   No.

23        Q.   Did Jose ever ask you to have sex with

24   him?

25        A.   No.

111

1    you that you thought was inappropriate other than

2    what you've already told me?

3        A.   No.   That's all.   But just the part about

4    him -- about I -- me going to his house.   He

5    insisted a lot about that.

6        Q.   How often did he insist that you go to his

7    house or ask you to go to his house?

8        A.   It was during the week that he insisted

9    and insisted.   And since I wouldn't say yes or no,

10   he said, "You are bad because you don't want to go

11   clean up my house."

12       Q.   Other than the times that you told Jose

13   that he needed to respect you or when you ignored

14   him or pushed him away, did you ever make a

15   complaint to anyone else about Jose's conduct

16   towards you?

17       A.   No.

18       Q.   Why not?

19       A.   People at work or people close to me?

20       Q.   Good question.   People at work, like people

21   at ABM?

22       A.   No.

23       Q.   How come you didn't complain?

24       A.   Maybe because of the lack of information,

25   or maybe I thought they weren't going to support me

112

1    on that.

2        Q.   Why did you think they wouldn't support

3    you?

4        A.   Because -- I don't know.  I didn't

5    consider about complaining for the same reason

6    because -- because maybe -- I don't know.  That was

7    something I was feeling embarrassed about, too.

8    They weren't going to believe me.

9        Q.   Was there any particular reason you felt

10   that way or that's just how you felt?

11       A.   More than anything, I was embarrassed.

12       Q.   Are you aware of any other employees who

13   complained about inappropriate conduct that -- by

14   Jose?

15       A.   No.

16       Q.   Did you ever complain to anyone at ABM

17   about anything else?

18       MS. GARCIA:   Objection; the word

19   "complain" is vague.  "Anything else" is also vague

20   and ambiguous.

21   BY MS. ROBINSON:

22       Q.   Anything else related to your work

23   conditions aside from conduct by Jose.

24       A.   I didn't understand the question correctly.

25       Q.   Did you ever make complaints to anyone at

132

REPORTER'S CERTIFICATE

1

2

3      I, CYNTHIA R. POLA, CSR No. 11204, Certified

4   Shorthand Reporter, certify:

5      That the foregoing proceedings were taken

6   before me at the time and place therein set forth,

7   at which time the witness was put under oath by me;

8      That the testimony of the witness, the

9   questions propounded, and all objections and

10  statements made at the time of the examination were

11  recorded stenographically by me and were thereafter

12  transcribed;

13     That the foregoing is a true and correct

14  transcript of my shorthand notes so taken.

15     I further certify that I am not a relative or

16  employee of any attorney for the parties, nor

17  financially interested in the action.

18     I declare under penalty of perjury under the

19  laws of California that the foregoing is true and

20  correct.

21     Dated this 8th day of March, 2010.

22

23

24     _Cynthia R. Pola_

25  CYNTHIA R. POLA, CSR No. 11204

12/07/2009  00:45 15596511835                ABM                        #0907 P.015/018

# EMPLOYEE INFORMATION REGARDING THE HARASSMENT HOTLINE®

### * * * PLEASE READ FULLY, SIGN BELOW AND RETURN TO YOUR SUPERVISOR. * * *

**TO:**      ALL EMPLOYEES

**FROM:**    ABM JANITORIAL SERVICES

**SUBJECT:** OUR COMMITMENT TO A ZERO TOLERANCE POLICY AGAINST EMPLOYEE HARASSMENT

**DATE:**    JANUARY 1, 1999

ABM Janitorial Services has a zero tolerance policy regarding any discriminatory, harassing, or retaliatory conduct in the workplace. Pursuant to that policy, ABM Janitorial Services has subscribed to a telephone reporting/complaint service called the Human Resources ("HR") Harassment Hotline® so that our employees can readily report such acts (as well as theft and safety matters) without fear of retaliation, job loss or embarrassment.

The hotline is an unbiased, third party reporting system and satisfies the United States Supreme Court's position that companies must "...clearly show they provide a simple complaint process that is calculated to encourage victims of harassment to come forward."

We do not anticipate that our employees will need to use the HR Harassment Hotline®, as we expect and assume that all of our employees will conduct themselves free of harassment. Still, if it is needed, the service is available and allows ANY employee to report any allegation of sexual harassment, discrimination, retaliation, theft, or any safety concern that occurs in the workplace or any harassment by a third party.

For the convenience of our employees, the Hotline can be accessed 24-hours per day, 7-days per week. The toll-free number is 1-800-97-STOP IT which is 1-800-977-8674. Our Company has a unique identification number, it is 980043. Remember that any employee may call the toll-free telephone number at any time and report harassment, discrimination, retaliation, theft, or any safety concern without fear of retaliation.

Sexual harassment, discrimination, retaliation and other dysfunctional behavior cannot and will not be tolerated under any circumstances. The only way we can stop such behavior in the workplace is bring it out into the open by communication and total employee/employer cooperation.

"I have read this document and I understand that I can report any act of harassment (sexual or otherwise) to either a company representative or call the HR Harassment Hotline® without fear of retaliation or job loss."

Print your name ___ *Claimant 11* _____

Sign your name ___ *Claimant 11* _____

Date signed  *9-1-005*

The toll free harassment hotline telephone number is:
**1-800-97-STOP IT • 1-800-977-8674**
**Our Company Identification Code is: 980043**

Attn: Supervisor
Original to Personnel File
Copy to Employee

DEFT(S) _2001_ PLF(S) ____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE _February 24, 2010_
WITNESS:



# SEXUAL HARASSMENT INFORMATION SHEET
## ACKNOWLEDGEMENT

I acknowledge that I have been provided with a copy of ABM's Company Policy on Sexual Harassment. I also understand that it is my responsibility to read this information as provided by my employer, and that I may, at any time, review the contents contained within this information sheet with my employer.

Dated: _9-1-005_

_Claimant 11_
(Employee's Printed Name)

_Claimant 11_
(Employee's Signature)

(Witness Signature)

DEFT(S) _2009_ PLF(S) _____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR # 11204
DATE: _February 24, 2010_
WITNESS:

ABM-045 (4/96)

# EXHIBIT

# L

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

_____

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT<br>OPPORTUNITY COMMISSION, | ) Case No.<br>) |
|         Plaintiff, | ) 1:07CV01428 LJO-TAG<br>) |
|     vs. | )<br>) |
| ERIKA MORALES AND ANONYMOUS<br>PLAINTIFFS ONE THROUGH EIGHT, | )<br>) |
|    Plaintiff Intervenors, | )<br>) |
|     vs. | )<br>) |
| ABM INDUSTRIES INCORPORATED<br>AND ABM JANITORIAL SERVICES,<br>INC.; ABM JANITORIAL NORTHERN<br>CALIFORNIA; JOSE VASQUEZ; DOES<br>- 10 INCLUSIVE, | )<br>)<br>)<br>)<br>) |
|     Defendants. | )<br>) |

DEPOSITION OF **Claimant 12**
TUESDAY, NOVEMBER 17, 2009
2:57 P.M.

JOB No. 18077-B

Page 19

1      A.    Yes.

2      Q.    Now, during the eight years that you have

3   been in Bakersfield, during that entire time, have

4   you been able to understand a little bit of English?

5      A.    Yes.

6      Q.    Have you ever been convicted of a crime?

7      A.    No, never.

8      Q.    Do you have a personal computer?

9      A.    My daughter.

10     Q.    Do you ever use your daughter's computer?

11     A.    No.

12     Q.    Have you ever used a computer for sending

13  or receiving e-mail?

14     A.    No.

15     Q.    When did you first start working for ABM?

16     A.    April -- I think it was 2005.

17     Q.    I want you to go back to that point in

18  time and share with me, please, who you worked with

19  right before you came to work for ABM.

20     A.    I worked in the grapes in the field, and a

21  while ago I worked at a furniture store, company.

22     Q.    Was that -- when you worked at the

23  furniture store company, was that before you worked

24  at ABM or after you worked at ABM?

25     A.    I worked in the grapes before working at

8a2b39d8-dc8b-4572-aade-4a3ba9b95d47

Page 26

1           The application, you filled that out at

2   the ABM office, correct?

3           A.   Yes.

4           Q.   Now, Exhibit 910 is dated at the top

5   April 11, 2005.

6           Does that date appear to jibe with your

7   memory as to the date you filled out the application?

8           A.   I don't remember, but I think so.

9           Q.   Do you remember if you filled out any

10  other documents besides the application at the date

11  and time that you filled out the application?

12          A.   I don't remember.

13          MR. FARMER:   Let's mark as Exhibit 911.

14          MS. GARCIA:   Just for the record,

15  Exhibit 911 is in English.

16          (Whereupon, Exhibit No. 911 was

17          marked for identification.)

18  BY MR. FARMER:

19          Q.   My question to you, ma'am, once you have a

20  time to look at that, if you recognize what we

21  marked as Exhibit 911?

22          A.   Yes.

23          Q.   Is that your signature on Exhibit 911?

24          A.   Yes.

25          Q.   Do you recall reading what's been marked

8a2b39d8-dc8b-4572-aade-4a3ba9b95d47

Page 32

1          Now besides that, do you remember if Jose

2    Vasquez had said anything else to you on that day?

3          A.   I don't remember.

4          Q.   Did Mr. Vasquez tell you where you would

5    be working for -- or what location you would be

6    working at for ABM?

7          A.   I only remember -- I don't remember if it

8    was that day or the following day that I worked in a

9    company -- a telephone company.

10         Q.   When was your last day at ABM?

11         A.   I don't remember.

12         Q.   Was it this year some time?

13         A.   No, not this year.

14         Q.   Was it some time in 2008?

15         A.   I don't know.  I don't remember.

16         Q.   How many years do you estimate that you

17   worked at ABM?

18         A.   About 6, 7, 8 months.  I don't know.

19         Q.   Okay.  If you filled out the application

20   on April 11, 2005 --

21         A.   Yes.

22         Q.   -- would your -- to your estimation, your

23   employment would have ended some time then in 2005?

24         A.   I don't remember.

25         Q.   You said it was only six to eight months

Page 33

1    that you worked at ABM, correct?

2         A.   Yes.

3         Q.   Nine months from April would have been

4    about approximately December of 2005 or maybe even

5    January of 2006.

6              Do you remember if you were still working

7    at ABM around Christmastime of 2005?

8         A.   No.

9         Q.   So your employment would have ended some

10   time before then?

11        A.   Yes.

12        Q.   Do you remember if you were working at ABM

13   around, let's say, Halloween time in 2005?

14        A.   No, not on Halloween.  Before, I think.

15        Q.   So would you -- would your employment have

16   ended then some time in September 2005?

17        A.   Yes.

18        Q.   Now, through that entire time that you --

19   you worked at ABM, did you work at the same location?

20        A.   No.

21        Q.   Now, you worked at the telephone company,

22   correct?

23        A.   Yes.

24        Q.   What other locations did you work at?

25        A.   There were the offices at ABM, the radio,

8a2b39d8-dc8b-4572-aade-4a3ba9b95d47

Page 41

1    harassing me.  That is strong for me.  He would
2    always do it when he was alone.  When I was alone,
3    he would do that.  What it was more at church, really.
4         Q.   Anything else -- again, I'm going to ask
5    you some more questions about these, ma'am.  I'm
6    trying to get a general list first here, if I can.
7         Now, besides what you told me before about
8    telling you bad things, hugging you, strong words
9    towards you, look for the opportunity to be alone
10   with you, hugged you at church, anything else that
11   you felt that he did that was inappropriate towards
12   you?
13        A.   One time also at the gas station he
14   followed me, and there he told me that he wanted to
15   be with me, and I said no.  I said not to be
16   bothering me and not to be telling me that.
17        Q.   Anything else that we need to add to the
18   list?
19        A.   Right now I don't remember more.
20        Q.   Okay.  Let me go -- now, I'm just letting
21   you know where I'm going, ma'am.  I'm going to go
22   through the list that you gave me and ask you some
23   more specific questions.
24        Now, the first thing that I have is that
25   he would tell you bad things.  And you had told me

Page 43

1          THE VIDEOGRAPHER:   No.

2

3                    EXAMINATION (CONTINUED)

4     BY MR. FARMER:

5          Q.   Ma'am, you understand you are still under

6     oath?

7          A.   Yes.

8          Q.   Now, when we left off, we were chatting

9     about the first area of things that you had that you

10    felt Mr. Vasquez did inappropriate towards you and

11    that was telling you bad things.

12               And I had in my notes that you were

13    getting ready to tell me more specifically as to

14    what bad things he had told you.

15               So I will ask you to please tell me what

16    bad things he had said to you.

17          A.   Well, sexual positions, how he would put

18    the people where -- with whom he was going out with,

19    and that if he would put me like that, the way he

20    would put them, I would like it, and I would come

21    back to him again.

22          Q.   Now, what did you -- what did you mean by

23    where he would put the people?

24          A.   The sexual positions.

25          Q.   Did he list specifically names or

1   descriptions of any type of sexual positions?

2        A.   He would speak about the oral sex -- oral

3   sex, and he put give the commentary of -- he would

4   say that he would make them -- the jump of the

5   tiger.  He would say something like that.  That is

6   all he would do is just be talking about sexual

7   things of how he was going to put me.

8        Q.   He -- I think you said jump of the tiger?

9        A.   Yes.  He would speak like that.

10            According to him, he was joking about how

11   he would put them.

12        Q.   I'm sorry.  What was the joke?

13        A.   Well, he would talk about the positions in

14   which -- how he would put them and how I was going

15   to like it, that he was going to do to me, and I was

16   going to like it and all that stuff.

17        Q.   Now, was the jump of the tiger, was that a

18   sexual position, to your understanding?

19        A.   Yes.

20        Q.   Did he describe what the position was to

21   you as well?

22        A.   No.

23        Q.   Now, besides the jump of the tiger, did he

24   specifically describe any other sexual positions to

25   you?

Page 47

1   important that you share with us what you can

2   remember specifically what he said.

3        A.   I don't remember.

4        Q.   So what I have about bad things was that

5   he would discuss sexual positions.   The only

6   positions that I have that you could remember were

7   talking about oral sex and jump of the tiger and

8   where he would put people.

9             MS. GARCIA:   Objection that mischaracterizes

10  her prior testimony.

11  BY MR. FARMER:

12       Q.   Was there anything more specific than that

13  that you can remember that you want to share here

14  with us today?

15       A.   More he would always be tell me the same

16  things.   I would try to not hear the dumb things

17  that he would always tell me.

18       Q.   And I understand that but --

19       A.   I don't remember.

20       Q.   -- if there is something else you remember

21  that you haven't shared with us, we need for you to

22  please share that with us.

23            Is there anything else?

24       A.   That he would do to me and tell me about

25  the time when I was alone he would try to touch me

Page 49

1   remember that you haven't shared with us already?

2        A.   I don't remember.

3        Q.   How many times did he use these strong

4   words towards you?

5        A.   All the time that I was working, two or

6   three times a week.

7        Q.   And was that the entire time that you

8   worked at ABM?

9        A.   Uh-huh.

10       Q.   That's a "yes"?

11       A.   Yes.

12       Q.   To your knowledge, did he ever use strong

13  words or direct strong words towards you when any

14  other person was around?

15       A.   Claimant 4 gave me the commentary the time

16  that he was working at the airport that I bent over,

17  he made a comment -- a vulgar commentary that when I

18  bent over, and he said "that ass" or something.   I

19  don't know, something like that, my rear.   I don't

20  know.

21       Q.   I think you said Claimant 4

22       A.   (Witness nods head.)

23       Q.   That's a "yes"?

24       A.   Yes.

25       Q.   Is her last name Claimant 4

8a2b39d8-dc8b-4572-aade-4a3ba9b95d47

Page 50

1      A.    I don't remember her last name.

2      Q.    But it was Claimant 4 that overheard that

3   comment?

4      A.    Yes.

5      Q.    Was there any other person besides

6   Endelissa, to your knowledge, that overheard Jose

7   Vasquez say strong words towards you?

8      A.    No.

9      Q.    And that just happened once that

10  had overheard that?

11         MS. GARCIA:  Objection; calls for

12  speculation.

13         THE WITNESS:  That I know of only

14  Claimant 4

15  BY MR. FARMER:

16     Q.    Did you complain to anyone at ABM about

17  Jose Vasquez using strong words towards you?

18     A.    To Claimant 4

19     Q.    And Claimant 4 -- was she a co-worker?

20     A.    Yes.

21     Q.    She was not your supervisor, correct?

22     A.    No.

23     Q.    Besides Claimant 4 did you complain to

24  anyone else at ABM about the strong words that Jose

25  Vasquez directed towards you?

Page 51

1        A.    To the girl with whom she was -- he was

2    going out with would tell him -- tell her that he

3    was flirting.

4        Q.    The girl that Jose Vasquez was going out

5    with?

6        A.    Yes.

7        Q.    Do you remember her name?

8        A.    I forgot her name.

9              Belen.

10       Q.    Belen?

11       A.    Yes.

12       Q.    And you don't recall that person's last

13   name?

14       A.    No.

15       Q.    Was Belen -- was she an employee of ABM,

16   to your knowledge?

17       A.    Yes.

18       Q.    Was she a supervisor?

19       A.    No.

20       Q.    She was another janitor?

21             MS. GARCIA:   Objection; calls for

22   speculation.

23             THE WITNESS:   She would clean.

24   BY MR. FARMER:

25       Q.    So besides *Claimant 4* and Belen, did you

Page 52

1    tell anyone else at ABM about Jose Vasquez directing

2    strong words towards you?

3         A.   Angelica.

4         Q.   And that was your first friend that helped

5    you get your job at ABM?

6         A.   Yes.

7         Q.   And she wasn't a supervisor with ABM, was

8    she?

9              MS. GARCIA:  Objection; calls for

10   speculation.

11             THE WITNESS:  I didn't understand.  Sorry.

12   BY MR. FARMER:

13        Q.   Angelica -- was she -- was she somebody

14   that was doing cleaning work like yourself for ABM?

15        A.   Yes.

16        Q.   To your knowledge, was Angelica a

17   supervisor?

18        A.   No.

19        Q.   Okay.  Besides Claimant 4    Belen and

20   Angelica, did you tell anyone else with ABM about

21   strong words being directed towards you by Jose

22   Vasquez?

23        A.   No.

24        Q.   Did Claimant 4 Belen or Angelica -- did

25   any of them tell you to go complain to anyone else

Page 58

1    Q.   Well, let me -- let me -- what is -- what

2    is your understanding -- what is your understanding

3    of a hug?

4    A.   When he comes in the back and he hugs you,

5    and then I push him away rapidly.

6    Q.   How many times did that happen?

7    A.   Two or three times.  The time that he

8    hugged me more was when I was inside the rest room.

9    Q.   And what was different about that time?

10   A.   He did hug me a stronger.  He did hug me

11   there well.

12   MS. GARCIA:  Again, just for the record,

13   she is lifting her hands in a cross motion towards

14   her chest.

15   BY MR. FARMER:

16   Q.   So you pushed him away two to three times

17   where he tried to hug you, correct?

18   A.   Yes.

19   Q.   And then there was the one time in the

20   church where he actually hugged you?

21   A.   Yes.

22   Q.   Now, the one time in the church when he

23   hugged you, did he touch your breasts?

24   A.   Well, he put his hands here on my breasts.

25   Q.   Did he put his hands above your breasts,

Page 59

1    on your breasts, below your breasts?

2         A.    Above my breasts.

3              THE VIDEOGRAPHER:   Clip it on the -- right

4    here.

5    BY MR. FARMER:

6         Q.    That one time that he hugged you in the

7    rest room at the church, how long did that last?

8         A.    Seconds.   Seconds.

9         Q.    Did he say anything as he was hugging you?

10        A.    Not to scream, because I started to

11   scream.  And I would tell him that I was going to

12   scream so that Belen could hear.  And I would say,

13   "Well, I'm going to scream and Belen is going to

14   hear me."  And he said, "Don't scream because they

15   are going to hear us."

16             MS. GARCIA:   And I heard in Spanish she

17   said Belen "novia."  You might want to ask her.

18             THE WITNESS:   Yes.   It was his girlfriend

19   at that time.

20   BY MR. FARMER:

21        Q.    Did he say anything else to you that one

22   time he hugged you in the church?

23        A.    Only not to be -- to scream because they

24   were going to hear us, and then I rapidly left and

25   he also left.

Page 60

1          Q.    When did he hug you in the rest room of

2    the church in time?

3          A.    Excuse me.   Did you say what time?

4          Q.    I was trying to find out what date and

5    time.

6                We have that you worked at ABM

7    approximately from April 2005 through September 2005,

8    and I'm trying to find out when in that range the

9    hug occurred.

10         A.    Night about 12:00, 1:00 in the morning.

11         Q.    Do you remember the approximate date?

12         A.    No.

13         Q.    Was it closer in time to when you started

14   with ABM, the middle, towards the end?

15         A.    The middle.

16         Q.    Have you told me everything that you can

17   remember about Jose Vasquez hugging you while you

18   worked at ABM?

19         A.    Yes.

20         Q.    Now, you also said that you believed he

21   looked for opportunities to be alone with you.

22               Do you recall that?

23         A.    Yes.

24         Q.    How do you know that he looked for

25   opportunities to be alone with you?

Page 61

1     A.    Because we worked, his girlfriend and I,

2    together.  So then when he would come, he would see

3    me alone he would go with me when I was alone.

4     Q.    And was that when he would use the strong

5    words?

6     A.    Yes.

7     Q.    Now, in regards to Jose Vasquez hugging or

8    trying to hug you, did you complain to anybody at

9    ABM about that?

10     A.    No.

11     Q.    Any particular reason why you didn't

12    complain?

13     A.    No.  I would always tell my friend about

14    that, and we didn't know who we could come complain

15    to because we would never see anyone.  It was always

16    him who we would see all the time only.

17     Q.    Did you know a gentleman by the name of

18    Javier Vasquez that worked at ABM?

19     A.    Yes.

20     Q.    What was your understanding of Javier

21    Vasquez's position?

22     A.    That he was higher than -- higher than his

23    brother.

24     Q.    His brother as in?

25     A.    There was a higher position and that's

Page 62

1   his.

2       Q.    You said he was higher than his brother.

3   Are you referring to Jose Vasquez?

4       A.    Javier -- Javier was more -- more than

5   him, yes.

6       Q.    Did ever know or understand that you could

7   complain to Javier Vasquez about misconduct of Jose

8   Vasquez?

9       A.    No.

10      Q.    How often did you feel that -- strike

11  that.

12          During the entire time that you worked at

13  ABM, how often, to your understanding, did Jose

14  Vasquez look for opportunities to be alone with you?

15      A.    I think because every time he would come,

16  I was alone.  Belen was very rapid to work.  She

17  would finish up all the time.

18      Q.    Well, I had it down that there would be

19  two to three times a week that he would use strong

20  words towards you.

21          Would he look for opportunities for you to

22  be alone then about two to three times a week?

23          MS. GARCIA:  Objection; calls for

24  speculation.

25          THE WITNESS:  Yes.

Page 63

BY MR. FARMER:

Q.   Have you told me everything that you can remember about your belief that Jose Vasquez would look for opportunities to be alone with you?

A.   Yes.

Q.   Did you complain to anyone at ABM about your belief that Jose Vasquez looked for opportunities to be alone with you?

A.   No.   I never complained.   I never complained to anyone in the office.

Q.   Did you complain to someone?

A.   Only with the co-workers.

Q.   And by co-workers, do you mean Belen, Angelica and Claimant 4

A.   Yes.

Q.   And did you tell your co-workers as well that Jose Vasquez had hugged you and tried to hug you?

A.   I told Claimant 4 that.

Q.   But you didn't tell Belen or Angelica?

A.   No.

Q.   Now, the last thing that I had on my list was you were at a gas station, and he said he wanted to be with you.

A.   Yes.

MS. GARCIA:   Objection; that

8a2b39d8-dc8b-4572-aade-4a3ba9b95d47

Page 73

1    question?

2               MR. FARMER:  Have the question read back,

3    please.

4               THE COURT REPORTER:  "By that, do you mean

5         ABM lost the contract with the church?"

6               THE WITNESS:  Yes.

7    BY MR. FARMER:

8         Q.    And those 10 to 15 hours that you were

9    working a week after that, was -- was that done

10   working at the ABM offices and the radio station?

11        A.    After what?  I'm sorry.

12        Q.    After your hours were cut down to 10 to 15

13   hours a week after the church was lost, those 10 to

14   15 hours were spent at the -- cleaning the ABM

15   offices and the radio station?

16        A.    I think so.

17        Q.    So you decided to quit your employment

18   because it wasn't enough hours, it sounds like, if I

19   am understanding you correctly?

20               MS. GARCIA:  Objection; that

21   mischaracterizes her prior testimony.

22   BY MR. FARMER:

23        Q.    Go ahead.

24        A.    Yes, that's why.

25        Q.    After you quit ABM, did you subsequently

8a2b39d8-dc8b-4572-aade-4a3ba9b95d47

Page 77

1     Glenwood Gardens?

2          A.   9.00, I think.

3          Q.   You receive any type of health insurance

4     or other type of benefits at Glenwood Gardens?

5          A.   No.

6          Q.   When you worked at ABM, did you ever

7     receive any type of written warnings in regards to

8     your work performance?

9          A.   No.

10         Q.   Were you ever suspended from work when you

11    worked at ABM?

12         A.   No.

13         Q.   When were you first contacted about this

14    lawsuit?

15         MS. GARCIA:   Objection; I'm going to

16    instruct her not to answer as to any communications

17    between her attorneys.

18         THE WITNESS:   No.   I don't remember.

19    BY MR. FARMER:

20         Q.   Can you give me an estimate?

21         A.   What I was aware of was that only that my

22    friend Claimant 4 gave me the commentary that this

23    man was very bad.   He was doing bad things.   That

24    she saw him on the Internet, and it said that what

25    he was doing was something serious, and that is how

Page 87

1      A.   Yes.

2      Q.   Since you stopped working with Jose

3  Vasquez, has those symptoms stopped?

4      A.   The only part that has happened to me,

5  yes.  Right now I feel fine, but when I worked with

6  him, I would become nervous that I would arrive all

7  the time.

8      Q.   So in other words, you only had these

9  feelings of nervousness, being uneasy,

10  uncomfortable, blushing and embarrassed when you

11  worked with Jose Vasquez, correct?

12      A.   Yes.

13      Q.   Did you see any type of doctor or

14  psychiatrist over any of those symptoms?

15      A.   No.

16          Could I make a commentary about something

17  that you asked me earlier?

18      Q.   Sure.

19      A.   About the hours, when they were taking off

20  that, they would only give me four hours.

21          Also, I didn't want to work during the

22  night because of the same reason.  I was afraid that

23  he would come and would do something and to find me

24  alone, and he would want to do something to me.

25      Q.   So you're correcting your earlier

DAVID  FELDMAN  WORLDWIDE,  INC.
450 Seventh Avenue - Ste 2803, New York, NY 10123   (212)705-8585

8a2b39d8-dc8b-4572-aade-4a3ba9b95d47

Page 88

1    testimony that, just so I understand, the reason you

2    quit was because of the reduction in hours and not

3    wanting to work with Jose Vasquez, correct?

4         A.   I didn't want to work during the night

5    with him.

6         Q.   Do you believe that you've suffered any

7    type of financial harm as a result of the misconduct

8    of Jose Vasquez that was directed towards you?

9              MS. GARCIA:  Objection; calls for a legal

10   conclusion.

11             THE WITNESS:  I don't know.

12   BY MR. FARMER:

13        Q.   Do you understand my question, ma'am?

14        A.   Could you repeat it?

15             MR. FARMER:  Can I have the question read

16   back, please.

17             THE COURT REPORTER:  "Do you believe that

18        you've suffered any type of financial harm as

19        a result of the misconduct of Jose Vasquez

20        that was directed towards you?"

21             MS. GARCIA:  Objection; calls for a legal

22   conclusion.  Objection; asked and answered.

23             THE WITNESS:  No.

24   BY MR. FARMER:

25        Q.   And I'm sorry.  The answer was "no"?

95

REPORTER'S CERTIFICATE

1

2

3      I, CYNTHIA R. POLA, CSR No. 11204, Certified

4  Shorthand Reporter, certify:

5      That the foregoing proceedings were taken

6  before me at the time and place therein set forth,

7  at which time the witness was put under oath by me;

8      That the testimony of the witness, the

9  questions propounded, and all objections and

10 statements made at the time of the examination were

11 recorded stenographically by me and were thereafter

12 transcribed;

13     That the foregoing is a true and correct

14 transcript of my shorthand notes so taken.

15     I further certify that I am not a relative or

16 employee of any attorney for the parties, nor

17 financially interested in the action.

18     I declare under penalty of perjury under the

19 laws of California that the foregoing is true and

20 correct.

21     Dated this 27th day of November, 2009.

22

23

24  *Cynthia R. Pola*
    CYNTHIA R. POLA, CSR No. 11204

25

# SEXUAL HARASSMENT INFORMATION SHEET
## ACKNOWLEDGMENT

I acknowledge that I have been provided with a copy of ABM's Company Policy on Sexual Harassment. I also understand that it is my responsibility to read this information as provided by my employer, and that I may, at any time, review the contents contained within this information sheet with my employer.

Dated: 04 - 11 - 05

Claimant 12

(Employee's Printed Name)

Claimant 12

(Employee's Signature)

(Witness Signature)

DEFT(S) _911_ PLF(S) _____ EXHIBIT FOR I.D.
CYNTHIA R. POLA, CSR #11264
DATE: _November 17, 2009_
WITNESS:

D1407

911

# EXHIBIT

# M

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Plaintiff,

                         No.  1:07-CV-01428 LJO

ERIKA MORALES and ANONYMOUS
PLAINTIFFS ONE THROUGH EIGHT,

        Plaintiff-Intervenors,

      v.

ABM INDUSTRIES INCORPORATED, et al.,

        Defendants.

CERTIFIED
COPY

_____

VIDEOTAPED DEPOSITION OF JOSE G. VASQUEZ

Los Angeles, California

Wednesday, September 24, 2008

Reported by:
GINA CANGIAMILA
CSR No. 10256

JOB No. 96710

JOSE G. VASQUEZ                                    09/24/08

1          A.   No.

2          Q.   How did you come to know that there was a job

3     available at ABM prior to you applying?

10:54:32   4          A.   By Javier.

5          Q.   How is it that Javier told you about a job

6     opening at ABM?

7          A.   He called me, and he told me there was a

8     position on the floor -- on the utility crew.

10:54:59   9          Q.   What did you --

10         MS. VILLEGAS:   I didn't catch the response.   I'm

11    sorry.

12                         (Record read.)

13         MS. VILLEGAS:   Thank you.

14    BY MR. VIRAMONTES:

15         Q.   And what did you tell Javier?

16         A.   That's when I went to apply.

17         Q.   Is that what you told him?

18         A.   No.   I wasn't -- I told him that I was going to

19    go over there.

20         Q.   To go over there to apply?

21         A.   To the office, yes.

10:55:31  22         Q.   How long had you been out of jail when Javier

23    told you about this job opening?

24         A.   I can't remember.   It was in the same month.

25         Q.   So within a month of your leaving jail, Javier

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

JOSE G. VASQUEZ                                      09/24/08

|  |  |
|---|---|
| | 1 |
| 11:02:30 | 2 |

1    Q.   But somebody told you to show up to work?

11:02:30    2    A.   Yes.

3    Q.   You're just not sure who?

4    A.   I'm not sure.

5    Q.   And what were your job responsibilities when

6    you were first hired at ABM?

7    A.   I would go in and clean floors and carpets.

8    Q.   Anything else?

11:03:01    9    A.   That was it.

10    Q.   And it was about 2004 when you were hired at

11    ABM; is that right?

12    A.   Yes.

13    Q.   And what was your job title when you were first

14    hired by ABM?

15    A.   Utility crew.

11:03:27    16    Q.   Other than cleaning floors and carpets, did you

17    have any other responsibilities when you were first

18    hired at ABM?

19    A.   No.  Waxing floors, too.

20    Q.   Did you clean the floors, clean the carpets and

21    wax the floors in different buildings where ABM --

22    A.   Strip, strip them, stripping floors.

23    Q.   And you would do that work at different

24    buildings where ABM told you to go?

25    A.   Yes.

41

1    sites prior to your promotion?

2        A.   I can't recall.   I don't remember if I did or

3    not.

4        Q.   You may have?

5        A.   I may have.

6        Q.   Did the utility crew have a foreman?

7        A.   No.

11:06:18   8    Q.   What position were you promoted into?

9        A.   Supervisor, district supervisor.

10       Q.   How did you come to apply for the promotion?

11:06:30   11   MR. JACOBY:   Assumes facts not in evidence, lacks

12   foundation.

13       MR. VIRAMONTES:   You can answer.

14       THE WITNESS:   How did I -- can you repeat that,

15   please?

16   BY MR. VIRAMONTES:

17       Q.   Okay.   Who told you that there was an opening

18   for a district supervisor?

19       MR. JACOBY:   Assumes facts not in evidence, lacks

20   foundation.

21       THE WITNESS:   I think, I believe Javier and Rick

22   Steiner.

23   BY MR. VIRAMONTES:

24       Q.   Did you tell them you were interested in

11:06:59   25   becoming a district supervisor?

43

JOSE G. VASQUEZ                                          09/24/08

1   you were alone in a building with her once a week?  Was

2   it like a one month period, a six month period, a two

3   year period?  I'm asking for the length of the period.

4          A.  Oh, I'm sorry.

5          Q.  That's okay.  I could have been more clear.

6          A.  I can't be sure, but I think it was -- it

12:12:28  7   wasn't that long.  Could be less than a month.

8          Q.  As a supervisor, did you try to visit each work

9   site every week?

10         A.  Yes.

11         Q.  Is that something you were able to accomplish

12   most weeks?

13         A.  Not all of them, because there was too many.

14   There's some buildings that I -- that I -- I didn't get

15   to visit.  I would visit next, the next day.

12:12:57  16         Q.  But it was a goal for you to visit every work

17   site each week?

18         A.  I couldn't get to them all, but it was -- it

19   was something I -- I wanted to do every week.

20         Q.  Are you familiar with percentages?  You know,

21   fifty's about half?

22         A.  Yes.

23         Q.  What percentage of work sites were you able to

24   get to every week?  Was it ninety or fifty or ten?

25         A.  I think it was eighty percent, if I'm

80

JOSE G. VASQUEZ                                    09/24/08

1     correct.

12:13:35  2        Q.   Were there any rooms in the Bank of America

3     building that did not have security cameras?

4        A.   I believe the janitorial.

5        Q.   The janitorial room?

6        A.   Uh-huh, yes.

7        Q.   Is it your understanding that Erika Morales

12:13:57  8   would have to go to the janitorial room to get cleaning

9     supplies to do her job?

10       A.   Did I -- do I understand what?

11       Q.   Is it your understanding that Erika Morales

12    would have to go into the janitorial room to get

13    cleaning supplies to do her job?

14       A.   Yes.

15       Q.   Were you ever in the janitorial room with Ms.

16    Morales?

17       A.   No.

18       Q.   You're positive about that?

19       A.   I'm positive.

20       MR. JACOBY:   Argumentative.

21    BY MR. VIRAMONTES:

12:14:34  22       Q.   Did you ever make any sexual comments to Erika

23    Morales?

24       A.   No.

25       Q.   Did you ever touch Erika Morales sexually?

JOSE G. VASQUEZ                                    09/24/08

1        Q.  So the only thing you heard back through the

2   employees was that they were asking about how they were

3   being treated at work?

4        A.  Yes.

5        Q.  So you don't know one way or the other whether

14:23:59  6   that was the EEOC charge?  It could have been something

7   else?

8        A.  It could have been.

9        Q.  And it's your recollection that Anthony

10  McFarland never interviewed you about these sexual

11  harassment allegations after they got the EEOC charge?

12       A.  Correct.

13       Q.  And this woman who was with Anthony McFarland,

14  she never interviewed you about the sexual harassment

15  allegations?

16       A.  No.

14:24:50  17       Q.  Are you still working for ABM today?

18       A.  No.

19       Q.  When is it that you stopped working for ABM?

14:24:57  20       A.  I believe it was December of 2006.

21       Q.  Was it your choice to leave ABM?

22       A.  Yes.

23       MR. JACOBY:  Calls for speculation.

24  BY MR. VIRAMONTES:

25       Q.  So -- so you -- it's your understanding that

123

JOSE G. VASQUEZ                                              09/24/08

```
15:13:12   1    All right.  Okay.
           2    BY MR. VIRAMONTES:
           3        Q.  Is this your application when you first applied
           4    for a job at ABM?
           5        A.  Yes.
           6        Q.  Is Exhibit 1004 the -- your application for
           7    when you first applied at ABM?
15:13:29   8        A.  Yes.
           9        Q.  I want to draw your attention to the -- to the
          10    third section, where it says "General."
          11        A.  Yes.
          12        Q.  It says, "Do you have any relatives employed by
          13    ABM Janitorial."  Do you see that?
          14        A.  Yes.
          15        Q.  It's unmarked.  Is this a correct copy, that
          16    you didn't mark this on your application?
          17        A.  Yes.
15:14:02  18        Q.  And to the right where it says, "If yes, give
          19    name," that's blank.  Did you also leave that blank?
          20        A.  Where -- where is that?  "If yes, give name."
          21    Oh, okay.  Yes.
          22        Q.  And to the right of that, it's "Relationship,"
          23    that's also blank.  Did you leave that blank?
          24        A.  Yes.
          25        Q.  Two lines, or two sections down from that,
```

140

1     A.  No, it's not.

2     Q.  Do you know if that's Rick Steiner's writing?

3     A.  I don't.

4     MR. JACOBY:  Lacks foundation.

15:59:42   5     MR. VIRAMONTES:  Label the next Exhibit 1024.

15:59:44   6          (Deposition Exhibit 1024 marked.)

7     THE WITNESS:  Yes.

8  BY MR. VIRAMONTES:

9     Q.  Is this the -- is Exhibit 1024 the document,

10  one of the documents you received to tell you that you

11  were promoted?

12     A.  Yes.

13     Q.  And is that your signature on Exhibit 1024?

14     A.  Yes.

16:01:30   15     Q.  Did Rick Steiner tell you that he felt that you

16  were the person best qualified for the job working at

17  ABM?

18     A.  Yes.

19     Q.  Did Tom Cassell tell you that he thought you

20  were the best person qualified for the job working at

21  ABM?

22     A.  Yes.

23     Q.  Did Javier Vasquez tell you that he thought you

24  were the best person qualified for the job working at

25  ABM?

157

JOSE G. VASQUEZ                              09/24/08

1       A.  When I go to the office, it would be in my

2   box.

3       Q.  There would be a, that same kind of stack?  It

4   would be just like complaints, except it would be

5   special work?

6       A.  No stacks, just --

7       Q.  A few, okay.  How did you decide which sites

8   were important to visit once or twice --

9       A.  All sites were important.

10       Q.  Okay.  If you had to skip a site, what would --

16:39:59 11   which ones would you skip?

12       MR. JACOBY:  Incomplete hypothetical, vague.

13       MR. MALLISON:  I'll clarify the question slightly.

14       Q.  You said before that you only visited about

15   eighty percent of the sites.

16       A.  Yes.

17       Q.  Is that because you couldn't get around to all

18   of them?  It's too hard, there's too many, right?

19       A.  Yes.

20       Q.  How many sites were there?

21       A.  I can't remember.  From thirty to forty.

22       Q.  Thirty to forty sites that you supervised?

23       A.  Cover from Delano, Bakersfield, Tahachapi,

16:40:28 24   Taft, Frazier Park, the whole county.

25       Q.  So the twenty percent that you didn't visit,

182

JOSE G. VASQUEZ                                        09/24/08

1    which ones were they typically?

2         A.   That I didn't visit?

3         Q.   Uh-huh.

4         A.   The far ones.   Those were the last visit.

16:40:53  5    Q.   Okay.   And were there some that you visited

6    more than once a week?

7         A.   Yes.

8         Q.   Which ones were those?

9         A.   I think it was Clinica Sierra Vista.   They were

10   very picky on their cleaning, being a clinica.

11        Q.   Was there any other sites that you visited more

12   than once a week?

13        A.   More than once a week?

14        Q.   Uh-huh.

16:41:30  15   A.   I think those were the ones that were very

16   picky, Clinica Sierra Vista.

17        Q.   Did you have any training manuals that you kept

18   with you?   Training manuals.

19        A.   In my possession, in my truck?

20        Q.   Yeah.

21        A.   No.

22        Q.   Do you have any -- personally, do you have any

23   records that relate to any complaints of sexual

16:41:59  24   harassment in your possession?

25        A.   Did I have what?

183

1               I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3             That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11             Further, that if the foregoing pertains to

12  the original transcript of a deposition in a Federal

13  Case, before completion of the proceedings, review of

14  the transcript [ X ] was [   ] was not requested.

15          I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18          IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated:   OCT 1 0 2008 _____

22

23

GINA CANGIAMILA

24  CSR No. 10256

25

**ABM**
Services

## APPLICATION FOR EMPLOYMENT/SERVICE EMPLOYEE    ABM-124

DATE: 1/24/04

| NOTE | A | This application will remain active for 90 days only. If you wish to be considered for employment thereafter, yo submit another Employment Application. |
|---|---|---|
| | B | Applicants receive consideration for employment without regard to race, color, ancestry, religion, gender, age, origin, sexual orientation, disability, veteran status or marital status. ABM Janitorial is an Affirmative Action em |
| | C | Statements made in this application will be relied upon in making the hiring decision. |
| | D | Any promises regarding the terms of employment and / or promotional opportunities, whether express or implie null and void unless made in writing and signed by an officer of the Company. |
| | E | ABM Janitorial is committed to a safe, healthy work environment. Applicants and employees may be require take a drug test. |

### I.D.

NAME LAST: Vasquez    MIDDLE: G.    FIRST: Jose

PRESENT STREET ADDRESS: 6601 Eucalyptus #229    SOCIAL SECURITY NUMBER:

CITY: Bakersfield    STATE: Ca    ZIP CODE: 93301    HOME T.: 36e 6714

### POSITION DESIRED

TYPE OF WORK DESIRED:

ARE YOU AT LEAST 18 YEARS OF AG [X] YES [ ] N

HOW WERE YOU REFERRED TO ABM Janitorial?    WAGES EXPECTED

### GENERAL

HAVE YOU EVER WORKED FOR ABM Janitorial BEFORE? IF YES, WHERE AND WHEN?
[ ] YES [X] NO

DO YOU HAVE ANY RELATIVES EMPLOYED BY ABM Janitorial? IF YES, GIVE NAME
[ ] YES [ ] NO

HAVE YOU SERVED IN THE U.S. ARMED SERVICES? IF YES, BRANCH OF SERVICE / HIGHEST RANK RECEIVED    RELATIONSHIP
[ ] YES [X] NO

TYPE OF TRAINING AND DUTY IN SERVICE

EXHIBIT
1004
Vasquez 9/cr/c

HAVE YOU EVER BEEN CONVICTED OF A CRIME?
[ ] YES [ ] NO
IF YES, PLEASE EXPLAIN

NOTE: OMIT MINOR TRAFFIC VIOLATIONS.
A CONVICTION WILL NOT NECESSARILY BAR APPLICANTS FROM EMPLOYMENT.

UPON AN OFFER OF EMPLOYMENT, CAN YOU, AS REQUIRED BY LAW, PROVIDE THE APPROPRIATE ORIGINAL DOCUMENTS SHOWING ELIGIBILITY TO WORK IN THE UNITED STA
[X] YES [ ] NO

IN WHICH FOREIGN LANGUAGES DO YOU HAVE WORKING SKILL?    SPEAK    READ    WRITE

HAVE YOU EVER BEEN BONDED?
[ ] YES [ ] NO    HAVE YOU EVER BEEN REFUSED BONDING?

### EDUCATION

| NAME OF SCHOOL | LOCATION | GRADUATED? LAST GRADE COMPLETED | SPECIAL COURSES MAJOR / GRADE POINT AV |
|---|---|---|---|
| HIGH SCHOOL | | | [ ] YES |
| COLLEGE / UNIVERSITY | | DEGREE | |
| GRADUATE OR BUSINESS | | DEGREE | |

## ... ~ AND OTHER CLEANING EXPERIENCE (PLEASE CHECK BOX)

| EXPERIENCE | YRS | MOS | EXPERIENCE | YRS | MOS | EXPERIENCE | YRS | MOS |
|---|---|---|---|---|---|---|---|---|
| ☐ Office Buildings / Banks | | | ☐ Schools | | | ☐ Route Work | | |
| ☐ Industrial | | | ☐ Airports | | | ☐ Floor Waxing | | |
| ☐ Department Stores | | | ☐ Hospitals | | | ☑ Carpet Cleaning | | |
| ☑ Retail Shopping Centers | | | ☐ Hotels | | | ☑ Window Cleaning | | |
| ☐ Theaters | | | ☐ Other: | | | ☐ Other: | | |

DO YOU HAVE A LIFE SAFETY CERTIFICATE?
☐ YES    ☐ NO

IS THERE ANY ADDITIONAL INFORMATION RELATIVE TO CHANGE
OF NAME, USE OF ASSUMED NAME, OR NICKNAME NECESSARY
TO ENABLE A CHECK ON YOUR WORK HISTORY?    ☐ YES    ☑ NO

DRIVER'S LICENSE NUMBER IF DRIVING REQUIRED.

LIST SPECIAL SKILLS AND EQUIPMENT YOU CAN OPERATE    IF YES, EXPLAIN

## ALL APPLICANTS READ AND COMPLETE THIS SECTION

I certify that the information contained in this employment application is complete, correct and accurate to the best of my knowledge and I understand that any falsifications or omissions may result in denial of employment or dismissal. I authorize ABM Janitorial to act as my agent in securing information about me from any person or company without liability to such person or company or to ABM Janitorial. If an employment relationship is established, I understand that I will be an employee-at-will and that my employment and compensation can be terminated with or without cause and with or without notice, at any time by either myself or ABM Janitorial. No modifications of these statements shall be valid unless in writing signed by me and the Company President. In addition, if accepted for employment, I hereby agree to abide by the rules and policies of ABM Janitorial.

APPLICANT SIGNATURE                                        DATE

January 28, 2005                    **Promotion**

Joe Vasquez

Dear Joe:

I am pleased to offer you a promotion to the position of Supervisor effective February 1, 2005. In this position, you will report directly to me. Your compensation will be $1,100.00 bi-monthly. We will review your progress in 90 days, to if you are meeting the requirements of your new role. We will review the Supervisory Incentive Plan with you at that time.

In your new role, your present benefits will reflect that of an exempt supervisory employee. These benefits will be covered with you by Tom Cazale in Fresno on February 3, 2005 at 11:30am, along with your regular orientation paperwork promoting you to Supervisor.

You will be provided a company vehicle and a gas card to perform your job duties.

Human Resources will review your personnel file to ensure all the necessary paper work has been completed. If additional documentation is needed, it will be completed on the 3rd.

Joe, you are a valuable member of our Branch Team, and I believe your experience will benefit both ABM and the Customer in this role. Should you have any questions, please do not hesitate to contact me.

Sincerely,

Ric Steiner
District Manager

I accept the terms of this promotion: _____
                                         Signature

                                     _____ 1-28-05 _____
                                         Date

EXHIBIT
1024
Vasquez 4/24/08
PENGAD 800-631-6989