Anna Y. Park (SBN164242)
Elizabeth Esparza-Cervantes (SBN 205412)
Lorena Garcia-Bautista (SBN 234091)
Derek W. Li (SBN 150122)
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
255 E. Temple St., 4th Floor
Los Angeles, CA. 90012
Telephone: (213) 894-1108
Facsimile: (213) 894-1301
E-Mail:  lado.legal@eeoc.gov


Attorneys for Plaintiff
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> ERIKA MORALES and ANONYMOUS PLAINTIFFS ONE THROUGH EIGHT, <br><br> Plaintiff-Intervenors, <br><br> vs. <br><br> ABM INDUSTRIES INC.ORPORATED, ABM JANITORIAL SERVICES, INC., and ABM JANITORIAL NORTHERN CALIFORNIA, <br><br> Defendants. | CIVIL NO. 1:07-CV-01428 LJO (JLT) <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES OPPOSING DEFENDANTS' MOTION FOR SUMMARY OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION RE: FRESNO CLAIMANTS AND PARENT CORPORATIONS** <br><br> Date:       June 17, 2010 <br> Time:       8:30 a.m. <br> Judge:      The Honorable Lawrence O'Neill <br> Courtroom: 4 |

## TABLE OF CONTENTS

I.      INTRODUCTION ……………………………………………………………..1

II.     FACTUAL BACKGROUND ………………………………………….. …….2

        A.      INTRODUCTION ……………………………………………………… 2

        B.      DEFENDANTS' FAILURE TO PREVENT AND REMEDY SEXUAL

                HARASSMENT ……………………………………………………… 3

                1.      Defendants' Failure to Provide Policies, Procedures, and Training on

                        Sexual Harassment in a Language Understandable by Their Largely

                        Spanish-speaking Employees. …………………………………… 3

                2.      Defendants' Failure to Provide Effective Sexual Harassment Training to

                        its Managers and Supervisors. ………………………………….. 4

                3.      Defendants' Failure in Responding to Complaints of Sexual Harassment.

                        …………………………………………………………… 4

                4.      Defendants' Failures to Respond Adequately to Sexual Harassment is Due

                        to Substandard Investigations. ………………………………… 13

        C.      RELEVANT PROCEDURAL HISTORY …………………………...…13

III.    ARGUMENT ……………………………………………………………14

        A.      DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE

                DENIED IF THERE IS A TRIABLE ISSUE OF MATERIAL FACT. ……….14

        B.      DEFENDANTS' ARTIFICIAL DIVISION OF FRESNO AND BAKERSFIELD

                CLAIMANTS CONFLICTS WITH THE REALITY THAT ALL THE………14

                EMPLOYEES OF THE CENTRAL VALLEY SHARE SIMILAR WORKING

                CONDITIONS DUE TO BEING EMPLOYED AND CONTROLLED BY

                DEFENDANTS. ………………………………………………………15

        C.      THE EVIDENCE ESTABLISHES AT LEAST TRIABLE ISSUES OF FACT AS

                TO DEFENDANTS' LIABILITY FOR ITS COMPANY-WIDE FAILURES IN

                PREVENTING AND REMEDYING A SEXUALLY HOSTILE WORK

                ENVIRONMENT. ……………………………….......................................16

Pl. Opp. to Def. Mot. Summ. J. (Fresno & Jt. Employer)

i

1.  Under the Totality of Circumstances, Defendants Subjected Claimants to Sexually Hostile Work Environment. ………………………………..16

2.  Defendants Cannot Establish the *Faragher / Ellerth* Defense to Supervisor Harassment Because the Harassment Resulted in Tangible Employment Action. ………………………………………………………………………20

3.  Defendants Cannot Establish the *Faragher / Ellerth* Defense to Supervisor Harassment Because They Failed to Exercise Reasonable Care in Preventing and Remedying Sexual Harassment. …………….............21

4.  Defendants Cannot Establish the *Faragher / Ellerth* Defense Because the Claimants either Complained of Sexual Harassment or Acted Reasonably in Light of Defendants' Failures to Prevent and Remedy Sexual Harassment. ………………………………………………………………….23

5.  Defendants are Liable for any Sexually Hostile Work Environment Caused by Co-Workers. …………………………………………………24

D.  THE EVIDENCE ESTABLISHES AT LEAST TRIABLE ISSUES TO WHETHER DEFENDANTS RETALIATED AGAINST CLAIMANTS. …..25

E.  DEFENDANTS MISCONSTRUED THE LAW FOR A QUID PRO QUO CLAIM SINCE A TANGIBLE EMPLOYMENT ACTION IS NOT REQUIRED. …………………………………………………………………26

F.  HILDA GOMEZ AND ANA GUTIERREZ' CLAIMS ARE NOT TIME-BARRED. …………………………………………………………………27

G.  PLAINTIFFS HAVE MET ALL THE CONDITIONS PRECEDENT FOR THIS LAWSUIT FOR ALL CLAIMANTS THROUGH THE MORALES' CHARGE. …………………………………………………………………28

H.  ABM, INC. AND ABM JAN. ARE JOINTLY LIABLE ………………………32

1.  Introduction ………………………………………………………………..32

2.  Factual Background ………………………………………………………..32

Pl. Opp. to Def. Mot. Summ. J. (Fresno & Jt. Employer)

ii

3.     Argument – Defendants' Motion for Summary Judgment Should be Denied Because There are Triable Issues as to Whether ABM, Inc. and ABM JAN. Should be Held Liable as Joint Employers………………35

IV.   CONCLUSION …………………………………………………………………..40

Pl. Opp. to Def. Mot. Summ. J. (Fresno & Jt. Employer)

iii

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ……………………………………… 15

*Andrews v. Philadelphia*, 895 F.2d 1469 (3d Cir. 1990) …………………………………… 17

*Baker v. Stuart Broad. Co.*, 560 F.2d 389 (8th Cir. 1977) …………………………………36

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) …………………………………… 20

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ……………………………… 25

*Burrell v. Star Nursery*, 170 F.3d 951 (9th Cir. 1999) …………………………………………… 18

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ………………..……… 24

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) …………………………………………………… 14

*Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004) …………………………………………..36

*Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731 (5th Cir. 1986) ………..………36

*Clackamas Gastroenterology Assoc. v. Wells*, 538 U.S. 440 (2003) …………………..………36

*Davis v. Team Electric Co,*, 520 F.3d 1080 (9th Cir. 2008) …………………………………… 15

*Davis v. Tri-State Mack Dist.*, 981 F.2d 340 (8th Cir. 1992) …………………………………..21

*Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1237 (M.D. Ala. 2001) …………..30

*Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir. 1998) …………………..………………24

*Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir. 1998) ………………………………17

EEOC Compliance Manual, Section 2: Threshold Issues, No. 915.003, at 44-47 ……………..36

EEOC Compliance Manual, Section 2: Threshold Issues, No. 915.003, at 44-46 ………..……36

*EEOC Policy Guidance on Current Issues on Sexual Harassment,* N-915-050 (1990) ……… 26

*EEOC v. American Nat'l Bank*, 652 F.2d 1176 (4th Cir. 1981) …………………………………30

*EEOC v. Burlington Medical Supplies, Inc.*, 536 F. Supp. 2d 647 (E.D.Va. 2008) …………… 19

*EEOC v. California Psychiatric Transitions*, 644 F.Supp. 2d 1249 (E.D. Cal. 2009) …………31

*EEOC v. Caterpillar, Inc.*, 409 F.3d 831 (7th Cir. 2005) …………………………………………31

*EEOC v. Chicago Miniature Lamp Works*, 640 F. Supp. 1291 (N.D. Ill. 1986) ………………28

*EEOC v. CRST Expedited, Inc.* 2009 WL 1175169 (N.D. Iowa) ………………………………31

*EEOC v. Hearst Corp.*, 553 F.2d 579 (9th Cir. 1977) …………………………………………28

*EEOC v. Keco Indus., Inc.*, 748 F.2d 1097 (6th Cir. 1984) …………………………………..31

1  *EEOC v. NCL American, Inc., et. al.*, 536 F.Supp.2d  1216 (D. Hawaii 2008) …………........31

2  *EEOC v. Newpapers, Inc.*, 39 Fair Empl. Prac. Cas. (BNA) 891, 892 (E.D. Wis. 1985) ………27

3  *EEOC v. Occidental Life Ins. Co. of California*, 535 F.2d 533 (9th Cir. 1976) …………………29

4  *EEOC v. Peterson, Howell & Heather, Inc.,* 702 F. Supp. 1213 (D.Md. 1989) …………………28

5  *EEOC v. Preferred Management Corp.*, 216 F. Supp. 2d 763 (S.D. Ind. 2002) …………..…... 27

6  *EEOC v. Rhone-Poulenc, Inc.,* 876 F.2d 16 (3d Cir. 1989) …………………………………...30

7  *EEOC v. Warshawsky and Co.*, 1994 WL 384041, *2–3 (N.D. Ill. 1994) ……………………. 27

8  *Eich v. Bd. of Regents*, 350 F.3d 752 (8th Cir. 2003) …………………………………….... 20

9  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001) …………………………………... 15

10  *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) …………………………………… 20

11  *Fuller v. City of Oakland*, 47 F.3d 1522 (9th Cir. 1995) …………………………………21

12  *Georator Corp. v. EEOC*, 592 F. 765 (4th Cir. 1979) …………..…………………………31

13  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217 (9th Cir. 1998) …………………………………25

14  *Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997) ………..……………………………………36

15  *Graves v. Lowery*, 117 F.3d 723 (3d Cir. 1997) ……………………………………………. 36

16  *Guardian Assoc. of the N.Y. City Police Dept. v. Civil Service Comm'n of the City*

17  *of New York*, 633 F.2d 232 (2d Cir. 1980) ……..…………..………………………………28

18  *Heyne v. Caruso*, 60 F.3d 1475  (9th Cir. 1995) ……………………………………….. 19

19  *Holly D. v. Cal. Inst. of Tech.*, 339 F. 3d 1158 (9th Cir. 2003) ……………..…………………. 26

20  *Marshall v. Sun Oil Co. (Del.)*, 605 F. 2d 1331 (5th Cir. 1979)) ……………………………. 30

21  *McDonnell Douglas v. Green*, 411 U.S. 792 (1972) ……………………………………………31

22  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) …………………………………21

23  *McGinest v. GTE Service Corp.*, 360 F.3d 1103 (9th Cir. 2004) ……………………………. 15

24  *Meritor Sav. Bank, FSM v.* Vinson, 477 U.S. 57 (1986) ………………………………………. 17

25  *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512 (5th Cir. 2001) …………………24

26  *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) …………………………. 17

27  *Nat'l. Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ……………………………27

28  *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864 (9th Cir. 2001) …………………………... 17

*Penn. State Police v. Suders*, 542 U.S. 129 (2004) …………..………………………………... 20

Pl. Opp. to Def. Mot. Summ. J. (Fresno & Jt. Employer)

v

*Perry v. Ethan Allen Inc.,* 115 F.3d 143 (2d Cir. 1997) …………….……………………. 18

*Porter v. California Dept. Corrections,* 449 F.3d. 885 (9th Cir. 2005) ………………………. 15

*Quinn v. Consolidated Freightways Corp.,* 283 F.3d 572 (3d Cir. 2002) ……………….…... 18

*Reeves v. Sanderson Plumbing Prod. Inc.,* 530 U.S. 133 (2000) ……………………………. 15

*Romano v. U-Haul Inter.,* 233 F.3d 655 (1st Cir. 2000) ……………………………………..36

*Sandoval v. ABM,* 552 F. Supp. 2d 867 (D.Minn. 2008) …………………………………..32

*Sandoval v. ABM, Inc.,* 552 F. Supp. 2d 867 (D.Minn. 2008) …………………………… 19

*Sandoval v. ABM, Inc.,* 578 F.3d 787 (8th Cir. 2009) ………………………………………… 1

*Sandoval v. ABM, Inc.,* 578 F.3d 787 (8th Cir. 2009) ……………………………………….. 19

*Sandoval v. ABM, Inc.,* 578 F.3d 787 (8th Cir. 2009) …………………………………………32

*Sandoval v. American Bldg. Maintenance Industries, Inc.,* 578 F.3d 787 (8th Cir. 2009) …...36

*Schiano v. Quality Payroll System, Inc.,* 445 F.3d 597 (2d Cir. 2006) ………………………. 15

*Swinton v. Potomac Corp.,* 270 F.3d 794 (9th Cir. 2001) ………………………………………. 24

*Valentin-Almeyda v. Municipality of Aguadilla,* 447 F.3d 85 (1st Cir. 2006) ……..……………23

*Vandermeer v. Douglas County,* 15 F. Supp. 2d 970 (D. Nev. 1998) …………..……………24

*Waterson v. Plank Road Motel Corp.,* 43 F. Supp. 2d 284 (N.D.N.Y. 1999) …………..……… 18

*Williams v. General Motors Corp.,* 187 F.3d 533 (6th Cir. 1999) ………………..……………... 17

*Woods v. Graphic Comm.,* 925 F.2d 1195 (9th Cir. 1991) …………………………………….. 18

*Wynn v. Nat'l Broad. Co., Inc.,* 234 F. Supp. 2d 1067 (C.D. Cal. 2002) …………………………36

**STATUTES**

42 U.S.C. § 2000e-1(c)(3) …………………………………………………………………………36

# I.      **INTRODUCTION**

Defendants ABM Industries Inc. ("ABM Inc."), ABM Janitorial Services, and ABM Northern California ("ABM N. Cal.) employ and/or control employees throughout the country, including the Central Valley of California.  Because of this control, Defendants are responsible for protecting its employees from a sexually hostile work environment through distribution of understandable policies and procedures and training of its employees of their avenues to seek help and of its managers and human resources staff to ensure complaints are responded with proper investigation and remedial measures.  Unfortunately, Defendants failed in their responsibilities due to their pattern or practice of tolerating and condoning a sexually hostile work environment.  Because of Defendants' failure, the EEOC filed this lawsuit to vindicate the public interest and the interests of the Charging Party and class members throughout the Central Valley of California.  As demonstrated by *Sandoval v. ABM, Inc.*, 578 F.3d 787 (8th Cir. 2009), Defendants have had a long-standing problem nationwide with failing to prevent and to remedy sexual harassment with its workforce.

Defendants filed their motion for summary judgment on a number of grounds with respect to the Fresno Claimants.  Analytically, Defendants erred in trying to balkanize EEOC's one sexually hostile work environment claim against the Claimants' employer.  Instead, the totality of the circumstances of all of the Central Valley should be considered.  Under such an analysis, the evidence shows that Defendants are liable to the Claimants for sexually hostile work environment by supervisors and co-workers, quid pro quo harassment, retaliation, and sex discrimination.  Under its statutory authority, EEOC has fulfilled all of the condition precedents for all the Claimants, including those who worked in Fresno.  Furthermore, following the analysis of the Eighth Circuit's decision in *Sandoval*, not only is ABM N. Cal. liable for violating the Claimants' rights, but ABM, Inc. and ABM Jan. are also liable.  At the very least, evidence numerous triable issues with respect to all of the claims.  For all of the reasons stated, Defendants' motion for summary judgment should be denied in its entirety.[1]

//

//

---

[1]      Defendants moved for summary judgment on Plaintiffs' discrimination claim.  Sexual harassment or sexually hostile work environment, quid pro quo harassment, and retaliation are forms of sex discrimination.  Thus, by establishing Defendants' liability for these claims, Defendants are liable for sex discrimination as well.

## II.   **FACTUAL BACKGROUND**

**A.   Introduction**

The 21 Claimants[2] are all female employees who worked in the Central Valley as janitors. They are primarily Spanish-speaking employees who are not fluent in English.  They worked as janitors in different worksites at night like office buildings either alone or in teams of two or three employees. Even when they worked in teams, they often were alone to clean the rooms inside the office building. They would often be alone when their primarily male supervisors came by to their worksites.

From 2000 through 2009, the Claimants and other women were sexually harassed by at least thirteen harassers, including supervisors and a convicted sex offender.  (Plaintiff Uncontroverted Facts hereinafter ("PUF") 1.1-21.24; 28.1-49.57.)[3]  The claimants and other female janitorial employees were subjected to repeated sexually egregious acts, including being raped; groping of the breasts and rear ends; forcing to touch a supervisor's erect penis; touching of the vaginal area; inappropriate touching of the hips, legs, face, shoulders, and hips; hugging and attempted hugging; kissing; stalking; slapping of the face; and sexual advances.  (PUF 1.1-21.24; 28.1-49.57.)  The claimants were also subjected to repeatedly inappropriate sexual comments or propositioning language on a weekly basis throughout their employment by ABMs' managers, supervisors, or co-workers.  (PUF 1.1-21.24; 28.1-48.13.) Moreover, the sexual harassment is corroborated by various witnesses or other female janitors who

---

[2]      The 21 claimants are all female janitors who worked alone or in teams of two to three employees during the night shift at ABM's worksites in Bakersfield, Fresno, Visalia, and Ceres.  Erika Morales, Claimant 6, Claimant 3, Claimant 2, Claimant 5, Claimant 7, and Claimant 4 are represented by Stan Mallison and Hector Martinez.  Together with the Law Office of Mallison and Martinez, the EEOC represents these claimants.  In addition, the EEOC solely represents claimants Lucia Cardiel, Maribel Lopez, Maria Socorro Zapien, Gloria Bernal, Guadalupe Barron, Patricia DeVera, Teresa Sanchez, Maria Olga Birrueta, Irene Bravo, Ana M. Gutierrez, Martha Castaneda Garcia, Luisa Gonzalez, Delia DeMejia, and Maria Quintero.

[3]      All references to exhibits are to EEOC's Declarations and Exhibits Supporting its Oppositions to Defendants' Motions for Summary Judgment.  To avoid needless duplication of exhibits, EEOC submits one set of exhibits in several volumes that combine all the exhibits used to support EEOC's oppositions.  The EEOC incorporates by reference all facts and arguments set forth in its opposition and supporting pleadings and exhibits to Defendants' motions for summary judgment on the Bakersfield Claimants.

testified that they were sexual harassed in a similar manner by the same individuals. [4] (PUF 1.1-21.24; 28.1-48.13.)

The sexual harassment permeated throughout the company. (PUF 1.1-49.57.) The reason for this persistent sexual harassment problem is the comprehensive failure by Defendants to prevent and to remedy sexual harassment. (PUF 1.1-49.57)

**B.   Defendants' Failure to Prevent and Remedy Sexual Harassment**

**1.   Defendants' Failure to Provide Policies and Training on Sexual Harassment in a Language Understandable by Their Largely Spanish-speaking Employees.**

Defendants understood that they have a large monolingual Spanish-speaking workforce. (PUF 22.1-22.48) However, their translated documents proved meaningless to at least fourteen employees, including four harassers and ten Claimants[5] who are mono-lingual Spanish speakers and who did not receive any Spanish language sexual harassment policies and procedures. (PUF 1.1-22.48, 27.1-27.2.)

Further, non-management staff did not receive any training on Defendants' policies and procedures against sexual harassment. (PUF 24.1-26.16.) As a result, many female claimants did not know whether there were different avenues within the company to address sexual harassment, especially when the harassment was by their direct supervisors. (PUF 1.1-21.24; 22.1-25.6.) Several of the janitors, including Claimants No. 6, Gloria Bernal, Lucia Cardiel, Irene Bravo, Maria Olga Birrueta, Teresa Sanchez, Guadalupe Barron, and Maribel Lopez were unaware of ABM's 1-800 harassment hotline number. (PUF 24.1-24.13.) Several of the janitors were also unaware that ABM had a human resource department where they can file complaints of harassment. (PUF 25.1-25.6.)

---

[4]   Due to space limitations, Plaintiffs incorporate by reference Plaintiffs' Statement of Uncontroverted Facts and supporting Declaration and exhibits. These documents and supporting exhibits elaborate in greater details that the Claimants and other female janitorial employees were subjected to repeated sexually egregious acts, including being raped or sexually assaulted and other physical and verbal harassment. (PUF 1.1-21.24; 28.1-49.57.)

[5]   The harassers who needed and did not receive a Spanish version of the sexual harassment documents were Cervantes, Arturo Jimenez-Sanchez, Jose Morales Lozano, and Adalberto Pilar Rodriguez. (PUF 22.35-22.45.) The Claimants who did not receive such documents included Birrueta, Bravo, Garcia, DeMejia, and Sanchez, the Claimants at issue in Defendants' motion. (PUF 22.2-22.34) Other Claimants include Cardiel, Claimant 4, Claimant 2, Portillo De Tellez. (PUF 22.2-22.34.)

Other claimants did not know other supervisors, other than the harasser, or who else to complain to. (PUF 1.1-21.24.)

### 2. Defendants' Failure to Provide Effective Sexual Harassment Training to its Managers and Supervisors.

Defendants claim to provide annual sexual harassment training to managers and supervisors. (PUF 26.1-26.2.)  Despite such training, at least 13 harassers and at least nine are supervisors who despite receiving the sexual harassment training have been involved in numerous incidents of sexual harassment.[6]  Also, Defendants' sexual harassment training was ineffective as mono-lingual Spanish speaking supervisors were known to have simply chatted with other supervisors during the training because they could not understand the materials that were presented in English.  (PUF 27.1-27.2.).

Further, the Defendants' sexual harassment training of managers and supervisors was ineffective as they often did not know how to report, respond, and investigate sexual harassment complaints.  Supervisor Guerrero acknowledged that he did not understand how to interview or conduct an investigation.  (PUF 26.10.)  Supervisor Juarez confirmed that he did not receive training on how to conduct investigations of sexual harassment, but yet he gathered information regarding Mara Murillo's complaint of sexual assault.  (PUF 26.11.)  Further, ABM's supervisors repeatedly failed to report complaints of sexual harassment and failed to report violations of ABM's nepotism policy.  (PUF 1.1-21.24; 28.1-47.34; 50.1-50.15.)

### 3. Defendants' Failure in Responding to Complaints of Sexual Harassment.

As early as 2001 and through 2009, Defendants have been on notice that they have a longstanding and widespread problem of sexual harassment throughout the Central Valley.  With few exceptions, Defendants failed to discipline the harassers.

As early as 2001, Luisa Gonzalez, working in Bakersfield, complained to Oscar Amaya that Supervisor Mondragon was sexually harassing her.  (PUF 28.1.)  In 2003, Gomez, who worked in Visalia, complained to Supervisor Lara about being harassed by Supervisor Cervantes.  (PUF 29.1-29.3)  Between 2000 to 2005, Supervisor Cervantes engaged in graphic verbal sexual harassment.

---

[6]      The EEOC has identified at least five Leads who were engaged in the sexual harassment.  They are Jose Morales Lozano, Adalberto Pilar Rodriguez, Carlos Castaneda, Arturo Jimenez Sanchez, Antonio Duran.  (PUF 1.1-21.24; 52.1-52.20.)  The Leads are considered supervisors because they controlled the employees' work conditions and schedules. (1.1-21.24; 52.1-52.20)

(PUF 10.1-10.27)  He started commenting on her physical appearance.  (PUF 10.5)  Then, he repeatedly asked her to have sex with him and made suggestive gestures to her with his tongue.  (PUF 10.8)  He spied on and stalked Gomez in such a way that Gomez feared that he would follow her home.  (PUF 10.9)  He also told her that he had dreamt about her and that he woke up "all wet."  (PUF  10.11.)

When Gomez complained about Supervisor Cervantes' repeated sexual harassment to Supervisor Lara, he just laughed and told her that Cervantes would not change.  (PUF 10.20.)  After she complained, Supervisor Cervantes increased her workload.  (PUF 10.21.)  When she asked for a raise, Supervisor Cervantes told her that he could do something for her, but would not because she had not accepted his advances to watch pornographic movies together.  (PUF 10.22.)  He further harassed Gomez by requiring her to come to work on the weekend so he could grab her arm to ask her "You're never going to love me?"  (PUF 10.23.)  He also forced her to squat down to clean up non-existent stains so he that he could watch her from behind, leading him to tell her that he liked to see her in that position.  (PUF 10.24.) Because she could not tolerate Supervisor Cervantes' harassment any more, Gomez left her employment with Defendants.  (*Id.*)  Despite Gomez' complaint and Supervisor Cervantes' ongoing harassment, Defendants failed to discipline him.

Additionally, high level upper management clearly knew about the growing harassment problem in the Central Valley as early as 2004 or 2005.  A female janitor named Teresa, who worked in Fresno, complained to Branch Manager Bautista and Supervisor Guerrero in either 2004 or 2005 about Lead Jose Morales Lozano's sexual advances to get her to watch pornographic videotapes at the worksite.  (PUF 30.1-30.17.)  Supervisor Guerrero also knew that Lozano had a cowboy figurine with a visible penis for other employees to see.  (*Id*.)  However, even though the complaint of Lozano's sexual harassment reached Regional Human Resources Manager Cazale, Defendants failed to take any disciplinary action against Jose Morales.  (PUF 30.1-30.17.)

Further, Regional Human Resource Manager Cazale investigated in 2004 or 2005 a complaint of a male employee stalking a female janitor, Ker Vue, at a Fresno worksite.  While the harasser was finally terminated, nothing was done to protect Vue from the harasser who continued to star at her outside the worksite.  (PUF 31.1-31.4.)

Defendants' sexual harassment problem was not confined to female janitors working in Fresno. In 2005, Claimant 3 and Claimant 2, both of whom worked in Bakersfield, complained to Supervisor

Javier Vasquez about Jose Vasquez' sexual harassment, which included nonconsensual touchings, cornering them in the restroom, and boasting of sexual escapades.  (PUF 32.1-32.12.)  Instead of dealing with the harassment, Supervisor Javier Vasquez laughed and simply told them to ignore Jose Vasquez, who happened to be his relative.  (PUF 32.1-32.12; 5.32-5.35; 16.21-16.30.)

As early as 2005, Defendants' upper management knew that Jose Vasquez was a repeat harasser and a convicted sex offender.  (PUF 34.1-35.95.)  Supervisor Jose Vasquez was hired and quickly promoted to be a lead, even though other managers knew that he was related to Javier Vasquez and it was against Defendants' anti-nepotism policy to hire a relative and he failed to disclose his prior sex felony conviction on his application form.  (PUF 49.1-49.57; 50.1-50.15.)  On June 2005, a church volunteer at the Valley Bible Church reported to the police that Jose Vasquez sexually assault a scared female janitor, later known to be Angelica Jauregui, by grabbing her breasts and groping her vagina.  (PUF 34.1-34.41.)  This incident was brought to the attention of Regional Human Resource Manager Cazale, District Manager Ric Steiner, and Senior Regional Vice President Tim Brekke.  (PUF 34.1-34.41.)  While there was an investigation, Regional Human Resource Manager Cazale decided that it was not necessary to talk to the police or to interview the eyewitness who reported the assault to the police.  (PUF  34.20; 34.24; 34.27.)  Cazale not only did not discipline Jose Vasquez but he was allowed to continue supervising janitors.  (PUF 34.30; 34.39-34.40.)

In addition to the Valley Bible Church police report, Defendants' upper management became aware of two anonymous letters sent in August and September 2005 complaining about sexual harassment by Jose Vasquez.  (PUF 35.1-35.95.)  The letters also notified Defendants that Jose Vasquez was a sex offender, who was related to his supervisor.  (PUF 35.4; 35.29.)  Upper management such as Assistant General Counsel Hanson, Senior Regional Vice President Brekke, and Regional Operational Manager Faisal Algaheim all acknowledged knowing about the anonymous letters.  (PUF 35.5; 35.6; 35.14; 35.16.)  However, Defendants failed to initiate an investigation into Vasquez' criminal background.  (PUF 35.29-35.48.)  Despite being placed on notice by the two letters, Defendants failed to investigate the allegations made by the letters.  (PUF 35.66-35.93.)  Defendants did not discipline Vasquez at all until around a month after the EEOC notified Defendants in December 2006 that Jose Vasquez was a convicted rapist.  (PUF 35.29-35.48; 37.8.)

Despite clear notice of Jose Vasquez' sexual harassing behavior, Defendants continued to allow him to supervise female employees and to work until December 2006.  (PUF 35.61-35.65.)  Not surprisingly, Jose Vasquez was also involved in many other incidents of harassment, victimizing numerous female janitors.  (PUF 1.1-1.20; 4.1-4.22; 5.1-5.42; 6.1-6.22; 9.1-9.13; 12.1-12.30; 13.1-13.48; 14.1-14.24; 15.1-15.60; 16.1-16.40; 17.1-17.30; 19.1-19.10.)  From 2004 through August 2006, Jose Vasquez's sexual harassment of Claimant 6 included fondling her leg and raping her in the conference room at the Rabobank building worksite.  (PUF  13.1-13.48.)  From 2004 and to 2005, Jose Vasquez' harassment of Erika Morales included punching and slapping her in the face, grabbing her breast and vagina, and forced her to touch his erect penis more than 20 times.  (PUF 15.1-15.60.)  From 2004 through 2006, Jose Vasquez sexually harassed a number of female workers, including Claimant 5, Claimant 2, Claimant 3, Lucia Cardiel, Maribel Lopez, Ana Portillo de Tellez, Claimant 4, Guadalupe Barron, Gloria Bernal, and Patricia DeVera.  (PUF .1-1.20; 4.1-4.22; 5.1-5.42; 6.1-6.22; 9.1-9.13; 12.1-12.30; 13.1-13.48; 14.1-14.24; 15.1-15.60; 16.1-16.40; 17.1-17.30; 19.1-19.10.)  The harassment ranged from commenting on their private parts, sexual propositions, inappropriate touching of their bodies, graphically describing sexual acts, leering at their bodies.  (PUF .1-1.20; 4.1-4.22; 5.1-5.42; 6.1-6.22; 9.1-9.13; 12.1-12.30; 13.1-13.48; 14.1-14.24; 15.1-15.60; 16.1-16.40; 17.1-17.30; 19.1-19.10.)  If Defendants had discipline Jose Vasquez after receiving the June 2005 police report of the sexual assault at Valley Bible Church and the two anonymous letters in July and August 2005, much of the harassment might have been prevented.

Furthermore, Defendants' management knew that sexual harassment was not confined to Jose Vasquez and to Bakersfield, when it received complaints of sexual harassment out of Fresno worksites after 2005.  For example, Bravo, who worked in Fresno, complained in 2006 about sexual harassment to Branch Manager Bautista and Supervisor Esquivel.  (PUF 39.1-39.3.)  During her employment as a janitor from September to November 2006, Lead Castaneda engaged in graphic sexual harassment.  (PUF 3.1-3.27.)  On one occasion, Castaneda asked whether she knew what oral sex was.  (PUF 3.10.)  He told her that oral sex was "the best thing."  (PUF 3.10.)  On another occasion, Castaneda spoke to another female employee in Bravo's presence that he was going to give his wife "a good job in bed."  (PUF 3.11.)  In as many as five times, he pestered and asked her if she had sexual relations.  (PUF 3.12.)  In addition to the verbal sexual harassment, Castaneda intentionally made the work environment

uncomfortable for Bravo.  (PUF 3.13)  He frequently came up from behind Bravo as she was picking up trash to scare her. (PUF 3.7.)  On three to four occasions, he got very close so he could breathe on her. (PUF 3.8.)  He also leered at her body.  (PUF 3.9.)  Because she had refused his advances, he gave her more work to do than another female employee who succumbed to his advances.  (PUF 3.16.)

Because the circumstances became so unbearable, Bravo felt that she had no choice but to complain.  Bravo went to complain twice to Branch Manager Bautista but was told that he did not have time to talk to her.  (PUF 3.18.) When Bravo complained to Supervisor Esquivel, he yelled at her and fired her on the spot.  (PUF 3.19.)  When she called Defendants' headquarters in San Francisco to complain, she was told that ABM would call her back, but ABM never returned her call.  (PUF 3.22/) Defendants failed to discipline Castaneda for his sexual harassment of Bravo.

Because Defendants ignored Bravo's sexual harassment complaint against Castaneda, he continued to sexually harass others, including Delia DeMejia in 2008.  (PUF 8.1-8.25.)  Lead Castaneda talked about sex in front of her.  (PUF 8.3-8.8.)  He told her that women had the right to have many lovers if they were not sexually satisfied.  (PUF 8.4.)  He boasted that he kept his wife sexually satisfied and spoke about her daughter who only cared about sex.  (*Id.*)  DeMejia's co-worker, Virginia, also confirmed to her that Castaneda always talked about sex, especially how her husband liked to have sex.  (PUF 8.11.)  Virginia further confided her fears when she learned that someone drew a naked picture of her in the men's restroom.  (PUF 8.12.)  While DeMejia's co-worker confided that she was uncomfortable with Castaneda, she feared losing her job if she complained.  (PUF 8.11.)  Further, DeMejia sensed that Lead Castaneda was looking at her in such a way as if he was checking out her body.  He winked at her and she caught him staring at her read end at least twice. (PUF 8.7)  When DeMejia resisted his advances by trying to avoid him, he became overcritical with her work and started to complain about her work. (PUF 8.15-8.17.)

Because of Lead Castaneda's treatment of her, DeMejia went to Supervisor Jimenez to complain about Castaneda's inappropriate conduct. (PUF 8.19-8.23.) Instead of investigating, Supervisor Jimenez told DeMejia that things between her and Castaneda were a personal matter.  (PUF 8.22)  Further, Jimenez told DeMejia that she would not work there any more.  (*Id.*)  Because DeMejia did not know that Defendants had a sexual harassment policy, she did not know what further recourse

she had. (PUF 8.25)  Eventually, DeMejia filed a charge of sexual harassment and retaliation with the EEOC.  (PUF 46.1) Defendants failed to discipline Castaneda for his sexual harassment of DeMejia.

Similarly in 2008, Zapien, who worked in Fresno, complained about being sexually harassed to Supervisor Esquivel.  (PUF 43.1)  From 2006 through February 2009, Zapien faced sexual harassment from Supervisor Duran.  (PUF 21.1-21.24.)  He verbally harassed her as often as 40 times by making comments about her looks when he came uncomfortably close to her, whenever she worked alone. (PUF 21.7-21.9)  He repeatedly told her as often as fifteen times that he missed her.  (PUF 21.10.)  In 2007, Supervisor Esquivel asked her about how many boyfriends she had and that he found her to be attractive.  (PUF 21.14)  He repeatedly pressured her to go out to lunch with him.  (PUF 21.15.)

Supervisor Duran discouraged Zapien from complaining by telling her about another employee who complained about him to Supervisor Esquivel.  (PUF 21.19)  Duran emphasized that another person's complaint did not work," and instead, Defendants ended up firing her.  (PUF 21.19.)  Despite his threats, Zapien went to Supervisor Esquivel to complain but he cut her off and told her that she had to do as Duran pleased because he was his boss.  (PUF  21.20.)  It did not occur to her to complain about someone else because she did not know of any other ABM supervisors. (PUF 21.21.)  Defendants failed to discipline Supervisor Duran for his sexual harassment of Zapien.  (PUF 43.1.)

Supervisor Duran was not the only supervisor in Fresno engaging in sexual harassment.  In 2008 and 2009, Branch Manager Bautista and Supervisor Esquivel investigated a complaint as to whether Supervisor Guerrero had sexual contact with female workers.  (PUF 44.1-44.15.)  Defendants failed to discipline him.  (*Id.*)  In 2008, Gloria Orozco filed a sexual harassment complaint against ABM alleging non-consensual sex with Supervisor Morales-Rodriguez.  (PUF 45.1-45.4)

Complaints of sexual harassment was only a fraction of the actual harassment since female employees either felt that complaining would be futile or would result in reprisals.  For example, Supervisor Morales harassed Ana Gutierrez from 2004 through 2006.  (PUF 11.1-11.18.)  Between 20 to 50 times, Gutierrez saw Supervisor Morales leering and staring at her buttocks.  (PUF 11.5.)  He kept telling her between 20 to 50 times that she looked really good.  (PUF 11.6.)  In 2006, Supervisor Morales told her that her husband must be doing a good job in the bedroom.  (PUF 11.8.)  Morales advised her that he was looking for a woman since his wife worked at night and would not be home until the morning.  (PUF 11.9.)  Other co-workers told Gutierrez that he had been spreading rumors that

he and Gutierrez were together in a relationship, that he would be happy to have a night with Gutierrez, and that he watched a pornographic movie with a female co-worker.  (PUF 11.11-11.16.)  Gutierrez also saw him hugging another employee.  (PUF 11.15.)  Other co-workers told Gutierrez in 2007 that he had been spreading rumors that he and Gutierrez were together in a relationship. (PUF 11.11,)  Further, on more than five occasions, she heard Supervisor Morales said that ABM would not believe the employees who complained against him and would take his side because he had been there for years.  (PUF 11.18.)  Thus, Gutierrez did not complain because she was afraid that she would not be believed and that her supervisor would transfer her to a more difficult worksite.  (PUF 11.17.)

Another example of the barriers to complaining is Garcia who was sexually harassed by Supervisor Cervantes and co-worker Rene between August 2007 to August 2009.  (PUF 7.1-7.17.)  Rene grabbed Garcia's buttocks as she bent over to pick up trash when they were working alone at a movie theater.  (PUF 7.9.)  When they were alone, Rene told Garcia that he rather have sex than eat.  (PUF 7.10.)  He also told her that she looked much younger than her age.  (PUF 7.11.)  Garcia did not complain about Rene's sexual harassment because it would have been futile since Cervantes told her that Rene was his favorite and a trusted individual.  (PUF 7.13.)  Further, he was engaged in sexual harassment.  (PUF 7.5-7.8.)  Her co-workers told her that Cervantes was looking at how she fit into her pants and wanted her.  (PUF 7.7.)  Supervisor Cervantes pressured Garcia by asking her to invite him over to her home for dinner. (PUF 7.8.)  Further, she also did not know that Defendants had a sexual harassment prevention policy and did not know about Defendant's 1-800 number.  (PUF 7.14-7.16)

Birrueta faced similar barriers to complain about her harassment. (PUF 2.14-2.15.)  During a five to six week period in the summer of 2008, co-workers Arturo and another female co-worker harassed her.  (PUF 2.1-2.15.)  Arturo told her that he would slap her butt for each time she would leave trash behind.  (PUF 2.5.)  He repeatedly propositioned her to go out with him and to accompany him to a "dark area," making her uncomfortable.  (PUF 2.7.)  Also, when Birrueta was picking up trash, she felt a co-worker touching Birrueta's vagina from behind, which may her feel very uncomfortable working there.  (PUF 2.8.)  Further, she heard Supervisor Rodriguez talking about his "balls" with other co-worker. (PUF 2.11) Because Birrueta felt uncomfortable working in such an environment, she left her job.  (PUF 2.13.)  She did not complain before she left because she did not think that she would be believed since the harasser had been there for a long time and she had just started.  (PUF 2.12.)

Similar to the problem of sexual assaults in Bakersfield, Defendants' management knew that they had a problem with sexual assault in Fresno as well.  In 2006, Teresa Sanchez, who worked at the PELCO worksite in Clovis near Fresno, complained in 2006 to Supervisors Juarez and Esquivel and Branch Manager Bautista about being sexually assaulted.  (PUF 20.1-20.28.)  During her employment with Defendants, Teresa Sanchez was sexually harassed by Supervisor Juarez from 2000 to 2004.  (PUF 20.4-20.11.)  Supervisor Juarez repeatedly verbally harassed Sanchez.  (PUF 20.4-20.44.)  In 2004, he made demands with sexual overtones that she massage his upper thigh, near his groin and that she leave the building to dance with him.  (PUF 20.6-20.8.)  He also showed up at her house and demanded for her to get in the car with him, leading Sanchez to believe that there were sexual overtones.  (PUF 20.9.)  Further, a co-worker told her that Supervisor Juarez had rolled up a plastic bag like a penis and was swinging around.  (PUF 20.10.)  Sanchez did not complain about Supervisor Juarez' harassment because he always reminded that she gave her a job.  (PUF 20.20.)  From talking to co-workers, she was fearful that no one would take action when employees complained.  (PUF 20.20.)

Besides Supervisor Juarez, Supervisor Rodriguez also verbally harassed Sanchez by talking in front of her about his sexual escapades, including sex with co-workers.  (PUF 20.12-20.17.)  He further commented that she had a nice butt.  (PUF 20.12.)  However, his harassment quickly escalated to physical assault when she was cleaning a restroom in 2006.  (PUF 20.13.)  He closed the door, turned off the lights, and proceeded to grab her buttocks and leg to prevent her from getting away.  (PUF 20.13.)  Fortunately, she was saved when a co-worker heard her screaming. (PUF 20.13)

Shortly after the assault, Supervisor Juarez told her that she could no longer work at the PELCO worksite.  When she complained to Supervisor Esquivel about her removal from PELCO and the sexual assault, he failed to act and simply told her to talk to Branch Manager Bautista.  (PUF 20.21-20.22)  Esquivel's failure to act was not surprisingly since he himself engaged in sexual harassment.  (PUF 21.14-21.16.)  Despite setting numerous appoints with Branch Manager Bautista, Sanchez never met him because he either missed or cancelled the appointment.  (PUF 20.23-20.24.)  Then, Defendants refused to give her work anywhere else.  (PUF 20.22-20.28.)  Defendants failed to discipline neither Supervisor Juarez nor Rodriguez for their sexual harassment of Sanchez.

Unfortunately, the lack of adequate disciplinary action allowed Supervisor Rodriguez to continue supervising female employees at the PELCO worksite.  Not surprisingly, Supervisor

Rodriguez soon sexually harassed Quintero since 2007 at the PELCO worksite.  (PUF 18.1-18.31.)  He sexually harassed her on a daily basis with sexual propositioning and talked about different sexual positions. (PUF 18.4-18.21.)  Then in 2008, he cornered her while she was working at the PELCO worksite in a room with no cameras.  (PUF 18.5.)  He told her of his desire to take her to a dark room, to put her on all fours, to pounce on her like a tiger.  (PUF 18.5; 18.7; 18.10.)  He also threatened her physical safety by saying that "This birdie is not going to escape from me alive."  (PUF 18.11.)

Unfortunately, the harassment got worst.  Rodriguez also sexually harassed Quintero's 21-year old daughter, Edith Martinez, who also worked at ABM.  (PUF 18.12-18.14.)  Quintero saw him caressing her daughter's hair from the back of her head to her buttocks. (PUF 18.13.)  Unable to withstand the harassment of her daughter, Quintero complained to Supervisor Juarez about Supervisor Rodriguez.  (PUF 18.15.)  Supervisor Juarez refused to do anything.  (PUF 18.15-18.16.)  Instead, after her complaint, she saw her hours went down from 40 hours per week to only 16 hours.  (PUF 18.16.)  Defendants failed to discipline Rodriguez for his sexual harassment of Quintero.  (PUF 18.15-18.16.)

Defendants failure to deal adequately with Supervisor Rodriguez' harassment allowed him to sexually assault Mara Murillo in 2009 in the restroom.  (PUF 18.20.)  In 2009, Quintero heard a female co-worker, Murillo, being harassed by Rodriguez in a restroom.  (PUF 18.19-18.20.)  She saw Murillo running from a restroom crying.  (PUF 18.19.)  Murillo told Quintero that he unzipped her pants.  (PUF 18.19.)  This harassment resulted in a police report in August 2009 for sexual battery against Supervisor Rodriguez.  (PUF 18.20.)  Quintero and Murillo both complained to the worksite and then to Defendants.  (PUF 18.22; 18.26.)  While Quintero cooperated with Defendants' investigation, Supervisors Esquivel and Juarez threatened her that she would be fired if she would take to anyone else about Murillo's assault.  (PUF 18.28.)  The subsequent police report placed Defendants' management on notice of the unabated problem of severe sexual harassment.  (PUF 18.20; 47.33.)

Therefore, from 2000 through 2009, Defendants' management had repeated notice of widespread sexual harassment problem by numerous harassers, including supervisors.  Yet, their failure to correct the problem allowed the sexual harassment problem to continue to fester and to escalate.

**4.    Defendants' Failures to Respond Adequately to Sexual Harassment is Due to Substandard Investigations.**

Michael Robbins, EEOC's expert on sexual harassment investigation, concluded that Defendants failed to take the appropriate disciplinary and remedial action because of their ineffective and substandard investigation.  (PUF 48.12.)  Due to space constraints, Plaintiffs have not elaborated on the defective investigation but requests the Court to review Robbins' pain-staking reports of Defendants' investigations of sexual harassment complaints from employees working not only in Bakersfield, but in Fresno and other areas as well in the Central Valley.  (PUF 48.12.)  As found by Robbins, the repeated ineffectiveness of Defendants' investigations shows a company-wide wide comprehensiveness failure by Defendants to prevent sexual harassment on many levels.  (PUF 48.12.)  While Defendants claimed that they have a "zero-tolerance" sexual harassment policy, Robbins found that Defendants' harassment policies and training materials were not followed.  (PUF 48.12.)  He found that Defendants' investigations, including those conducted by Defendants' human resources professionals, failed to meet basic standards of completeness, thoroughness, and impartiality.  Because the investigations were flawed, Robbins concluded that Defendants failed to take the appropriate disciplinary and remedial action to correct and prevent future harassment.  (PUF 48.12.)

It is within this backdrop of ineffective policies and procedures, inadequate training, substandard investigations, and ineffective remedial actions that led to rampant sexual harassment at Defendants' worksites from 2000 through in 2009 throughout the Central Valley.

**C.    Relevant Procedural History**

On or about June 2006, Defendants were served with Charging Party Erika Morales' EEOC charge where she complains to being subjected to sexual harassment and constructive discharge and states that she "believe[s] a class of females have been discriminated against on the basis of their sex in violation of Title VII."  (PUF 51.1-51.4; 51.9.)  The charge does not limit "a class of females" to only those in Bakersfield or Fresno.  On or about April 25, 2007, Defendants were served with the EEOC's letter of determination finding "reasonable cause to believe that Charging Party [Erika Morales] was subjected to sexual harassment and was constructively discharged" and females as a class has been subjected to sexual harassment.  (PUF 51.25-51.29.)  The Letter of Determination does not limit its finding to only those who worked in Bakersfield or Fresno.  In addition, the EEOC requested

information from Defendants in August 2006 as to ABM's organizational chart and ABM's policies and procedures.  (PUF 51.23-51.24; 51.41.)  Defendants' human resource coordinator Anthony MacFarlane, who conducts works for all ABM Janitorial Services' northern California region, was interviewed by the EEOC's investigator.  (PUF 51.22)    Further, in June 2007, the EEOC notified Defendants that "In the event of litigation, the Commission may expand … to include additional victims of discrimination."  (PUF 51.40.)  During the summer of 2007, the EEOC and Defendants engaged in a conciliation process for all of the discrimination claims contained in the EEOC's letter of determination.  (PUF 51.31.)  On or about September 25-26, 2007, the Defendants were served with EEOC's conciliation failure letter stating that conciliation efforts as to all the discrimination charges contained in the EEOC's letter of determination had failed.  (PUF 51.33.)

A second charge of sexual harassment was filed by the Law Offices of Mallison and Martinez on behalf of Claimant 6, another ABM janitor.  (PUF 51.10-51.11.)  Charging Party Morales also amended her charge to indicate a claim of continuing action.  The EEOC found cause for Morales and a class of similarly situated individuals and conciliated without success.  (PUF 51.5-51.13; 51.25-51.33.)

Since the conditions precedents to the lawsuit were met, the EEOC filed its initial complaint in 2007 and its amended complaint in 2009 in the public interest and in the interest of the Charging Party and similarly situated individuals.  (PUF 51.34-51.35.)  Around April 21, 2009, Dejia Mejia, who worked for Defendants in Fresno, filed a charge complaining of sexual harassment.  (PUF 51.42-51.44.)  Around December 14, 2009, a letter of determination was sent to Defendants finding reasonable cause that the Charging Party and a class of employees were subjected by Defendants to sexual harassment.  (PUF 51.45.)  Then, on March 5, 2010, the EEOC sent a letter to Defendants notifying that conciliation had failed.  (PUF 51.46-51.48.)  After the completion of the administrative process, the EEOC filed the present lawsuit against Defendants.

## III.    ARGUMENT

**A.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED IF THERE IS A TRIABLE ISSUE OF MATERIAL FACT.**

The moving party bears the initial burden of identifying the evidence which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  The burden shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial.

*Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).  The court must view all evidence and justifiable inferences in the light most favorable to the non-moving party.  *Porter v. California Dept. Corrections*, 449 F.3d. 885, 891 (9th Cir. 2005).  The district court "must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prod. Inc.,* 530 U.S. 133, 144 (2000).  Any doubt as to the existence of any issue of material fact requires the denial of the motion.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

A plaintiff alleging employment discrimination "need produce very little evidence in order to overcome an employer's motion for summary judgment.  *Davis v. Team Electric Co,*, 520 F.3d 1080, 1089 (9th Cir. 2008).  The Ninth Circuit recognizes "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."  *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).  The court further cautioned "when a court too readily grants summary judgment, it runs the risk of providing a protective shield for discriminatory behavior that our society has determined must be extirpated."  *Id.*  Inquiry into hostile work environment is particularly unsuitable for summary judgment because "hostile work environment claims present 'mixed question[s] of law and fact' that are especially well-suited for jury determination."  *Schiano v. Quality Payroll System, Inc.*, 445 F.3d 597, 605 (2d Cir. 2006).  As Defendants have not met its burden of showing the absence of disputed issues of material fact, its motion should be denied.

**B.      DEFENDANTS' ARTIFICIAL DIVISION OF FRESNO AND BAKERSFIELD CLAIMANTS CONFLICTS WITH THE REALITY THAT ALL THE EMPLOYEES OF THE CENTRAL VALLEY SHARE SIMILAR WORKING CONDITIONS DUE TO BEING EMPLOYED AND CONTROLLED BY DEFENDANTS.**

In its memorandum of points and authorities, Defendants frame the "allegations of two entirely separate and unrelated groups of claimants.  Defendants named one group as the "Bakersfield Claimants" and other group as the "Fresno Claimants."  Defendants attempt to paint a picture that the two sets of claimants exist independently of each other.

Notwithstanding the names given, the reality is that all the claimants were Defendants ABM's employees.[7] The two districts do not operate independently.  As discussed later, they and their employees are all controlled by Defendants.  Further, Defendants themselves do not distinguish the Fresno and Bakersfield offices as completely independent entities.  The same human resources department oversaw all the ABM employees, regardless of whether they are in Fresno or Bakersfield.  Despite Defendants' attempt to conjure an alternate universe, the reality is that Defendants treated the Central Valley as an integrated whole.  Due to being employed by the same employer and controlled by the same higher-level subsidiary and corporate parent, all the employees of the Central Valley have more in common with each other than differences.

**C.   THE EVIDENCE ESTABLISHES TRIABLE ISSUES OF FACT AS TO DEFENDANTS' LIABILITY FOR ITS COMPANY-WIDE FAILURES IN PREVENTING AND REMEDYING A SEXUALLY HOSTILE WORK ENVIRONMENT.**

**1.    Under the Totality of Circumstances, Defendants Subjected Claimants to a Sexually Hostile Work Environment.**

Defendants argue that the sexually hostile work environment claims of Birrueta, Bravo, Garcia, Gutierrez, Zapien, and DeMejia must fail because the harassment they experienced was not severe or pervasive.  Defendants' arguments are without merit because they are wrong on the facts and the law.

Defendants mischaracterize the harassment suffered by the Claimants.  The harassers graphically talked about oral sex, sexual intercourse, and sexual affairs to Bravo, Gutierrez, DeMejia, and Bravo.  The harassers leered looking at the Claimants' private parts.   Birrueta was not only subjected to sexual propositions and threat by co-workers to invite her to a "dark place", but she had to endure having a co-worker feeling her vagina.  Similarly, besides being subjected to graphic comments about sex, propositions, and suggestive comments about her appearance, Garcia was subjected to having her buttocks grabbed.  Further, DeMejia's harassment was not simply one Incident.  Co-worker Castaneda talked at length about lovers and affairs, leering at her, and made phone calls to her; and

---

[7]    Another example of Defendants evading reality is that two of the claimants, Hilda Gomez and Martha Castaneda Garcia, were not part of either Fresno or Bakersfield branch office.  (cite) They were part of the Visalia branch office, which is around 44 miles south of Fresno and around 81 miles north of Bakersfield.

spoke on another occasion about women being horny and about his daughter's sex life.  The harassment endured by the Claimants was not simply stray or innocuous verbal comments.

Defendants mischaracterize the harassment by attempting to isolate them without considering them in context of all the circumstances.  A hostile work environment is actionable if the harassing conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.  *Meritor Sav. Bank, FSM v. Vinson*, 477 U.S. 57, 67 (1986).  The Supreme Court instructed that hostile work environment "claims are based on the cumulative effect of individual acts," requiring looking at all the circumstances.  *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).  "Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes." *Williams v. General Motors Corp.*, 187 F.3d 533, 563 (6th Cir. 1999).  *Id.*  Further, the harassment must be seen from the perspective of a reasonable person in the plaintiff's position.  *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001).  As explained by the Third Circuit, "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Andrews v. Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990).  Innocuous occurrence may in the context of a pattern of discriminatory harassment take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender."  *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1109 (9th Cir. 1998).

Therefore, the sexual harassment must be seen in the proper context and circumstances which shows the Claimants' extreme vulnerability and Defendants' indifference to sexual harassment.  These Claimants were monolingual women with few work options.  They often worked alone at night with minimum contact with anyone.  Further, they (Birrueta, Bravo, Garcia, and DeMejia) worked at a company which failed to distribute its sexual harassment policy and procedures in a language that they could understand.  Thus, many of them did not know that the employer took a strong stance against sexual harassment and what recourse was available if harassed, especially if the harassment was by their immediate supervisor or if he was not responsive to their complaints.  Further, complaints of sexual harassment were met with indifference.  For example, Bravo, Zapien, and DeMejia complained

about being sexually harassed to Branch Manager Bautista and/or Supervisor Esquivel or Jimenez, but no investigation or discipline was initiated.  Some of the supervisors like Esquivel and Cervantes were themselves engaged in sexual harassment of Bravo and/or Garcia.  Further, some like DeMejia were retaliated against when they complained about the harassment.  Claimants such as Gutiererz did not complain because they were told by their supervisors that they would not be believed or that they feared retaliation.  Besides the specific incident of harassment, all of the above circumstances, especially Defendants' failure to respond adequately to complaints, must also be considered because they exacerbated the effect of the harassment in creating a hostile work environment.

Further, Defendants incorrectly suggests that verbal harassment is insufficient to establish a sexually hostile work environment.  (Def. Mot. (Fresno) 19.)  However, verbal harassment alone can establish at least a triable issue as to whether there was sexually hostile work environment.  *See, e.g., Nichols.*, 256 F.3d at 870 (insults, name-calling, and vulgarities sufficient for a hostile work environment claim); *Burrell v. Star Nursery*, 170 F.3d 951, 953, 957 (9th Cir. 1999) *(*triable issue of hostile work environment when supervisor made comments with sexual references, remarked about taking a trip with her, and how well-built plaintiff was).  Further, while an isolated incident is not enough, the number of incidents alone is not determinative.  *Woods v. Graphic Comm.*, 925 F.2d 1195, 2101 (9th Cir. 1991).  Conversely, incidents that are much less severe may constitute harassment in the context of a working atmosphere polluted with racial or sexual tension.  *See Woods*, 925 F.2d at 1202.

Defendant's attempt to isolate the Claimants individually and into Fresno or Bakersfield Claimants ignores well-established legal authorities that harassment of other employees is relevant to determine a hostile work environment claim, even if the Claimant was not aware of the harassment.  "Offensive comments do not need to be made directly to an employee for a work environment to be considered hostile."  *Davis*, 520 F.3d at 1095.  Workplace harassment of others is admissible to prove the existence of a hostile work environment whether or not the plaintiff-employee is aware of such harassment.  *See, e.g.*, *Quinn v. Consolidated Freightways Corp.*, 283 F.3d 572, 578-579 (3d Cir. 2002) (district court erred in excluding co-worker's testimony about sexually charged worksite other than the plaintiff's worksite, where such testimony could establish atmosphere of condoned sexual harassment); *Perry v. Ethan Allen Inc.,* 115 F.3d 143, 151-152 (2d Cir. 1997) (harassment of other employees, even if not known to plaintiff, is relevant to whether hostile work environment existed); *Waterson v. Plank*

*Road Motel Corp.,* 43 F. Supp. 2d 284, 288 (N.D.N.Y. 1999) (testimony of another female regarding her own experience of alleged sexual harassment and discrimination while working for defendant company is relevant to show hostile work environment existed); *see also Heyne v. Caruso*, 60 F.3d 1475, 1481 (9th Cir. 1995) (harassment of other employees relevant to sexual harassment claim)

Even when the employees may work in different worksites, all their circumstances are relevant in a sexually hostile work environment analysis. *See Sandoval*, 578 F.3d at 801; *EEOC v. Burlington Medical Supplies, Inc.*, 536 F. Supp. 2d 647 (E.D.Va. 2008) (in a sexual harassment case involving employees working throughout the United States, the harassment of each plaintiff needs to be considered together). Even though each claimant worked at separate worksites and had allegations of harassment against different supervisors, the Eighth Circuit held that "[w]hen judging the severity and pervasiveness of workplace sexual harassment, this court has long held harassment directed towards other female employees is relevant and must be considered" because it is "highly probative of the type of workplace environment [the claimant] was subjected to, and whether a reasonable employer should have discovered the sexual harassment." *Sandoval*, 578 F.3d at 803; *Sandoval v. ABM, Inc.*, 552 F. Supp. 2d 867, 900-905 (D.Minn. 2008).

Therefore, the claims of Birrueta, Bravo, Garcia, Gutierrez, Zapien, and DeMejia should not be seen individually or even simply with the other Fresno claimants, but should be seen together with all the claimants in the Central Valley. In all, there are 21 Claimants and additional witnesses who are victims of sexual harassment by 13 different harassers due to Defendants' practice of condoning and tolerating harassment from 2001 to the present. The harassment includes an attempted rape in 2005 by Jose Vasquez, a convicted sex offender, who continued to be Defendants' employee without discipline until December 2006, despite Defendants' knowledge of his despicable conduct. This harassment also includes Supervisor Adalberto Rodriguez' attempted rape in 2006 of Teresa Sanchez in the restroom of the PELCO worksite near Fresno. Defendants' failure to discipline Supervisor Rodriguez resulted in another sexual assault in 2009 of Murillo again at the PELCO worksite. Besides the sexual harassments themselves, Defendants failed to disseminate Spanish policies and procedures to a largely monolingual work force, failed to train employees and supervisors about sexual harassment policies and procedures, and failed to investigate complaints adequately. These company-wide failures have exacerbated the hostile work environment caused by the harassment themselves.

Under the totality of the circumstances of considering all who were sexual harassed, a sexually hostile work environment existed for all the Claimants.  Even if the harassment is seen from the viewpoint of the female monolingual janitors working alone with an employer who was indifferent to preventing and remedying sexual harassment, each Claimant's circumstances also establish a sexually hostile work environment.  "Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." *Eich v. Bd. of Regents*, 350 F.3d 752, 761 (8th Cir. 2003).  At the very least, the evidence establishes a close case where it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment.  *Davis*, 520 F.3d at 1096.

**2.      Defendants Cannot Establish the *Faragher / Ellerth* Defense to Supervisor Harassment Because the Harassment Resulted in Tangible Employment Action.**

Defendants cannot raise an affirmative *Ellerth / Faragher* defense if plaintiff can establish that she suffered a tangible employment action as a result of harassment by her supervisor.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  A tangible employment action is a significant change in the plaintiff's employment status.  *Penn. State Police v. Suders*, 542 U.S. 129, 137-138 (2004).

Here, Supervisor Rodriguez sexually harassed and assaulted Sanchez which eventually resulted in her being removed from the PELCO worksite and eventually not being given any hours to work.  Similarly, Supervisor Rodriguez' sexual harassment of Quintero eventually resulted in her work hours being reduced from 40 to 16 hours.  Further, Lead Castaneda's sexual harassment of DeMejia resulted in her being told that she could no longer work for Defendants.  Lead Castaneda's harassment of Bravo also led her being yelled at by her supervisor and fired on the spot.  To the extent that whether a lead is a supervisor is a triable issue of fact since a lead has supervisory responsibilities over the claimants.

Further, the employer cannot raise the *Ellerth / Faragher* defense if the tangible employment action carried out under a supervisor's official authority was part of the conduct leading to the constructive discharge.  *Id.* at 140-141.  Thus, since Gomez and Birrueta left their employment for Defendants due to intolerable conditions caused by the harassment of a supervisor, Defendants cannot raise a *Ellerth / Faragher* defense with respect to them either.

3.   **Defendants Cannot Establish the *Faragher / Ellerth* Defense to Supervisor Harassment Because They Failed to Exercise Reasonable Care in Preventing and Remedying Sexual Harassment.**

Defendants misconstrue the law by claiming that it has a complete defense to supervisor's sexual harassment due to the failure to complain by Claimants Birrueta, Bravo, Garcia, Gutierrez, Zapien, and DeMejia.  (Def. Mot. 22 (citing the *"Ellerth / Faragher"* defense.")  Defendants' arguments are meritless because they are wrong on the law and the facts.

Defendants misconstrue the *Ellerth / Faragher* defense[8] by suggesting that the defense only requires a showing that the Claimants did not complain.  (Def. Mot. 22.)  To assert this defense in the absence of a tangible employment action, the defendant must not only show that plaintiff unreasonably failed to take advantage of any preventive and corrective opportunities, but also that it had exercised reasonable care to prevent and promptly to correct sexually harassing behavior.  *Ellerth*, 524 U.S. at 764-765; *Faragher*, 524 U.S. at 807-808.  To prevent and eliminate sexual harassment, "an employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing sanctions." *Davis v. Tri-State Mack Dist.*, 981 F.2d 340, 344 (8th Cir. 1992) (quoting 29 C.F..R. § 1604.11(f) (emphasis added)).  "[T]o be adequate, remedial actions must be designed not only to prevent future conduct by the harasser, but also by other potential harassers." *McGinest.*, 360 F.3d at 1121 (9th Cir. 2004); *Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th Cir. 1995) (same).

Here, Defendants failed to prevent and remedy sexual harassment.  First, what happened with the Claimants at issue is part of Defendants' overall practice of not adequately dealing with sexual harassment.  While Defendants have a sexual harassment policy and complaint procedure, Defendants failed to distribute Spanish-language policies and procedures on sexual harassment to the Spanish-speaking claimants.  Defendants failed to train the Claimants that they enforce a strong policy against sexual harassment.  Defendants failed to train their supervisors as to their handling of sexual harassment complaints, when their Spanish-speaking supervisors could not under the trainings in

---

[8]      Defendants argues that failure to complain is a complete defense to all Title VII claims, when the *Faragher / Ellerth* defense only applies to a claim based on harassment by a supervisor.  (Def. Mot. 22.)

English.  Not surprisingly, thirteen male supervisors or co-workers sexually harassed at least 21 claimants and other female employees from 2000 to the present.  While Defendants may claim that they did not know about the sexual harassment problem, but they were on notice as early as 2001 when Luisa Gonzalez, who worked in Bakersfield, complained to Supervisor Mondragon about being sexually harassed or when Hilda Gomez, who worked in Visalia, complained about being harassed to Supervisor Lara.  Further, high level upper management clearly knew about the growing harassment problem when Branch Manager Bautista knew in 2004 or 2005 about the complaints of Teresa, who worked in Fresno, about Jose Lozano's attempt to get her to watch pornographic videotapes at the worksite and when Regional Human Resource Manager Cazale investigated in 2004 or 2005 a stalking of a female janitor, who worked in Fresno.  These incidents known by upper management are in addition to the Cazale's investigation in 2005 of Jose Vasquez' harassment at the Valley Bible Church and the knowledge of Assistant General Counsel Teuila Hanson, Regional Operation Manager Faisal Algaheim, Senior Regional Vice President Brekke of two anonymous letters in 2005 complaining about Jose Vasequez' sexual harassment and his background as a convicted sex offender.  Further, Teresa Sanchez, who worked at the PELCO worksite in Clovis near Fresno, complained in 2006 to Supervisors Juarez and Esquivel and Branch Manager about Supervisor Adalberto Rodriguez' attempted rape by trying to forcibly kiss her, removing her clothing, and grabbing at her breast and vagina.  Yet, Supervisor Rodriguez was not disciplined and Sanchez that she could not no longer work at the PELCo worksite.  This lack of discipline led to Supervisor Rodriguez's harassment of Quintero at the PELCO worksite, which included threats to her that "This birdie is not going to escape from me alive; and Quintero's daughter.  When Quintero's complaint to Supervisor Juarez in 2007 or 2008 about Supervisor Rodriguez was ignored, Supervisor Rodriguez sexually assaulted Mara Murillo in 2009 in the restroom.  The subsequent police report clearly placed Defendants' management on notice of the unabated problem of severe sexual harassment.  Not surprisingly, Bravo's complaints of sexual harassment by Castaneda in 2006 were ignored by Branch Manager Bautista and Supervisor Esquivel. Thus, Castaneda continued to sexually harass others, including Delia DeMejia, who worked in Fresno and who filed an EEOC charge of discrimination in 2009.  Similarly, while working in Chowchilla, Zapien complained in 2008 to Supervisor Esquivel about Supervisor's Duran verbal harassment was ignored, but her complaint was ignored and Esquivel himself verbally sexually harassed her as well.  In

2008 and 2009, Branch Manager Bautista and Supervisor Esquivel investigated a complaint as to whether Supervisor Guerrero had sexual contact with female workers.  In 2008, Gloria Orozco filed a sexual harassment complaint against ABM alleging non-consensual sex with Supervisor Rodriguez.

As stated by Michael Robbins, EEOC's expert on sexual harassment investigation, the repeated ineffectiveness of investigation shows a company-wide wide comprehensiveness failure by Defendants to prevent sexual harassment on many levels.  While Defendants claimed that they have a "zero-tolerance" sexual harassment policy, Robbins found that Defendants' harassment policies and training materials were not followed.  He found that Defendants' investigations, including those conducted by Defendants' human resources professionals, failed to meet basic standards of completeness, thoroughness, and impartiality.  Because the investigations were flawed, Robbins concluded that Defendants failed to take the appropriate disciplinary and remedial action.

The evidence shows that Defendants have filed to exercise reasonable care in preventing and remedying sexual harassment.  At the minimum, there are triable issues as to whether Defendants exercised reasonable care.  Defendants' failure to prevent and remedy sexual harassment alone is sufficient to defeat their *Faragher / Ellerth* defense.

### 4. Defendants Cannot Establish the *Faragher / Ellerth* Defense Because the Claimants either Complained of Sexual Harassment or Acted Reasonably in Light of Defendants' Failures to Prevent and Remedy Sexual Harassment.

Defendants incorrectly claim that Claimants Bravo, DeMejia, and Zapien failed to complain about harassment.  (Def. Mot. 22.)  Due to Castaneda's sexual harassment, Bravo complained to Branch Manager Bautista but was told that he did not have time to talk with her; complained to Supervisor Esquivel, who yelled at her and fired her on the spot; and called ABM headquarters in San Francisco, but no one returned her call.  DeMejia complained about co-worker Castaneda's sexual harassment to Supervisor Jose Jimenez, who told her that she could no longer work there.  Further, due to Supervisor Duran's sexual harassment, Zapien complained to Supervisor Esquivel, but he cut her off and told her that she had to do what Duran wanted because he was her boss.  Even if what the Claimants did were attempts to complaint, which were ignored, they could still be considered to determine whether the employee acted reasonably in a *Faragher / Ellerth* analysis.  *See Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 99 (1st Cir. 2006).

Not complaining about sexual harassment does not always establish an unreasonable failure to take advantage of preventative and corrective measures.  Defendants' *Faragher / Ellerth* defense may be defeated if the reluctance to report acts of harassment is based on a "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint."  *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293-295 (2d Cir. 1999), *overruled on other grounds*; *see Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 64-65 (2d Cir. 1998) (the court ruled that the jury could find that the plaintiff, a functionally illiterate immigrant, believed that she would lose her job if she reported harassment, and, if so, the failure to report was excusable.); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 525-526 (5th Cir. 2001) (jury's finding that plaintiff's failure to avail himself of available remedies was not unreasonable given the department head's veiled threats of removal and influence at the university).  Similarly, Gutierrez did not complain because of her fear of retaliation, since Supervisor Morales said that ABM would not believe employees who complained against him and would take his side.  Birrueta did not know that she could make a complaint of sexual harassment and did not believe that she would be believed because the harassing supervisor had been there for a long time.  Garcia did not complain because her own supervisor was engaged in the harassment and she did not know who else to receive her complaint.  At the very least, there are triable issues as to whether the Claimants unreasonably failed to take advantage of any preventive and corrective opportunities.  *See* V*andermeer v. Douglas County*, 15 F. Supp. 2d 970, 981 (D. Nev. 1998) (a triable issue as to whether plaintiff acted reasonably by not complaining when she thought that it was futile because the harasser's supervisors knew of the harassers' behavior but had failed to act).

### 5. Defendants are Liable for Co-workers' Sexual Harassment.

To the extent that the Claimant were harassed by co-workers, the Defendants are liable if Defendants knew or should have known of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment.  *Swinton v. Potomac Corp.*, 270 F.3d 794, 803-805 (9th Cir. 2001).  Defendants claim that Birrueta, Bravo, and Garcia allege co-worker harassment.

Similarly to the *Faragher / Ellerth*  analysis, Defendants were on notice of their sexual harassment problem on their worksites way before Birrueta started working for Defendants in 2008 and Garcia starting in 2007 through 2009, and Bravo in 2006.  Yet, they failed to prevent and remedy the

1    problems.  Further, Garcia was harassed also by Supervisor Cervantes and Bravo was harassed by a

2    lead, Castaneda.  A lead has supervisory responsibilities over the Claimants.  At the very least, there is

3    a triable issue of fact with respect whether a lead is a supervisor.  With respect to these Claimants,

4    Defendants are under either for supervisory or co-worker harassment.

5    **D.    THE EVIDENCE ESTABLISHES AT LEAST TRIABLE ISSUES AS TO WHETHER**

6    **       DEFENDANTS RETALIATED AGAINST CLAIMANTS**

7           With respect to the Fresno claimants that are subject of Defendants' motion for summary

8    judgment on retaliation, Plaintiffs are pursuing a retaliation claim on behalf of Bravo, Sanchez, Mejia,

9    and Quintero.  Retaliation is shown if the employee is subjected to an adverse employment action

10   because of his protected activity.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-60, 68

11   (2006)  An adverse employment actions "are likely to deter victims of discrimination from complaining

12   to the EEOC, the courts, and their employers.  *Id.* at 68.

13          Sanchez complained to Supervisor Esquivel about the sexual assault and being removed from

14   the PELCO worksite.  Afterwards, Defendants refused to give her any more work, causing her to leave.

15   Similarly, Quintero complained to Supervisor Juarez about Supervisor Rodriguez sexually harassing

16   her daughter.  Then, Quintero saw that her hours went down from 40 hours to 16 hours per week.

17          When DeMejia resisted Lead Castenada's advances, he became over critical with her work and

18   started to complained about her.  When DeMejia went to Supervisor Jimenez to complain about

19   Castaneda's inappropriate behavior, Jimenez told her that she could no longer work there any more.

20   Similarly, Bravo went to Supervisor Esquivel to complain about Castaneda's sexual harassment.  She

21   also called ABM's corporate headquarters in San Francisco, but no one got back to her.  When she

22   complained to Supervisor Esquivel, he yelled at her and fired her on the spot.

23          Being fired or having one's hours eliminated or reduced is the kind of action which would

24   dissuade an employee from complaining.  Defendants may argue that the claimants never actually

25   complained about the harassment.  However, the EEOC only needs to show "very little" direct

26   evidence.  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).  Even if what the

27   Claimants did were attempts to complaint, which were ignored, they could still be considered in the

28   Court's analysis.  *See Valentin-Almeyda*, 447 F.3d at 99.  Therefore, the evidence establishes at least a

     triable issue as to whether Defendants retaliated against Sanchez, Quintero, DeMejia, and Bravo.

**E.     DEFENDANTS MISCONSTRUED THE LAW FOR A QUID PRO QUO CLAIM SINCE A TANGIBLE EMPLOYMENT ACTION IS NOT REQUIRED.**

Defendants argue that a tangible employment action is required for a quid pro quo claim. Defendants argue that a tangible employment action means a significant change in employment status, such as hiring, firing, failing to promote, and reassignment.  However, Defendants are wrong with respect to the law for a quid pro quo claim.

A tangible employment is not a required element of a qui pro quo harassment.  This type of harassment occurs when harassers "explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon her acceptance of sexual conduct."  *Holly D. v. Cal. Inst. of Tech.*, 339 F. 3d 1158, 1170 n. 15 (9th Cir. 2003).  Thus, harassment conditioned on the absence of a job detriment or continued employment is sufficient to establish a qui pro quo claim.  Even if the term "tangible employment action" is used, there is no requirement that it must cause economic harm or injury to the employee.  *Id.* at 1070.  Further, "[i]f constructive discharge due to a hostile work environment is proven, the claim also becomes one of 'quid pro quo' harassment.  *EEOC Policy Guidance on Current Issues on Sexual Harassment,* N-915-050, 18 (1990).

Here, Bravo, DeMejia, and Birrueta experienced quid pro quo sexual harassment.  DeMejia and Bravo understood that failure to engage in sexual conduct or failure to go along with the harassment would result in their termination or in harsher conditions.  Supervisor Castaneda gave Bravo more work for refusing to engage in sexually offensive conduct.  Bravo saw that Supervisor Castaneda reduced the work of a female co-worker who participated in sexually offensive conduct.  Castaneda targeted Bravo for termination and terminated her, though he made it see like she was not appropriately doing her work.  (PUF 3.20.)  When DeMejia did not respond to his sexual conduct and tried to avoid him Castaneda attacked her performance and caused her termination.  (PUF 8.15-8.17, 8.20-21, 8.23.) Birrueta also learned from her female co-workers that flirting with Supervisor Rodriguez lowered one's workload or at least allowed one to continue to be employed.  (PUF 2.10.)

With respect to Garcia, Gutierrez, Sanchez, Zapien, each felt compelled to leave Defendants because to continue her employment would mean that they would have to endure intolerable sexual harassment.  Following EEOC guidance stated above, quid pro quo harassment is established if there is constructive discharge due to a hostile work environment.

At the very least, the evidence establishes a triable issue as to whether each of the claimants suffered quid pro quo harassment.  For these reasons, summary judgment should not be granted on the Claimants' quid pro quo claim.

**F.      HILDA GOMEZ AND ANA GUTIERREZ' CLAIMS ARE NOT TIME-BARRED.**

Defendants argues that September 3, 2005 is the 300-day limitations date for which each claimant must prove that she last experienced at the latest, since Charging Party Morales filed her EEOC charge on June 30, 2006.  (Def. Mot. 17.)  Thus, Defendants argue that Gutierrez and Gomez are time-barred.  Defendants are factually and legally incorrect.

With respect to Gomez, Defendants are factually incorrect that she was not sexually harassed after September 3, 2005.  She worked for Defendants until March 2007.  In 2006, Supervisor Morales sexually harassed Gomez by telling her that her husband must be doing a good job in the bedroom. Other co-workers told Gutierrez in 2007 that Supervisor Morales had been spreading rumors that he and Gutierrez were together in a relationship and that he said in 2005 that he would be happy to have a night with Gutierrez.  Thus, her harassment to continue well within the 300-day limitations period based on Charging Party's Morales' charge.

Even if a claimant ended her employment before September 3, 2005, plaintiffs can pursue her claim under a continuing violation theory since the plaintiffs allege that Defendants' company-wide failure to deal with its sexual harassment problem over a long period of time from 2000 to the present. The EEOC's authority to seek relief for individuals harmed prior to the charge-filing period is well-established.  *See*, *EEOC v. Preferred Management Corp.*, 216 F. Supp. 2d 763, 813-15 (S.D. Ind. 2002) (where EEOC has a single timely charge, it may proceed on pattern or practice claim on behalf of class members injured prior to 300 day filing period); *EEOC v. Warshawsky and Co.*, 1994 WL 384041, *2– 3 (N.D. Ill. 1994) (allowing relief for persons terminated more than 300 days before filing of the charge); *EEOC v. Newpapers, Inc.*, 39 Fair Empl. Prac. Cas. (BNA) 891, 892 (E.D. Wis. 1985) (EEOC can pursue relief for class members denied employment prior to 300 days before charge was filed).  For a sexually hostile work environment, Title VII allows plaintiffs to challenge the entire hostile work environment, even those acts which preceded the 300-day window because the continuing hostile environment is a single violation.  *See Nat'l. Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116- 117, 122 (2002).  Members of the group, although not personally exposed to discrimination during the

300-day period, would nonetheless be entitled to relief if others of the group were exposed to discrimination during the 300-day period. *See EEOC v. Chicago Miniature Lamp Works*, 640 F. Supp. 1291, 1294 n. 8 (N.D. Ill. 1986) (given the continuation discrimination against Black employees, any person suffering discrimination before the 300-day filing period is a class member); *EEOC v. Peterson, Howell & Heather, Inc.,* 702 F. Supp. 1213, 1226 (D.Md. 1989) (recovery permitted for persons experiencing discrimination before the charge filing deadline if defendants engaged in a continuous course of discrimination extending into the timely filing period); *see also Guardian Assoc. of the N.Y. City Police Dept., v. Civil Service Comm'n of the City of New York*, 633 F.2d 232, 251 (2d Cir. 1980) (rejected limitations period by deeming all plaintiffs injured by the discrimination are entitled to relief).

Besides Gutierrez, Defendants argue in their summary judgment motions that Hilda Gomez, Maria Cantoral, Reyna Morales, Anna Portillo-Tellez, and Patrica DeVera are time-barred. However, plaintiffs are seeking relief due to Defendants' failure to deal with its company-wide sexual harassment problem over a long period of time. So, even if the harassment for the above claimants ended before September 3, 2005, they are still entitled to relief.

## G.   PLAINTIFFS HAVE MET ALL THE CONDITIONS PRECEDENT FOR THIS LAWSUIT FOR ALL CLAIMANTS THROUGH THE MORALES' CHARGE.[9]

Defendants claim that the EEOC's reasonable cause finding for Erika Morales and a class of similarly-situated individuals does not extend to individuals who worked in Fresno. (Def. Mot. (Fresno) 11-17.) Defendants then raised a related argument that claimants discovered during the discovery phase of the litigation are not part of the EEOC's reasonable investigation of the Morales' charge. On both points, Defendants are wrong.

In civil actions brought in its own name, the EEOC has the authority to seek relief for "any discrimination stated in the charge itself or discovered in the course of a reasonable investigation of the charge, provided that such additional discrimination was included in the EEOC 'reasonable cause' determination and was followed by compliance with the conciliation procedures of the Act." *EEOC v. Hearst Corp.*, 553 F.2d 579, 580 (9th Cir. 1977) (EEOC allowed to pursue case for females and other

---

[9]     The EEOC incorporates by reference the arguments raised in its motion for partial summary judgment regarding Defendants' affirmative defenses on the same issue. (Docket # 222.)

minority groups even though the EEOC only alleged discrimination towards males); *EEOC v. Occidental Life Ins. Co. of California*, 535 F.2d 533 (9th Cir. 1976) (EEOC was able to litigate additional charges where they are justified by new information during the investigation). In other words, if the Respondent receives notice of its findings, then the EEOC has the right to proceed in accordance with those findings.

Here, the Morales charge is more than sufficient for the EEOC to proceed for all claimants. The Charge notified Defendants that she and "a class of females" had been discriminated against and the subsequent letter of determination notified her of the EEOC's finding that "females as a class" have been subjected to sexual harassment. However, there is nothing in the charge, letter of determination, or the conciliation suggesting that the class of females or similarly situated individuals would be restricted to those employees who worked only in Bakersfield. Since those documents were directed to Defendants, those notices placed them on notice that the charge, investigation,[10] and finding potentially could encompass any of their employees.[11]

The premise behind Defendants' position is that the Fresno claimants are totally separate from the Bakersfield claimants. However, Defendants are wrong. The different branches do not operate independently when they have to abide by Defendants' dictates with respect to their policies and practices with respect to sexual harassment. As explained in Plaintiffs' Opposition Briefs, the common thread tying all the employees together is that they are employed and controlled by Defendants, whose failure to prevent and remedy sexual harassment throughout the Central Valley, created and perpetuated a sexually hostile work environment. The EEOC is suing the *employer* with one primary claim.

---

[10]    Further, the EEOC did not confine its investigation to only Bakersfield's facilities. The EEOC requested information from Defendants in August 2006 as to ABM's organizational chart and ABM's policies and procedures. The EEOC interviewed Defendants' human resource coordinator Anthony MacFarlane, who worked for all ABM Janitorial Services' northern California region. Further, in June 2007, the EEOC notified Defendants that "In the event of litigation, the Commission may expand … to include additional victims of discrimination. " (PUF 51.40.) Thus, the EEOC was concerned about Defendants as a whole or at least in the Central Valley to be investigated.

[11]    Similarly, the charge filed by Plaintiff-Intervenors and subsequent 9/17/07 determination of reasonable cause by the EEOC provided further notice to Defendants that Charging Party and "similarly situated individuals" were subjected to sexual harassment and constructive discharge.

Defendant's claim that the Fresno class members should be considered separate from the Bakersfield claimants because they were not identified by the EEOC at the investigatory or conciliation stage lacks merit. Once the EEOC finds cause on a "class" violation, notifies the respondent of its belief in the existence of a systemic problem, and attempts to conciliate on that basis, the EEOC need not identify all potential victims as a predicate for litigating those claims. *See EEOC v. Rhone-Poulenc, Inc.,* 876 F.2d 16(3d Cir. 1989) ("in a class action [age discrimination] suit, '[t]he EEOC is not required to provide documentation of individual attempts to conciliate on behalf of each potential claimant"). The rationale of courts finding such efforts adequate despite the failure to identify all victims, applies with equal force to the suggestion here that the EEOC should have named the Fresno individuals it sought to add at some earlier date. As a district court recently observed in discussing the satisfaction of pre-suit requirements in a Title VII class gender and sexual harassment case, once the EEOC notifies the respondent that it is investigating possible discrimination against a class of employees, "it would be wasteful, if not in vain to attempt to conciliate the claims of numerous employees, all with the same grievance,"' "[i]f it is impossible to reach settlement with one discriminate, what reason would there be to assume the next one would be successful."' *Dinkins v. Charoen Pokphand USA, Inc.,* 133 F. Supp. 2d 1237, 1246 (M.D. Ala. 2001).

This case is analytically similar to a Fourth Circuit case allowing the EEOC to proceed in litigation on behalf of employees at a branch or facility that was not directly stated in the charge, determined to have discriminated, or conciliated. *EEOC v. American Nat'l Bank*, 652 F.2d 1176 (4th Cir. 1981). In *American Nat'l Bank*, the EEOC filed a lawsuit against a bank alleging race discrimination in hiring after investigating and issued a determination on a charge from a single charging party only with respect to the hiring practices at the Suffolk branch. *Id.* at 1181. The Fourth Circuit reversed the district court's ruling that it had no jurisdiction over claims arising from defendant's Portsmouth branches. *Id.* at 1184. The Fourth Circuit reasoned that:

> The crucial issue was instead whether the district court had jurisdiction over the same charge of discrimination against a single defendant, expanded to Inc.lude the same practices at all its branch offices when the *original charge and investigation focused on one city* but where there was common ownership and control over branches in both city and a nearby city, and where the challenged practices are similar. We conclude that jurisdiction over charges pertaining to all branches … was proper in this case because there was, through EEOC's investigation and attempted conciliation with regard to Suffolk, adequate notice to the defendant of the

1

practices under investigation and ample opportunity for conciliation concerning those practices.

2

*Id.* at 1185 (emphasis added).

3

4        A similar decision was reached in a case recently decided in the Eastern District of California.

5   In *EEOC v. California Psychiatric Transitions*, 644 F. Supp. 2d 1249 (E.D. Cal. 2009), the EEOC

6   brought an action under Title VII alleging that a female charging party and a class of similarly-situated

7   employees were subjected to sexual harassment.  The defendant-employer sought summary judgment

8   on the EEOC's claim on behalf of similarly-situated claimants the grounds that "the EEOC has not

9   satisfied with the notice and conciliation prerequisites to proceed with the class claims" because it was

10  "not informed of the either the identity of the claimants or the facts underlying their claims at any stage

11  during the administrative process, and was therefore denied an opportunity to 'conciliate.'"  *Id.* at 1271-

12  72.  In denying the defendant's motion for summary judgment and *granting* the EEOC's counter-

13  motion for summary judgment finding that the EEOC had "satisfied the conditions precedent to bring a

14  hostile work environment claim on behalf of similarly aggrieved persons"  the district court found that

15  the EEOC "had provided adequate notice to [the employer] of the sexual harassment of similarly

16  situated women," and  "satisfied the statutory condition precedent of conciliation on behalf  of

17  allegedly aggrieved individuals." *Id*. at 1272-74.  In other words, the district court allowed the EEOC to

18  pursue victim-specific relief for claimants discovered and identified by name after EEOC filed suit.

19        Whatever criticisms ABM has concerning the adequacy of EEOC's investigation, they are

20  misplaced as to whether it is proper for the EEOC to seek relief for individual class members identified

21  during litigation.  Courts have made it clear that the scope of an EEOC investigation is not judicially

22  reviewable.  *See EEOC v. Caterpillar, Inc.*, 409 F.3d 831, 833 (7th Cir. 2005); *EEOC v. Keco Indus.,*

23  *Inc.*, 748 F.2d 1097 (6th Cir. 1984); *Georator Corp. v. EEOC*, 592 F. 765, 767 (4th Cir. 1979); *EEOC v.*

24  *NCL American, Inc.,* 536 F. Supp. 2d  1216, 1221-22 (D. Hawaii 2008).  The reason is because Title

25  VII proceedings are reviewed de novo.  *McDonnell Douglas v. Green*, 411 U.S. 792, 798 (1972).

26        Furthermore, ABM's heavy reliance on a recent unpublished opinion from the Northern District

27  of Iowa, *EEOC v. CRST Expedited, Inc.* 2009 WL 1175169 (N.D. Iowa) is wholly unavailing for the

28  following reasons.  *CRST* is not persuasive because it is an unpublished district court opinion from the

    Northern District of Iowa.  It is wrongly decided and the EEOC has just filed its opening brief.

To the extent that a finding regarding Fresno employees needed to be made, Delia DeMejia, an employee reporting to the Fresno branch, filed a charge in 2009.[12]  In its letter of determination, the EEOC made a class finding.  Thus, the technical findings have been made and the lawsuit should be allowed to proceed not only with the Bakersfield's claimants but on behalf of all the claimants.  644 F.Supp. 2d 1249 (E.D. Cal. 2009)  Irrespective of the DeMejia charge, because the Morales' charge and subsequent administrative process adequately placed Defendants on notice of the unlawful practice at issu, the EEOC can proceed on behalf of all the claimants in the Central Valley.

**H.    ABM, INC. AND ABM JAN. ARE JOINTLY LIABLE**

**1.    INTRODUCTION**

Defendants argue that, as parent companies, ABM, Inc. and ABM Jan. should not be liable for Title VII violations of their subsidiary, ABM N. Cal.  (Def. Mot. (Fresno) at 23-38.)  Defendants are asking the Court to make essentially the same ruling as the district court made in *Sandoval v. ABM*, 552 F. Supp. 2d 867 (D.Minn. 2008), which the Eighth Circuit soundly overruled in *Sandoval v. ABM, Inc.*, 578 F.3d 787 (8th Cir. 2009).  The *Sandoval* case was a sexual hostile work environment case involving a number of individual plaintiffs against ABM, Inc. d/b/a ABM Jan., the parent, and ABM of Kentucky, the subsidiary.  ABM of Kentucky directly employed the plaintiffs as janitors.  Although the district court granted the parent company's summary judgment motion, the Eighth Circuit rejected that decision, finding that there was a triable issue of material fact as to whether ABM, Inc. should be considered the plaintiffs' employer as well.  *Sandoval*, 578 F.3d at 800.  The facts of the instant case are remarkably similar to the *Sandoval* case on this issue.  Based on applying the applicable facts to the law, ABM, Inc. and ABM Jan. are liable for any violations found against ABM N. Cal in this case.  At the very least, there are triable issues of fact which warrant the denial of Defendants' motion for summary judgment on this issue.

**2.    FACTUAL BACKGROUND**

ABM, Inc. provides various building maintenance and facility services to clients nationwide.

---

[12]    Defendants insinuate that the DeMejia charge was disingenuous effort by the EEOC is without any evidentiary basis.  Each individual has the right to file her own charge.  Once a charge is filed, the EEOC has the statutory obligation to process the charge administratively.  If the EEOC was truly concerned about this issue, then the EEOC would have had every single one of the Fresno claimants file a charge.  The law stated above does not require such action.

(PUF 53.1)  To provide its janitorial services, ABM, Inc. utilizes its wholly-owned subsidiary company: ABM Jan.  ABM Jan., in turn, utilizes a collection of wholly-owned, local janitorial subsidiary companies, each of which provides ABM, Inc.'s janitorial services to a particular geographic region.  (PUF 53.1-53.4.)  ABM N. Cal. is the local janitorial subsidiary serving Central California, the region at issue in this case.  (PUF 55.48.)  Although Defendants claim that ABM N. Cal. was the sole employer here, the evidence shows that ABM, Inc. and ABM Jan. were the ones running the show.  The evidence shows that ABM, Inc. managed some 75,000 "employees" and through ABM Jan., employees that worked out of 111 local subsidiary "branch offices." (PUF 53.1.)  Thus, although ABM N. Cal. was the direct employer on paper, the evidence shows that all three Defendants were acting as one employer.

It is clear that the policies governing ABM N. Cal. employees were handed down from above by ABM, Inc. and ABM Jan.  (PUF 59.1-59.172.)  All ABM N. Cal. employees received ABM Jan.'s Employee Handbook setting forth the terms and conditions of their employment.  (PUF 14.24; 22.11; 22.24; 22.41; 59.17-59.19; 59.22; 59.24; 59.63; 59.141; 59.151-59.155.)  The ABM Jan. Handbook— which was prepared by ABM, Inc.'s human resources department—included a statement from ABM, Inc.'s president and CEO wherein he welcomed the ABM N. (PUF 59.24) Cal. employees to the ABM family and notified them of the Handbook's usefulness as a reference for employment guidelines, procedures, policies, and details of what is expected of employees.  (PUF 59.24.)

Defendants also promulgated an ABM, Inc. Code of Business Conduct and Ethics to ABM N. Cal. employees. (PUF 49.56; 56.1 59.1-59.5; 59.9-59.16; 59.18; 59.169; 59.146-59.148.)  This ABM, Inc. Code set forth the conduct required of all ABM N. Cal. employees, including provisions regarding loyalty to the company, anti-nepotism rules, and compliance with civil rights laws concerning employment discrimination and harassment.  (*Id.*) Only ABM, Inc. had the power to revise the Code; the subsidiaries governed by the ABM, Inc. Code—including ABM Jan. and ABM N. Cal.—had no such discretion.  (*Id.*)  Indeed, no local janitorial subsidiary ever rejected or negotiated either the ABM Jan. Handbook or ABM, Inc. Code. (PUF 59.147; 59.169.)

Beyond common policies, the three companies shared common personnel.  (PUF 55.1-55.121; 56.1-56.22; 57.1-57.17; 58.1; 59.1-59.172.)  Jim McClure was the Executive Vice President of ABM, Inc.  (PUF 55.77.)  Mr. McClure also served as CEO for ABM Jan. and each of ABM Jan.'s local

janitorial subsidiaries, including ABM N. Cal. (PUF 54.4; 55.1; 55.4; 55.8; 55.41; 55.77.)  However, as the CEO of ABM N. Cal., Mr. McClure reported to ABM, Inc.'s CEO, Henrik Slipsager.  (PUF 55.2; 55.5-55.6; 55.40; 55.79.)  Additionally, Mr. McClure and two other ABM Jan. employees were the supervisors of the regional executive for ABM N. Cal., Tim Brekke.  (PUF 55.8-55.9; 59.134; 55.43-55.45.)  In fact, Mr. McClure supervised the regional executive of each local janitorial subsidiary. (PUF 55.855.9; 59.134; 55.43-55.45.)  Further, Messrs. McClure and Slipslager, along with James Lusk—who was also the CFO of ABM, Inc.—each served on the Boards of each of the three Defendants.  (PUF 55.1-55.121; 56.1-56.22.)  Chris Boubier was the secretary of ABM Jan. and ABM N. Cal.  Anthony Scaglione was the treasurer of all three Defendants.  (PUF 55.21; 55.22; 56.89-56.13; 55.14-55.16; 56.7; 56.10; 56.15.)

Not even ABM N. Cal.'s managers were able to distinguish between ABM, Inc., ABM Jan., and ABM N. Cal.  (PUF 54.1-54.17.)  ABM N. Cal. Branch Manager, Tony Bautista, treated ABM, Inc. and ABM N. Cal. the same because "we work for ABM Janitorial . . . ."  (PUF 54.3.)  Similarly, Operations Manager Jose Esquivel confirmed that he, Tony Bautista, and Tim Brekke all worked for "American Building Maintenance." (PUF 54.4.)  Tom Cazale testified that ABM's janitorial divisions were a division of ABM, Inc., not a subsidiary.  (PUF 54.2.)  And ABM N. Cal.'s regional operations manager, Faisal Algaheim, stated that his employees are part of ABM Jan.  (PUF 54.5)  The three Defendants also shared whole departments of staff, including legal services and human resources departments.  (PUF 57.1-57.17; 59.1-59.172.)  Clearly, ABM, Inc., ABM Jan., and ABM N. Cal. failed to maintain clear lines of separateness.

> Besides company-wide policies and common personnel, ABM, Inc. and ABM Jan. controlled ABM N. Cal.'s day-to-day employment practices. As it did with its other local janitorial subsidiaries, ABM, Inc. entered into a Service Agreement with ABM N. Cal. whereby ABM, Inc. provided services in the areas of human resources, employee benefits, job safety, information technology, administrative support, and legal guidance. (PUF 59.20; 59.34; 59.36-59.37; 59.53; 59.83; 59.146)

ABM, Inc. managed ABM N. Cal.'s personnel information and payroll taxes, prepared Annual Affirmative Action Plans, instituted mandatory discrimination training, oversaw a harassment complaint hotline, monitored compliance with employment laws through the Human Resources Audit Protocol, and managed all employment-related lawsuits and claims brought against ABM N. Cal.  (PUF 57.10; 59.20; 59.31; 59.34; 59.36-59.37; 59.45; 59.53; 59.64; 59.68 59.76; 59.83-59.126.)  ABM, Inc.

advised ABM N. Cal. regarding hiring, pay, benefits, job safety, employee performance, terminations, and compliance with equal employment opportunity laws.  (PUF 57.1-57.17; 58.1; 59.1-59.172; 60.1-60.6.)  ABM, Inc. and ABM Jan.'s legal and human resources staff even approved of various ABM N. Cal. decisions to hire, discipline, and fire employees.  (PUF 57.11; 58.1.)

ABM, Inc. exerted particular control over ABM N. Cal.'s policies and practices with regard to the subject of this case: sexual harassment.  ABM, Inc. mandated ABM N. Cal.'s training regarding sexual harassment.  (PUF 59.25-59.27; 59.162-59.164; 59.168.)  It advised ABM N. Cal. on how to handle sexual harassment complaints, including the specific forms to be used during sexual harassment investigations.  (PUF 34.8; 59.85; 55.88; 55.93; 57.2-57.11.)  ABM, Inc. maintained the complaint hotline used by ABM N. Cal. employees to file sexual harassment complaints.  (PUF 59.65-59.66; 59.133; 59.161.)  ABM, Inc. and ABM Jan.'s legal and human resources staff even made the decision to suspend Jose Vasquez—ostensibly an ABM N. Cal. employee—without pay. (PUF 57.11.)  Indeed, ABM, Inc. had received two separate letters notifying the company that Jose Vasquez was sexually harassing at least one ABM N. Cal. employee, notice that the company initially ignored.  (PUF 34.1-34.41; 35.1-35.95.)  After charges were filed against the companies, it was ABM, Inc. employee Teuila Hanson who responded to and investigated the allegation.  (PUF 55.88; 55.93; 57.2-57.11.)

ABM N. Cal. did not pay ABM, Inc. for each individual service, however; ABM N. Cal. merely transferred to ABM, Inc. one-percent of its gross operating revenue, as did all the other local janitorial subsidiaries.  (PUF 59.39; 59.51; 59.78-59.79.)  ABM, Inc. did not provide these services to any non-ABM company.  (PUF 59.44.)  Thus, regardless of who is listed as the employer of record, there exists significant evidence that ABM, Inc., ABM Jan., and ABM N. Cal. all acted as one with regard to the employees at issue in this case.  Thus, summary judgment is inappropriate.

**3.    ARGUMENT – THE EVIDENCE ESTABLISHES TRIABLE ISSUES AS TO WHETHER ABM, INC. AND ABM JAN. SHOULD BE HELD LIABLE AS JOINT EMPLOYERS.**

"Title VII of the Civil Rights act of 1964 is to be accorded a liberal construction in order to carry out the purposes of Congress to eliminate . . . discrimination."  *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977) (quotation marks and citations omitted).  "Such liberal construction is also to be given to the definition of 'employer.'"  *Id*. (citations omitted).  Although a direct employer is

liable for any discrimination suffered by its employees, an entity other than the direct employer can be jointly liable for any such violations where both the direct employer and another entity are acting as a single employer to the relevant employees. *Id.* Courts analyze four broad factors to determine whether two ostensibly separate companies are jointly liable for the discriminatory acts of the direct employer. Those factors are 1) interrelation of operations, 2) common management, (3) centralized control of labor relations, and (4) common financial control. *Sandoval v. American Bldg. Maintenance Industries, Inc.*, 578 F.3d 787, 796 (8th Cir. 2009); *Wynn v. Nat'l Broad. Co., Inc.*, 234 F. Supp. 2d 1067 (C.D. Cal. 2002); *see also* 42 U.S.C. § 2000e-1(c)(3) (adopting the four factor test in the Title VII context); EEOC Compliance Manual, Section 2: Threshold Issues, No. 915.003, at 44-47.

Joint employer liability is a fact-intensive inquiry unsuitable for disposition as a matter of law. *See Graves v. Lowery*, 117 F.3d 723, 727-29 (3d Cir. 1997). Courts consider many factors relevant to the analysis, each particular to the factual situation at hand.[13] *See, e.g., Sandoval*, 578 F.3d at 795-800 (analyzing factors); EEOC Compliance Manual, Section 2: Threshold Issues, No. 915.003, at 44-46 (listing factors); *cf. Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004) (listing factors in context of FMLA). The most important factor, however, is centralized control of labor relations, including the right to hire, supervise, and fire employees and generally control the terms and conditions of their employment. *Chaiffetz v. Robertson Research Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir. 1986); *see also Clackamas Gastroenterology Assoc. v. Wells*, 538 U.S. 440, 448-51 (2003).

The *Sandoval* case, in particular, is strikingly similar to the case at bar. The plaintiffs in *Sandoval* were a class of female employees alleging sexual harassment against ABM, Inc. d/b/a ABM Jan., as well as their direct employer, ABM of Kentucky, which was ABM, Inc.'s local janitorial

---

[13]     Although Defendants seem to acknowledge that multiple factors involved in the analysis of joint liability, they cite to inapplicable state law and challenged out-of-circuit case law to claim that the central question in this Court's analysis ought to be what entity made the final discriminatory decision at issue here. (Def. Mot. (Fresno) at 29:7-12.) Although that question might be appropriate were the EEOC asserting an indirect employer theory of liability, the question is not dispositive in the context of deciding the sole question of liability here: whether two seemingly distinct entities were acting as a single or joint employer. Further, Defendants' failure to articulate just what the "final discriminatory decision" would be in this class sexual harassment case evidences the question's inapplicability to the facts at issue here. Indeed, the federal cases on which Defendants rely to claim a "final decision test" have been called into doubt by other circuit courts. *See, e.g., Romano v. U-Haul Inter.*, 233 F.3d 655, 666 (1st Cir. 2000).

subsidiary branch.  *Sandoval*, 578 F.3d at 790.  Although the district court in *Sandoval* granted the parent company's motion for summary judgment, the Eight Circuit reversed, finding sufficient evidence to prove that ABM, Inc. / ABM Jan. and ABM of Kentucky were jointly liable because they acted as one employer.  *Id*. at 800.

The *Sandoval* court cited multiple examples of the co-employer relationship between ABM, Inc. and the local subsidiary, ABM of Kentucky.  These included use of a standard ABM Jan. Handbook and ABM, Inc. Code, common ownership and management between the parent and subsidiary; use of a standard Service Agreement whereby the parent company was involved in several legal and human resources functions of the subsidiary, the parent's mandatory training and auditing of the subsidiary's employees, and ABM, Inc. / ABM Jan.'s public representations regarding the size of its workforce and centralized control of legal and human resources services at ABM of Kentucky.  *Id*. at 795-800.  In the eyes of the Eighth Circuit, the evidence was sufficient to show that ABM, Inc. / ABM Jan. sufficiently controlled the terms and conditions of the local janitorial subsidiary's employees.  Based on this evidence, the Eighth Circuit ruled that the parent's involvement in the operations of the local subsidiary was sufficient to create a genuine issue of fact with respect to whether the parent and subsidiary were jointly liable.  *Id*. at 800 (reversing district court's grant of summary judgment with regard to ABM, Inc.).[14]

In all material respects, the relationship between ABM, Inc., ABM Jan., and ABM N. Cal. is practically indistinguishable from the relationship between ABM, Inc. / ABM Jan. and ABM of Kentucky as described in *Sandoval*.  ABM N. Cal. was the wholly owned subsidiary of ABM Jan., which was in turn the wholly owned subsidiary of ABM, Inc.  Thus, all three Defendants shared common ownership.  Beyond ownership, the companies shared actual employment policies.  ABM Jan.'s Employee Handbook, which was prepared by ABM, Inc.'s human resources department, set various terms and conditions of employment for ABM N. Cal. employees.  The ABM, Inc. Code of

---

[14]     *See also Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391-92 (8th Cir. 1977) (reversing summary judgment for second company where the company had common ownership and control with direct employer and control of direct employer's policies); *Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997) (reversing dismissal where parent's personnel policies applied to subsidiary's employees, subsidiary's employees were told they were employees of parent, parent investigated complaints of sexual harassment made against the subsidiary, and parent hired and terminated subsidiary's employees).

Business Conduct and Ethics further governed the conduct required of ABM N. Cal. employees, including with regard to civil rights, employment discrimination, and harassment.  ABM N. Cal. had no power to implement or revise these important employment policies; rather, they were handed down whole cloth from ABM, Inc.

Beyond common policies, ABM, Inc., ABM Jan. and ABM N. Cal. also shared common officers and Board members, including Jim McClure, Henrik Slipsager, James Lusk, Chris Boubier, and Anthony Scaglione.  Messrs. McClure and Brekke reported to people outside the company for which they worked, all people who worked elsewhere in the ABM family.  Not even ABM N. Cal.'s managers were able to distinguish between ABM, Inc., ABM Jan., and ABM N. Cal.  ABM N. Cal. managers Tony Bautista, Jose Esquivel, Tom Cazale, and Faisal Algaheim all suggested they saw ABM as one big entity without corporate boundaries.  By presenting evidence that the employees and managers themselves did not understand any significant difference between the companies, the EEOC has presented an even stronger case than in *Sandoval* that the parent companies were co-employers of the relevant employees.

As in *Sandoval*, ABM, Inc. was proud that its "dynamic corporate Human Resources Department train[ed] and inspire[d] a field of 50-plus [HR] generalists who serve[d] ABMI's subsidiary companies with 73,000 employees nationwide."  Via multiple public forums—including its website, magazine, and corporate filings—ABM, Inc. made clear that, through ABM Jan., it was in charge of thousands of janitorial "employees" in local subsidiary "branch offices" throughout the nation.  According to ABM, Inc., "corporate oversight . . . allow[ed] our branches to deliver quality service to our clients."  ABM, Inc. promoted the degree to which it consolidated whole departments of staff between the companies, including the legal services and human resources departments.  And the parent even required the human resources representatives in the local branches to become certified by a special ABM, Inc. human resources certification program.  Yet, when people notified ABM, Inc. about the harassment occurring at its local branches, the company still ignored the complaints.  Thus, although ABM N. Cal. was the direct employer on paper, the evidence shows that ABM, Inc. and ABM Jan. acted as co-employers.

As in *Sandoval*, ABM, Inc. entered into a standard Service Agreement with the local subsidiary ABM N. Cal. whereby ABM, Inc. provided services in the areas of human resources, employee

benefits, job safety, general legal guidance, administrative support, information technology,

management of personnel information, e-mail logistics, management of lawsuits and claims against

ABM N. Cal., and payroll taxes, among other areas.  According to ABM, Inc.,

> [o]ur corporate professionals have developed comprehensive standards for all procedures and protocols in the areas of human resources, safety and training.  These programs are distributed subsidiary-wide, providing our employees with the latest in cleaning methods, technology and safety guidelines. Experienced management and supervision, along with a well-trained, dedicated work force, are the keys to providing the superior service upon which our customers rely.

Thus, in reality, there were no meaningful lines between ABM, Inc., ABM Jan., and ABM N. Cal.

In particular, ABM, Inc. and ABM Jan. controlled human resources at ABM N. Cal., including the ability to hire, supervise, and fire ABM N. Cal. employees and generally control the terms and conditions of their employment.  Beyond the common handbook, code, rules and policies described above, Defendants utilized a centralized human resources department that "directly respond[ed], on a daily basis, to a wide range of inquiries from employees, supervisors, and human resource managers throughout the company's subsidiaries, and instruct[ed] subsidiaries on the application of federal labor laws to the company's entire workforce."  ABM, Inc. provided centralized investigations into complaints of discrimination, coordinated audits to ensure compliance with employment laws, formulated regular affirmative action plans, monitored compliance with employment laws through its audit protocol, instituted mandatory training programs in employment discrimination matters, and gave general legal advice with regard to various human resources matters at ABM N. Cal.

ABM, Inc. advised ABM N. Cal. regarding hiring, pay, benefits, job safety, employee performance, terminations, and compliance with equal employment opportunity laws.  With regard to the subject of this case, sexual harassment, the parent companies mandated harassment training, advised on how to handle harassment complaints, provided harassment investigation forms and advice, and oversaw the harassment complaint hotline.  ABM, Inc. and ABM Jan.'s legal and human resources staff even approved of various ABM N. Cal. decisions to hire, discipline, and fire employees.  ABM, Inc. and ABM Jan.'s legal and human resources staff even made the decision to suspend Jose Vasquez, the main harasser in this case whom Defendants claim was an ABM N. Cal. employee.  After charges were filed against the companies, ABM, Inc. employee Teuila Hanson responded to and investigated the allegations.  This evidence shows that, notwithstanding Defendants implications, ABM, Inc. did not

merely facilitate a simple benefits program for ABM N. Cal.'s employees, and ABM Jan. did not merely assist with some of ABM N. Cal.'s basic payroll duties.  Rather, ABM, Inc. and ABM Jan. governed the terms and conditions of employment of ABM N. Cal.'s employees.  Regardless of which entity Defendants chose to list as the employer of record, there exists significant evidence that ABM, Inc., ABM Jan., and ABM N. Cal. all acted as one with regard to the employees at issue in this case. Thus, this Court should deny Defendants' motion for summary judgment.

III.   **CONCLUSION**

For the reasons stated, the EEOC requests for Defendants' motion for summary judgment to be denied in its entirety.


Dated:  June 3, 2010                              Respectfully submitted,

                                                  U.S. EQUAL EMPLOYMENT OPPORTUNITY
                                                  COMMISSION

                                                  /S/   Derek W. Li_____
                                                  Derek W. Li
                                                  Attorneys for Plaintiff U.S. EEOC


                                                  MALLISON & MARTINEZ

                                                  /s/ Stan Mallison
                                                  Stan Mallison
                                                  Attorney for Plaintiff Intervenors