# EXHIBIT 2067

# EXHIBIT 2067



EXPERT TESTIMONY
TRAINING
INVESTIGATIONS
*In The*
*Employment Area*

•

EXTTI,

INCORPORATED

•

153 Stagecoach Road

Bell Canyon, CA

91307-1046

•

Phone

(818) 712-0203

Fax

(818) 712-9902

•

email

extti@ix.netcom.com.

www.extti.com

March 20, 2010

Elizabeth Esparza-Cervantes
Senior Trial Attorney
Equal Employment Opportunity Commission
255 E. Temple Street, 4th Floor
Los Angeles, CA 90012

Re: *EEOC v. ABM Industries, Inc., et al.*

Dear Ms. Esparza-Cervantes:

This letter constitutes my Expert Report in the above-referenced action. As a preliminary matter, please note that to the extent that discovery is on-going in this case and that such discovery produces information relevant to my opinions, I may supplement the opinions expressed herein.

## Opinions

Based on the information that I have reviewed and on my background and experience, I anticipate expressing opinions concerning whether the Company (ABM industries) took reasonable steps to prevent and correct harassment from occurring.

## Bases for Opinions

In my opinion, the Company failed to take reasonable steps to prevent harassment from occurring.

In this regard, there are four steps which, in my opinion, employers normally take to prevent harassment from occurring. First, the employer should promulgate maintain and enforce good harassment policies. Second, the employer should provide harassment awareness training for management.[1] Third, when harassment allegations arise, they should be treated seriously, an adequate investigation should be conducted and reasonable conclusions

---

[1] Related to this, management should do that which they are trained to do.

reached. Fourth, based upon the investigation, the employer should take prompt and appropriate remedial or disciplinary action.

**Policies --**

In my opinion, the Company's harassment policies, as written, were consistent with standard practices. However, the Company did not enforce its policies.

As to enforcement, the Company's harassment policies provided that the Company would investigate harassment allegations--and that it would do so thoroughly, objectively, and completely. As will be discussed in more detail below, however, the investigations about which I am able to form opinions, were neither thorough nor complete. Thus, the Company failed to enforce its own policies.

In my opinion, maintaining a policy, but not enforcing it, is of little value. As a result, my conclusion is that the Company failed with respect to this first step in preventing harassment from occurring.

**Training --**

With respect to training, the only training materials I have seen so far are fairly minimal. However, I do not have enough information to express an opinion on the training at this point. However, I do have a few concerns:

According to José Vasquez, Javier Vasquez did some of the harassment training.[2]  In my opinion, Javier Vasquez was not an appropriate person to be doing that training.

The training materials indicate that investigations would be conducted by or with the oversight of Human Resources.  Yet, I know of at least one situation where that did not occur (below). So, at least as to that situation, the management officials who were involved do not seem to have done that which they were trained to do.

**Investigations --**

With respect to conducting investigations, at this time, I am able to form an opinion with respect to several situations. Each is discussed below.

### The Valley Bible Church situation

The Company provided janitorial services at Valley Bible Church. The church was located in Bakersfield California. On June 26 or June 27, 2005, Richard Steiner (then a District

---

[2] More on Javier and José Vasquez' is discussed below.

Manager for the Company) received a call from "Pastor Ron" at the church. According to Mr. Steiner, Pastor Ron said that someone at the church had witnessed José Vasquez (Route Supervisor) touching a janitor and that the janitor "appeared not to agree with it." The caller said that the police were coming in to investigate.

By letter of June 27, a more "formal" complaint was made. The complaint was made by Scott Stevenson, an individual affiliated with the church.[3] Mr. Stephenson claimed to be a witness to the inappropriate conduct. In his letter, Mr. Stephenson identified the alleged victim of the conduct as Angelica Jaregui. He then described the incident saying that José Vasquez "continued to push her [i.e. Ms. Jaregui] back against the back while grabbing her breasts and on one occasion it appeared to me that he groped her vagina."

As a result of this complaint, the Company determined to conduct an investigation into the allegations. In my opinion, that investigation was not consistent with standard practices or the Company's own policies and procedures. The reasons for my conclusions follow:

**Investigator/Trained and Experienced—** In my opinion, standard practice is for investigations to be conducted by someone trained and experienced in conducting workplace investigations. As the EEOC states in its *Guidance*, "Whoever conducts the investigation should be well-trained in the skills that are required for interviewing witnesses and evaluating credibility."[4]

Similarly, in *Advanced Investigations of Harassment Complaints* (2006), Liebert Cassidy Whitmore talk about the need for the investigator to be "someone who is knowledgeable in the area of harassment... the investigator should also either be trained or have experience in conducting investigations."[5]

According to the Company's Regional Human Resources Director, Tom Cazale, the investigation here was conducted by Sylvia Chalenroth. Ms. Chalenroth was an Administrative Assistant with the Company. In the past, she had been a supervisor. She was not part of the Company's Human Resources function. So far as I can tell, Ms. Chalenroth had no training or experience in conducting workplace investigations. Indeed, the only training given to Ms. Chalenroth about which Mr. Cazale was aware, is the general harassment avoidance training that the Company provided to its supervisors and managers.

---

[3] The Bakersfield Police Report regarding the incident refers to him as School Kitchen Manager.

[4] *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999) (the "*EEOC Guidance*"). This *EEOC Guidance* is widely relied on by Human Resource Professionals and workplace investigators as a practical guide both for preventing harassment and discrimination in the workplace and for conducting proper workplace investigations. It is a close to a "Bible" on workplace investigations as exists. There are, of course, many other resources on workplace investigations with which I am familiar. All are consistent with the *EEOC Guidance*. This includes books, papers and articles that I have read in this area as well as papers that I have delivered and articles that I have written. Some of these other materials are referred to herein.

[5] *Advanced Investigations of Harassment Complaints* at page 7.

Mr. Cazale explained why he chose Ms. Chalenroth to do the investigation, rather than having somebody in the Company's Human Resources group do so. He testified in his deposition that he did not have a Human Resources ("HR") Representative in Bakersfield at the time and so had Ms. Chalenroth conduct the investigation. He did this because he wanted it done quickly and no HR person was nearby. He confessed that it "would have been ideal had we one [i.e. an HR person nearby], but I was more concerned about getting a fast answer because of the allegations."

In my opinion, while conducting a prompt investigation is an important goal, speed is not more important than having someone conduct the investigation who, because of their training and experience, knows what they are doing. As will be seen below, Ms. Chalenroth did not.

Moreover, Mr. Cazale's concern about lack of a Human Resources Representative in Bakersfield, seems poorly considered when two other factors are evaluated. First, Mr. Cazale's office was not that far from Bakersfield as he was located in Sacramento.[6] My view is that sacrificing a proper investigation in order to avoid a relatively short drive, was a bad choice by the Company here. Second, as will be discussed below, the interview(s) conducted by Ms. Chalenroth were done by telephone anyway. Since a determination was made to conduct interviews by telephone, Mr. Cazale could have done this as easily as Ms. Chalenroth. Presumably, there is telephone service between Sacramento and Bakersfield.

**Interview with the Complaining Party—** In my opinion, following a review of any documents relevant to the matter, the first step of actually conducting an investigation is to interview the Complaining Party or alleged victim.[7] Here, Ms. Chalenroth did interview Ms. Jaregui.[8] However, there are several problems with the interview.

First, as mentioned above, the interview was conducted via telephone. This means that Ms. Chalenroth did not place herself in a position to determine credibility.

In this regard, particularly in harassment situations, the parties and/or witnesses often differ in their accounts of the relevant events.[9] In such situations, the job of the investigator is to

---

[6] A search on MapQuest shows the cities to be under 300 miles apart. So, just a five-hour drive.

[7] Technically, Ms. Jaregui was not the Complaining Party. Mr. Stevenson and Pastor Ron were. However, as she was the alleged victim, starting with her make some sense. Unfortunately, as will be discussed below, Mr. Stevenson was not interviewed at all.

[8] José Vasquez says that Mr. Steiner also spoke to Ms. Jaregui. Mr. Steiner's and Mr. Cazale's testimony is different. However, José did not actually see her being interviewed. Instead, he just knew he and Ms. Jaregui "arrived" at Mr. Steiner's office at the same time and that she entered the office after he was "interviewed." José Vasquez also says that Ms. Jaregui was present in the lobby when Mr. Cazale and Mr. Steiner (together) interviewed him and that, when Mr. Steiner told him to go to the police to describe the incident, he offered to (and did) drive Ms. Jaregui and 2 other witnesses. In my opinion, if true, all of this is both intimidating and a breach of confidentiality.

[9] Here, although there were some discrepancies between what Ms. Jaregui and what José Alvarez said about the incident in question, their versions were fairly consistent with each other—except when the Bakersfield Police Report about the incident is considered. What was not consistent was Mr. Stephenson's version, as described in his June 27 letter. Because no one interviewed Ms. Jaregui in person, the Company was not in a position to determine if she was telling the truth or,

determine credibility. As the EEOC states in its *Guidance*, "If there are conflicting versions of relevant events, the employer will have to weigh each party's credibility."

Similarly, Liebert, Cassidy Whitmore state, "After the interviews, important material facts will most likely be in dispute because witnesses tend to remember things differently.... The investigator must weigh the relative credibility of the complainant, alleged harasser, and witnesses."[10]

Of course, one way to determine credibility is to observe "Demeanor: Did the person seem to be telling the truth or lying?"[11] Clearly, demeanor cannot be observed via telephone. Because Ms. Chalenroth interviewed Ms. Jaregui via telephone, demeanor could not be observed here. Thus, Ms. Chalenroth did not place herself in a position to determine credibility.

That interviews should be conducted in person was the Company's process as well.

In this regard, Anthony MacFarlane was the Company's HR Coordinator. One of the jobs he performed for the Company was to conduct workplace investigations--including in Bakersfield. In his deposition, Mr. MacFarlane explained that his understanding of the Company's investigation process was that "in order for me to get the statement [i.e., from the witness or party], I have to be sitting down with the employee and interviewing them." However, as mentioned above, that is not what Ms. Chalenroth did here. Specifically, there was no "sitting down" with Ms. Jaregui, no in person interview. In this way, the Company violated standard practices and its own policies and procedures.

Another problem with the interview of Ms. Jaregui is that Ms. Chalenroth took no notes.

In my opinion, part of conducting a proper investigation is taking detailed, accurate notes. For example, Liebert Cassidy Whitmore discuss the "notes of witness interviews".[12] Also, they talk of keeping "notes of your interviews with witnesses."[13] Similarly, in *Investigating*

---

instead, was intimidated by her having raised allegations against her supervisor. Moreover, as will be discussed below, nobody interviewed Mr. Stephenson at all. As to the discrepancies between Ms. Jaregui and José Alvarez, according to Mr. Steiner, Ms. Chalenroth told him that Ms. Jaregui said that she and José Vasquez were "joking around" and that Mr. Vasquez "touched her on the arm not the breast ... and said he was going to throw her in the dumpster." So far as I can see, Ms. Jaregui was not asked about the allegation relating to his having groped her vagina. Nor was she asked about the allegation that José Vasquez had attempted to block her from leaving the area in which the incident had occurred. Mr. Vasquez also said that they had been joking--but said he had "**attempted** to pick her up." [Emphasis added]. But, Mr. Steiner testified that Mr. Vasquez told him he was "**lifting her up** into the dumpster or whatever, the trash bin." [Emphasis added]. Moreover, a July 1, 2005 Memo from Mr. Cazale and Mr. Steiner says Mr. Vasquez "held her arms down."

[10] *Advanced Investigations of Harassment Complaints*, page 30.
[11] EEOC Guidance. *See also*, Amy Oppenheimer & Craig Pratt, *Investigating Workplace Harassment* (SHRM, 2008) at pp. 110-115.
[12] *Advanced Investigations of Harassment Complaints*, at page 11.
[13] *Advanced Investigations of Harassment Complaints*, at pages 11, 20, 21.

*Workplace Harassment*, the authors devote several pages to the importance of documentation, including note taking.[14]

The Company's practice was the same.[15] That is, note taking was required when conducting workplace investigations. For example, in his deposition, Mr. MacFarlane explained that his understanding of the Company's process was that, when an employee was interviewed, the investigator would take notes or have the employee write out a statement—preferably both. However, here, there are neither notes of an interview with or a written statement by Ms. Jaregui. Thus, once again, the Company violated standard practices and its own policies and procedures when interviewing Ms. Jaregui.

**Interview with the Witnesses—** Following the interview with the Complaining Party or alleged victim, standard practice is to interview witnesses, people "who could reasonably be expected to have relevant information." *EEOC Guidance.* As the authors of *Investigating Workplace Conduct, Investigator's Guidebook* state, "Witness interviews are the heart of most investigations."[16]

Similarly, the Liebert Cassidy Whitmore book talks about the importance of interviewing "all percipient witnesses."[17] A brochure published by the California Department of Fair Employment and Housing states, "Anyone with information regarding the matter should be interviewed."[18]

In my opinion, conducting witness interviews is part of conducting a thorough investigation. Moreover, the Company's own policies and procedures talk about the importance of conducting a thorough investigation. For example, the Company's Employee Handbook states that "the Company's policy is to immediately conduct a thorough, objective, and complete investigation of any harassment complaint." Similarly, The Company's separate "Unlawful Harassment Policy" states, "Your supervisor or Human Resources Representative will conduct an immediate, thorough, objective and complete investigation."

In fact, Mr. MacFarlane confirmed that the Company's investigation process, was to interview witnesses as well.

In this regard, Mr. MacFarlane explained that that when conducting an investigation, after getting a statement from the Complaining Party he then would interview additional witnesses.[19] For example, in an investigation of allegations that occurred in San Jose, he interviewed the Complaining Party, the accused and witnesses identified by both.

---

[14] *Investigating Workplace Harassment*, pp. 79-86.
[15] Indeed, I have seen notes in other investigations conducted by the Company.
[16] *Investigating Workplace Conduct, Investigator's Guidebook* (Equal Employment Advisory Council, 1999), p. 20.
[17] *Advanced Investigations of Harassment Complaints*, page 29.
[18] DFEH185.
[19] In his Affidavit with the EEOC, McFarlane confirmed that the Company's investigation process included getting "statements from witnesses." The Affidavit is unsigned. In his deposition, Mr. MacFarlane disputed certain portions of

Moreover, MacFarlane testified that, for all investigations, there was a "form questionnaire."[20] In the questionnaire "there's a complainant questionnaire, there's an accused questionnaire, and there's a witness questionnaire. Those are standard. I use those for everything...." Mr. MacFarlane referred to this as a "template." He testified that they are "required" to ask these questions of the witnesses, accused and complainant.

That interviewing witnesses was the Company's practice, also, was confirmed in the Company's September 26, 2006 letter to the EEOC. In that letter, Teuila Hanson, Assistant General Counsel, wrote that "at the Bakersfield branch, complaints of harassment are investigated by Tony MacFarlane or Tom Cazale. Witnesses are identified and interviewed."

Apparently, there is a dispute as to whether **any** witnesses were interviewed. involving the Valley Bible Church situation. What is clear is that no one from Valley Bible Church was interviewed. Yet, several people here reasonably could have been expected to have had relevant information. This included Pastor Ron--who had raised the complaint. Even more importantly, it included Mr. Stevenson--who was a witness to the alleged inappropriate conduct.

Mr. Stephenson's letter also mentioned another witness. This was "Christina's grandmother who spoke to Angelica [Jaregui] for 20 minutes." Standard practice is to interview individuals who spoke to the Complaining Party about the incident, close to the time of the incident.[21] However, Christina's grandmother was not interviewed either.

In my opinion, standard practice also would have been to interview other women working at the church. Such individuals should have been interviewed for two reasons. First, to see if they had witnessed any inappropriate conduct. Second, to see how they had been treated by José Vasquez.[22] Apparently, there is a dispute as to whether any such individuals were interviewed. If they were not, they should have been. Indeed, this would be part of conducting a thorough investigation.

The Company's position seems to be that three female janitors working at the church were interviewed. For example, Mr. Cazale says that he asked Mr. Steiner to arrange for them to be interviewed. Mr. Steiner confirms this and says that they were brought to his office to be interviewed. Mr. Steiner seems to believe that they were interviewed by telephone, by Ms. Chalenroth. If this is true, it means that, once again, someone untrained and inexperienced conducted the interviews. Once again the interviews were conducted by telephone. Once again the investigator did not place herself in a position to determine credibility. Moreover,

---

the Affidavit. The portions quoted herein were not among those disputed. Instead, they were confirmed by him in his deposition as being accurate.

[20] Indeed, I have seen such questionnaires in other investigations conducted by the Company.

[21] EEOC Guidance.

[22] In my opinion, standard practice is to interview individuals similarly situated to the victim and the complaining party. See, EEOC Guidance.

once again, no notes were taken. All of this would be in violation of standard practices and the Company's own policies and procedures.

**Interviewing the Accused—** Following interviews with relevant witnesses, standard practice is to interview the person being accused, here, José Vasquez. In fact, José Vasquez was interviewed.[23] Moreover, it appears that he was interviewed in person. However, instead of being interviewed by Ms. Chalenroth, he was interviewed by Mr. Steiner.[24] They are two problems with this.

First, like Ms. Chalenroth, Mr. Steiner had no background in workplace investigations. Instead, his experience primarily was as a salesman. He never worked as an HR person and had no training in HR--aside from attending the general sexual harassment training provided to management and supervisory personnel at the Company. So he too was an inappropriate person to be conducting the investigation here.

Second, the fact that Mr. Steiner spoke to one party while Ms. Chalenroth spoke to the other (and perhaps to some witnesses) means that neither investigator was in a position to determine relative credibility. This, in turn, means that the Company was not in a position to determine credibility as a result of the investigation.

In addition, at least according to José Vasquez, all that was asked of him was whether he had "hugged" Ms. Jaregui. If this is true, then he was not asked about the actual allegations[25]— which is the very purpose of interviewing the person being accused.

**Determination—** "Once all of the evidence is in, interviews are finalized, and credibility issues are resolved, management should make a determination...."[26]

It appears that the Company did make a determination here. It determined that the complained-of incidents did not occur.[27] The problem, however, is that no reasonable determination can be made based on an inadequate investigation. For the reasons discussed above, my opinion is that the investigation here was an inadequate one. As a result, the determination was unreasonable.

### The Anonymous Letters

On August 31, 2005 and then on September 7, 2005, the Company received anonymous letters (one in English and one in Spanish) raising allegations against José Vasquez and his

---

[23] Once again, however, it appears that no notes were taken.

[24] José Vasquez' says that both Mr. Steiner and Mr. Cazale spoke to him about the situation. Mr. Cazale's testimony is different.

[25] For example, the allegation that he had grabbed her breasts, grabbed her vagina and that he had blocked her way.

[26] *EEOC Guidance.*

[27] However, José Vasquez was given a written warning for touching an employee.

family member and supervisor, Javier Vasquez.[28] Among other things, the authors of the letters reiterated some of the allegations relating to José Vasquez' conduct at the church. They said that nothing had been done about that conduct.

In addition, the authors alleged that an employee at another location, the Sierra Vista Clinic, also had been treated inappropriately by José Vasquez. This employee was identified as "Erica." The specific allegation was that José Vasquez had "grabbed [her] by the breast and asks[ed] 'Are they real?'" They asked that an investigation be conducted adding, "Please help us."

The Company's position is that it did investigate. As with the prior investigation, my opinion is that this was nothing close to a proper investigation. The Company violated standard practices and its own policies and procedures. Thus, the Company did not help them.

**Interview with the Complaining Party—** As mentioned above, the first step in conducting an investigation is to interview the Complaining Party and/or victim. This is not only standard practice, but Mr. MacFarlane explained that this was the Company's practice as well. However, here there was no interview with "Erica." The Company's explanation is that they were unable to locate her. In my opinion, the Company's efforts to do so were woefully inadequate. There was nothing "thorough" or "complete" about them.

In this regard, Mr. Steiner testified that in order to find "Erica", he manually looked through a green-bar printout of the payroll records of the people paid in the District. It took him 10 to 15 minutes to do this. According to Mr. Steiner, he was unable to locate her. He then informed Mr. Cazale of his failure to find "Erica."

Mr. Steiner says that, in his attempt to find "Erica," he did not look in the Company's computer base (i.e., the payroll system), because he did not have access to it. Moreover, even with respect to his manual check, he looked at the payroll printouts for the then-current time period--he does not recall looking at prior time periods. Further, no attempt was made to interview other employees at the Clinic to see if they might know who Erica was.[29] Mr. Cazale testified that, looking back now, he believes Mr. Steiner could have done a better job in his search for "Erica."

Mr. Cazale says that, after Mr. Steiner told him that he could not locate Erica, he did one additional thing with respect to attempting to find her. Specifically, he had an address for the anonymous letter, and so he sent 2 letters (one in English and one in Spanish) to that

---

[28] Javier was José's supervisor. One of the allegations in the letters was that the two were related. The authors of the letters alleged that other relatives also worked for the company. The Company had a policy which would have prohibited such employment.

[29] There is some testimony that José and Javier Vasquez were asked -- the people accused of the misconduct. Clearly, they had a motivation to feign ignorance. Moreover, Mr. Steiner testified that he doesn't specifically recall asking anyone (including Javier Vasquez) whether they knew who Erica was.

address asking for more information. He received no response to the letters and did nothing more.

However, no attempt was made to go through the Company's records to find which employee records matched that address—then to interview any employees at that address. Yet, both the Company's application forms and Personal Action Notices included employee addresses.

Mr. Cazale says that after he got no response to his letters, the matter was turned over to the Company's Legal Department, to Ms. Hanson. Legal took it over in late 2006 or early 2007.

In my opinion there was nothing thorough about any of this. And the result of that was that "Erica" never was located. It appears that part of the problem is that her name was spelled "Erika." But, because of the Company's lack of thoroughness, it failed to discover this.

In fact, in June, 2006 and then again in January, 2007, Erika Morales filed EEOC Charges claiming sexual harassment by José Vasquez. However, even once she was clearly identified by name, address, and phone number, no attempt was made to interview her. Thus, the Company violated standard practices and its own policies and procedures by failing to interview the alleged victim.

**Interview with the Witnesses—** As mentioned above, both standard practice and the Company's own policies and procedures are to interview witnesses. However, no witnesses were interviewed. Specifically, no one was interviewed to ask if they knew who "Erica" was. No one was interview to see if they knew anything about the allegations. And those similarly situated employees were not interviewed either. Thus, once again, the Company violated standard practices and its own policies and procedures.

**Interviewing the Accused—** As mentioned above, Company policies and standard practices are to interview the person or persons accused of misconduct. Here, the individuals being accused were Javier and José Vasquez. Both were interviewed. However, there was nothing thorough about either interview.

As to Javier Vasquez, Mr. Steiner interviewed him before the EEOC charges were filed. It appears that he was asked about the allegations concerning him (which did not involve sexual harassment claims, but did involve other policy violations) but he was not asked about the allegations concerning José.[30] In my opinion, failing to ask about the allegations concerning José means that the interview was not a thorough or complete one. Additionally, at least according to Javier Vasquez, this "interview" only lasted 5 to 10 minutes. Moreover, so far as I can see, no notes were taken of the interview.[31]

---

[30] Except that Javier testified that Mr. Steiner said, "We're getting these reports that [José] is harassing this woman." Javier replied, "no, I didn't know nothing about it."

[31] The closest thing to notes is a statement written by Javier which addresses some of the allegations. It does not address allegations relating to José.

According to Javier Vasquez, after being interviewed by Mr. Steiner, Javier then went to José and spoke to him about the allegations.[32] He asked José if the allegations "were true, if he knows anything about it." José "said he didn't know." Later, he spoke to José about the allegations at Valley Bible Church as well. Still later (and even worse), he spoke to the alleged victim, Ms. Jaregui.

In my opinion, all these interchanges constitute a violation of confidentiality which should be a part of every investigation. Indeed, Mr. MacFarlane explained in his deposition that the Company's investigation process was to obtain a confidentiality agreement with each witness. Similarly, in *Investigating Workplace Conduct, Investigator's Guidebook,* the authors write:

> "Explain to each witness that it is important to keep the investigation as confidential as possible in order to ensure that the process is fair to everyone. Advise the witness not to discuss matters related to the case with anyone at any time without your permission. You may want to have each witness sign a statement acknowledging their understanding of, and agreement to, the need for confidentiality."

One of the allegations in the anonymous letters was the claim that José Vasquez had been in jail for sexual harassment. In my opinion, this was a serious allegation not only given the claims raised against José, but also because he was a supervisor who, at times, was alone, at night, with female employees.[33] However, nothing was done to investigate this allegation at that time (i.e. before the EEOC charges were filed). In addition, José Vasquez was not even interviewed at that time.

Mr. Cazale explained why there was no investigation as to the allegations that José Vasquez had been in jail for sexual harassment. He said that the reason this was not investigated was that the Valley Bible Church situation "went down". "I thought we had a thorough investigation and he [José Vasquez] was issued a formal warning, which if anything occurred, his employment would be terminated." So he did not look into the allegation that José Vasquez had been in jail for sexual harassment. And he did not tell Mr. Steiner to do so either. Indeed, Mr. Steiner confirms that he did not do so. In fact, Ms. Hanson stated that until the EEOC later notified the Company that José Vasquez had, in fact, been convicted of rape, nobody looked into whether Jose Vasquez had served any time in jail. Mr. Cazale testified that, looking back now, he wishes that he had conducted an investigation into this issue at the time. He feels the way the Company handled the situation was an "embarrassment." I agree.

---

[32] Javier Vasquez testified that Mr. Steiner did not tell him not to talk to José.

[33] Mr. Steiner testified that he would not have hired José Vasquez if he had known that he was a registered sex offender because "Well, he was in charge of female janitors."

This failure to investigate is all the more egregious because the Company had some evidence that the allegations might be true. Moreover, they had an easy means of determining the truth of the allegations.

Specifically, in his employment application, José Vasquez' left blank many questions--including whether he been convicted of a crime. In my opinion, given the allegation that he had been jailed for sexual harassment, a review of the application would have been standard practice. And his failure to answer the "conviction" question should have caused concern. Yet, the Company did not even look at his application.

Moreover, José Vasquez had signed a form allowing the Company to conduct a background check (including a criminal check) on him. Thus, the Company had the means in hand to check to see if the "jail" allegations were true. At that time, they did nothing to do so. Again, there is nothing thorough or complete about this.[34]

As mentioned above, in June 2006 and again in January 2007, Erika Morales filed EEOC charges claiming harassment by José Vasquez. After the EEOC charges were filed, Mr. McFarlane was assigned to conduct an investigation.[35] He testified, "For this particular investigation [into Erika Morales' allegations in the EEOC Charge] ...I wasn't instructed to talk to anybody besides the accused [Jose], the manager [Javier], and gather the personnel files."[36]

In fact, it appears that Javier Vasquez was interviewed again. As to José Vasquez, Mr. McFarlane says he interviewed José at about the same time—after the EEOC Charge came in. However, José Vasquez denies that he was interviewed about any harassment allegations—except those relating to the Valley Bible Church situation (above). Moreover, he specifically denied being interviewed by Mr. McFarlane. For example, in his deposition he testified:

> "Q. And it's your recollection that Anthony
> McFarland [sic] never interviewed you about these sexual
> harassment allegations after they got the EEOC charge?
> A. Correct."

If José Vasquez is telling the truth, then this is a failure to interview **both** the Complaining Party and the accused.

Mr. MacFarlane also explained that he was asked to check California's Registered Sex Offender Website. This took him about an hour. The request to check the website only

---

[34] As the Company later discovered, a check on the California Registered Sex Offender Website would have revealed the rape conviction as well.
[35] Mr. MacFarlane testified that he was the only person conducting interviews on these issues.
[36] In his EEOC Affidavit, Mr. MacFarlane confirmed that, in particular, he did "not interview any other females who worked with José Vasquez to see if they had been subjected to similar treatment."

came after the EEOC (in December 2006) informed the Company that, in fact, José Vasquez had been convicted of rape. Indeed, well over a year after the allegation had been raised and based only on an hour of effort, Mr. MacFarlane discovered that it was true--José Vasquez had been convicted of rape by force. Again, there is nothing thorough about this.[37]

In my opinion, the failure to interview the alleged victim, failure to interview witnesses, failure to investigate the jail allegation (until long after it was made) and failure to thoroughly interview the individuals accused of misconduct rendered this an almost useless investigation. It was not consistent with standard practices or the Company's own policies and procedures.

### Other Situations

In addition to the above situations, I have been provided with some limited information concerning other allegations--and information regarding resulting investigations. This information is, by no means, complete. However, I have significant concerns about the Company's practices.

For example, one situation involved allegations raised at another facility, "Pelco." An investigation was conducted into the allegations. The investigator was Valetta Johnson, who reported to Mr. Cazale in the Company's Human Resources Department. However, after talking to the accused and some witnesses, there was a re-interview of the Complaining Party. Rather than conducting this re-interview herself, it was done by the Company's Vice President of Human Resources without Ms. Johnson. As a result, Ms. Johnson did not place herself in a position to determine credibility.

In 2008, an EEOC Charge was filed relating to another facility located in Visalia. This time, Mr. Cazale did the investigation. However, he did not interview the Complaining Party. He explained, "I didn't have her to talk to. I only had the written statements." It appears this was because she had filed an EEOC Charge. As a result, Mr. Cazale simply took the allegations from the Charge. However, standard practice and the Company's own policies and procedures were to interview the Complaining Party. By failing to do so, Mr. Cazale violated standard practices and the Company's own policies and procedures.[38]

Another incident arose relating to the Company's operations for the city of Fresno. Mr. Cazale testified that the investigation was done by the "local people"--the site supervisor and José Esquivel (Operations Manager). According to Mr. Cazale, HR was not involved. However, as mentioned above, standard practice is for the investigation to be conducted by somebody trained and experienced. Moreover, the Company's training materials say that "[w]orkplace investigations must be conducted by or with the oversight of a Certified

---

[37] José Vasquez was then put on investigative suspension and he then resigned.
[38] Obviously, one cannot determine credibility based on a written statement alone—with no interview.

Human Resources Manager or Director." It appears that this was not done here. Thus, once again, the Company failed to follow standard practices and its own policies and procedures.

Yet another incident arose in Santa Rosa at a Juvenile Correctional Facility for which the Company provided janitorial services. This was in 2006. In that situation, a minor in custody raised allegations against a Company employee. Mr. MacFarlane was assigned to do the investigation. However, while he interviewed the accused employee, he did not interview the minor who had raised the allegations (i.e., the Complaining Party). Moreover, although he did get the police report about the incident, he did not even request an interview with the minor. Again, standard practice and the Company's own policies and procedures were to interview the Complaining Party. Since no attempt was made to do so here, the Company violated standard practices and its own policies and procedures.

As a result of all of the above, at least with respect to the situations about which I am able to form an opinion, my view is that the Company failed with respect to conducting adequate investigations--the third step in preventing harassment from occurring.

**Remedial or Disciplinary Action –**

With respect to the investigations discussed above, because the investigations were inadequate, the Company was not in a position to reach reasonable conclusions as to that which occurred. Because they were unable to reach reasonable conclusions as to that which occurred, they were not in a position to take appropriate disciplinary action with respect to what had occurred. Therefore, my opinion is that the Company failed with respect to this final step as well.

**Data Considered**

I have considered the deposition transcripts of Mr. Cazale, Mr. MacFarlane, Mr. Steiner, Ms. Hanson, Javier Vasquez and José Vasquez as well as exhibits thereto.

I have reviewed a number Company policies and procedures including the Company's Employee Handbook, Unlawful Harassment Policy, Sexual Harassment Policy, Sexual Harassment in the Workplace training materials, New Hire Checklist, personnel action notifications, Employee Information Regarding The Harassment Hot Line form, and other discovery exchanged among the parties.

I have reviewed the EEOC's *Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors* (June 1999); the DFEH Brochure, *Sexual Harassment, The Facts About Sexual Harassment; Advanced Investigations of Harassment Complaints* (Liebert Cassidy Whitmore 2006); Amy Oppenheimer & Craig Pratt, *Investigating Workplace Harassment* (SHRM, 2008);

and *Investigating Workplace Conduct, Investigator's Guidebook* (Equal Employment Advisory Council, 1999) and the Bakersfield Police Report of the Valley Bible Church incident.

Based on additional discovery that occurs, I may add to some of this data.

## Exhibits

I intend to use portions of the above data as a summary of or in support of my opinions. In addition, I may utilize graphs, charts or other demonstrative evidence, including, but not limited to evidence presented on PowerPoint.

## Qualifications and Publications

Please see my C.V. attached hereto as Exhibit "A". I have been retained as an Expert Witness/Consultant on close to 400 occasions--both by Defendants and Plaintiffs. The vast bulk of my retentions have been on preventing harassment, discrimination and/or retaliation from occurring--including on issues relating to workplace investigations. That is the situation here as well.

My analysis and opinions have been found by multiple courts to be a proper subject matter for expert testimony. For example, in *Rosenman v. Christensen, Miller, et al.* 91 Cal. App. 4th 859 (2001), the Second District Court of the Appeal relied on my expert testimony on the certain human resource issues to partially reverse an award against a plaintiff in an employment matter.

In *EEOC v. Scolari Warehouse Markets*, 488 F. Supp. 2d 1117 (D. N.V. 2007), the Federal District Court, relying in large part on a Declaration I submitted, denied Defendant's Motion for Summary Judgment. My Declaration in that matter related to the Company's failure to adequately investigate certain harassment allegations. The Court noted: "Furthermore, this Court finds particularly instructive the expert, Michael Robbins's report.... Notably, Mr. Robbins 'has worked as an expert witness on more than 250 occasions,' and he "has extensive experience conducting harassment, discrimination and employee misconduct investigations -- having conducted over 200 workplace investigations.'. . . Many of his other accomplishments, such as his background in employment law, his publications in employment law journals and reports, his teaching and lecturing experience at various employment law centers and law schools, and his membership on the Executive Board of the Los Angeles County Bar Association's Labor & Employment Law Section, as well as others, leads this Court to view Mr. Robbins as a reputable source of expert testimony." *Id.* at 1134.

Currently, I am employed by Extti, Incorporated where I hold the position of President. I founded Extti in early 1998. Extti provides Expert Testimony, Training and Investigation services in the employment area. Thus, at Extti, my work as an Expert Witness is only one

of the services which I perform. In addition, I regularly conduct harassment/discrimination awareness training. And I have extensive experience conducting harassment, discrimination, retaliation and employee misconduct investigations.

I estimate that I have conducted well over 250 workplace investigations over a period of 33 years. I estimate that I have supervised and directed about 250 additional investigations. I have conducted (and supervised) investigations in both the public and private sectors. Currently, I am involved with several workplace investigations.

In addition to my practical experience in this area, I have taught many seminars on how to conduct proper workplace investigations. In these seminars, I have taught Human Resource Professionals, other Management personnel, and Labor and Employment Attorneys how to conduct workplace investigations. Examples over the past several years include:

- The Southern California Employment Roundtable (SCERT). These seminars were attended by Human Resource Professionals, other management personnel and State and Federal government investigators.

- The Employer's Group (an organization that provides Human Resource support services to five thousand employers). Almost 300 Human Resource Professionals and other management personnel attended that seminar.

- Three workplace investigation-related seminars for the Los Angeles County Bar Association (2001, 2004 and 2005).

- Two for the California Employment Lawyer's Association (CELA) (1999 and also in 2003).

- Two for the Association of Defense Counsel of Northern California and Nevada.

- The annual convention of the National Employment Lawyers' Association (NELA).

- A Human Resource Seminar sponsored by LORMAN Educational Services.

- The California State Bar Association, Labor and Employment Section.

- The Beverly Hills Bar Association.

- The Orange County Bar Association.

16 |

- The Wilshire Bar Association.

- The County Counsel's Association -- on workplace investigations in the Public sector.

- LEFTLAW (essentially, the Los Angeles Chapter of CELA).

Just a few weeks ago, I conducted another seminar on workplace investigations for the Los Angeles County Bar Association's Labor & Employment Section. Approximately 80 to 90 Labor & Employment Attorneys and Human Resource Professionals attended that program.

On June 1, 2010, I will be presenting at an all-day seminar on conducting workplace investigations sponsored by the California Association of Workplace Investigators (CAOWI). It is entitled, Mastering the Art of Employment Investigations.

In addition to the above, I have been hired by a number of employers to teach their Human Resources Personnel how to conduct workplace investigations.

The training that I have given in the area of workplace investigations is only part of the teaching that I have conducted for Human Resource professionals. Indeed, I have provided training in a variety of areas. And, in addition, for three years, I taught Human Resources at Loyola Marymount University in Los Angeles, California.

I am a member of a number of relevant professional organizations as well. For example, I am a member of the Executive Board of Los Angeles County Bar Association's Section of Labor & Employment Law. In addition, I am a Charter Member of the California Association of Workplace Investigators (CAOWI) and am a Founder and President of the Society of Independent Workplace Investigators (SIWI).

My list of publications follows:

- "State Wrongful Discharge Law: Are Unionized Employees Covered?" *Employee Relations Law Journal* (1986).

- A chapter entitled "Sexual Harassment and the Law" which was contained in a book entitled Preventing Worker's Compensation Abuse (Griffin, 1992).

- Portions of two chapters in the first and second editions of The Developing Labor Law (BNA).

- An article in the *Civil Litigation Reporter* relating to *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal. Rptr. 211 (1988).

Expert Report: EEOC v. ABM Industries, Inc. et al.

- "Why, How and What Now? The Ramifications of the Duty to Investigate In California Discrimination Actions," *Bender's California Labor & Employment Bulletin* (April-May 2007).

- "Why How and What Now? Deriving Maximum Value from Your Neutral Investigation," *Bender's California Labor & Employment Bulletin* (November-December 2007).

- "Effective Use of Experts in Disability Cases," FORUM Magazine (January-February 2008).

- "Why, How and What Now? Getting Your Expert Testimony Admitted." *Bender's California Labor & Employment Bulletin.* November-December 2008).


## Compensation to be Paid

My rate is $500 per hour for all work per hour (with a four hour minimum) for any type of testimony.

## Cases in Which I Have Testified

Please see list of cases in which I have testified, attached hereto as Exhibit "B".

As mentioned above, I may supplement my opinion once further discovery has been completed and I have been given a chance to review that discovery.

In the meantime, please feel free to contact me if you have questions or I may be of further service.


Very Truly Yours,



Michael A. Robbins
President

# Exhibit A



**MICHAEL A. ROBBINS**
**President**
**EXTTI, Incorporated**
153 Stagecoach Road
Bell Canyon, CA. 91307-1046
818.712.0203
818.712.9902- Fax
mrobbins@extti.com
**www.extti.com**

**Practice Areas:**

**Expert Testimony, Training, Investigations—**
*in the Employment*
*Area.*

**Professional History:**

Michael A. Robbins founded EXTTI, Incorporated in 1998. EXTTI provides **Expert Testimony, Training and Investigations** on employment issues. Mr. Robbins frequently appears as an Expert Witness in harassment, discrimination and other employment matters--both for Plaintiffs and Defendants. He has worked as an expert witness on close to 400 occasions. In addition, he regularly conducts harassment/ discrimination awareness training. He has extensive experience conducting harassment, discrimination and employee misconduct investigations--having conducted over 250 workplace investigations and supervised about 200 more.

From 1991 to 1998 Mr. Robbins was a Partner in the Beverly Hills law firm of Rosenfeld, Meyer & Susman, LLP. With 60 attorneys, RM&S was the largest firm in Beverly Hills. From 1991 to 1997 he was head of that firm's Labor and Employment Law Department. In 1997, Mr. Robbins was elected C.E.O. and Managing Partner of the firm.

From 1982 through1990, Mr. Robbins was first, a Senior Associate, and later a Partner in the International law firm of Pepper, Hamilton, LLP. During that time, he twice headed that firm's West Coast Labor Law Department.

In 1981 and 1982, Mr. Robbins worked as Director of Labor Relations and Labor Counsel for Golden West Broadcasters/Golden West Television (which then owned KTLA-TV, KMPC, KSFO and the Angels baseball franchise, among other companies).

In 1980 and 1981, Mr. Robbins was a Senior Attorney at CBS, Inc. working in the Labor Law Department.

Mr. Robbins began his career in 1977 at the National Labor Relations Board (NLRB).

**Professional**

Mr. Robbins is a Founding Member of the Society of Independent

**Affiliations/
Activities:**

Workplace Investigators (SIWI) and is a Charter Member of the California Association of Workplace Investigators (CAOWI). He is a member of the State Bar of California (Labor and Employment Law Section) and is on the Executive Board of the Los Angeles County Bar Association's Labor & Employment Law Section. Also, he is a member of the American Bar Association (Section of Labor and Employment Law). In 1995, *The Los Angeles Business Journal* selected Mr. Robbins for inclusion in their "Who's Who in Law". In 2006, Mr. Robbins was selected for inclusion in "Best Lawyers in America, Preferred Experts". He has been extensively involved with non-profit entities—including serving as Vice President of Personnel and later President for one such organization.

**Teaching/ Lectures:**

Mr. Robbins has widely written and lectured in the area of Employment Law and Human Resources. For more than a decade, he was a speaker for the Continuing Education of the Bar (CEB) at its Employment Law Practice: Annual Recent Developments Program—moderating the program for most of that time. He has spoken at numerous seminars for Bar Associations and Human Resource conferences. For three years, he was an Adjunct Professor at the Loyola Marymount University Center for Industrial Relations. He has been a guest lecturer at Stanford Law School and UCLA's Anderson School of Management and has conducted harassment and discrimination training seminars and workshops throughout the U.S. Also, he has trained both attorneys and Human Resource Professionals on how to conduct workplace investigations and on ways to prevent harassment and discrimination.

**Publications/
Appearances:**

Mr. Robbins was twice a Contributing Editor for <u>The Developing Labor Law</u> (BNA) and was a Contributing Author of a chapter on sexual harassment, in <u>Workers' Compensation Abuse</u> (Griffin). His articles have been published in the *Civil Litigation Reporter, Employee Relations Law Journal, Forum Magazine, and Benders' California Labor & Employment Bulletin.* Periodically, he has been quoted in *Daily Variety, The Los Angeles Times, The Los Angeles Business Journal, The Los Angeles Daily Journal, The San Jose Mercury News* and in other publications regarding labor and employment issues. Also, he has appeared on NBC, on several local television stations and on Public Radio.

**Education:**

Mr. Robbins is a Phi Beta Kappa graduate of San Diego State University in History (A.B., Highest Honors, 1975), where he was Valedictorian—first in a graduating class of over 5,000.

In 1978, he graduated from the UCLA School of Law where he was selected to participate in the Moot Court Honors Program. While in Law School, Mr. Robbins worked for the UCLA Institute of Industrial Relations and was a Judicial Extern for the Second District, California

Court of Appeal.

**Selected Speaking engagements and presentations (2005 to 2010):**

"The Year in Review." The Los Angeles County Bar Association's 30th Annual Labor and Employment Law Symposium.

"Work Place Investigations on Trial: How Defendants Conduct Bulletproof Investigations and How Plaintiffs Shoot them Down." The Los Angeles County Bar Association.

"Hot Topics in Disability Discrimination." The 28th Annual Los Angeles County Bar Association's Labor and Employment Law Symposium.

"Sexual Harassment Investigations; Protecting your Clients, Protecting Your Law Firm." The Wilshire Bar Association.

"Internal Investigations on Trial: Plaintiff and Defense Perspectives." The California State Bar.

"Harassment and Discrimination Investigations: Protecting Your Clients, Protecting Your Law Firm." The Labor & Employment Section of the Orange County Bar Association.

"Disability Discrimination Cases; From Intake Through Trial". The California Employment Lawyers Association.

"Working on the Chain Gang, Accommodating the Disabled Worker". The Consumer Attorneys of California.

"Employee Discharge and Documentation in California." Lorman Educational Services.

Moderator of the Los Angeles County Bar Association's program on *Lyle v. Warner Bros.* (the "Friends lawsuit)".

Conducting workplace investigations. The Sixteenth Annual Convention of the National Employment Lawyers Association (NELA).

"Investigation Advice - Workplace Investigations by the Experts." The Beverly Hills Bar Association.

Conducting Workplace Investigations In The Public Sector. The annual meeting of the County Counsels' Association of California.

**Exhibit B**

## Michael A. Robbins
## Expert Testimony List[1]

| Case Name: | Deposition or Trial[2]: | |
|---|---|---|
| Guzman v. Longs' Drugs | Deposition | BC 297 542 |
| Haluck and Litton v. Ricoh Electronics | Deposition and Trial | 03CC10166 |
| Harmon v. Angel Kidney Care | Trial | No Case Number Found |
| Walter, Harbridge, Tompkins v. Catholic Healthcare West, Northridge Hospital | Deposition | BC291483 |
| Davis v. Robert Bosch Tool Corp | Deposition and Trial | BC310229 |
| Alvarado v. BHNSX Medical Group, First Medical Staffing, Alapour, et. al. | Deposition | No Case Number Found |
| Harrah v. Hewlett- Packard Corporation;  Compaq Computer; Sullivan | Deposition | No Case Number Found |
| Coleman v. IPC International | Deposition and Trial | BC312880 |
| Marks v. Maxon Computer, Inc. | Deposition and Trial | SC039443 |
| Fortenberry v. Red Robin, Int'l, et. al. | Deposition | BC313469 |
| EEOC v. Riviera Casino (Federal) | Deposition | CV-S-02-1238HDM-PAL |
| Naughton v. Zacky, Spectra Skin and Body | Deposition | No Case Number Found |
| Simonson v. Allied Surgical Center, Management, Inc. | Deposition | SC080383 |
| Zheng v, Siebel Systems, Inc. | Deposition | CIV435601 |
| Reyes & Perez v. Torrance Health Ass'n, et. al | Deposition | BC326897 |
| Magnandonovan v. City of L.A. | Deposition and Trial | BC286908 |
| Charles v. State of California | Trial | RG03-112609 |
| Vancil v. PG&E | Deposition | RG-04135709 |
| Snider v. Laquer, Urban, Clifford & Hodge, LLP | Deposition and Trial | BC329157 |

[1] 2005 to 2010
[2] Trial= Trial or Arbitration.

| | | |
|---|---|---|
| EEOC v. Custom Companies, Inc. (Federal) | Deposition | 02CV3768 |
| Traeger-Brady v. Ingram Micro | Deposition and Trial | 05CC04954 |
| Derr v. Footlocker, Inc., CHAMPS Sports | Deposition | 2:04-CV-9523DT(EX) |
| Ngo v. A-Plus Manufac. Corp., C-Mac Industries, Inc., Solectron Corp. | Deposition | CV810433 |
| Denenberg v. State of Calif., Caltrans | Deposition and Trial | GIC836582 |
| Stevens v. Vons | Deposition | SC041162 |
| Stepp v. Naumann & Levine | Trial | GIC853385 |
| Saccone v. Aventis Pharmaceutical | Deposition | BC327123 |
| Goodin v. The Standard Register Co. | Deposition | BC338759 |
| Person v. Brassfield Communications | Deposition and Trial | BC343998 |
| Jones v. Social Vocational Services | Deposition and Trial | BC346953 |
| Cochinwala v. Oracle | Deposition and Trial | 1220033608 |
| Luke v. DWP, City of LA | Deposition | BC290779 |
| Shelly v. CRST International | Deposition and Trial | No case number found |
| Wallace v. Countrywide | Deposition | 04CC11425 |
| Crable v. HSBC Card Services, Inc. | Deposition | No case number found |
| Morales v. R Ranch Markets, Inc. | Trial | BC350124 |
| Distelrath v. CHP, State of Calif. | Deposition | BC315085 |
| Otis v. Irvine USD | Deposition | 05CC0851 |
| O'Leary v. DR Horton | Deposition | 06-00639 |
| EEOC v. Scolari Warehouse Stores | Deposition | CV-N-040229LRH-RAM |
| McCall v. Safety Consultant Services, Inc., School Ten, Inc, Alfred Escobar | Deposition and Trial | VC046814 |
| La Pham v. Santa Ana USD | Deposition | 06CC01937 |
| Jimenez v. Rowland USD | Deposition | BL358662 |
| Bain v. Countrywide | Deposition and Trial | 12200347733 |
| EEOC v. Leo Palace | Deposition | 1:06CV00028 |
| Lang v. PSF | Deposition | 06CC13276 |
| Ashworth v. Foot Locker, Inc. | Deposition | CV066121DPP(FFMx) |
| Acosta v. Bijan, Fashion | Deposition | BC363777 |

| | | |
|---|---|---|
| World | | |
| Kinkaid v. Tribune Co. | Deposition | BC367308 |
| Gillette v. ANTC | Trial | 05-ARB-142 |
| Roe v. Wal*Mart | Deposition | CV2005-009394 |
| Asperi & Asperi v. Hyundai Motor American | Deposition | 06CC09820 |
| Connelly v. Toll Brothers | Deposition and Trial | 73160023907JOGU |
| Isman v. Beverly Hospital | Deposition and Trial | BC366198 |
| Richardson v. Selective Insurance Group, Inc. and Selective Insurance Company of America | Deposition | RDB06-CV-2594 |
| Morales v. MTA | Deposition and Trial | BC739557 |
| Nguyen v. Computer Services Corp. | Deposition | BC358617 |
| DFEH (Carauddo) v. Lucent Technologies | Deposition | C07-3747 Pjh |
| Abdel v. Citigroup | Trial | 72 160 000944 DECR |
| Sharbono v. Chicago Title | Deposition | 07CC05199 |
| Belshe v. Ojai Valley School | Deposition | 56-2007-00286520-CU-WT-VTA |
| Vara v. Countrywide | Deposition | 1120037370 |
| Burgess v. The Grand Del Mar | Deposition and Trial | NO. 37-2008-00079210-CU-WE-CTL |
| Ewing v. Fidelity National Title | Deposition | BC386339 |
| EEOC v. Bill Heard | Deposition | NO.: 2:07-CV-1195-RLH-PAL |
| Hampton v. Spectrum Security Services, Inc. | Deposition and Trial | BC 387130 |
| Vrastil v. Madison Marquette | Trial | YC052811 |
| Martinez v. County of Los Angeles | Deposition and Trial | BC 377968 |
| Espinosa v. County of Orange | Deposition and Trial | 30-2008 00110643 |
| Curry v. Schlumberger | Deposition | BC398542 |
| Lopez v. Stanislaus County | Deposition and Trial | No. 628471 |
| Klein v. Raytheon | Deposition | CV08-6461 CAS |