# EXHIBIT 2068

# EXHIBIT 2068



**EXPERT TESTIMONY**
**TRAINING**
**INVESTIGATIONS**
*In The*
*Employment Area*

•

EXTTI,
INCORPORATED

•

153 Stagecoach Road

Bell Canyon, CA

91307-1046

•

Phone

(818) 712-0203

Fax

(818) 712-9902

•

email

extti@ix.netcom.com.

www.extti.com

April 26, 2010

Elizabeth Esparza-Cervantes
Senior Trial Attorney
Equal Employment Opportunity Commission
255 E. Temple Street, 4th Floor
Los Angeles, CA 90012

Re: *EEOC v. ABM Industries, Inc., et al.*

Dear Ms. Esparza-Cervantes:

This letter constitutes my Supplemental Expert Report in the above-referenced action.

## Policies

In my initial report, I reviewed the Company's polices and criticized the Company for failing to enforce them. Since the time of that report, I have seen many more harassment and discrimination polices (discussed below). Like the Company's other such polices, they provide that the Company would investigate harassment allegations--and that it would do so thoroughly, objectively, completely, impartially and confidentially. As is discussed in my initial report and also in more detail below, the investigations about which I am able to form opinions, did not contain these elements. Thus, the Company failed to enforce its own policies.

As to the issue of the policies themselves, several employees testified that, although they spoke little or no English, they only were provided polices in English. If what they testified to is true, my opinion is that, in those situations, the Company failed to properly promulgate its policies. For both of these reasons, the Company failed to take this step in preventing harassment from occurring.

## Training

At the time of my initial report, I had seen little in the way of training materials. Since that time I have reviewed two training materials. The training materials

are entitled "When's My Turn?" And "With All Due Respect, Promoting a Respectful Workplace." Fundamentally, the materials are consistent with the Company's policies. Specifically, they call for an investigation when harassment allegations arise. For example, the "With All Due Respect" training materials state, "All complaints will be immediately investigated...." The same materials state that any person in authority who is aware of offensive and harassing behavior has a duty to "ensure that all incidents of harassment are thoroughly investigated..." Further, the materials state that once a complaint of harassment is received, the Company will "[c]onduct a formal investigation into the complaint and take steps to ensure that the harassment stops." However, as can be seen from the investigations mentioned in my initial report, as well as those discussed herein, the investigations about which I am aware[1] were not thorough. Thus, the Company not only failed to follow its own policies and procedures, but it failed to follow its training materials as well.[2]

## Investigations

The materials which I have reviewed since my initial report, have confirmed my views concerning the Company's failure to follow standard practices and its own policies and procedures with respect to conducting workplace Investigations.

### The Valley Bible Church situation

As mentioned in my initial report, in late June 2005, the Company received complaints that a female employee, Angelica Jaregui, had been groped by a supervisor, José Vazquez. As a result, the Company conducted an investigation. In my earlier report, I criticized many aspects of the investigation. Fundamentally, I do not believe that the investigation was consistent with standard practices or the Company's own policies and procedures. As mentioned above, I do not believe that the investigation was consistent with the Company's training materials either.

One of the depositions which I read after my initial report, was that of Timothy Brekke, Senior Regional Vice President. The Company's operations at Valley Bible Church were within his Region.

In his deposition, Mr. Brekke testified that Company's Regional Human Resources Director, Tom Cazale, assured him that "they have done their diligence as far as checking with the person who filed the complaint...." My opinion is that an interview with the person who filed the complaint should have been done as part of a complete, thorough investigation. That person was "Pastor Ron." However, despite the assurance given to Mr. Brekke, no interview with Pastor Ron took place.

Similarly, my opinion is that standard practices, and the Company's own policies and procedures, called for an interview of Scott Stevenson. Mr. Stevenson claimed that he was a

---

[1] With one exception, discussed below.
[2] I have seen no Spanish-language training materials. If there were management-level employees who spoke only Spanish and did not receive training in Spanish, then as to such employees, this would be a failure to complete this step in preventing harassment from occurring.

Supplemental Expert Report - EEOC v. ABM Industries, Inc., et al.

Case 1:07-cv-01428-LJO-JLT    Document 263-51    Filed 06/04/10    Page 4 of 15

witness to the complained-of incidents. Clearly, a thorough, complete investigation would have included an interview with him. In fact, Mr. Brekke testified, "If Scott Stevenson was truly a witness and we were truly aware of his statement to ABM, then I would consider it to be part of the investigation." In fact, it is undisputed that ABM did know of Mr. Stevenson's claim that he was a witness. Yet, no interview with him took place either.

In my initial report, I also wrote about the need to interview other female employees who worked for José Vazquez at Valley Bible Church. I also mentioned that there appeared to be a dispute as to whether other women were interviewed. Mr. Brekke testified that his understanding was that part of the investigation included "talking to all the female employees in Bakersfield to make a fair assessment in what was going on there regarding the allegations." I agree that this should have been done. If it was not, the Company failed to follow standard practices and its own policies and procedures.

Since my initial report I also reviewed the deposition of Faisal Algaheim. Mr. Algaheim was Regional Operations Manager for the area in which José Vazquez worked. Mr. Algaheim testified that, he would have liked to have known the outcome of any investigations that were conducted relating to misconduct allegations raised against José Vazquez. I agree that as Regional Operations Manager, Mr. Algaheim should have known. However, Mr. Algaheim testified that he was not told the outcome of any investigations relating to José Vazquez.

### The Anonymous Letters

As mentioned in my initial report, one of the allegations in the anonymous letters was a claim that José Vazquez had been in jail for sexual harassment. My opinion is that this was a serious allegation and should have been investigated. Mr. Brekke agrees. Specifically, in his deposition, he testified that the Company should have investigated those allegations. However, no investigation into those allegations took place.

Mr. Brekke also testified that José Vazquez should have been interviewed as part of an investigation into the "jail" allegation. My opinion is the same. However, José Vazquez was not interviewed about this allegation either.

Even before the "jail" allegations arose, however, the Company was on notice that something in this area might be awry. Specifically the Company's Employment Application required disclosure of criminal convictions. Company policy was that the Application be completely filled out (including the part relating to convictions) and that it be reviewed by management prior to the employee being hired. In my opinion, such a procedure is consistent with standard practices.

Had management followed the Company's own procedures, a management review of the Application would have revealed José Vazquez' failure to complete the "conviction" section. This then should have prompted an inquiry into the reasons behind the failure. But, none of that occurred here. Instead, José Vazquez failed to complete the "conviction" section of the

Application, no one questioned this failure and he was hired. In my opinion, all of this was contrary to standard practices and to the Company's own procedures.

Mr. Brekke additionally testified that when the anonymous letter came in raising the "jail" allegation, someone from the Company should have gone back and looked at the Application. He believes this occurred. In reality it didn't. In my opinion it should have.

As mentioned in my initial report, both standard practice and the Company's own policies and procedures were to interview witnesses. However, as to the allegations raised in the anonymous letters, no witnesses were interviewed.[3] Specifically, no one was interviewed to ask if they knew who the alleged victim, "Erica," was. No one was interviewed to see if they knew anything about the allegations. And those similarly situated employees were not interviewed either. Mr. Brekke agrees that, as part of the investigation into the allegations in the anonymous letters, other women working with José Vazquez should have been interviewed. Moreover, he testified that he believes that employees working at the facility should have been interviewed to find out if they knew who Erica was. However, none of this occurred here either. These are yet additional ways in which the Company failed to conduct a complete thorough investigation.

### Other investigations

As mentioned in my earlier report, standard practice is for investigations to be conducted by somebody trained and experienced. Moreover, the Company's training materials say that "[w]orkplace investigations must be conducted by or with the oversight of a Certified Human Resources Manager or Director." However, based upon the deposition testimony of Mr. Cazale and also of Jose Luis Esquivel Salinas (Operations Manager in Fresno), it appears that several investigations were conducted without such HR involvement. Those investigation, as well as others, are discussed below.

**Orozco allegations against Morales-** Gloria Orozco raised certain harassment allegations against Jesus Morales.[4] Unlike some others (below) was an investigation that was conducted by Human Resources. The investigation was conducted by Mr. Cazale after an EEOC Charge of harassment and discrimination was filed. In my opinion, this investigation was deficient.

For example, Mr. Cazale conducted no interview with Ms. Orozco.[5] He did conduct a very brief interview with Mr. Morales. In addition, he conducted a brief interview with one witness. Fundamentally, he concluded that Mr. Morales had a sexual relationship with Ms. Orozco. He concluded this without conducting any interview with Ms. Orozco. Mr. Morales

---

[3] With the possible exception of witnesses who may have been interviewed concerning the Valley Bible Church situation.
[4] An employee named "Teresa" also raised harassment allegations against Jesus Morales. However, this was another employee named Jesus Morales. She alleged that he had asked her (and other female employees) to watch pornographic movies with him. Although the Company was aware of the allegations, no investigation was conducted. This despite Company polices (and standard practices) to do so.
[5] I cannot tell if he attempted to do so.

4 | Page

was terminated for violating the Company's harassment policy by having a sexual relationship with Ms. Orozco and also for failing to disclose the relationship.

In addition, one of the allegations in the EEOC Charge was retaliation. Specifically, Ms. Orozco claimed that her manager, Juan Medina[6], terminated her--supposedly because of customer complaints concerning her work. In her EEOC Charge, Ms. Orozco claimed that Mr. Medina was aware of the harassment and even the discussed the allegations with her, but that he did nothing about it--stating that it was her fault. Thus, she claimed that she was really fired for complaining about the harassment. Despite these retaliation allegations, Mr. Cazale failed to interview Mr. Medina. Additionally, he failed to interview Ms. Orozco's direct supervisor, Francisco Cervantes.[7] Moreover, so far as I can see, no conclusion was reached with respect to the retaliation allegations. Again, the Company failed to conduct a complete thorough investigation.

**Murillo allegations against Rodriguez-** Mara Murillo brought sexual harassment allegations against Adalberto Pilar Rodriguez (Foreperson).[8] Basically, these were sexual battery allegations. Among other things, Ms. Murillo alleged that Mr. Rodriguez trapped her in the restroom, lowered her pants and fondled her buttocks and vagina. These incidents allegedly occurred at the Company's Pelco location. Although the Company promised they would do a "thorough investigation of the complaint,"[9] my opinion is that the investigation(s) were not through.

Allen Juarez (Operations Manager) testified that he was the first person to receive the complaint. Initially, the complaint came from a co-employee of Ms. Murillo, Maria Quintero. After getting the complaint from Ms. Quintero, he spoke to Ms. Murillo. From Mr. Juarez' point of view, he simply was gathering facts so that the allegations could be reported to his supervisor, Mr. Esquivel. The problem, however, is that he went well beyond initial fact-gathering. For example, he also spoke to Mr. Rodriguez about the allegations and not only told Mr. Rodriguez that the allegations related to Ms. Murillo, but also that Ms. Quintero was a witness. This meant that he breached confidentiality--something he testified he knew was important to maintain in such circumstances.[10] Also, he provided an opportunity for Mr. Rodriguez to coerce Ms. Murillo and Ms. Quintero (who were subordinate employees) with respect to the investigation. In my opinion, Mr. Juarez did not act in an appropriate way.

Mr. Esquivel claims that, once he was informed of the allegations, he conducted an investigation. Apparently, Valetta Johnson conducted interviews as well.[11] In my opinion, the

---

[6] Ms. Orosco stated in her EEOC Charge that she did not know his last name. However, appears to be Mr. Medina, the Branch Manager.

[7] In a written statement, Mr. Medina claimed that Mr. Cervantes was involved in the decisions he made relating to Ms. Orosco.

[8] In the Company's Summary and Conclusion documents, Mr. Rodriquez is referred to as a "Foreperson." However, in deposition, he testified that he was a "lead."

[9] See, Mr. Cazale's' August 27, 2009 letter.

[10] Company policy called for a confidential investigation. Standard practice is the same.

[11] As mentioned in my initial report, Ms. Johnson reported to Mr. Cazale.

investigation(s) were deficient. Moreover, having three separate people look into the same allegations (Mr. Juarez[12], then Mr. Esquivel, then Ms. Johnson) is contrary to standard practices.[13]

As to the investigation that he conducted, Mr. Esquivel claims that he conducted two interviews with Ms. Murillo. In the first interview with her, Tony Bautista (Branch Manager, later Senior Brach Manager and Mr. Esquivel's direct Supervisor) and Mr. Juarez were present.[14] Mr. Esquivel admits that having so many people present was contrary to his own practices. He testified that it is not the normal way he conducts interviews. In my opinion, it is contrary to standard practices as well. Having three management employees present during an interview with employee who is claiming sexual harassment and battery, would tend to be intimidating.

Mr. Esquivel says that a subsequent interview with Ms. Murillo was conducted by Ms. Johnson. Mr. Esquivel says that he was simply there as an interpreter. However, the problem with this is that Ms. Johnson was not in a position to evaluate credibility as she was not present in Ms. Murillo's earlier interview.

Mr. Esquivel says that he interviewed Mr. Rodriguez on two occasions as well. He did the first interview without the other supervisors being present. However, Mr. Juarez was present during the second interview. In my opinion, for purposes of determining credibility, there should be a consistency of investigators--which clearly was not the case here.[15]

Mr. Esquivel says that he interviewed two witnesses. Neither of the other two managerial employees was present during these interviews. One witness was Maria Quintero.[16] The other was an individual who supposedly had some evidence to confirm the allegations. This later witness denied having any such information. Ms. Quintero, however, said that, the day of the incident, she heard somebody screaming, "Let me go, let me go." Later she found Ms. Murillo "crying, pale, shaking."

---

[12] Mr. Juarez claims that he was not conducting an investigation. Yet, he conducted more interviews than any of the other investigators did.

[13] On top of this, Mr. Juarez was not neutral as he was conducting his part of the investigation—though objectivity, impartiality and fairness were required by Company policy and standard practices. Mr. Juarez' admitted lack of neutrality is based on his testimony that, after his first two meetings with Ms. Murillo (and so well before he had completed his "investigation"), he "had his doubts" about the truth of the allegations. Moreover, Mr. Juarez testified that he had not received any training on how to conduct investigations and that he does not conduct them himself. Thus, he was not trained or experienced either.

[14] Mr. Bautista says that, at one point, a witness, Maria Quintero, was in the room at the same time. In my opinion, it is contrary to standard practices to interview a witnesses or party with another witness present. Plus, the Company's own policies were that investigations be confidential. Having a witness present during the interview of a party is the exact opposite of confidentiality.

[15] In his deposition, Mr. Rodriguez testified that he made a number of complaints about Ms. Murillo to Mr. Juarez. Mr. Rodriguez seems to believe that these may be the reason she made up allegations about him—to get back at him. In these circumstances, Mr. Juarez was a witness, should not have been involved in the interviews but should have been interviewed.

[16] Mr. Juarez testified that Mr. Esquivel, Mr. Bautista and he all were in the interview with Ms. Quintero. Once again, too many people.

Ms. Quintero was interviewed by Ms. Johnson as well. In that interview, Ms. Quintero reiterated the screaming that she had heard. Also, she confirmed inappropriate sexual activity by Mr. Rodriguez directed towards her and claimed that Mr. Rodriguez also had assaulted her daughter. However, there was no interview with Ms. Quintero's daughter.[17] In addition, although Ms. Quintero said that Mr. Rodriguez tried to "do something" to her when she was a new employee (apparently, about a year prior) and that he talked to her about "sexual positions," she was not asked details about either of these allegations. This was in the interview conducted by Ms. Johnson. However, Mr. Juarez testified that Ms. Quintero had told him that Mr. Rodriguez had asked her to sit on his lap. Apparently, no one told Ms Johnson about this as it is not mentioned in the notes she took of her interview with Ms. Quintero and apparently was not covered with her.[18]

In a report filed with the police around the same time as the Company's "investigation," Ms. Murillo claimed that Ms. Quintero also knew about inappropriate activity by Mr. Rodriguez directed to "other women."[19] Clearly, part of doing a thorough investigation would be to interview these "other women."

As to the "other women," several were interviewed. However, the "other women" were interviewed by Mr. Juarez, not by Ms. Johnson or Mr. Esquivel.[20] As a result of this, none of the people involved in interviewing the parties or witnesses here, was in a position to determine credibility.

Mr. Juarez' Memo (or email—it is hard to tell which) of September 3, 2009 regarding these interviews indicates that the other women indicated they had no problems or issues of the sorts involved here. However, a Memo from ABM's client, Pelco, indicates just the opposite.

This is a Memo of August 25, 2009 from Julie DeBenedetto (Pelco Director of Employee Services & Facilities). In that Memo, Ms. DeBenedetto wrote, "Other Women are now coming forward, one woman has said that she was raped but it has been a couple of years since the incident, not clear where this took place." The August 25 Memo was copied to Hakim Eslami at Pelco. That same day, Mr. Bautista requested a meeting with Mr. Eslami for the next day, August 26. This meeting included ABM's HR Representative (presumably, Ms. Johnson). Yet, so far as I can see, the Company never obtained any information about the other women who were "coming forward"–nor about the "woman [who] said that she

---

[17] A Company document shows that they recognized the need to interview the daughter (who was an ABM employee), Edith Martinez. The document says, "Interview…Edith Martinez…."

[18] In fact, it is not mentioned in any notes. This too is a failure to take detailed, accurate notes.

[19] The police report is a little unclear. It may be that Ms. Murillo was saying that she knew of the other women.

[20] Mr. Juarez' interview with them was not exactly thorough. He testified that he asked the employees whether they had experienced any kind of misconduct or inappropriate or unwelcome behavior toward them from Mr. Rodriguez. He did not ask them any other questions. Moreover, he testified that he did not consider what he was doing to be an investigation. If so, then these "other women" were not interviewed as part of any investigation—despite the Company promise (in Mr. Cazale's August 17, 2009 letter) that it would interview witnesses.

was raped." Again, there was nothing thorough about any of this.[21] Moreover, it points out the problem with multiple investigators and multiple investigations of the same incidents(s).

Ms. Johnson interviewed Mr. Rodriguez too—with Mr. Esquivel present as an interpreter.[22] During the interview, he raised several allegations concerning Ms. Murillo. For example, he claimed that she had told him that she "liked him" that she "wanted the whole thing" with him,[23] that she was flirting with him and that she had arranged to see him after work.[24] However, Ms. Murillo was never re-interviewed and asked about these allegations. That is, she was not given a fair opportunity to respond to the allegations raised against her. Yet, Ms. Johnson reached a conclusion that some of the allegations Mr. Rodriguez raised against Ms. Murillo were true.[25]

As to the allegations against him, although Mr. Rodriguez generally denied touching Ms. Murillo or putting his hands on her, he was not asked about the specific allegations against him--which is the very purpose of the interview.[26] Similarly, he was not asked anything about the allegations that Ms. Quintero raised against him—not even about the allegation that he had asked Ms. Quintero to sit on his lap.[27] Similarly, Mr. Rodriguez was not asked about any of the allegations concerning Ms. Quintero's daughter.[28]

As mentioned in my initial report as well as this Supplemental Report, the Company's own policies call for a thorough complete investigation. Moreover, in their letter to Ms. Murillo, the Company promised the same thing. In this regard, in their August 21, 2009 letter to Ms. Murillo Mr. Cazale promised the Company would "conduct a prompt and thorough investigation of your complaint." For the above reasons my opinion is that there was nothing thorough about this investigation.

Ultimately, the Company made a determination as to the harassment allegations. Specifically, in a September 17, 2009 letter to Ms. Murillo, Ms. Johnson explained, "we were unable to conclude that physical harassment has occurred. We found no witnesses, nor any other type of evidence to support your claim." In her "Summary and Conclusion" Ms. Johnson

---

[21] Interestingly, an August 24, 2009 Pelco Memo seems to indicate that the Company did know about these types of allegations from other women. Discussing a conversation with Mr. Bautista, a Pelco employee wrote, "Tony [Bautista] mentioned that there were employees now stepping forward and [talking] to his HR Department about this type of incident." Yet, despite this information from others, the Company still determined that the investigation was "inconclusive."

[22] Mr. Rodriguez testified that he was interviewed twice—not three times as the Company seems to be saying.

[23] In his deposition testimony, Mr. Rodriguez explained this--that Ms. Murillo said, "I'm not a person that wants a hug and a kiss. I'm a person that wants everything."

[24] In his deposition, Mr. Rodriguez testified that he never said anything about meeting Ms. Murillo outside of work—as is in the interview notes. If he is telling the truth, then this means that the notes are not accurate.

[25] For example, she concluded that Ms. Murillo had agreed to meet Mr. Rodriguez outside of work.

[26] Mr. Rodriguez testified that in the interview conducted by Ms. Johnson (whom he referred to as the "woman from Sacramento"), he was asked some specifics. If this is true, it means that Ms. Johnson failed to take detailed, accurate notes.

[27] Mr. Rodriguez testified that he was not even told about sexual allegations raised by Ms. Quintero.

[28] In his deposition, Mr. Rodriguez testified that he was asked about an allegation concerning Ms. Quintero's daughter. It is not in any notes. If he is telling the truth, then this means that the notes are not accurate

explained that her findings were "inconclusive."[29] In that report she concluded, among other things that "there is no evidence that physical sexual harassment occurred..." In addition, "other female employees.... stated that they have not experienced or seen any harassment from [Mr.] Rodriguez." In my opinion, none of these conclusions was reasonable.

First, my view is that the purpose of an investigation is to reach a conclusion. Because most sexual harassment situations do not occur in front of witnesses, normally there are no witnesses to support the claim. For example, one would not expect witnesses to have been in the restroom during the alleged assault. Similarly, rarely is there other evidence to support the claim--though sometimes there is. So, the situation presented here was not unusual.

In situations where there are no witnesses or evidence, the job of the investigator still is to decide credibility and make a determination. However, Ms. Johnson was not in a position to determine credibility here. Thus, she was not in a position to make a determination. As a result, she did not make a determination--instead simply saying that the investigation was "inconclusive." Simply stated, Ms. Johnson did not do her job here.[30]

Ms. Johnson's inability to reach a conclusion here, was all that more unreasonable given the fact that many of the reasons that she cited for her inability to make a determination, simply are not supported by her own investigation.

For example, although Ms. Johnson stated that there were no witnesses to support the claim, there was a witness who supported the claim, Ms. Quintero. At or about the time of the alleged incident, Ms. Quintero heard someone screaming, "Let me go, let me go." Thereafter, she found Ms. Murillo "crying, pale, shaking." All of this is evidence that the incident did occur. Thus, there was witness support for the claim.

Ms. Johnson attempted to minimize Ms. Quintero's support by stating that while Ms. Quintero "heard screaming outside the bathroom" in the interview with Ms. Murillo, Ms. Murillo simply stated that she "didn't say anything while she was in the stall with Aldaberto Rodriguez, except to leave her alone." Of course, this was confirmed by Ms. Quintero who heard Ms. Murillo screaming "Let me go, let me go."[31] In addition to this, in Ms. Johnson's interview with Ms. Murillo, Ms. Murillo confirmed this as well. The notes say, "She was screaming + telling him to leave her alone."[32] This is very close to what Ms. Quintero said she heard. Which means, of course, that there was witness support for the claim--despite Ms. Johnson's conclusion to the contrary.

---

[29] Mr. Bautista also testified that he understood that the investigation was inconclusive. Mr. Rodriguez was told the same thing in a September 17, 2009 letter addressed to him by Mr. Bautista.

[30] The same applies to Mr. Esquivel who repeatedly testified that when he was doing an investigation, his job was not to make a determination at all.

[31] Mr. Juarez testified that Ms. Quintero told him that she had heard Ms. Murillo telling Mr. Rodriguez to stop, to leave her alone.

[32] Mr. Bautista says that Ms. Murillo also told him that she was yelling or screaming.

Ms. Johnson also reported that no other woman had experienced or seen any harassment by Mr. Rodriguez. Yet, Ms. Quintero said that she had experienced some kind of sexual behavior directed toward her. Moreover, she stated that her daughter had been subjected to inappropriate activity by Mr. Rodriguez as well. Plus, Mr. Eslami (who was interviewed) knew of the other women coming forward—including the other woman who said she had been raped. So there was evidence of other woman who had experienced or seen harassment—despite Ms. Johnson's statement to the contrary.

In my opinion this was neither a thorough complete investigation, nor were the conclusions reached reasonable ones.

**Hernandez allegations against "JB"-** Another situation involved Martha Hernandez bringing allegations against "JB."[33] Ms. Hernandez claimed that JB verbally harassed her "with sexual remarks."

In this regard, the original complaint was brought to David Guerrero--a management level employee of the Company assigned to the Company's Fresno City Hall location. This original complaint was brought by one of Ms. Hernandez' relatives. Thereafter, Mr. Guerrero conducted a brief interview with Ms. Hernandez. In that interview, general allegations were raised--but with no specifics. The notes of the interview were under six sentences long. However, a couple of days later, a second interview was conducted with Ms. Hernandez.

This was a more extensive interview. Indeed, Ms. Hernandez provided a number of specific examples of inappropriate sexual comments made to her. Aside from delineating these sexual comments, she also stated that she did not feel safe. Unfortunately, like the interview with Ms. Murillo (above) too many management level employees were present during this interview. Specifically, Mr. Guerrero, Mr. Bautista (Branch Manager) and Mr. Esquivel all interviewed Ms. Hernandez. It appears that the interview lasted about a half-hour.

After this second interview with Ms. Hernandez, two of the managers (Mr. Guerrero and Mr. Esquivel) interviewed JB. Notes of the interview are extremely brief--under eight sentences. Importantly, the notes contained no specific admissions or denials. That is, although in her second interview Ms. Hernandez listed specific allegations of inappropriate activity, the notes do not show specific admissions or denials by JB's with respect to those allegations. Additionally, JB raised certain allegations against Ms. Hernandez. For example, he said that she "voluntarily talked about her private life and that she told him how she was mistreated by her husband." However, Ms. Hernandez was not provided any opportunity to respond to the allegations JB raised against her.

Aside from interviewing the two parties, nothing else was done. For example, no other similarly situated females were interviewed to see if they experienced similar behaviors. Like

---

[33] His name is redacted in the "investigation" documents I was given to review.

the other investigations, there was nothing thorough about this—even though the Company reported in its May 16, 2005 letter to JB that the allegations had "been thoroughly investigated."

Ultimately, a conclusion was reached that "harassment of some form did occur" and the Company took some actions as a result of this. For example, JB was relocated, given a final warning and provided harassment training. The problem is that it is impossible to know what appropriate disciplinary or remedial action is, without doing a complete, thorough investigation in order to determine what occurred--and that was not done here. In addition, all of this seems to have been done without involvement by Human Resources—which was required by Company policy. For all these reasons, my opinion is that the investigation was deficient.

**Mendez allegations against Mondragon-** Another sexual harassment allegation was raised by Luisa Mendez Gonzalez against Jorge Mondragon. Basically her allegation was that on her first day of work, Mr. Mondragon told her that he was interested in her. Thereafter he kept trying to touch her and hug her. She identified four witnesses whom she felt knew about the allegations. All this came out in an interview with her.

Of the four witnesses identified by Ms. Mendez, two were interviewed, one was not interviewed, and I cannot tell about the fourth. However, a fourth witness was interviewed. It appears that at least three of the four were interviewed by telephone. Assuming that to be the case, this means that the investigators did not place themselves in a position to determine credibility--you cannot determine credibility via telephone (based on an inability to observe demeanor). Further, the witnesses were asked very little--almost nothing about the allegations. For example, the notes of the interviews range from 1 to 8 sentences. Hardly a thorough investigation.

As to the interview of the accused, Mr. Mondragon, it appears very little was covered with him either. For example, the notes of the interview with him contain only 10 sentences. Moreover, looking at the substance of what he said, Mr. Mondragon was not asked to admit or deny any of her allegations--with the exception of asking whether he told Ms. Mendez at any time that she would "loose work if she wouldn't spend time with us."[Sic]. Further, Mr. Mondragon indicated that Ms. Mendez agreed to have a relationship with him and told him that they needed to live together. Ms. Mendez was not asked to admit or deny these allegations raised against her.

My opinion is that this investigation was not a complete or thorough one either. Moreover, it seems to have been conducted without involvement from Human Resources—a violation of the Company's policies and procedures.

**DeMejia allegations against Castaneda-** Delia DeMejia raised the sexual harassment allegations against her supervisor, Carlos Castaneda. In essence, she complained that he made comments and gestures to her of a sexual nature. She claimed that she was discharged

Supplemental Expert Report - EEOC v. ABM Industries, Inc., et al.

Case 1:07-cv-01428-LJO-JLT Document 263-51 Filed 06/04/10 Page 13 of 15

in retaliation for opposing this activity. Originally the allegations were raised in a Charge filed with the EEOC. Mr. Castaneda's supervisor was José Jimenez. Shortly after receipt of the EEOC charge, Mr. Jimenez called Mr. Castaneda and asked him about his interactions with Ms. DeMejia. Nothing was asked about sexual comments or gestures. A few days later, Mr. Bautista and Mr. Esquivel met with Mr. Castaneda.[34] Again, he was asked about his interactions with Ms. DeMejia. Again, nothing was asked about sexual comments or gestures.

A few days later, Mr. Cazale met with Ms. DeMejia. In the interview, she delineated the sexual comments she claimed Mr. Castaneda had made to her. The interview did not cover the alleged sexual gestures. In this interview, Ms. DeMejia clarified that Mr. Jimenez was the one who had retaliated against her.

That same day, Mr. Cazale interviewed Mr. Castaneda. The notes of the interview are extremely brief--just 10 sentences. Although Mr. Castaneda generally denied making sexual comments or gestures, the specific comments allegedly made were not covered with him. That is he was not asked to admit or deny specific comments Ms. DeMejia said he directed towards her. Further, the retaliation allegation was not covered at all.

That same day, Mr. Cazale interview two witnesses. Apparently, both were female employees who had worked with Mr. Castaneda. The notes of their interviews also are very brief. Neither was asked about sexual comments or gestures.[35]

Finally, that same day, Mr. Cazale interviewed Mr. Jimenez--the individual accused of retaliation. The notes of this interview are six sentences long. Although Mr. Cazale was accused of retaliation, the notes show that he was not asked anything about retaliation.

In my opinion, this was not a complete thorough investigation. It was not consistent with standard practices or the Company's own policies and procedures. Thus, it is little wonder that, according to Mr. Bautista, the results were inconclusive.

**Hotline Complaint-** In September, 2007, the Company received an anonymous complaint via the Company's hotline. Basically, the Complaining Party stated that he or she had discovered that two employees had sexual intercourse in the workplace. Little specific information was supplied, except for the names of the two employees who supposedly were involved.

Although it is a little difficult to tell exactly what occurred, the Company's response to this seems to have been to interview witnesses (other employees at the worksite) and also the two employees who supposedly were involved. Notes were taken of the interviews. Also, a

---

[34] Mr. Bautista testified that Mr. Esquivel conducted the interview-- although the notes of the interview do not show that Mr. Esquivel was present.

[35] However, one said that Mr. Castaneda did not make any sexual comments to her when they had lunch together on one occasion.

criminal background check was run on the accused. The two employees admitted a consensual relationship but denied having sex at work. No one was a witness to inappropriate activity. The criminal background check did not turn up anything.

So far as I can tell, the investigation here was adequate. However, it shows that the Company did know how to conduct an adequate investigation. Unfortunately, in the other situations discussed in my initial report and in this Supplemental Report, the Company failed to do so.

**Overall Conclusion**

Based on all of the information that I have reviewed, my conclusion is that there was a comprehensive failure to prevent harassment from occurring here. Specifically, the Company's own harassment policies and procedures were not followed. Additionally, there is some evidence that they were not properly promulgated either. Similarly, the Company did not follow its own harassment training materials.

When harassment allegations arose, sometimes such allegations were ignored. When those types of allegations were investigated (with one exception), the investigations were inadequate.

At times, the Company reached no conclusions in its investigations. Because its investigations were inadequate, when conclusions were reached, the conclusions could not be reasonable ones. Moreover, sometimes the conclusions were not even consistent with the information the Company obtained during its investigation.

Finally, the Company was not able to take appropriate disciplinary or remedial action. This is because its failure to properly investigate meant that it was not able to reach conclusions as to that which occurred. Without knowing what occurred, it is impossible to know what action to take as a result of that which has occurred.

**Additional documents reviewed**

In addition to the documents mentioned in my initial report, I have reviewed the depositions of Timothy Brekke, Faisal Algaheim, José Luis Esquivel Salinas, Adalberto Rodriguez, Antonio Bautista and Allen Juarez—and exhibits attached thereto. Also, I reviewed portions of the depositions of Maria Birrueta, Irene Bravo, Lucia Cardiel, Martha Castaneda Garcia, Delia DeMejia, Hilda Gomez, Claimant 4, Claimant 2, Claimant 7, Teresa Sanchez, Francisco Cervantes, Arturo Jimenez and Jose Lozano-Morales.

I have reviewed several hundred pages of documents comprising Company polices, including Bates Nos. D1978-2464 and also, the Company's 2007 "Unlawful Harassment Policy."

Also, I reviewed several documents which I understand were obtained from Pelco—specifically Bates EEOC1128-1146. Finally, I reviewed materials relating to the

investigations discussed herein—including redacted investigation materials Bates D2563-D2741.

In addition, I reviewed, two training materials: "When's My Turn?" And "With All Due Respect, Promoting a Respectful Workplace."

**Additional testimony**

Since the time of my initial report, I have testified in the following deposition:
*Martinez v. Rite Aid Corporation* (BC401746).

**Additional publications**

Since the time of my initial report, I have had one additional article accepted for publication. It is "Workplace Investigations: Understanding Standard Practice," to be published in *Bender's California Labor & Employment Bulletin.* May 2010.

Very Truly Yours,

Michael A. Robbins
President